**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PRIMESOURCE BUILDING PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| HUTTIG BUILDING PRODUCTS, INC., | ) | JURY DEMANDED AS TO |
| KENNETH FISHBEIN, DAVID FISHBEIN, | ) | COUNTS I and VI |
| MONA ZINMAN and ROBERT FURIO, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff PrimeSource Building Products, Inc. ("PrimeSource" or "Plaintiff") files this Complaint For Injunctive And Other Relief against Defendants Huttig Building Products, Inc. ("Huttig"), Kenneth Fishbein ("K. Fishbein"), David Fishbein ("D. Fishbein"), Mona Zinman ("Zinman") and Robert Furio ("Furio") (K. Fishbein, Zinman, D. Fishbein and Furio are referred to collectively as the "Individual Defendants"). Huttig and the Individual Defendants are collectively referred to herein as "Defendants."

**NATURE OF THE ACTION**

1.     Plaintiff is a leading distributor of building products, including a proprietary fastener and building products line known as GripRite®. On November 15, 2016, Defendant Huttig announced the hiring of PrimeSource's four most recent former CEOs for the purpose of forming a new division (the "HuttiGrip division") designed to compete with and take business from PrimeSource's GripRite® branded products.

2.     PrimeSource has learned that the HuttiGrip division was formed and launched with the cooperation and assistance of the individual defendants, all of whom were previously CEOs of

PrimeSource with intimate knowledge of PrimeSource's most valuable and proprietary information, relationships, strategies, methods, processes and trade secrets, and all of whom are now employed by Huttig. The Individual Defendants' actions violate non-use, non-disclosure, non-compete and non-solicitation agreements each had with PrimeSource. Moreover, it is simply not plausible for Huttig to profitably create and launch an operation competitive with PrimeSource without the use of PrimeSource's trade secrets and confidential information, all of which was in the possession of the Individual Defendants. In addition, Huttig and the Individual Defendants have recently recruited numerous PrimeSource employees to leave PrimeSource and work with Huttig, in violation of those employees' non-compete and non-disclosure agreements; and several of those employees downloaded PrimeSource information onto external memory devices or stole information from PrimeSource by emailing or downloading to cloud servers to facilitate Huttig competing with PrimeSource.

3.      In sum, Huttig and the Individual Defendants have engaged in illegal conduct intended to destroy the GripRite® product line and secure GripRite®'s business for Huttig.

## JURISDICTION AND VENUE

4.      Jurisdiction and venue are proper in this Honorable Court.

5.      This Court has subject matter jurisdiction over this matter pursuant to the Defend Trade Secrets Act, 18 U.S.C. §§ 1836-39 *et. seq.*

6.      The Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332 in that there is diversity between Plaintiff and Defendants and the amount in controversy exceeds $75,000.

7.      Venue is proper in this District because the acts complained of occurred within this District.

## PARTIES

8.      Plaintiff PrimeSource is a Delaware corporation. Its primary place of business and corporate headquarters are located at 1321 Greenway Drive, Irving, Texas 75038.

9.      Defendant Huttig is a Delaware corporation engaging in business in the State of Illinois. Huttig is registered to do business in the State of Illinois.

10.     Defendant K. Fishbein is an individual and resident of Illinois.

11.     Defendant D. Fishbein is an individual and resident of Illinois.

12.     Defendant Zinman is an individual and resident of New York.

13.     Defendant Furio is an individual and resident of Illinois.

## FACTUAL BACKGROUND

**PrimeSource and Its Business**

14.     PrimeSource is a distributor of fasteners and other building products, primarily in North America.  PrimeSource also supplies products under its own proprietary brands, including Grip-Rite®. PrimeSource has 34 distribution centers and approximately 1,100 employees throughout the United States and distributes products throughout North America and the Caribbean. PrimeSource's roots date back to before the 1950s and, since that time, has spent considerable time, money and effort perfecting and refining its business and its relationships with customers, suppliers, and vendors.

15.     As a distributor, PrimeSource's strength is in its relationships with its suppliers and customers and the knowledge base that PrimeSource has developed over the years regarding the identity, personnel, capabilities, and desires of each of its customers.

16.     PrimeSource's main products are collated, packaged, and bulk nails and screws, construction staples and other construction fasteners, rebar, wire rod, wire and steel mesh, concrete

accessories, wraps and weather barriers, building accessories, wire fence products, roofing products and accessories, gypsum, and insulation products and accessories.

17.     PrimeSource distributes products both by (1) purchasing and maintaining an inventory of building products in each of its distribution centers to cater to the local market and the customers in that geographic location; and (2) by arranging direct purchase transactions where product is delivered from the supplier to the buyer without routing through PrimeSource's distribution center network.

18.     Since 1967, in addition to its distribution and wholesale sales of third-party brands and private-labeled building products, PrimeSource has actively developed its own proprietary brands of fasteners and building products, including among others its most well-known GripRite® brand, which it supplies through its traditional distribution channels.

19.     Grip-Rite® is a top-selling brand of fasteners and other building products in North America. Customers request Grip-Rite® branded building products by name, including tools, compressors, hoses, fittings, fencing, rebar, steel stakes, house-wrap, concrete accessories, collated, bulk and packaged fasteners, floor protection, gypsum products, roofing accessories, poly products, underlayments, tarps and other barriers. Grip-Rite® has been continuously used as a registered trademark by PrimeSource and its predecessor entities since February 1971.

20.     PrimeSource's customers for building products, including third-party branded building products, as well as building products supplied under PrimeSource's proprietary brands, including Grip-Rite®, range widely from small local hardware stores, lumber yards, and specialty building supplies dealers; to franchised and licensed businesses; to multi-national home improvement stores, pro-channel customers and retailers whose brands are household names.

**PrimeSource's Ownership And Management History**

21.     Each of the four Individual Defendants worked for decades at PrimeSource and each ultimately served as a CEO of PrimeSource.  Zinman and K. Fishbein were co-CEOs, as were Furio and D. Fishbein, as successors to Zinman and K. Fishbein. The periods of each of their employment with PrimeSource were, generally, as follows:

    a.   K. Fishbein

        i.   Initial Date of Employment:  November 1, 1965
        ii.   Term of Status as CEO: March 24, 2007 - December 31, 2014
        iii.   Last Date of Employment: December 31, 2014

    b.   Zinman

        i.   Initial Date of Employment: December 27, 1967
        ii.   Term of Status as CEO: March 24, 2007 - December 31, 2014
        iii.   Last Date of Employment: December 31, 2014

    c.   D. Fishbein

        i.   Initial Date of Employment: June 11, 1984
        ii.   Term of Status as CEO: January 1, 2014 – September 15, 2015
        iii.   Last Date of Employment: September 15, 2015

    d.   Furio

        i.   Initial Date of Employment: June 30, 1986
        ii.   Term of Status as CEO: January 1, 2014 – September 15, 2015
        iii.   Last Date of Employment: September 15, 2015

22.     The Co-CEOs managed the business together by dividing the primary responsibilities of the company into sales and operations and then working together to develop and implement strategic initiatives, importantly including the development of the Grip-Rite® brand.

23.     K. Fishbein and D. Fishbein built and managed the customer side of the business. This included building and maintaining relationships with major and national customers, and

overseeing all sales employees across the business platform. The sales team solicited and made sales, fulfilled orders, and oversaw shipment of product to customers.

24.     Zinman and Furio built and managed the supply and operational side of the business. This included a focus on building and maintaining relationships with suppliers, manufacturers and vendors; development of new products including the products making up the GripRite® brand, purchasing and importing product from overseas, and brokering direct sales procuring quality product within North America. The operational role also included organizing and managing the logistics of acquiring product, overseeing inventory levels across the company's distribution centers, and getting product to customers in a timely manner.

25.     PrimeSource's business is as equally dependent on (i) locating suppliers and obtaining product, (ii) developing and maintaining relationships with its customers and (iii) establishing and maintaining efficient, supplier and customer-specific, complete and comprehensive operations and logistics functions, including shipping and ground transportation, an optimized distribution center network, and just-in-time and customized packaging, labeling, warehousing and delivery services. It is all of these aspects of the business, together with the relationships at the foundation thereof and the business practices and methods thereunder, which the Individual Defendants oversaw and were ultimately responsible. Indeed, these Individual Defendants were in lead executive roles for decades prior to becoming CEOs and were heavily involved in the development of the GripRite® brand and the PrimeSource distribution services model and business.

26.     In 2014, the then-controlling owners of PrimeSource (Itochu International) put the company on the market for sale and, during that year and through closing of a sale in May 2015, PrimeSource and the Individual Defendants marketed the business for sale. In or around December

6

2014, in connection with this process, PrimeSource and the Individual Defendants met with Defendant Huttig. Prior to exchanging information, Huttig signed a Non-Disclosure Agreement ("Huttig NDA"). Upon information and belief, there was no prior relationship of any significance between the two companies or between the executives of the two companies.

27.     After the Huttig NDA was executed, a meeting was scheduled and, at the meeting, Huttig and PrimeSource discussed various matters. PrimeSource's GripRite® brand and competitive strength in the fastener and building supply industries was discussed. Due to the confidential nature of that meeting, information relevant to this matter will be disclosed under a protective order during the course of this litigation.

**Platinum Equity Acquisition**

28.     In 2014, PrimeSource began talks with Platinum Equity, LLC ("Platinum") regarding potential acquisition of PrimeSource. Platinum and PrimeSource thereafter consummated a deal for Platinum to acquire PrimeSource which closed on May 8, 2015 (the "Closing Date").

29.     The employment of K. Fishbein and Zinman ended on December 31, 2014 pursuant to previously negotiated deals which included a lucrative pay-out in exchange for agreeing to respect restrictive covenants.

30.     After the buyout, D. Fishbein and Furio continued in their roles as co-CEOs. Platinum later decided to make a management change and offered D. Fishbein and Furio lucrative severance agreements in connection with their termination. Their employment ended on September 16, 2015.

31.     Importantly to this matter, each and every one of the Individual Defendants negotiated and accepted contracts which contained lucrative severance packages, under which they

were paid handsomely in return for their agreement and covenants not to disparage PrimeSource and not to use or disclose confidential information, not to compete with PrimeSource and not to solicit PrimeSource employees, customers, vendors or suppliers. In essence, they were paid to and agreed to step completely away from the industry for a period of time.

32.     These agreements were all related to and were conditions of the substantial acquisition by Platinum of PrimeSource. The specific purpose was to provide the new buyer protection from raiding of its customers, employees, suppliers, and vendors and to protect the company from competition by the people who grew the business and knew it the best. These individuals were not otherwise entitled to the extraordinary compensation paid to them by PrimeSource under these special agreements and the payments were made to secure the buyer with the full benefit of its purchase.

**K. Fishbein and Zinman Agreements**

33.     K. Fishbein and Zinman signed Consulting and Retention Agreements on or around September 29, 2014. These agreements were near-identical and provided, at section 4.1 thereof, that they would not "engage in any activity which is directly competitive with, or that causes material harm to PrimeSource" for a period ending eighteen months after the Closing Date (or until after November 8, 2016); and agreed that they would not "associate" with any Material Competitor during that time.

34.     K. Fishbein and Zinman were each substantially compensated in consideration of their agreements and covenants.

35.     Under the agreement at section 4.4 thereof, K. Fishbein and Zinman agreed to return to PrimeSource all benefits he/she would obtain under the terms of the agreement if they violated Section 4.1. In addition, they agreed that PrimeSource would be entitled to injunctive

relief and "to an equitable accounting of all earnings, profits and other benefits arising from such violation.…"

36.     In addition to other legal and equitable relief, Plaintiff sues to recover all the benefits provided under the agreements to K. Fishbein and Zinman; for injunctive relief; and for an equitable accounting of all earnings, profits and other benefits received or to be received by K. Fishbein and Zinman from Huttig or as a result of their individual actions and their dealings, association and employment with, for, on behalf of, and for the benefit and enrichment of Huttig.

**D. Fishbein and Furio Agreements**

37.     D. Fishbein and Furio signed "Severance Agreements and Release of Claims" on or around September 24, 2015. These agreements were near-identical and provided at section 3 (titled "Consideration") substantial sums of money as severance. Other payments and benefits were provided and all of these payments and other consideration were specifically contingent upon compliance with, among other things, paragraphs 5, 6 and 13 of the agreements.

38.     Section 5 is titled, "Company Property," and required them to return all company property.

39.     Section 6 is titled, "Mutual Non-Disparagement, Confidentiality and Cooperation," and required them, among other things, not to "disparage" PrimeSource or any of its officers, directors, employees or agents.

40.     Section 13 is titled, "Continuation of All Obligations Under Any Other Agreement You Have With the Company," and is an affirmation that they will abide by, among other things, the confidentiality and non-compete provisions contained in each of their previously signed "Amended and Restated Employment Agreements" (signed upon closing of the purchase of the company on May 8, 2016).

41.     Pursuant to section 11, titled "Breach," of each of the D. Fishbein and Furio Severance Agreements, both of these defendants agreed to repay any and all amounts received upon notice of breach. Neither have repaid as required by the agreements.

**Key Agreements To Step Away From the Industry For a Specified Period of Time**

42.     Given their roles and relationships, as well as their deep knowledge of PrimeSource's business, the lucrative multi-million dollar payments and packages were provided in exchange for their agreement not to interfere with the company's business, not to partake in predatory practices to harm the company and, indeed, to literally step away from the industry for the specified period of time.   Each of the Individual Defendants was well compensated to stand down with the intent that they would not have any financial incentive or need to attack the company.

43.     Each of the Individual Defendants had extensive time to review their agreements and to have attorneys of their choice review and advise them on the terms thereof.   Each of the Individual Defendants had the right not to enter into their respective agreements, but each chose to do so, and to happily pocket and enjoy the financial considerations thereof, with the full knowledge of the terms and with the understanding that they would not attempt to benefit themselves or others financially by trading on the decades of investment made by PrimeSource and the confidential and trade secret (secret sauce information) of which they had special and intimate knowledge.

**Huttig**

44.     Huttig currently advertises itself as a distributor of building products specializing in millwork, such as milled wood products, while also providing an array of other building products. The company started as a sawmill and lumberyard and evolved into a window sash and

10

door manufacturer. Huttig is best known for its millwork, pre-fabricated windows and doors, and pre-hung doors. To put it simply, Huttig is not a fastener company and has not been a material supplier or distributor of the types of products specialized in by PrimeSource.

45.     Huttig is a direct competitor of PrimeSource in the sale, marketing, and distribution of building products. Huttig competes in the market place with PrimeSource, but is not a high volume seller in the products in which PrimeSource specializes and excels at marketing, such as fasteners and building accessories of the type sold by PrimeSource. Huttig has traditionally not focused its efforts towards selling fasteners and other building accessories of the type sold by PrimeSource, but has sold these products in a small variety to serve its existing millwork lines.

46.     Huttig developed its own private label brand of fasteners called HuttiGrip several years ago, but the HuttiGrip product has always been an ancillary service item and not a product the company was proactively marketing and selling as a product line independent of its core business, as confirmed in practice. Huttig has primarily sold fasteners only as an add-on service to its customers. In other words, if a customer buying windows or cabinets also wanted to purchase fasteners as an add-on to its primary product purchase, rather than separately sourcing the material, Huttig provided this limited private label option.

47.     PrimeSource asserts that Huttig could not and has not been able to make its HuttiGrip fastener sales successfully work on a separate and independent platform for many reasons, including but not limited to (1) Huttig does not have relationships with production and supply mills for many products in the Grip-Rite® product line and could not source sufficient product to be competitive; (2) Huttig does not have a recognized private label brand; (3) its private label brand, HuttiGrip, is sold only as a service and add-on to current customers in the pre-fabricated window and door and milled wood products industries; (4) Huttig does not sell the

variety of products already established under the GripRite® brand; (5) Huttig has a relationship with a third-party manufacturer to source fastener needs for its customers; (6) Huttig's distribution centers are not set up to store, hold or source large quantities of fasteners and building supplies; (7) Huttig does not have a sufficiently experienced sales force necessary to be successful in fastener and building supply sales; and (8) it would be cost-prohibitive and very risky for Huttig to go head-to-head against established fastener and building supply brands, like GripRite®.

**November 15, 2106 Press Release**

48.     In a press release announcing the start of the HuttiGrip division on November 15, 2016, Huttig stated that it had hired all four of PrimeSource's prior CEOs and was initiating a new division to focus on the development of the HuttiGrip brand of fasteners and other specialty building products.

49.     The press release indicates Huttig's intent to mimic the success of the GripRite® brand and to go head-to-head with PrimeSource using the same business model developed and managed by the Individual Defendants for PrimeSource. Indeed, upon review of the unlawful activities of the Individual Defendants over the past year, including forensic analysis and discussions with insiders in the industry, it is clear (upon information and belief) that, starting sometime on or after September 16, 2015, all of the Individual Defendants planned and prepared to compete and engaged in directly competitive activities in direct violation of all of their agreements with PrimeSource. Some of these unlawful activities are identified in the chart below.

**Timeline of Defendants' Acts of Unfair Competition**

| January  2016 | D. Fishbein discusses with Brad Strosahl, PrimeSource VP of Major Accounts, the enforceability of Strosahl's restrictive covenants contained in his employment agreement with PrimeSource, implicitly for the purpose of later joining D. Fishbein in a business to be competitive with PrimeSource. |
|---|---|

| | |
|---|---|
| January 2016 | D. Fishbein, K. Fishbein and Furio attend the International Builders Show for the clear purpose of maintaining relationships, a presence in the industry and initiating plans for competition with PrimeSource. |
| March 2016 | Huttig files to register HuttiGrip as a trademark, changing the colors of the HuttiGrip brand from Huttig's traditional green and orange to the long-used red and black colors associated with GripRite®. |
| Approx. July 2016 | D. Fishbein reaches out to a former employee and asks him to consider leaving his business to join him in the development of a business competitive to PrimeSource. |
| August 12, 2016 | Upon information and belief, B. Strosahl meets with D. Fishbein and others in Lincolnshire, Illinois to discuss plans and to prepare for the launch of the HuttiGrip business. |
| September 18, 2016 | D. Fishbein emails with PrimeSource employee Samuel Sprague asking Sprague to send him Sprague's employment agreement with PrimeSource for analysis. |
| September 2016 | Sam Sprague tells a recruiter that he is close to having an offer from another competitor of PrimeSource (presumably Huttig) |
| October 10, 2016 | Strosahl sends a list of mills, which is confidential PrimeSource information, to his personal email account. |
| October 27-28, 2016 | Sam Sprague uploads a substantial amount of confidential and trade secret information from PrimeSource servers onto external flash drives. |
| November 11-15, 2016 | Strosahl asks his team to determine the competitive advantage of PrimeSource over Huttig for a number of products as a "fire drill." |
| November 16, 2016 | Strosahl accepts offer from Huttig; Strosahl emails family members telling them to change his contact information from his PrimeSource account to his personal email account. |
| November 18, 2016 | Sam Sprague, Garrett Kessler and Al Sagunsky resign, all PrimeSource managerial sales personnel, providing their resignation notices to Strosahl on the same day. |
| November 28, 2016 | Strosahl resigns |

50.  In sum, over the course of at least the last 12 months, the Individual Defendants

have targeted PrimeSource's business model, employees, customers, suppliers, manufacturers, and confidential and trade secret information; they have made substantial plans and preparations in order to give themselves a competitive and financial advantage and in order to aid Huttig in developing a new division with the intent to compete directly and aggressively against and take business from PrimeSource for the benefit and enrichment of Huttig and themselves.

**Huttig Interferes with Individual Defendants' Agreements**

51.     As detailed above, Huttig has used, is using, and (if not stopped) will continue to use PrimeSource's confidential information and trade secrets in an effort and with a specific goal to unlawfully harm PrimeSource's position in the marketplace to Huttig's benefit. Huttig has used, is using, and (if not stopped) will continue to use the knowledge PrimeSource developed about the market, customers, vendors, and suppliers, over years and after significant investments of time and energy, to directly compete with PrimeSource and with the specific goal and intent to harm PrimeSource by using its own information against it. The information it has stolen and is using are legally and contractually protected confidential information and trade secrets.

52.     In addition to violating the terms of the NDA it signed with PrimeSource, Huttig is also in violation of the Defend Trade Secrets Act.  Further, Huttig is interfering with and has interfered with PrimeSource's agreements with the Individual Defendants and other current and former employees.  Huttig is specifically causing or encouraging the Individual Defendants to breach the non-disclosure provisions in their agreements; and is causing or encouraging other current and former employees to provide confidential and trade secret information in violation of their contracts and the law.

53.     Huttig has, upon information and belief, encouraged or knowingly accepted the benefits of the breaches by the Individual Defendants and has and will inevitability continue to

call on them to use PrimeSource confidential information and to acquire or attempt to acquire PrimeSource confidential information for its use and benefit.

54.     Upon information and belief, the Individual Defendants have long been discussing with Huttig and with certain current and former PrimeSource employees their plans to publicly re-enter the fastener and specialty building products business and compete with PrimeSource.  Upon information and belief, the Individual Defendants have also been discussing their plans with PrimeSource customers, vendors and suppliers.

55.     Upon information and belief, Huttig and the Individual Plaintiffs have PrimeSource customer and supplier lists and proprietary information related to same.  Further, Huttig and the Individual Defendants have received from other former PrimeSource employees, electronically and/or in hard copy format, PrimeSource confidential and trade secret information with knowledge or reckless disregard of receiving same.

56.     Because Defendants have created a new division of Huttig, intended to be replicate PrimeSource's GripRite® division, the Defendants will actually use, have threatened to use, and will inevitably use PrimeSource proprietary and confidential data and information.  For example, it will be impossible to locate customers and suppliers, based on the competitive nature of this industry, and impossible to develop successful relationships out of thin air without using PrimeSource confidential and trade secret information. Huttig will also have to use Defendants' knowledge gained from PrimeSource to source products since it did not and does not have that information without accessing and using PrimeSource's information.

**PrimeSource's Vendors**

57.     PrimeSource spent decades and immeasurable amounts of money and energy developing its network of suppliers around the world and its processes and procedures for

15

establishing, maintaining, and growing its relationships and goodwill with these suppliers. PrimeSource has also spent years refining and perfecting its method of getting product from its suppliers directly to customers; and from its suppliers to its distribution centers in order to ultimately serve the buying needs of its customers.

58.     PrimeSource partners with recognized and reputable manufacturers. Amid the plethora of production houses around the world, finding those that can be trusted and are capable of supporting top-tier suppliers and distributors like PrimeSource is difficult and requires a great deal of expensive and time-consuming trial and error. PrimeSource has spent years developing business relationships with reputable vendors and suppliers. It required considerable resources to locate and develop these relationships which allow PrimeSource to obtain quality products at competitive pricing and rates. These relationships have developed over the many years which span PrimeSource's involvement in the industry and the Individual Defendants are well aware of the value of these relationships. The benefits of those relationships are owned by PrimeSource—not the Individual Defendants—and their covenant not to interfere with those relationships was an important part of each of their agreements with PrimeSource.

59.     Although the identity of a small number of PrimeSource's vendors and suppliers are known or knowable through public information, the bulk of PrimeSource's vendors and suppliers, their contact information, identity and the nature and terms of PrimeSource's relationships with its vendors and suppliers are not known to PrimeSource's competitors, nor can they be determined through public resources. Consequently, PrimeSource is able to use that information to gain and maintain a significant economic and competitive advantage over its competitors.

**PrimeSource's Customers**

60.     Likewise, PrimeSource has spent decades and immeasurable amounts of time, money and energy developing and maintaining its network of customers and potential customers. Its customer relationships and goodwill that it built with its customers at a great expense and investment are vital to PrimeSource's business. PrimeSource maintains strict confidentiality of its customer's contact identity and information, customers' needs and desires, prospective customer information, purchases, promotions and discounts, and effectiveness and preferences related to its relationships with customers. PrimeSource's customers are varied and includes independent lumber yards, independent building supply dealers, major big-box retailers, retail building supply chains, concrete and construction supply yards, roofing wholesalers, drywall distributors, wire and fencing supply yards, agricultural supply yards, steel fabricators industrial customers, specialty wholesalers, and specialty distributors. Each type of customer and each customer has its own unique needs and particular contact people. Over many years, PrimeSource has learned and gathered knowledge of these unique needs. Over many years, and through hard work, dedication and expense, PrimeSource  learned and gathered knowledge of these unique needs and maintains this valuable information in strict secrecy, which gives it a strong competitive advantage in the marketplace.

61.     Although PrimeSource publishes some of the branch or company names of certain customers for marketing purposes, the bulk of PrimeSource's customers, their contact information, identity, and the nature and terms of PrimeSource's relationships with its customers are not known to PrimeSource's competitors, nor can they be determined through public resources. Consequently, PrimeSource is able to use the information it has developed and gathered, to gain a significant economic and competitive advantage over its competitors and would suffer irreparable loss of

business and significant economic harm if its competitors were to have or gain access to such information.

**Primesource's Customer and Vendor Information is Kept Secret**

62.     PrimeSource's employees generally fall into one of a few primary functions of the company—sales, procurement, operations and logistics.

63.     Sales roles focus on building relationships with customers, soliciting and making sales, order fulfillment, and overseeing shipping of product to customers. Procurement roles focus on building relationships with suppliers, manufacturers and vendors, including developing new products, purchasing and importing product, and brokering direct sales. Maintaining independence of sales and procurement serves the dual purpose of establishing an efficient structure while also allowing PrimeSource to maintain and keep its "recipe" for success confidential.

64.     Notably, the company has a history of co-CEO roles reflecting the distinct need for focused management over each of the company's vital functions. Huttig, by employing all 4 of the people who served in the CEO roles over the last decade are attempting to avoid the time, money, and effort required (and, importantly, which PrimeSource was required to expend) in order to become a relevant and formidable competitor immediately.

65.     Without trading on PrimeSource's confidential and trade secret information, Huttig would have to invest significant time and resources into the development of this business. Huttig has specifically never been willing to invest its resources into such a business and has never been successful in developing a separate fastener division because it was aware that the barriers to entry were significant.  Instead of competing fairly and squarely, Huttig is instead employing the Individual Defendants who are in violation of their agreements with PrimeSource, have tortiously interfered with those agreements, and have misappropriated trade secret information in order to

make an end-run at competing in this industry because Huttig recognizes that it cannot do this without engaging in unfair and illegal practices in order to improve its odds of success.

66.     To put it in simple terms, Huttig has stolen the secret recipe, the chef, and the ingredients for a golden cake which they had been trying to bake for years without success and, importantly, to which they would have never had access to without engaging in illegal and illicit behavior to steal it.

67.     PrimeSource employs a number of measures to protect against the disclosure of its Confidential Information, such as limiting access to such information to only those employees who have a need to know; providing access on a tiered basis so that the type and amount of information provided to an employee is based on his or her position and role at PrimeSource; password protecting its computers; issuing key cards and limiting access to certain areas of headquarters; controlling access over the limited confidential information located in distribution centers; terminating access to Confidential Information at the conclusion of employment; maintenance and oversight of employment policies intended to support the company's efforts at maintaining secrecy of its proprietary information; and obtaining non-disclosure and restrictive covenant agreements with key employees who have access to Confidential Information.

**COUNT I**
**VIOLATION OF THE DEFEND TRADE SECRETS**
**ACT AGAINST ALL DEFENDANTS**

68.     All foregoing paragraphs are incorporated by reference as if fully set forth herein.

69.     The Defend Trade Secrets Act, 18 U.S.C. §§ 1836-39 *et. seq*., provides a remedy against each and every one of the Defendants for its/his theft of and actual or threatened improper use of PrimeSource's trade secrets.

70. The following information, known to each of the Individual Defendants, constitutes a trade secret and/or confidential information:

a.  Information regarding the names, identities and contact information of Plaintiff's customers and potential customers;

b.  Information regarding the preferences, financial information or any other non-public information specific to Plaintiff's customers and potential customers;

c.  Financial information regarding PrimeSource;

d.  Financial information regarding Plaintiff's customers and potential customers;

e.  Customer lists and prospective customer lists compiled by PrimeSource;

f.  Customer and prospective customer information compiled by PrimeSource;

g.  Information regarding the names, identities and contact information of Plaintiff's customers, vendors, and/or suppliers and potential customers, vendors, and/or suppliers;

h.  Information regarding the preferences, financial information or any other non-public information specific to Plaintiff's customers, vendors and/or suppliers and potential customers, vendors and/or suppliers;

i.  Vendor and supplier lists and prospective vendor and supplier lists compiled by PrimeSource;

j.  Vendor and supplier and prospective vendor and supplier information compiled by PrimeSource;

k.  Plaintiff's methods of operation;

l.  Plaintiff's price lists,

m.  Plaintiff's current and past personnel data;

n.  Plaintiff's current and future business plans; and

o.  Plaintiff's current and future advertising or marketing plans

71. As discussed above, PrimeSource maintains confidential information relating to its customers including knowledge of their product requirements and preferences, key personnel,

20

purchasing habits, and the prices PrimeSource charges them. This information, over time, helps PrimeSource to maintain and grow those customer relationships in an efficient, cost-effective and successful fashion that its competitors cannot duplicate. PrimeSource also maintains confidential information concerning its financial arrangements, employee information, product and product development information, internal information such as PrimeSource's own price points, key personnel, vendor costs, etc.

72.     Compiling and maintaining such information provides PrimeSource with a competitive advantage that allows it to better serve its customers in the market for building materials and fasteners. The information is not generally known and is valuable as a result, and would give any of PrimeSource's competitors—like Huttig—an unfair competitive advantage.

73.     Because of the value of the information, which PrimeSource has spent a significant amount of time and invested substantial resources developing, PrimeSource restricts access to such information and requires that it be kept strictly confidential by its employees. PrimeSource employs a number of measures to protect against its disclosure such as limiting access to information to only employees with a need to know; password protecting its computers; issuing key cards to limit access to certain areas of its distribution centers and headquarters, terminating access to confidential information at the conclusion of employment, and requiring its employees to sign nondisclosure, nonsolicitation and, in some cases, noncompetition agreements.

74.     Defendants possess information that constitutes PrimeSource trade secrets and to the extent there is not specific and intentional use of this information, it is meritable, based on the Individual Defendants' experience, that PrimeSource's trade secrets and confidential information will be used.  Use of that information will provide Huttig with an unfair competitive advantage,

and cause significant harm to PrimeSource, including, among other things, the loss of the value of that information.

WHEREFORE, PrimeSource requests that: a) a temporary restraining order be entered prohibiting Huttigs use of PrimeSource's trade secrets; b) preliminary and permanent injunctions be entered prohibiting Huttis's use of PrimeSource's trade secrets; c) PrimeSource be awarded damages for Huttig's violation of the Act; and d) PrimeSource be awarded such other relief as provided by the Act.

## COUNT II
## BREACH OF CONTRACT AGAINST KENNETH FISHBEIN

75.    Plaintiff incorporates all prior paragraphs and factual allegations by reference.

76.    A breach of contract occurs when (1) there is a valid, enforceable contract, (2) the plaintiff is a proper party to sue for breach of the contract, (3) the plaintiff performed its contractual obligations, (4) defendant breached the contract, and (5) the defendant's breach caused the plaintiff injury.

77.    Defendant Kenneth Fishbein ("K. Fishbein") signed the K. Fishbein Severance Agreement and Release of Claims ("K. Fishbein Severance Agreement") with PrimeSource on May 8, 2015, for and in consideration of Plaintiff providing Kenneth Fishbein with a substantial severance compensation in exchange for the confidentiality, nondisclosure, non-compete, non-solicit and other restrictive covenants in the K. Fishbein Severance Agreement.

78.    Per the terms of the K. Fishbein Severance Agreement, Defendant Kenneth Fishbein is prohibited from the following:

   a.    disclosing any confidential information, including information regarding PrimeSource's customers, suppliers, marketing arrangements, or methods of operations. This confidential information includes the systems, know-how and records, products, services, costs, inventions, computer software programs, marketing and sales techniques or programs, methods,

methodologies, manuals, lists and other trade secrets acquired, sold, developed, maintained by PrimeSource, and the nature and terms of the PrimeSource's relationships with its customers, suppliers, lenders, underwriters, and vendors;

b. competing with PrimeSource, including assisting competitors from creating a competing business;

c. soliciting PrimeSource employees to join a competitor.

79. Since leaving his employment with PrimeSource on December 31, 2014, Defendant K. Fishbein has taken and used confidential PrimeSource information for the purpose of planning and preparing to compete with PrimeSource, and to carry out his duties and work at Huttig. K. Fishbein is using his knowledge of PrimeSource's customers and vendors and of PrimeSource's prices to undercut PrimeSource in the market place.

80. He has also violated his non-compete by association with Huttig prior to November 15, 2016 for purposes of forming a competing entity.

81. And he has violated the non-solicitation provisions by recruiting others to join Huttig.

82. PrimeSource has performed its obligations under the Severance Agreement.

WHEREFORE, PrimeSource requests that a temporary restraining order and preliminary and permanent injunctions be entered prohibiting K. Fishbein's from violating his Severance Agreement.

## COUNT III
## BREACH OF CONTRACT AGAINST DAVID FISHBEIN

83. Plaintiff incorporates all prior paragraphs and factual allegations by reference.

84. A breach of contract occurs when (1) there is a valid, enforceable contract, (2) the plaintiff is a proper party to sue for breach of the contract, (3) the plaintiff performed its contractual

obligations, (4) defendant breached the contract, and (5) the defendant's breach caused the plaintiff injury.

85.     Defendant David Fishbein ("D. Fishbein") signed the D. Fishbein Severance Agreement and Release of Claims ("D. Fishbein Severance Agreement") with PrimeSource on September 21, 2015, for and in consideration of Plaintiff providing D. Fishbein with a substantial severance compensation in exchange for the confidentiality, nondisclosure, non-compete, non-solicit and other restrictive covenants in the D. Fishbein Severance Agreement.

86.     Per the terms of the D. Fishbein Severance Agreement, Defendant D. Fishbein is prohibited from the following:

a.      disclosing any confidential information, including information regarding PrimeSource's customers, suppliers, marketing arrangements, or methods of operations. This confidential information includes the systems, know-how and records, products, services, costs, inventions, computer software programs, marketing and sales techniques or programs, methods, methodologies, manuals, lists and other trade secrets acquired, sold, developed, maintained by PrimeSource, and the nature and terms of the PrimeSource's relationships with its customers, suppliers, lenders, underwriters, and vendors;

b.      competing with PrimeSource, including assisting competitors from creating a competing business;

c.      soliciting PrimeSource employees to join a competitor.

87.     Since leaving his employment with PrimeSource on September 15, 2015, Defendant D. Fishbein has taken and used confidential PrimeSource information for the purpose of planning and preparing to compete with PrimeSource, and to carry out his duties and work at Huttig. D. Fishbein is using his knowledge of PrimeSource's customers and vendors and of PrimeSource's prices to undercut PrimeSource in the market place.

88.     He also violated his non-compete by association with Huttig prior to November 16, 2016 for purposes of forming a competing entity.

89. And he also violated the non-solicitation provisions by recruiting others to join Huttig.

90. PrimeSource has performed its obligations under the Severance Agreement.

WHEREFORE, PrimeSource requests that a temporary restraining order and preliminary and permanent injunctions be entered prohibiting D. Fishbein's from violating his Severance Agreement.

## COUNT IV
## BREACH OF CONTRACT AGAINST MONA ZINMAN

91. Plaintiff incorporates all prior paragraphs and factual allegations by reference.

92. A breach of contract occurs when (1) there is a valid, enforceable contract, (2) the plaintiff is a proper party to sue for breach of the contract, (3) the plaintiff performed its contractual obligations, (4) defendant breached the contract, and (5) the defendant's breach caused the plaintiff injury.

93. Defendant Mona Zinman ("Zinman") signed the Zinman Severance Agreement and Release of Claims ("Zinman Severance Agreement") with PrimeSource on May 8, 2015, for and in consideration of Plaintiff providing Zinman with a substantial severance compensation in exchange for the confidentiality, nondisclosure, non-compete, non-solicit and other restrictive covenants in the Zinman Severance Agreement.

94. Per the terms of the Zinman Severance Agreement, Defendant Zinman is prohibited from the following:

        a.     disclosing any confidential information, including information regarding PrimeSource's customers, suppliers, marketing arrangements, or methods of operations. This confidential information includes the systems, know-how and records, products, services, costs, inventions, computer software programs, marketing and sales techniques or programs, methods, methodologies, manuals, lists and other trade secrets acquired, sold, developed, maintained by PrimeSource, and the nature and terms of the

PrimeSource's relationships with its customers, suppliers, lenders, underwriters, and vendors;

b. competing with PrimeSource, including assisting competitors from creating a competing business;

c. soliciting PrimeSource employees to join a competitor.

95. Since leaving her employment with PrimeSource on December 31, 2014, Defendant Zinman has taken and used confidential PrimeSource information for the purpose of planning and preparing to compete with PrimeSource, and to carry out her duties and work at Huttig. Zinman is using her knowledge of PrimeSource's customers and vendors and of PrimeSource's prices to undercut PrimeSource in the market place.

96. She also violated his non-compete by association with Huttig prior to November 15, 2016 for purposes of forming a competing entity.

97. And she violated the non-solicitation provisions by recruiting others to join Huttig.

98. PrimeSource has performed its obligations under the Severance Agreement.

WHEREFORE, PrimeSource requests that a temporary restraining order and preliminary and permanent injunctions be entered prohibiting Zinman from violating her Severance Agreement.

## COUNT V
## BREACH OF CONTRACT AGAINST ROBERT FORIO

99. Plaintiff incorporates all prior paragraphs and factual allegations by reference.

100. A breach of contract occurs when (1) there is a valid, enforceable contract, (2) the plaintiff is a proper party to sue for breach of the contract, (3) the plaintiff performed its contractual obligations, (4) defendant breached the contract, and (5) the defendant's breach caused the plaintiff injury.

26

101. Defendant Robert Furio ("Furio") signed the Furio Severance Agreement and Release of Claims ("Furio Severance Agreement") with PrimeSource on September 24, 2015, for and in consideration of Plaintiff providing Forio with a substantial severance compensation in exchange for the confidentiality, nondisclosure, non-compete, non-solicit and other restrictive covenants in the Forio Severance Agreement.

102. Per the terms of the Forio Severance Agreement, Defendant Forio is prohibited from the following:

      a.    disclosing any confidential information, including information regarding PrimeSource's customers, suppliers, marketing arrangements, or methods of operations. This confidential information includes the systems, know-how and records, products, services, costs, inventions, computer software programs, marketing and sales techniques or programs, methods, methodologies, manuals, lists and other trade secrets acquired, sold, developed, maintained by PrimeSource, and the nature and terms of the PrimeSource's relationships with its customers, suppliers, lenders, underwriters, and vendors;

      b.    competing with PrimeSource, including assisting competitors from creating a competing business;

      c.    soliciting PrimeSource employees to join a competitor.

103. Since leaving his employment with PrimeSource on September 15, 2015, Defendant Forio has taken and used confidential PrimeSource information for the purpose of planning and preparing to compete with PrimeSource, and to carry out his duties and work at Huttig. Forio is using his knowledge of PrimeSource's customers and vendors and of PrimeSource's prices to undercut PrimeSource in the market place.

104. He also violated his non-compete by association with Huttig prior to November 15, 2016 for purposes of forming a competing entity.

105. And he violated the non-solicitation provisions by recruiting others to join Huttig.

106. PrimeSource has performed its obligations under the Severance Agreement.

27

WHEREFORE, PrimeSource requests that a temporary restraining order and preliminary and permanent injunctions be entered prohibiting Furio from violating his Severance Agreement.

## COUNT VI
## TORTIOUS INTERFERENCE WITH PRIMESOURCE'S
## CONTRACTS AGAINST HUTTIG

107.     Plaintiff incorporates all prior paragraphs and factual allegations by reference.

108.     To succeed on a claim for intentional interference, a plaintiff must show (1) that the plaintiff had a valid contract; (2) the defendant intentionally interfered with the contract; (3) the interference proximately caused the plaintiff's injury; (4) the plaintiff suffered actual damage or loss.

109.     Valid contracts exist between PrimeSource and K. Fishbein, D. Fishbein, Zinman and Furio. Huttig had knowledge of these contracts.   Valid contracts also exist between PrimeSource and other former PrimeSource employees who have defected to Huttig.

110.     Huttig worked with some or all of these individuals to plan and prepare to form the new Huttigrip division, engaged in actions based on its discussions with the Individual Defendants in order to effectuate the plans and preparations discussed between them, and then hired the Individual Defendants all in an attempt to unfairly compete with PrimeSource and move business that would otherwise be handled by PrimeSource to Huttig. Upon information and belief, Huttig's board of directors was briefed on and discussed the business opportunity. Upon information and belief, Huttig made a decision to expand the HuttiGrip brand and to make a significant financial outlay for the purpose of expanding the HuttiGrip brand all based on the plans and proposals provided by the Individual Defendants and other PrimeSource employees while they were still under contract with PrimeSource.

111.    Huttig unlawfully threatens the goodwill that PrimeSource has built up over many years with its employees and clients and unlawfully intrudes upon PrimeSource's trade secrets and property and PrimeSource's contractual relationships with its now former employees and current employees; and threatens economic damage through loss of business relationships.

WHEREFORE, PrimeSource Building Products, Inc. requests that a temporary restraining order and preliminary and permanent injunction be entered against Huttig Building Products, Inc. enjoining it from engaging in future tortious and that PrimeSource be awarded damages and other appropriate relief.

### COUNT VII
### FEDERAL TRADEMARK INFRINGEMENT

112.    Plaintiff incorporates all prior paragraphs and factual allegations by reference.

113.    The action set forth in this Count VIII arises under the Federal Trademark Act, 15 U.S.C. §§ 1051-1127.

114.    Jurisdiction over Count VIII is conferred by 28 U.S.C. § 1338.

115.    Venue is proper in this district under 28 U.S.C. § 1391.

116.    Plaintiff is in the business of selling and distributing fasteners using the GripRite® name.  Those products are packaged in a box bearing a distinctive black and red color scheme. Plaintiff has used the trademark "GripRite®" and this color scheme since at least 1971.

117.    Based on photos available on Huttig's website, it intends to sell its competing fasteners using the name "HuttiGrip" suing the same red and black color scheme employed by PrimeSource.  Huttig's actions in this regard are intentionally designed to cause a likelihood of confusion in the marketplace as to the source of Huttig's products.

118.    Huttig's aforesaid infringing activities have caused and threaten to cause great and irreparable harm to PrimeSource by diverting revenue from PrimeSource which PrimeSource would otherwise realize.

119.    Huttig's aforesaid infringing activities have caused and are likely to cause continued great irreparable harm to PrimeSource through confusion in the market and in the minds of PrimeSource's customers and potential customers, a likelihood of confusion, mistake or deception.

WHEREFORE, PrimeSource requests that judgment be entered in its favor and against Huttig, and that the court enter such injunctive relief and award damages as appropriate.

PRIME SOURCE BUILDING PRODUCTS, INC.

By:     /s Richard R. Winter
        One of Its Attorneys

Richard R. Winter (ARDC 6195210)
Steven L. Gillman (ARDC 3127956)
Chelsea A. McCarthy (ARDC 6288964)
Lisa M. Kpor (ARDC 6316953)
Holland & Knight LLP
131 S. Dearborn St., 30th Fl.
Chicago, IL 60603
312-263-3600
richard.winter@hklaw.com
steve.gillman@hklaw.com
chelsea.mccarthy@hklaw.com
lisa.kpor@hklaw.com

Mary Goodrich Nix (*pro hac vice to be filed*)
Sara A. Schretenthaler (*pro hac vice to be filed*)
Holland & Knight LLP
200 Crescent Court, Ste. 1600
Dallas, TX 75201
214-964-9407
mary.nix@hklaw.com
sara.schretenthaler@hklaw.com