**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PRIMESOURCE BUILDING PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 16 cv 11390 |
| | ) | |
| HUTTIG BUILDING PRODUCTS, INC., | ) | Hon. Jorge J. Alonso |
| KENNETH FISHBEIN, DAVID FISHBEIN, | ) | Magistrate Judge Young B. Kim |
| MONA ZINMAN and ROBERT FURIO, | ) | |
| | ) | |
| Defendants. | ) | |

**PRIMESOURCE'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
<u>PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY</u>**

Plaintiff PrimeSource Building Products, Inc. ("PrimeSource") is a leading manufacturer and distributor of fasteners, including its proprietary line, Grip-Rite®, for use in the building industry. Its business model, which took years and millions of dollars to develop, is based on efficient utilization of a vast supply chain, extensive knowledge of its customers' ordering patterns, and business planning that focuses on new products and building industry trends.

Defendant Huttig Building Products, Inc. ("Huttig"), one of PrimeSource's competitors, has long sought entry to this market. In late 2014, it explored the possibility of buying PrimeSource. Then, on November 15, 2016, Huttig announced the formation of a new fastener division called HuttiGrip that competes directly with PrimeSource. Huttig hired four former PrimeSource CEOs ("Former CEOs") to lead this division. Yet, the Former CEOs are all prohibited by contract from disclosing or using PrimeSource confidential information or engaging in activities injurious to PrimeSource after leaving its employ.

Within days after Huttig announced its new HuttiGrip division, seven PrimeSource employees with sales, account management, and/or management responsibilities quit and followed

the Former CEOs to Huttig. Each of these employees is covered by a non-compete and/or non-disclosure agreement that is being violated. PrimeSource has now learned through forensic investigation that some of the former employees emailed information to their personal email addresses and downloaded PrimeSource information onto memory devices in the days leading up to their departure from PrimeSource. In short, Huttig has engineered the creation of a new business division to reinvigorate a competing product line, not by developing it on its own, but by means of an improper short-cut.

PrimeSource is entitled to expedited discovery to further develop evidence that the Former CEOs orchestrated the creation of the HuttiGrip division in violation of their employment agreements, they impermissibly disclosed and used PrimeSource's confidential information and trade secrets in doing so, and they potentially instructed a number of now-former PrimeSource employees to steal PrimeSource information for Huttig's use. After an evidentiary hearing, PrimeSource will request that the Court enter a preliminary injunction to prevent further harm to PrimeSource.

## FACTS

PrimeSource is a leading distributor of building products, including a proprietary line of fasteners (such as bulk nails and screws, construction staples, rebar, etc.) and other building products known as Grip-Rite®. (First Amended Complaint for Injunctive and Other Relief ("Complaint") ¶¶ 1, 14, 16). PrimeSource has spent decades and immeasurable amounts of money and resources to develop a network of Grip-Rite® brand vendors, suppliers, and customers. *Id.*, ¶¶ 26, 29. PrimeSource's exclusive possession of key information about these vendors, suppliers, and customers has given PrimeSource and the Grip-Rite® brand a strong competitive advantage in the marketplace. *Id.*, ¶¶ 28-30.

Huttig is a distributor of building products specializing in millwork, but several years ago, Huttig developed its own private label brand of fasteners under a product line called HuttiGrip. *Id.*, ¶¶ 51, 53. The HuttiGrip brand is a direct competitor of the PrimeSource Grip-Rite® brand, but (until now) Huttig sold the HuttiGrip product primarily as an ancillary service item to its customers already purchasing other products. *Id.*, ¶¶ 51–53. On November 15, 2016, Huttig issued a press release announcing the hiring of the Former CEOs and the starting of a new division to focus on the HuttiGrip brand of fasteners and other specialty building products. *Id.*, ¶ 55.

The Former CEOs were integral to the creation, development and success of PrimeSource's Grip-Rite® brand. Kenneth Fishbein ("K. Fishbein") and Mona Zinman ("Zinman") became PrimeSource employees in 1965 and 1967 and served as co-CEOs of PrimeSource from 2007 to 2014. *Id.*, ¶ 21. David Fishbein ("D. Fishbein") and Robert Furio ("Furio") became PrimeSource employees in 1984 and 1986 and served as co-CEOs from 2014 to 2015. *Id.* Through their tenure, the Former CEOs acquired an intimate knowledge of PrimeSource's trade secrets and confidential information such as:

  a. Customer information, including the identity of customers and distribution channels, potential customers and contacts, historic ordering patterns and product mix, margins and merchandising plans;

  b. Supplier information, including identifying of national and international suppliers and the capabilities, contacts, product mix, cost and shipping information and logistics;

  c. Financial, budget and planning data, including historic sales and pricing patterns and margins, forecasts, growth strategies, new product research and development;

  d. Employee information, including identity, skill sets, compensation, and industry contacts;

  e. PrimeSource's aggregate business model incorporating all of the above.

*Id.*, ¶¶ 25, 61.

3

PrimeSource was sold to another entity, Platinum Equity, LLC on May 8, 2015. *Id.*, ¶ 38. On December 31, 2014, prior to the close of the Platinum deal, K. Fishbein and Zinman's employment with PrimeSource ended. *Id.*, ¶ 39. They received lucrative payouts under their employment agreements. *Id.*, ¶¶ 39, 44. Around September 15, 2015, Furio and D. Fishbein's employment ended, and they too received lucrative severance payouts. *Id.*, ¶ 40. Each of their employment agreements contained restrictive covenants that applied upon termination of employment. K. Fishbein and Zinman's employment agreements, executed on September 29, 2014, provided that, for eighteen months after the Platinum closing (until November 8, 2016), they would not engage in any activity directly competitive with PrimeSource, associate with any Material Competitor, or solicit PrimeSource employees. *Id.*, ¶ 43. D. Fishbein and Furio, under their agreements, agreed to return all company property and abide by confidentiality and non-compete provisions contained in previously-executed employment agreements. *Id.*, ¶¶ 46-49. They further agreed not to, until September 16, 2016 (one year after their employment ended), "engage in any conduct that is injurious to the reputation or interests of [PrimeSource]," including their agreement not to "render any services to" any Material Competitor or "become interested in or associated with any" Material Competitor. *See id.*, ¶¶ 48-49.

Despite these restrictions (and the lucrative payouts they received at the conclusion of their employment), the Former CEOs orchestrated their move to compete well before the expiration of the restrictive covenants. Starting as early as January 2016, the Former CEOs, or those acting at their direction, communicated and met with several PrimeSource employees to discuss and solicit them to work for a competitor, Huttig. *Id.*, ¶ 57. During this time period, in June 2016, Huttig registered HuttiGrip as a trademark, changing the colors of the HuttiGrip brand from Huttig's

4

traditional green and orange to the long-used identical red and black colors associated with Grip-Rite®.  *Id.*, ¶ 57.

Then, starting in September 2016, a forensic examination completed by PrimeSource demonstrates that some of the same PrimeSource employees with whom the Former CEOs had communicated were sending confidential PrimeSource information to their personal email accounts and/or uploading it to external memory devices.  For example, one employee, Brad Strosahl, who was already in negotiations with Huttig over the terms and conditions of his pending employment with the company, directed his PrimeSource team to determine the competitive advantage of PrimeSource over Huttig for a number of products.  *Id.*, ¶ 57.  While Strosahl explained the exercise as a "fire drill," in reality, it was to help him create a business plan for Huttig.  *Id.*, ¶ 57.  Immediately after Huttig's November 15 press release, PrimeSource's forensic investigation found that a number of employees uploaded to flash drives and/or forwarded to personal email addresses confidential PrimeSource information and trade secrets.  *Id.*, ¶ 57.  Within two weeks after the press release, all of these PrimeSource employees resigned and joined Huttig.  *Id.*, ¶ 57.  Upon information and belief, these employees stole PrimeSource's information at the behest of Huttig and the Former CEOs.

However, without the discovery process, there is much information that PrimeSource has yet to uncover.  Therefore, it seeks expedited discovery and an evidentiary hearing to further develop these facts.  After expedited discovery and an evidentiary hearing, PrimeSource requests that the Court enter a preliminary injunction. PrimeSource is likely to succeed on the merits of its claims, has no adequate remedy at law, and will suffer irreparable harm if Defendants are not enjoined from wrongfully using PrimeSource's trade secrets and confidential information.

**LEGAL STANDARD**

In the Seventh Circuit, a district court engages in the following two-step analysis to decide whether a preliminary injunction is necessary: In the first phase, the party seeking a preliminary injunction must make a threshold showing that absent preliminary injunctive relief: (1) it will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) it has a reasonable likelihood of success on the merits. *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661-62 (2015) [citations omitted]. If that showing is made, then the Court proceeds to the second phase, in which it considers: (4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties (the public interest). *Id.* at 662.

**ARGUMENT**

**I.     PRIMESOURCE IS LIKELY TO SUCCEED ON THE MERITS.**

PrimeSource seeks a preliminary injunction based on its claims against Defendants for violations of Illinois and federal trade secrets law; claims against the individual defendants for breach of the confidentiality provisions and restrictions in their employment agreements; and claims against Huttig for tortious interference with contract. PrimeSource is likely to succeed on each of these claims.

    **A.     Statutory Trade Secrets Claims**

The Defend Trade Secrets Act (DTSA) provides a cause of action to the "'owner of a trade secret that is misappropriated…if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.'" *Mission Measurement Corp. v. Blackbaud, Inc.*, No. 16 C 6003, 2016 WL 6277496, at \*4 (N.D. Ill. Oct. 27, 2016) (quoting 18 U.S.C. §

1836(b)(1)). Likewise, a plaintiff prevails under the Illinois Trade Secrets Act (ITSA) where a trade secret was misappropriated and used in the defendant's business. *Mission Measurement*, No. 16 C 6003, 2016 WL 6277496, at *4; *see also* 765 ILCS 1065/1 *et seq*. PrimeSource has alleged ample facts supporting the elements of a trade secret claim under both the DTSA and ITSA.

### 1. PrimeSource's Confidential Information Constitutes a Trade Secret.

The DTSA defines a trade secret broadly as "all forms and types of financial, business . . . information, including . . . methods, techniques, processes, procedures . . . if—(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Mission Measurement*, No. 16 C 6003, 2016 WL 6277496, at *4 (quoting 18 U.S.C. § 1839(3)). The ITSA's definition of trade secret is nearly identical. *Mission Measurement*, No. 16 C 6003, 2016 WL 6277496, at *4-5 (citing 765 ILCS 1065/2(d)). The PrimeSource information possessed by the individual defendants satisfies these requirements.

Through several decades of employment and service as CEOs of PrimeSource, each of the individual defendants were privy to a wealth of confidential PrimeSource information including:

a. Customer information, including the identity of customers and distribution channels, potential customers and contacts, historic ordering patterns and product mix, margins and merchandising plans;

b. Supplier information, including identify of national and international suppliers and the capabilities, contacts, product mix, cost and shipping information and logistics;

c. Financial, budget and planning data, including historic sales and pricing patterns and margins, forecasts, growth strategies, new product research and development;

d. Employee information, including identity, skill sets, compensation, and industry contacts;

  e. PrimeSource's aggregate business model incorporating all of the above.

(Complaint ¶ 61). This Court has found that information of this exact type constitutes trade secrets. *Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016) (internal quotation omitted) ("Trade secrets include customer lists that are not readily ascertainable, pricing, distribution, and marketing plans, and sales data and market analysis information.").

  PrimeSource has taken measures to keep this information secret by limiting access to such information to employees who have a need to know the information; providing access to information on a tiered basis that is based on an employee's position or role at PrimeSource; password protecting its computers; issuing key cards and limiting access to certain areas of headquarters; terminating access to confidential information at the end of employment; controlling access over the limited confidential information located in distribution centers; implementing employment policies intended to support the company's efforts at maintaining secrecy of its proprietary information; and obtaining non-disclosure and restrictive covenant agreements with key employees who have access to confidential information. (Complaint, ¶ 35). Likewise, PrimeSource derives an economic benefit and a competitive advantage from this information not being generally known or readily ascertainable.

  **2.** **Defendants Misappropriated PrimeSource's Trade Secrets.**

  Both the DTSA and ITSA define "misappropriation" as an unconsented disclosure or use of a trade secret by a person who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the secret was acquired through improper means, under circumstances giving rise to a duty to maintain its secrecy, or derived from or through a person who owed such a duty. *Mission Measurement*, No. 16 C 6003, 2016 WL 6277496, at *4; 18 U.S.C. § 1839(5); *cf.* 765 ILCS 1065/2(b). Fundamentally, each of the Former CEOs by virtue of being co-CEOs were privy to a wealth of PrimeSource trade secret information that they knew

8

was confidential. They were directly involved in the development of the PrimeSource business model and the information and strategy that has resulted in the success of the Grip-Rite® brand. By using their Grip-Rite® expertise to start the HuttiGrip division, the Former CEOs knew that they were improperly using proprietary PrimeSource information. Huttig hired them to do just that.

But this case is not solely about what the Former CEOs knew and obtained by virtue of being former co-CEOs. This is also a case about theft of information at their direction, or at least, their acquiescence. Contemporaneous with the announcement of the formation of the new Huttigrip division, there was a mass defection to Huttig of employees who previously worked for the co-CEOs, and with whom the co-CEOs had remained in contact. PrimeSource has developed evidence showing that in the days leading up to their resignations, some of these employees stole PrimeSource information. Several of these individuals emailed confidential information to their personal email accounts and downloaded confidential information onto flash drives just before their employment with PrimeSource ended. (Complaint, ¶ 57). "Because direct evidence of theft and use of trade secrets is often not available, the plaintiff can rely on circumstantial evidence to prove misappropriation by drawing inferences from perhaps ambiguous circumstantial evidence." *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 876 (N.D. Ill. 2001); (citing *PepsiCo, Inc. v. Redmond*, 1996 W.L. 3965, *15 (N.D.Ill.1996)). It is highly likely that PrimeSource will be successful on the merits of its misappropriation claims.

### 3. The Individual Defendants' Use or Disclosure of PrimeSource's Trade Secrets While Working at Huttig is Inevitable.

Even if this Court does not grant PrimeSource's motion based on the misappropriation that has already occurred, the Court should enjoin the Defendants from misappropriating PrimeSource's trade secrets under the inevitable disclosure doctrine. To determine whether inevitable disclosure of trade secrets will occur, courts look at the competition level between the former and current employers, whether the employee's position at the new employer is comparable to his former positon, and the actions the new employer has taken to prevent disclosure of the former employer's trade secrets. *RKI*, 177 F. Supp. 2d at 876.

Huttig hired the individual defendants to lead the new HuttiGrip division, their exact function with respect to PrimeSource's Grip-Rite® brand. Huttig did so with the express intent that they share PrimeSource trade secrets to make the HuttiGrip division successful. The Grip-Rite® and Huttigrip brands compete head-on. The development and expansion of the HuttiGrip brand will inevitably require the individual defendants to use the trade secret information they were privy to during their PrimeSource careers, culminating in being CEOs. Courts in this circuit have found the inevitable disclosure of trade secrets under similar circumstances. *See e.g., PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995) (affirming district court's grant of injunction against former employee); *AutoMed Techs., Inc. v. Eller*, 160 F. Supp. 2d 915, 921 (N.D. Ill. 2001) (holding inevitable disclosure adequately alleged where competitor hired former executives of plaintiff to work on the same project they had been developing for plaintiff).

### B. Breach of the Employment Contract Claims

The facts gathered by PrimeSource similarly show that the Former CEOs have breached the confidentiality provisions in their respective employment agreements. (Complaint, ¶¶ 72, 80, 88, 96). The Seventh Circuit has affirmed preliminary injunctions in order to safeguard

confidential information in similar type industries. In *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 ( 7th Cir. 2015), a case involving a senior executive for a large, nationwide roofing company, the court upheld a preliminary injunction to protect potential and actual customer relationships, recognizing that the employer "invested time, expertise, and money in developing its customers and potential customers . . . [and the employee] was directly involved in those efforts." 796 F. 2d at 665; *see also Certainteed Corp. v. Williams,* 481 F. 3d 528 (7th Cir. 2007) (reversing District Court and ordering preliminary injunction against a plant manager who had information about manufacturing processes). Here, a preliminary injunction is likewise necessary to safeguard against the disclosure and use of the wealth of confidential information to which the Former CEOs were privy during their long careers, culminating in being CEOs.

      **C.    Tortious Interference with Contract**

Huttig has tortiously interfered with the contracts of other former PrimeSource employees who have now joined Huttig. PrimeSource has separately filed suit against these former employees in *PrimeSource Building Products, Inc. v. Scott Felten, et al.*, Case: 16-cv-11468 (Dkt. 18) (N.D. Ill. Jan. 3, 2017) (the "Employee Complaint").

A claim for tortious interference with contract occurs with: (1) a valid and enforceable contract; (2) defendant's awareness of the contractual relationship; (3) defendant's intentional and unjustified inducement of a breach of the contract; (4) subsequent breach by the third party caused by the defendant's wrongful conduct; and (5) damages resulting from the breach. *Dallis v. Don Cunningham & Assocs.,* 11 F.3d 713, 717 (7th Cir. 1993). Many of the PrimeSource employees that Huttig poached have non-competes that prohibited working for a competitor for 18 months after termination of employment within 300 miles. (Employee Complaint ¶¶ 32, 46, 54, 63). The former employees directly violated the non-competition provisions by ending their employment

11

with PrimeSource, and then immediately starting work for Huttig in the HuttiGrip division. *Id.*, ¶¶ 34-39, 48-49, 56-57, 61, 65-67. Literally the day after Huttig publically announced the formation of the HuttiGrip division, the former employees began resigning from PrimeSource to join Huttig. (Complaint ¶¶ 57, 103). Huttig's employment of the former employees has caused or will inevitably cause the disclosure of PrimeSource's confidential information and loss of business relationships between PrimeSource and its customers, particularly given the evidence of theft by some of these individuals (Employee Complaint ¶¶ 39, 49, 57, 67); (Complaint ¶¶ 57, 104).

The non-competes are all enforceable agreements. Under Texas law, which governs the contracts, "the core inquiry [under the Covenants Not to Compete Act] is whether the covenant 'contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.'" *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 655 (Tex. 2006) (quoting Tex. Bus. & Com. Code § 15.50(a)). When supported by the evidence, "[t]wo to five years has repeatedly been held as a reasonable time in a noncompetition agreement." *Gallagher Healthcare Ins. Servs. v. Vogelsang*, 312 S.W.3d 640, 655 (Tex. App. 2009). A reasonable geographic limitation is considered to be the territory in which the employee worked while in the employment of his employer. *Curtis v. Ziff Energy Grp., Ltd.*, 12 S.W.3d 114, 119 (Tex. App. 1999). Texas courts have found that a legitimate business interest to protect is the prevention of employees using business contacts and goodwill to take the employer's customers. *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 387 (Tex. 1991).

Here, the 18-month duration of the non-competition provisions is well within the reasonable range under Texas law, and the geographical scope of 300 miles was tailored to the territories in which the former employees worked. (*See* Employee Complaint ¶¶ 32, 46, 54, 63).

PrimeSource executed these agreements specifically so the former employees would not trade on the confidential information they obtained while employed at PrimeSource. *Id*. The non-competes in the former employees' contracts are enforceable and PrimeSource is likely to succeed on the merits of its tortious interference claim against Huttig.

## II. PRIMESOURCE IS SUFFERING IRREPARABLE HARM AND HAS NO ADEQUATE REMEDY AT LAW.

PrimeSource is suffering irreparable harm because: (1) its trade secrets and confidential information have been compromised; and (2) it will lose business and market share to Huttig due to the disclosure and use of its trade secrets and confidential information.

Courts in the Seventh Circuit tend to merge the threshold requirements of irreparable harm and no adequate remedy at law. *Mintel Int'l Grp., Ltd. v. Neergheen,* No. 08-CV-3939, 2008 WL 2782818, at *5 (N.D. Ill. July 16, 2008). An injury is "irreparable" when the injured party cannot be adequately compensated in damages or when damages cannot be measured by any pecuniary standard. *Id*. Where a trade secret or other protectable interest or right is at issue, irreparable injury is presumed. *PepsiCo, Inc. v. Redmond*, No. 94 C 6838, 1996 WL 3965 at *28-29 (N.D. Ill. Jan. 2, 1996); *see also A-Tech Computer Servs. Inc. v. Soo Hoo*, 254 Ill. App. 3d 392, 400 (1st Dist. 1993). "Where trade secrets are involved, the threat is significant that the harm experienced by a misappropriation will be irreparable." *Huawei Techs. Co. v. Motorola, Inc.*, No. 11-CV-497, 2011 WL 612722, at *10 (N.D. Ill. Feb. 22, 2011). Further, both the ITSA and DTSA provide injunctive relief as a remedy for *actual or threatened* misappropriation of trade secrets. 18 U.S.C. § 1836(3)(A)(i); 765 ILCS 1065/3(a).

Huttig hired the Former CEOs to develop the HuttiGrip brand of fasteners and products—products that directly compete against the Grip-Rite® brand the individual defendants developed for PrimeSource. The individual defendants are using and will inevitably use their knowledge of

13

what made the Grip-Rite® brand successful to mimic that success at Huttig. PrimeSource's protectable interest in its trade secrets and confidential information alone are sufficient to show irreparable injury. Injunctive relief is especially appropriate in this case where the very statutes that govern trade secret misappropriation prescribe such a remedy. Moreover, "[i]t is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'" *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005).

### III. THE BALANCE OF HARM AND PUBLIC INTEREST FAVOR PRIMESOURCE

Because PrimeSource has demonstrated a likelihood of success on the merits and irreparable injury absent an injunction, the Court must weigh the error of denying an injunction and the resulting impact to PrimeSource, against the error of granting an injunction and the resulting impact to Defendants. *Foodcomm Int'l v. Barry*, 328 F.3d 300, 305 (7th Cir. 2003). Where the balance of equities favors the movant, an injunction should be granted. *United States v. NCR Corp.*, 688 F.3d 833, 843 (7th Cir. 2012) (affirming grant of preliminary injunction).

PrimeSource seeks to prevent the Defendants from retaining and using its trade secret and confidential information, and Huttig from interfering with valid contracts. Huttig will not be unfairly harmed if an injunction is entered. It remains free to fairly invest in and develop its competing fastener brand—just not with the unfair benefit of PrimeSource's trade secrets and confidential information. PrimeSource, on the other hand, is losing the competitive advantage it worked decades to obtain by the loss of its trade secrets and confidential information, and is in danger of disrupting and losing relationships with customers and suppliers, and goodwill. The substantial harm to PrimeSource outweighs the limited harm to Defendants. Without an injunction, the harm to PrimeSource in lost customers and revenue, and improper use of proprietary information, will be hard if not virtually impossible to detect and pin down.

Moreover, the public interest weighs in favor of PrimeSource. It is in the public interest to protect confidential information and enforce valid contracts. *nClosures Inc. v. Block & Co., Inc.*, No. 12 C 9358, 2013 WL 158954, at *4 (N.D. Ill. Jan. 15, 2013).

## **CONCLUSION**

For the reasons stated above, PrimeSource requests that this Court enter an order expediting discovery order, and after an evidentiary hearing, enter the preliminary injunction outlined in its motion.

    Respectfully submitted,

    PRIME SOURCE BUILDING PRODUCTS, INC.

    By: /s Richard R. Winter
        One of Its Attorneys

Richard R. Winter (ARDC 6195210)
Steven L. Gillman (ARDC 3127956)
Chelsea A. McCarthy (ARDC 6288964)
Holland & Knight LLP
131 S. Dearborn St., 30th Fl.
Chicago, IL 60603
312-263-3600
richard.winter@hklaw.com
steve.gillman@hklaw.com
chelsea.mccarthy@hklaw.com

Mary Goodrich Nix
Holland & Knight LLP
200 Crescent Court, Ste. 1600
Dallas, TX 75201
214-964-9407
mary.nix@hklaw.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that on January 19, 2017, I electronically transmitted the foregoing **PrimeSource Building Products, Inc.'s Memorandum of Law in Support of Motion for Preliminary Injunction** using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael R. Annis
Husch Blackwell LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
mike.annis@huschblackwell.com

Peter S. Coffey
Robert M. Romashko
Husch Blackwell LLP
120 S. Riverside Plaza, Ste. 2200
Chicago, IL 60606
peter.coffey@huschblackwell.com
robert.romashko@huschblackwell.com

                                          s/ Richard R. Winter