**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

PRIMESOURCE BUILDING PRODUCTS, INC., )
                                         )
                Plaintiff, )
                                         )      Civil Action No. 16 cv 11390
        v.                                 )
                                         )      Hon. Jorge L. Alonso
HUTTIG BUILDING PRODUCTS, INC., )      Magistrate Judge Young B. Kim
KENNETH FISHBEIN, DAVID FISHBEIN, )
MONA ZINMAN, and ROBERT FURIO, )
                                         )
            Defendants. )

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff PrimeSource Building Products, Inc. ("PrimeSource" or "Plaintiff") files this Second Amended Complaint for Injunctive and Other Relief against Defendants Huttig Building Products, Inc. ("Huttig"), Kenneth Fishbein ("K. Fishbein"), David Fishbein ("D. Fishbein"), Mona Zinman ("Zinman"), and Robert Furio ("Furio"), (K. Fishbein, Zinman, D. Fishbein and Furio are referred to collectively as the "CEO Defendants").

**NATURE OF THE ACTION**

1.      Plaintiff is a leading distributor of building products, including a proprietary fastener and building products line known as Grip-Rite®. On November 15, 2016, Defendant Huttig announced the hiring of PrimeSource's four former CEOs, the CEO Defendants, for the purpose of forming a new division (the "HuttiGrip division") to mirror, compete with, and take business from PrimeSource's Grip-Rite® branded products.

2.      PrimeSource has learned that the HuttiGrip division was formed and launched with the cooperation and assistance of the CEO Defendants, all of whom are now employed by Huttig and have intimate knowledge of the most valuable and proprietary PrimeSource information and

trade secrets, including information regarding: customer and supplier relationships, strategies, methods, and processes. The CEO Defendants' actions violate non-use, non-disclosure, non-compete and non-solicitation agreements each had with PrimeSource. Moreover, it is simply not plausible for Huttig to profitably create, launch, and replicate an operation competitive with PrimeSource without the use of PrimeSource's trade secrets and confidential information, which was and is in the possession of the CEO Defendants. In addition, as detailed herein, Huttig and the CEO Defendants have recently and strategically recruited numerous PrimeSource employees, particularly sales and account managers, to leave PrimeSource and work with Huttig in violation of those employees' non-compete and non-disclosure agreements; and several of those employees engaged in suspicious activity on their PrimeSource computers using external memory devices in the time immediately prior to their resignation from PrimeSource.

3.      In sum, Huttig and the CEO Defendants have engaged in illegal conduct intended to unfairly shortcut the creation of the HuttiGrip division as a replicate of PrimeSource in an effort to destroy the value of the Grip-Rite® product line and, in the process, secure PrimeSource's Grip-Rite® business for Huttig.

### JURISDICTION AND VENUE

4.      Jurisdiction and venue are proper in this Court.

5.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff raises federal questions under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836-39 *et. seq.*

6.      The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims arise out of the same case or controversy as the federal claims.

7.      This Court has personal jurisdiction over all Defendants because they either reside in this District or transact business in this District through the HuttiGrip division.

2

8.      Venue is proper in this District because a substantial part of the events giving rise to the claims occurred within this District.

## PARTIES

9.      Plaintiff PrimeSource is a Delaware corporation, with its principal place of business in Irving, Texas.

10.     Defendant Huttig is a Delaware corporation, with its principal place of business in St. Louis, Missouri.  The HuttiGrip division of Huttig is headquartered in Lincolnshire, Illinois.

11.     Defendant K. Fishbein is a resident and citizen of Illinois.

12.     Defendant D. Fishbein is a resident and citizen of Illinois.

13.     Defendant Zinman is a resident of New York, although she transacts business in Illinois through the HuttiGrip Division.

14.     Defendant Furio is a resident and citizen of Illinois.

## FACTUAL BACKGROUND

**PrimeSource and Its Business**

15.     PrimeSource is a distributor of fasteners and other building products.  PrimeSource also supplies products under its own proprietary brands, including Grip-Rite®. PrimeSource has 34 distribution centers and approximately 1,100 employees throughout the United States and distributes products throughout North America and the Caribbean. PrimeSource has spent considerable time, money and effort perfecting and refining its business model and its relationships with customers, suppliers, and vendors.

16.     As a distributor, PrimeSource's strength is in its relationships with its suppliers and customers, and the knowledge base that PrimeSource has developed over the years regarding the personnel, capabilities, needs and desires of each of its customers.

17.     PrimeSource's main products are collated, packaged, and bulk nails and screws, construction staples and other construction fasteners, rebar, wire rod, wire and steel mesh, concrete accessories, wraps and weather barriers, building accessories, wire fence products, roofing products and accessories, gypsum, and insulation products and accessories.

18.     PrimeSource distributes products both by (1) purchasing and maintaining an inventory of building products in each of its distribution centers to cater to the local market and the customers in that geographic location; and (2) by arranging direct purchase transactions where product is delivered from the supplier to the buyer without routing through PrimeSource's distribution center network.

19.     Since 1967, in addition to its distribution and wholesale sales of third-party brands and private-labeled building products, PrimeSource has actively developed its own proprietary brands of fasteners and building products, including, among others, its well-regarded and broadly-recognized Grip-Rite® brand, which it supplies through its traditional distribution channels.

20.     Grip-Rite® has been continuously used as a registered trademark by PrimeSource and its predecessor entities since February 1971.  Grip-Rite® is a top-selling brand of fasteners and other building products in North America. Customers request Grip-Rite® branded building products by name, including tools, compressors, hoses, fittings, fencing, rebar, steel stakes, house-wrap, concrete accessories, collated, bulk and packaged fasteners, floor protection, gypsum products, roofing accessories, poly products, underlayments, tarps and other barriers.

21.     PrimeSource's customers for building products, including third-party branded building products, as well as building products supplied under PrimeSource's proprietary brands, including Grip-Rite®, range widely from small local hardware stores, lumber yards, and specialty building supplies dealers; to franchised and licensed businesses; to multi-national home

4

improvement and big box stores, pro-channel customers and retailers whose brands are household names.

**PrimeSource's Ownership And Management History**

22.  Each of the four CEO Defendants worked for decades at PrimeSource and each ultimately served as a CEO of PrimeSource.  Zinman and K. Fishbein were co-CEOs, as were Furio and D. Fishbein, as successors to Zinman and K. Fishbein. The periods of each of their employment with PrimeSource were, generally, as follows:

  a.  K. Fishbein

      i.  Initial Date of Employment:  November 1, 1965
     ii.  Term of Status as CEO: March 24, 2007 - December 31, 2014
    iii.  Last Date of Employment: December 31, 2014

  b.  Zinman

      i.  Initial Date of Employment: December 27, 1967
     ii.  Term of Status as CEO: March 24, 2007 - December 31, 2014
    iii.  Last Date of Employment: December 31, 2014

  c.  D. Fishbein

      i.  Initial Date of Employment: June 11, 1984
     ii.  Term of Status as CEO: January 1, 2014 – September 16, 2015
    iii.  Last Date of Employment: September 16, 2015

  d.  Furio

      i.  Initial Date of Employment: June 30, 1986
     ii.  Term of Status as CEO: January 1, 2014 – September 16, 2015
    iii.  Last Date of Employment: September 16, 2015

23.  The Co-CEOs managed the business together by dividing their primary responsibilities for sales, supply and operations and then working together to develop and implement strategic initiatives, importantly including the expansion of the Grip-Rite® brand.

24.     Primarily, K. Fishbein and D. Fishbein built and managed the customer side of the business.  This included building and maintaining relationships with major and national retailers, and overseeing all sales employees across the business platform.  The sales team solicited and made sales, fulfilled orders, and oversaw shipment of product to customers.

25.     Primarily, Zinman and Furio built and managed the supply and operational side of the business.  This included a focus on building and maintaining relationships with suppliers, manufacturers, and vendors; development of new products including the products making up the Grip-Rite® brand; purchasing and importing product from overseas; and brokering direct sales procuring quality product within North America.  The operational role also included organizing and managing the logistics of acquiring product; overseeing inventory levels across the company's distribution centers and designing and operating distribution centers for optimal product distribution; and getting product to customers in a timely manner.

26.     PrimeSource's business is equally dependent on (i) locating suppliers and obtaining product, (ii) developing and maintaining relationships with its customers, and (iii) establishing and maintaining comprehensive and efficient supplier and customer-specific operations and logistics functions, including shipping and ground transportation, an optimized distribution center network, and just-in-time and customized packaging, labeling, warehousing and delivery services. It is all of these aspects of the business, together with the relationships at the foundation thereof and the business practices and methods thereunder, which the CEO Defendants oversaw and were ultimately responsible.

**PrimeSource's Vendors**

27.     PrimeSource spent decades and immeasurable amounts of money and resources developing its network of suppliers around the world and its processes and procedures for

6

establishing, maintaining, and growing its relationships and goodwill with these suppliers. PrimeSource has also spent years refining and perfecting its method of getting product from its suppliers directly to customers, and from its suppliers to its distribution centers, in order to ultimately serve the buying needs of its customers.

28.     PrimeSource partners with recognized and reputable manufacturers. Amid the plethora of production houses around the world, finding those that can be trusted and are capable of supporting top-tier suppliers and distributors like PrimeSource is difficult and requires a great deal of expensive and time-consuming trial and error. PrimeSource has spent years developing business relationships with reputable vendors and suppliers. It required considerable resources to locate and develop these relationships which allow PrimeSource to obtain high quality products at competitive pricing and rates. These relationships have developed over the many years which span PrimeSource's involvement in the industry and the CEO Defendants are well aware of the value of these relationships.  The benefits of those relationships are owned by PrimeSource—not the CEO Defendants—and their covenant not to interfere with those relationships was an important part of each of their agreements with PrimeSource.

29.     Although the identity of a small number of PrimeSource's vendors and suppliers are known or knowable through public information, the bulk of PrimeSource's vendors and suppliers, their contact information, identity and the nature and terms of PrimeSource's relationships with its vendors and suppliers are not known to PrimeSource's competitors, nor can they be determined through public resources. Consequently, PrimeSource is able to use that information to gain and maintain a significant economic and competitive advantage over its competitors.

**PrimeSource's Customers**

30.     Likewise, PrimeSource has spent decades and immeasurable amounts of money and resources developing and maintaining its network of customers and potential customers. Its customer relationships and goodwill that it built with its customers at a great expense and investment are vital to PrimeSource's business. PrimeSource maintains confidentiality of its customers' contact identity and information, customers' needs and desires, prospective customer information, purchases, promotions and discounts, and effectiveness and preferences related to its relationships with customers. PrimeSource's customers are varied and include independent lumber yards, independent building supply dealers, major big-box retailers, retail building supply chains, concrete and construction supply yards, roofing wholesalers, drywall distributors, wire and fencing supply yards, agricultural supply yards, steel fabricators industrial customers, specialty wholesalers, and specialty distributors. Each type of customer and each customer has its own unique needs and particular contact people. Over many years, PrimeSource has learned and gathered knowledge of these unique needs. Over many years, and through hard work, dedication and expense, PrimeSource  learned and gathered knowledge of these unique needs and maintains this valuable information in secrecy, which gives it a strong competitive advantage in the marketplace.

31.     Although PrimeSource publishes some of the brand or company names of certain customers for marketing purposes, the bulk of PrimeSource's customers, their contact information, identity, and the nature and terms of PrimeSource's relationships with its customers are not known to PrimeSource's competitors, nor can these details be determined through public resources. Consequently, PrimeSource is able to use the information it has developed and gathered to gain a significant economic and competitive advantage over its competitors and would suffer irreparable

loss of business and significant economic harm if its competitors were to have or gain access to such information.

32.     Indeed, Huttig itself considers similar information to be confidential.  Its Code of Business Conduct and Ethics Policy limits its employees' use of "confidential information" and defines confidential information as follows:

> Confidential information includes proprietary documents and data the Company has developed in the course of its business operations and encompasses both paper documents and electronic data.  Generally, confidential information includes non-public financial information, customer lists, marketing plans and strategies, sales data, internally developed training materials, proprietary software, and internal processes and procedures developed to support unique aspects of the Company's business.

**PrimeSource's Customer and Vendor Information is Kept Secret**

33.     PrimeSource's employees generally fall into one of a few primary functions of the company—sales, supply chain and logistics, and operations.

34.     Sales roles focus on building relationships with customers, soliciting and making sales, order fulfillment, overseeing order quality and account management.

35.     Supply chain and logistics roles focus on building relationships with suppliers, manufacturers and vendors, including developing new products, purchasing and importing product, and brokering direct sales.

36.     PrimeSource employs a number of measures to protect against the disclosure of its confidential information, such as limiting access to such information to only those employees who have a need to know; providing access on a tiered basis so that the type and amount of information provided to an employee is based on his or her position and role at PrimeSource; password protecting its computers; issuing key cards and limiting access to certain areas of headquarters; controlling access over the limited confidential information located in distribution centers;

terminating access to confidential information at the conclusion of employment; maintenance and oversight of employment policies intended to support the company's efforts at maintaining secrecy of its proprietary information; and obtaining non-disclosure and restrictive covenant agreements with key employees who have access to confidential information.

**Huttig's Proposed Purchase of PrimeSource**

37.    In 2014, the then-controlling owners of PrimeSource marketed the company for sale.  In or around December 2014, in connection with this process, PrimeSource, including the CEO Defendants, met with Defendant Huttig.

38.    Prior to, and as a condition of, being included in the sales process and exchanging information or attending a meeting with PrimeSource, Huttig signed a Non-Disclosure Agreement ("Huttig NDA") dated December 16, 2014.

39.    Upon information and belief, there was no prior relationship of any significance between the two companies or between the executives of the two companies.

40.    The Huttig NDA prohibited Huttig from disclosing any confidential information received in conjunction with the sale process or using that information for any purpose, except for evaluating a potential transaction.

41.    The Huttig NDA also prohibited Huttig, for a period of eighteen months after the date of the Huttig NDA, from "directly or indirectly, solicit[ing] for hire or hir[ing] as a director, officer, employee, independent contractor, consultant or advisor any person employed by any of the Company Parties or any of their subsidiaries in an executive or significant managerial, financial, sales, marketing, sourcing or buying position that you have discussions with, obtain information with respect to or that otherwise become known to you in the course of your evaluation of a possible Transaction . . . ."

42.     The Huttig NDA also provided:  "You acknowledge and agree that remedies at law are not adequate to protect the Company Parties against any actual or threatened breach of this agreement by you or your Representatives and that the Company Parties shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy for any such breach or threatened breach. . . . Such remedy shall not be deemed to be the exclusive remedy for breach of this agreement but shall be in addition to all other remedies available at law or equity to the Company Parties."

43.     After the Huttig NDA was executed, Huttig was included in the sales process, introduced to PrimeSource executives, including the CEO Defendants, and was given access to and received confidential PrimeSource information.  Representatives of PrimeSource, including the CEO Defendants, met with Huttig and discussed various matters, including PrimeSource's Grip-Rite® brand strategy, growth opportunities, and competitive strength in the fastener and building supply industries.  However, a deal between Huttig and PrimeSource did not materialize.

**Platinum Equity Acquisition**

44.     In 2014, PrimeSource began talks with Platinum Equity, LLC ("Platinum") regarding potential acquisition of PrimeSource. Platinum and PrimeSource thereafter consummated a deal for Platinum to acquire PrimeSource which closed on May 8, 2015 (the "Closing Date").

45.     The employment of K. Fishbein and Zinman ended on December 31, 2014 pursuant to agreements which included a lucrative pay-out in exchange for agreeing to respect restrictive covenants.

46.     After the buyout, D. Fishbein and Furio continued in their roles as co-CEOs. Platinum later decided to make a management change and offered D. Fishbein and Furio lucrative

severance agreements incorporating restrictive covenants in connection with their termination, which they accepted. Their employment ended on or about September 16, 2015.

47. In sum, the CEO Defendants negotiated and accepted contracts which contained lucrative severance packages, under which they were paid millions of dollars in return for their agreement and covenants not to disparage PrimeSource, not to use or disclose confidential information, not to compete with PrimeSource or associate with a PrimeSource competitor, and not to solicit PrimeSource employees, customers, vendors or suppliers.

48. These agreements, which are described more fully below, were all related to and were conditions of the substantial acquisition by Platinum of PrimeSource. The specific purpose was to provide the new buyer protection from raiding of its customers, employees, suppliers, and vendors and to protect the company from competition by the people who grew the business and knew it the best. These individuals were not otherwise entitled to the extraordinary compensation paid to them by PrimeSource under these special agreements and the payments were made to secure the buyer with the full benefit of its purchase.

**K. Fishbein and Zinman Agreements**

49. K. Fishbein and Zinman signed Consulting and Retention Agreements on or around September 29, 2014. These agreements were near-identical and provided, at section 4.1 thereof, that they would not "engage in any activity which is directly competitive with, or that causes material harm to PrimeSource" for a period ending eighteen months after the therein-defined Closing Date (or until after November 8, 2016); stipulated that they could not even "associate" with any Material Competitor during that time; and prohibited them from soliciting for employment or other services any PrimeSource employees.

12

50.    K. Fishbein and Zinman were each substantially compensated in consideration of their agreements and covenants.

51.    Under the agreement at section 4.4 thereof, K. Fishbein and Zinman agreed that PrimeSource would be entitled to injunctive relief and "to an equitable accounting of all earnings, profits and other benefits arising from such violation . . . ."

**D. Fishbein and Furio Agreements**

52.    D. Fishbein and Furio signed "Severance Agreements and Release of Claims" on or around September 24, 2015. These agreements were near-identical and provided at section 3 (titled "Consideration") substantial sums of money as severance, following their termination from PrimeSource effective September 16, 2015.  Other payments and benefits were provided and all of these payments and other consideration were specifically contingent upon compliance with, among other things, paragraphs 5, 6 and 13 of the agreements.

53.    Section 5 is titled, "Company Property," and required them to return all company property.

54.    Section 6 is titled, "Mutual Non-Disparagement, Confidentiality and Cooperation," and required them, among other things, not to "disparage" PrimeSource or any of its officers, directors, employees or agents.

55.    Section 13 is titled, "Continuation of All Obligations Under Any Other Agreement You Have With the Company," and is an affirmation that they will abide by, among other things, the confidentiality and non-compete provisions contained in each of their previously signed "Amended and Restated Employment Agreements" (signed upon closing of the purchase of the company on May 8, 2015), which included a prohibition against rendering any services to or

becoming interested in or associated with any material competitor for a period of twelve months following termination from PrimeSource.

56.     Pursuant to section 11, titled "Breach," of each of the D. Fishbein and Furio Severance Agreements, both of these defendants agreed to repay any and all amounts received upon notice of breach. Neither have repaid as required by the agreements.

**Huttig**

57.     Huttig has historically advertised itself as a distributor of building products specializing in millwork, such as milled wood products, while also providing an array of other building products. The company started as a sawmill and lumberyard and evolved into a window sash and door manufacturer.  Huttig is best known for its millwork, pre-fabricated windows and doors, and pre-hung doors.  To put it bluntly, Huttig is not a fastener company and has not been a material supplier or distributor of the types of products specialized in by PrimeSource.

58.     Huttig is a direct competitor of PrimeSource in the sale, marketing, and distribution of certain building products. Huttig competes in the market place with PrimeSource, but is not a high volume seller in the products in which PrimeSource specializes and excels at marketing, such as fasteners and building accessories of the type sold by PrimeSource.

59.     Huttig developed its own private label brand of fasteners called HuttiGrip several years ago, but the HuttiGrip product has always been an ancillary service item and not a product the company was proactively marketing and selling as a product line independent of its core business. Huttig has primarily sold fasteners only as an add-on service to its customers.  In other words, if a customer buying windows or cabinets also wanted to purchase fasteners as an add-on to its primary product purchase, rather than separately sourcing the material, Huttig provided this limited private label option.

14

60. As of November 2016, Huttig could not and has not been able to make its HuttiGrip fastener sales successfully work on a separate and independent platform for many reasons, including, upon information and belief: (1) Huttig does not have relationships with production and supply mills for many products in the Grip-Rite® product line and could not source sufficient product to be competitive; (2) Huttig does not have a recognized private label brand; (3) its private label brand, HuttiGrip, is sold only as a service and add-on to current customers in the pre-fabricated window and door and milled wood products industries; (4) Huttig does not sell the variety of products already established under the Grip-Rite® brand; (5) Huttig's distribution centers are not set up to store, hold or source large quantities of fasteners and building supplies; (6) Huttig does not have a sufficiently experienced sales force necessary to be successful in fastener and building supply sales; and (7) absent using PrimeSource's misappropriated confidential information, it would be cost-prohibitive and very risky for Huttig to go head-to-head against established fastener and building supply brands, like Grip-Rite®.

**Huttig Employs Former CEOs**

61. ██████████████████████████████████
████████████████████████████████████████
█████████████████████████████████████
██████████████████████████

62. ███████████████████████████████
████████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████████
████████████████

15

63. ████████████████████████████████████████

████████████████████████████████████████████

██████████████████

64.     Prior to entering employment agreements, on September 19, 2016, D. Fishbein and Furio entered into consulting agreements with Huttig.  Under the consulting agreements, D. Fishbein and Furio agreed to assist Huttig in developing the HuttiGrip division.  The term of the respective consulting agreements ended on November 18, 2016.

65.     Thereafter, on or about November 14, 2016, D. Fishbein and Furio entered into executive employment agreements with Huttig to manage and oversee the HuttiGrip Division.

66.     Also on or about November 14, 2016, K. Fishbein and Zinman entered into consulting agreements with Huttig to work with the HuttiGrip Division.

**November 15, 2016 Press Release**

67.     In a press release announcing the start of the HuttiGrip division on November 15, 2016, Huttig stated that it had hired all of the CEO Defendants and was initiating a new division to focus on the development of the HuttiGrip brand of fasteners and other specialty building products.

68.     The press release indicates Huttig's intent to mimic the success of the Grip-Rite® brand and to go head-to-head with PrimeSource using the same business model developed and managed by the CEO Defendants for PrimeSource. Indeed, one customer of PrimeSource has referred to the HuttiGrip division as "PrimeSource II."

69.     In the weeks since the November 16, 2016 Press Release, PrimeSource has learned that Huttig and the CEO Defendants, and PrimeSource employees who eventually joined Huttig,

16

undertook a series of actions starting in at least December 2015 designed to unfairly undermine PrimeSource to the benefit of Huttig, including the following:

a. In December 2015 and January 2016, D. Fishbein was in contact with Garrett Kessler, a then PrimeSource employee who now works at Huttig, about his PrimeSource non-compete agreement and his compensation at PrimeSource.

b. In January 2016, D. Fishbein discussed with Brad Strosahl, PrimeSource VP of Major Accounts, the enforceability of Strosahl's restrictive covenants contained in his employment agreement with PrimeSource, implicitly for the purpose of Strosahl later joining D. Fishbein in a business to be competitive with PrimeSource. During that same month, D. Fishbein sent invitations to PrimeSource employees Sam Sprague and Jordan Whitehead to connect via LinkedIn.

c. D. Fishbein, K. Fishbein and Furio attended the International Builders Show in Las Vegas in January, which is one of the most important networking trade shows and events for the building supply industry.

d. On June 22, 2016, Huttig registered its HuttiGrip as a trademark for the first time.

e. In or around July 2016, D. Fishbein reached out to a former PrimeSource employee and asked him to consider leaving his business to join him in the development of a business competitive to PrimeSource.

f. On August 9, 2016, the CEO Defendants met and had dinner in Lincolnshire, Illinois, upon information and belief, to discuss plans to work together in a venture competitive with PrimeSource and to prepare for the launch of the HuttiGrip business. At this same time, Brad Strosahl was also in Lincolnshire, Illinois for a PrimeSource meeting, and upon information and belief, met with one or more of the CEO Defendants.

g. On September 17 and 18 2016, Brad Strosahl and Samuel Sprague sent their PrimeSource employment agreement to D. Fishbein for analysis. Sam Sprague met D. Fisbhein for dinner and D. Fishbein and Bob Furio for drinks, upon information and belief, sometime prior to that date.

h. On October 10, 2016, Strosahl sent an email containing a document entitled "Weekly Update" from his PrimeSource account to his personal email account. This document contains confidential PrimeSource information, including information about customers and customer relationships. Strosahl also emailed to himself a list of nail importer mills.

i. On October 27–28, 2016, without any business reason, Sprague accessed confidential PrimeSource information on external flash drives in his possession.

j.   By late October and early November 2016, D. Fishbein was in contact with Sprague, Felten, Kessler, Kottmeyer, Sagunsky, and Whitehead requesting information about their compensation at PrimeSource and whether they had employment agreements at PrimeSource.

k.   On November 11, 2016, Strosahl had a call with D. Fishbein. On this same day, he asked his team to provide a detailed overview of all Major Accounts customers ostensibly for an upcoming meeting, but in reality to help him create a business plan for Huttig. He received information in response to his email from various unsuspecting PrimeSource employees from November 11 through November 15, 2016.

l.   On November 16, 2016, Strosahl emailed his father telling them to change his contact information from his PrimeSource account to his personal email account.

m.   On November 14, 2016, Scott Felten, Territory Manager and Purchaser for PrimeSource, plugged a USB device into his company laptop to access confidential information, including price pages, spreadsheets, and product information. On November 18, 2016, Scott Felten, Territory Manager and Purchaser, resigned and joined Huttig.

n.   On November 17, 2016, Sprague uploaded information from his PrimeSource computer onto a generic flash disk USB, which he retained after leaving PrimeSource. Sprague resigned that day and immediately went to work for Huttig.

o.   On November 17, 2016, Garrett Kessler and Al Sagunsky, both employed in PrimeSource's direct sales department resigned, providing their resignation notices to Strosahl. Upon resigning, Sagunsky transferred contacts and media from his company iPhone to another device. Kessler and Sagunsky both joined Huttig.

p.   During the time period immediately prior to his resignation on November 18, 2017, upon information and belief, without any legitimate business reason, PrimeSource employee Jordan Whitehead (referenced above) (i) opened on his computer a USB device containing over 4,000 PrimeSource items containing confidential and trade secret information, that Mr. Whitehead had placed on that USB drive and (ii) had plugged into his computer a USB containing a Customer Price folder. Whitehead resigned from PrimeSource on November 18 and joined Huttig.

q.   On November 28, 2016, Strosahl formally resigned from PrimeSource and joined Huttig. That same day, on information and belief, he directed the download of information from his PrimeSource computer to a general UDisk

18

USB device, including a .pst file containing confidential PrimeSource information.

r.   Since joining Huttig, several of the former PrimeSource employees have solicited business from PrimeSource's customers, in violation of their employment agreements with PrimeSource.

All of these activities were, on information and belief, performed at the direction or acquiescence of Huttig and/or the CEO Defendants for the benefit of Huttig.

**Huttig Replicates PrimeSource's Marks, Packaging, and SKUs**

70.   Since at least as early as 1967, PrimeSource or its predecessor-in-interest has continuously used the coined mark Grip-Rite® in commerce in the United States and the mark encompasses nails, and related fasteners, tools, building products, and other products used in the construction industry and related fields.

71.   Plaintiff has also for many years widely used a distinctive, non-functional packaging  in connection with its Grip-Rite® fastener products.  Elements of this packaging include typography, a color scheme incorporating bright color coded labels associated with the intended use of the fastener on neutral colored containers displayed in an array, clear plastic windows with rounded corners, labels covering only a portion of the box top, and images of the product, all in conjunction with the use of the Grip-Rite® mark.

72.   Huttig has selected similar marks and packaging for the products offered for sale by its recently-launched HuttiGrip division.

73.   At the time of the November 15, 2016 press release, the newly formed Huttig division was referred to as the "HuttiGrip" division.  However, in April 2017, Huttig filed a request with the United State Patent and Trademark Office to amend the "HuttiGrip" mark to include the mark "Huttig-Grip" in an attempt to make the HuttiGrip mark more similar to the Grip-Rite® mark and to trade on the goodwill of the Grip-Rite® mark.  With its request, Huttig

submitted specimens demonstrating multiple elements copied from the Grip-Rite® product packaging including an identical color scheme relating to the intended use of the products and the use of the "Huttig-Grip" mark on the packaging.

74.     In a further attempt to trade off the goodwill, reputation, and investments of PrimeSource into its Grip-Rite® products, Huttig has been copying PrimeSource's SKU numbers to assign to new products offered for sale out of the HuttiGrip division.  The SKU numbers are so similar that at least one customer remarked to Scott Felten, a former PrimeSource employee now employed by Huttig:  "good lord you kept basically the same sku's haha . . . ."

**COUNT I**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT**
**AGAINST ALL DEFENDANTS**

75.     All foregoing paragraphs are incorporated by reference as if fully set forth herein.

76.     The Defend Trade Secrets Act, 18 U.S.C. §§ 1836-39 *et. seq*., provides a remedy against the Defendants for their actual and threatened improper use of Prime Source's trade secrets.

77.     PrimeSource's trade secrets at issue are related to products and services used in, or intended for use in, interstate commerce.  Those trade secrets include:

a.  Historic sales, price, and profit data for a particular customer or customers;

b.  Historic purchasing, price and characteristics of a particular supplier or suppliers;

c.  Compilations of customer information reflecting identity, contacts, pricing, product mix, volumes, terms and/or ordering patterns.  Such information is reflected in PrimeSource's SAP and CRM system, and in other formats;

d.  Compilations of supplier information, reflecting identity, contacts, pricing, volumes, terms and/or ordering patterns.  Such information is reflected in PrimeSource's SAP system, and in other formats;

e.  Compilations of financial data reflecting operations;

f.  Information reflecting inventory planning and supply chain optimization;

20

g.  Information reflecting optimization of warehouse operations and distribution networks;

h.  Business plans and budgets, and company objectives including cost-savings and growth measures;

i.  Company-level strategic plans, product line strategic plans, supplier-level strategic plans and customer specific strategic plans; and

j.  Marketing strategy and targets.

78.    This information has value by virtue of its secrecy, and through it, PrimeSource is able to maintain and grow supplier and customer relationships in an efficient, cost-effective and successful fashion that its competitors cannot duplicate.

79.    Compiling and maintaining such information provides PrimeSource with a competitive advantage that allows it to better serve its customers in the market for building materials and fasteners. The information is not generally known outside of PrimeSource and is valuable as a result, and would give any of PrimeSource's competitors—like Huttig—an unfair competitive advantage.

80.    Because of the value of the information, which PrimeSource has spent a significant amount of time and invested substantial resources developing, PrimeSource restricts access to such information and requires that it be kept confidential by its employees. PrimeSource employs a number of measures to protect against its disclosure such as limiting access to information to only employees with a need to know; providing access on a tiered basis so that the type and amount of information provided to an employee is based on his or her position and role at PrimeSource; password protecting its computers; issuing key cards and limiting access to certain areas of its headquarters; controlling access over the limited confidential information located in distribution centers; terminating access to confidential information at the conclusion of employment; maintenance and oversight of employment policies intended to support the company's efforts at

maintaining secrecy of its proprietary information; and obtaining nondisclosure, non-solicitation and, in some cases, noncompetition agreements.

81.     The CEO Defendants came to know this information based on their positions at PrimeSource and under circumstances that gave rise to a duty for them to maintain the secrecy of the information, and they have misappropriated that information by utilizing it in their roles at Huttig.  Huttig has wrongfully acquired access to PrimeSource's trade secrets by the employment of the CEO Defendants and other former PrimeSource employees, including Brad Strosahl, for the purpose of gaining access to PrimeSource's trade secrets.  To the extent there is not specific and intentional use of this information, it is inevitable, based on the CEO Defendants' vast experience and leadership positions at Huttig, that PrimeSource's trade secrets will be used.  Use of that information will provide Huttig with an unfair competitive advantage, and cause significant harm to PrimeSource, including, among other things, the loss of the value of that information.

WHEREFORE, PrimeSource requests that: a) a temporary restraining order be entered prohibiting Huttig's use of PrimeSource's trade secrets; b) preliminary and permanent injunctions be entered prohibiting Huttig's use of PrimeSource's trade secrets; c) PrimeSource be awarded damages for Huttig's violation of the Act; and d) PrimeSource be awarded such other relief as provided by the Act.

## COUNT II
## VIOLATION OF THE ILLINOIS TRADE SECRETS ACT
## AGAINST ALL DEFENDANTS

82.     Plaintiff incorporates all prior paragraphs and factual allegations by reference.

83.     The Illinois Trade Secrets Act 765 ILCS 1065 *et. seq*., prohibits the misappropriation of trade secrets

67.    As reflected above, the Defendants have acquired and used PrimeSource's trade secrets in violation of the Illinois Trade Secrets Act.

WHEREFORE, PrimeSource requests that: a) a temporary restraining order be entered prohibiting Huttig's use of PrimeSource's trade secrets; b) preliminary and permanent injunctions be entered prohibiting Huttig's use of PrimeSource's trade secrets; c) PrimeSource be awarded damages for Huttig's violation of the Act; and d) PrimeSource be awarded such other relief as provided by the Illinois Trade Secrets Act.

**COUNT III**
**BREACH OF CONTRACT**
**AGAINST KENNETH FISHBEIN**

84.    Plaintiff incorporates all prior paragraphs and factual allegations by reference.

85.    A breach of contract occurs when (1) there is a valid, enforceable contract, (2) the plaintiff is a proper party to sue for breach of the contract, (3) the plaintiff performed its contractual obligations, (4) defendant breached the contract, and (5) the defendant's breach caused the plaintiff injury.

86.    Defendant K. Fishbein signed the K. Fishbein Consulting and Retention Agreement and Release of Claims ("K. Fishbein Consulting and Retention Agreement") with PrimeSource on September 29, 2014, and an Amendment thereto on April 6, 2015.  The Consulting and Retention Agreement incorporated by reference the terms of K. Fishbein's Employment Agreement.

87.    Per the terms of the K. Fishbein Consulting and Retention Agreement and Employment Agreement, Defendant Kenneth Fishbein was prohibited from disclosing any confidential information, competing with PrimeSource, including associating with material competitors, and soliciting PrimeSource employees to join a competitor.

88.     Since leaving his employment with PrimeSource on December 31, 2014, Defendant K. Fishbein has taken and used confidential PrimeSource information for the purpose of planning and preparing to compete with PrimeSource, and to carry out his duties and work at Huttig. K. Fishbein is using his knowledge of PrimeSource's customers and vendors and of PrimeSource's pricing methods and other information to undercut PrimeSource in the market place.

89.     He has also violated his non-compete by association with Huttig prior to November 8, 2016 for purposes of planning, preparing, and forming a competing entity.

90.     And he has violated the non-solicitation provisions by recruiting others to join Huttig.

91.     PrimeSource has performed its obligations under the Consulting and Retention Agreement and the Employment Agreement.

WHEREFORE, PrimeSource requests that a temporary restraining order and preliminary and permanent injunctions be entered prohibiting K. Fishbein's from further violations of his Agreements with PrimeSource, and awarding PrimeSource damages and such other relief as appropriate.

**COUNT IV**
**BREACH OF CONTRACT**
**AGAINST DAVID FISHBEIN**

92.     Plaintiff incorporates all prior paragraphs and factual allegations by reference.

93.     A breach of contract occurs when (1) there is a valid, enforceable contract, (2) the plaintiff is a proper party to sue for breach of the contract, (3) the plaintiff performed its contractual obligations, (4) defendant breached the contract, and (5) the defendant's breach caused the plaintiff injury.

94.     Defendant D. Fishbein signed the D. Fishbein Severance Agreement and Release of Claims ("D. Fishbein Severance Agreement") with PrimeSource on September 24, 2015, for and in consideration of Plaintiff providing D. Fishbein with a substantial severance compensation in exchange for the confidentiality, nondisclosure, non-compete, non-solicit and other restrictive covenants in the D. Fishbein Severance Agreement.  The Severance Agreement incorporates several provisions of D. Fishbein's Employment Agreement with PrimeSource.

95.     Per the terms of the D. Fishbein Severance Agreement and related Employment Agreement, Defendant D. Fishbein is prohibited from disclosing any of PrimeSource's confidential information, including information relating to PrimeSource's business operations, trade secrets, plans, products, processes, practices, or services including, without limitation, information relating to research, development, invention, suppliers, customers, purchasing, accounting, finance, price lists, and marketing; competing with PrimeSource, including association with material competitors; and soliciting PrimeSource employees to join a competitor.

96.      Since leaving his employment with PrimeSource on September 16, 2015, Defendant D. Fishbein has taken and used confidential PrimeSource information for the purpose of planning and preparing to compete with PrimeSource, and to carry out his duties and work at Huttig. D. Fishbein is using his knowledge of PrimeSource's customers and vendors and of PrimeSource's pricing methods and other information to undercut PrimeSource in the market place.

97.     He also violated his non-compete by association with Huttig prior to September 16, 2016 for purposes of planning, preparing and forming a competing entity.

98.     And he also violated the non-solicitation provisions by recruiting others to join Huttig.

25

99.     PrimeSource has performed its obligations under the Severance Agreement.

WHEREFORE, PrimeSource requests that a temporary restraining order and preliminary and permanent injunctions be entered prohibiting D. Fishbein's from violating his Severance Agreement, and awarding PrimeSource damages and such other relief as appropriate.

**COUNT V**
**BREACH OF CONTRACT**
**AGAINST MONA ZINMAN**

100.     Plaintiff incorporates all prior paragraphs and factual allegations by reference.

101.     A breach of contract occurs when (1) there is a valid, enforceable contract, (2) the plaintiff is a proper party to sue for breach of the contract, (3) the plaintiff performed its contractual obligations, (4) defendant breached the contract, and (5) the defendant's breach caused the plaintiff injury.

102.     Defendant Zinman signed the Zinman Consulting and Retention Agreement and Release of Claims ("Zinman Consulting and Retention Agreement") with PrimeSource on September 29, 2014, and an Amendment thereto on April 6, 2015.  The Consulting and Retention Agreement incorporated by reference the terms of Zinman's Employment Agreement.

103.     Per the terms of the Zinman Consulting and Retention Agreement and Employment Agreement, Defendant Zinman was prohibited from disclosing any confidential information, competing with PrimeSource, including associating with material competitors, and soliciting PrimeSource employees to join a competitor.

104.     Since leaving her employment with PrimeSource on December 31, 2014, Defendant Zinman has taken and used confidential PrimeSource information for the purpose of planning and preparing to compete with PrimeSource, and to carry out her duties and work at Huttig. Zinman is using her knowledge of PrimeSource's customers and vendors and of

26

PrimeSource's pricing and purchasing methods and other information to undercut PrimeSource in the market place.

105.    She also violated her non-compete by association with Huttig prior to November 8, 2016 for purposes of forming a competing entity.

106.    PrimeSource has performed its obligations under the Consulting and Retention Agreement and Employment Agreement.

WHEREFORE, PrimeSource requests that a temporary restraining order and preliminary and permanent injunctions be entered prohibiting Zinman from violating her Agreements with PrimeSource, and awarding PrimeSource damages and such other relief as appropriate.

## COUNT VI
## BREACH OF CONTRACT
## AGAINST ROBERT FURIO

107.    Plaintiff incorporates all prior paragraphs and factual allegations by reference.

108.    A breach of contract occurs when (1) there is a valid, enforceable contract, (2) the plaintiff is a proper party to sue for breach of the contract, (3) the plaintiff performed its contractual obligations, (4) defendant breached the contract, and (5) the defendant's breach caused the plaintiff injury.

109.    Defendant Furio signed the Furio Severance Agreement and Release of Claims ("Furio Severance Agreement") with PrimeSource on September 24, 2015, for and in consideration of Plaintiff providing Furio with a substantial severance compensation in exchange for the confidentiality, nondisclosure, non-compete, non-solicit and other restrictive covenants in the Furio Severance Agreement.  The Severance Agreement incorporates certain provisions of Furio's Employment Agreement with PrimeSource.

27

110.    Per the terms of the Furio Severance Agreement and related Employment Agreement , Defendant Furio is prohibited from disclosing any of PrimeSource's confidential information, including information relating to PrimeSource's business operations, trade secrets, plans, products, processes, practices, or services including, without limitation, information relating to research, development, invention, suppliers, customers, purchasing, accounting, finance, price lists, and marketing; competing with PrimeSource, including association with material competitors; and soliciting PrimeSource employees to join a competitor.

111.    Since leaving his employment with PrimeSource on September 16, 2015, Defendant Furio has taken and used confidential PrimeSource information for the purpose of planning and preparing to compete with PrimeSource, and to carry out his duties and work at Huttig. Furio is using his knowledge of PrimeSource's customers and vendors and of PrimeSource's pricing and purchasing methods and other information to undercut PrimeSource in the market place.

112.    He also violated his non-compete by association with Huttig prior to September 16, 2016 for purposes of planning, preparing and forming a competing entity.

113.    And he violated the non-solicitation provisions by recruiting others to join Huttig.

114.    PrimeSource has performed its obligations under the Severance Agreement and related Employment Agreement.

WHEREFORE, PrimeSource requests that a temporary restraining order and preliminary and permanent injunctions be entered prohibiting Furio from violating his Agreements with PrimeSource, and awarding PrimeSource damages and such other relief as appropriate.

## COUNT VII
## TORTIOUS INTERFERENCE WITH PRIMESOURCE CONTRACTS
## AGAINST HUTTIG

115.    Plaintiff incorporates all prior paragraphs and factual allegations by reference.

116.    To succeed on a claim for intentional interference, a plaintiff must show (1) that the plaintiff had a valid contract; (2) the defendant intentionally interfered with the contract; (3) the interference proximately caused the plaintiff's injury; (4) the plaintiff suffered actual damage or loss.

117.    Valid contracts exist between PrimeSource and K. Fishbein, D. Fishbein, Zinman and Furio. Valid contracts also exist between PrimeSource and Brad Strosahl, another former PrimeSource employee who defected to Huttig.  Huttig had knowledge of these agreements.

118.    Huttig collaborated with all of these former PrimeSource employees to plan, prepare, and form the new HuttiGrip division with full knowledge of the restrictions and limitations placed on these employees by their agreements with PrimeSource.  In so doing, they intentionally and tortiously interfered with these agreements and caused these former PrimeSource employees to breach their agreements with PrimeSource.

119.    PrimeSource has been damaged by Huttig's tortious conduct, which proximately caused PrimeSource's injury.

WHEREFORE, PrimeSource Building Products, Inc. requests that a temporary restraining order and preliminary and permanent injunction be entered against Huttig Building Products, Inc. enjoining it from engaging in further tortious conduct and that PrimeSource be awarded compensatory and punitive damages and other appropriate relief.

**COUNT VIII**
**BREACH OF THE HUTTIG NDA**
**AGAINST HUTTIG**

120.     Plaintiff incorporates all prior paragraphs and factual allegations by reference.

121.     The Huttig NDA entered into between Plaintiff and Huttig is a valid and enforceable contract.

122.     Plaintiff performed its obligations under the Huttig NDA by, among other things, including Huttig in the sales process and providing Huttig confidential PrimeSource information.

123.     Huttig breached the Huttig NDA by using confidential information it learned during the sale process to launch the HuttiGrip division and by soliciting for hire K. Fishbein, D. Fishbein, and Furio within eighteen months after the execution of the NDA.

124.     PrimeSource has been damaged by Huttig's breach.

125.     Huttig agreed that breach of the NDA would result in irreparable harm for which there is no adequate remedy at law.

WHEREFORE, PrimeSource Building Products, Inc. requests that a temporary restraining order and preliminary and permanent injunction be entered against Huttig Building Products, Inc. and that PrimeSource be awarded damages and such other relief as appropriate.

**COUNT IX**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**AGAINST HUTTIG**

126.     Plaintiff incorporates all prior paragraphs and factual allegations by reference.

127.     Bradley Strosahl, as a former Senior Vice President at PrimeSource, owed a fiduciary duty of loyalty to PrimeSource, even after his departure, not to take transactions or opportunities initiated during his time at PrimeSource, on behalf of PrimeSource and based on information and knowledge he acquired at PrimeSource, to another employer, such as Huttig.

128.     Strosahl breached this duty by, at least, taking an opportunity that PrimeSource had with American Fasteners, a domestic supplier of fasteners, to Huttig.  During his tenure with PrimeSource, Strosahl worked on securing an affiliation with American Fasteners in the weeks prior to his departure from PrimeSource.  Within a week of joining Huttig, Strosahl was in discussions with American Fasteners regarding an identical affiliation.  On May 9, 2017, Huttig issued a press release announcing that it had formed an affiliation with American Fasteners.

129.     Huttig aided and abetted Strosahl's breach of fiduciary duty to PrimeSource by encouraging Strosahl's pursuit of this opportunity on behalf of Huttig, knowing that it was an opportunity that he had been pursuing during his PrimeSource employment.

130.     Huttig assisted Strosahl by providing him with company resources to pursue and effect the affiliation with American Fasteners.

131.     Huttig was aware of its role in assisting Strosahl's breach of his fiduciary duty at the time it provided assistance.  Huttig knew that Strosahl had worked to create the affiliation with American Fasteners before he left PrimeSource, as Strosahl immediately began discussions with American Fasteners when he started his employment at Huttig.

132.     PrimeSource has incurred damages, including the revenue and additional business associated with the American Fasteners opportunity, as a result of Huttig's actions.

WHEREFORE, PrimeSource Building Products, Inc. requests that a temporary restraining order and preliminary and permanent injunction be entered against Huttig and that PrimeSource be awarded compensatory and punitive damages and other appropriate relief.

**COUNT X**
**TORTIOUS INTERFERENCE WITH PRIMESOURCE CONTRACTS**
**AGAINST DAVID FISHBEIN**

133.     Plaintiff incorporates all prior paragraphs and factual allegations by reference.

134.    To succeed on a claim for intentional interference, a plaintiff must show (1) that the plaintiff had a valid contract; (2) the defendant intentionally interfered with the contract; (3) the interference proximately caused the plaintiff's injury; (4) the plaintiff suffered actual damage or loss.

135.    Plaintiff had valid and enforceable employment agreements with former PrimeSource employees who now work for Huttig—Brad Strosahl, Sam Sprague, Scott Felten, Garrett Kessler, Daniel Kottmeyer, Allen Sagunsky, and Jordan Whitehead (the "Former PrimeSource Employees").

136.    Some of the Former PrimeSource Employees' PrimeSource employment agreements included provisions prohibiting the employees from working for a competitor or selling products or services to PrimeSource customers for a limited period of time after the Former PrimeSource Employees' departure from PrimeSource.  All of the Former PrimeSource Employees' PrimeSource employment agreements also included provisions prohibiting the employees from disclosing confidential PrimeSource information.

137.    D. Fishbein solicited the Former PrimeSource Employees for hire and did hire them to work for Huttig in the HuttiGrip division, which D. Fishbein leads.

138.    D. Fishbein targeted these individuals for hire at Huttig based on their experience working at PrimeSource.

139.    D. Fishbein was aware of the Former PrimeSource Employees' PrimeSource employment agreements and the provisions therein regarding non-competition, non-solicitation of customers, and non-disclosure of PrimeSource information.

140.    D. Fishbein intentionally interfered with these contracts by soliciting the Former PrimeSource Employees for hire, directing that they create lists of their former PrimeSource

32

customers and information related to those customers' purchasing history for use at Huttig, and taking no action upon the hire of the Former PrimeSource employees to prevent them from contacting or soliciting their former PrimeSource customers, directly or through others, or from using confidential PrimeSource information in carrying out their job duties at Huttig.

141.    PrimeSource has been damaged by D. Fishbein's tortious conduct, which proximately caused PrimeSource's injury.

WHEREFORE, PrimeSource Building Products, Inc. requests that a temporary restraining order and preliminary and permanent injunction be entered against D. Fishbein enjoining him from engaging in further tortious conduct and that PrimeSource be awarded compensatory and punitive damages and other appropriate relief.

## JURY DEMAND

Plaintiff demands a jury on all issues so triable.

Respectfully submitted,

**PRIME SOURCE BUILDING
PRODUCTS, INC.**

By:   s/ Chelsea Ashbrook McCarthy
       One of Its Attorneys

Richard R. Winter
Chelsea A. McCarthy
Holland & Knight LLP
131 S. Dearborn St., 30th Fl.
Chicago, IL 60603
312-263-3600
richard.winter@hklaw.com
chelsea.mccarthy@hklaw.com

Mary Goodrich Nix
Holland & Knight LLP
200 Crescent Court, Ste. 1600
Dallas, TX 75201
214-964-9407
mary.nix@hklaw.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney certifies that on **July 12, 2017**, the foregoing **Second Amended Complaint for Injunctive and Other Relief** was served via the CM/ECF system on all counsel of record.

<u>       s/ Chelsea Ashbrook McCarthy       </u>