IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PRIMESOURCE BUILDING PRODUCTS,
INC.,

        Plaintiff,

v.

HUTTIG BUILDING PRODUCTS, INC.,
KENNETH FISHBEIN, DAVID FISHBEIN,
MONA ZINMAN and ROBERT FURIO,

        Defendants.

No. 1:16-cv-11390

Hon. Jorge J. Alonso
Magistrate Judge Young B. Kim

## DEFENDANTS' ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Defendants Huttig Building Products, Inc. ("Huttig"), Kenneth Fishbein ("K. Fishbein"),

David Fishbein ("D. Fishbein"), Mona Zinman ("Zinman"), and Robert Furio ("Furio")

(collectively referred to as "Defendants"), by and through their undersigned counsel, file their

Answer to Plaintiff's Second Amended Complaint for Injunctive and Other Relief, Affirmative

Defenses and Counterclaims ("2d Amended Complaint"), as follows:

### NATURE OF THE ACTION

1.      Plaintiff is a leading distributor of building products, including a proprietary
fastener and building products line known as Grip-Rite®. On November 15, 2016, Defendant
Huttig announced the hiring of PrimeSource's four former CEOs, the CEO Defendants, for the
purpose of forming a new division (the "HuttiGrip division") to mirror, compete with, and take
business from PrimeSource's Grip-Rite® branded products.

**ANSWER:** Defendants admit that Plaintiff distributes building products, including products

provided under the Grip-Rite trademark.  Defendants further admit that on November 15, 2016,

Defendant Huttig issued a press release announcing the expansion of its building products

business, particularly in the category of fasteners, and that the same speaks for itself as to its terms and contents. Except as so expressly admitted, Defendants deny the allegations of fact contained in Paragraph 1 of Plaintiff's 2d Amended Complaint.

2. PrimeSource has learned that the HuttiGrip division was formed and launched with the cooperation and assistance of the CEO Defendants, all of whom are now employed by Huttig and have intimate knowledge of the most valuable and proprietary PrimeSource information, and trade secrets, including information regarding: customer and supplier relationships, strategies, methods, and processes The CEO Defendants' actions violate non-use, non-disclosure, non-compete and non-solicitation agreements each had with PrimeSource. Moreover, it is simply not plausible for Huttig to profitably create, launch and replicate an operation competitive with PrimeSource without the use of PrimeSource's trade secrets and confidential information, which was and is in the possession of the CEO Defendants. In addition, as detailed herein, Huttig and the CEO Defendants have recently and strategically recruited numerous PrimeSource employees, particularly sales and account managers, to leave PrimeSource and work with Huttig, in violation of those employees' non-compete and nondisclosure agreements; and several of those employees engaged in suspicious activity on their PrimeSource computers using external memory devices in the time immediately prior to their resignation from PrimeSource.

**ANSWER:** Defendants admit that Defendants K. Fishbein, D. Fishbein, Furio and Zinman are currently employed by or consultants for Huttig. Except as so expressly admitted, Defendants deny the allegations of fact contained in Paragraph 2 of Plaintiff's 2d Amended Complaint.

3. In sum, Huttig and the CEO Defendants have engaged in illegal conduct intended to unfairly shortcut the creation of the HuttiGrip division as a replicate of PrimeSource in an effort to destroy the value of the Grip-Rite® product line and, in the process, secure PrimeSource's Grip-Rite® business for Huttig.

**ANSWER:** Defendants deny the allegations of fact contained in Paragraph 3 of Plaintiff's 2d Amended Complaint.

## JURISDICTION AND VENUE

4. Jurisdiction and venue are proper in this Court.

**ANSWER:** Defendants admit the allegations contained in Paragraph 4 of Plaintiff's 2d Amended Complaint.

5.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff raises federal questions under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836-39 et. seq.

**ANSWER:** Defendants admit Plaintiff alleges violations of the Defend Trade Secrets Act but denies that Plaintiff is entitled to any of the relief sought herein.

6.     The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims arise out of the same case or controversy as the federal claims.

**ANSWER:** Paragraph 6 of Plaintiff's Amended Complaint contains legal conclusions to which no response is required.  To the extent a response is required, Defendants admit only that Plaintiff alleges this Court has supplemental jurisdiction over this matter pursuant to 28 U.S.C. § 1367.

7.     This Court has personal jurisdiction over all Defendants because they either reside in this District or transact business in this District through the HuttiGrip division.

**ANSWER:** Defendants admit only that Plaintiff alleges this Court has personal jurisdiction over Defendants and venue is proper in this District.  Except as so expressly admitted, Defendants deny the allegations of fact contained in Paragraph 7 of Plaintiff's 2d Amended Complaint.

8.     Venue is proper in this District because s substantial part of the events giving rise to the claims occurred within this District.

**ANSWER:** Defendants admit only that Plaintiff alleges that venue is proper in this District.  Except as so expressly admitted, Defendants deny the allegations of fact contained in Paragraph 8 of Plaintiff's 2d Amended Complaint.

**PARTIES**

9.     Plaintiff PrimeSource is a Delaware corporation, with its principal place of business in Irving, Texas.

**ANSWER:** Defendants admit the allegations of fact contained in Paragraph 9 of Plaintiff's 2d Amended Complaint.

3

10. Defendant Huttig is a Delaware corporation, with its principal place of business in St. Louis, Missouri. The HuttiGrip division of Huttig is headquartered in Lincolnshire, Illinois.

**ANSWER:** Defendants admit that Huttig is a Delaware corporation with a place of business in St. Louis, Missouri. Except as so expressly admitted, Defendants deny the allegations of fact contained in Paragraph 10 of Plaintiff's 2d Amended Complaint.

11. Defendant K. Fishbein is a resident and citizen of Illinois.

**ANSWER:** Defendants admit the allegations of fact contained in Paragraph 11 of Plaintiff's 2d Amended Complaint.

12. Defendant D. Fishbein is a resident and citizen of Illinois.

**ANSWER:** Defendants admit the allegations of fact contained in Paragraph 12 of Plaintiff's 2d Amended Complaint.

13. Defendant Zinman is a resident of New York, although she transacts business in Illinois through the HuttiGrip Division.

**ANSWER:** Defendants admit that Defendant Zinman is a resident of New York. Except as so expressly admitted, Defendants deny the allegations of fact contained in Paragraph 13 of Plaintiff's 2d Amended Complaint.

14. Defendant Furio is a resident and citizen of Illinois.

**ANSWER:** Defendants admit the allegations of fact contained in Paragraph 14 of Plaintiff's 2d Amended Complaint.

## FACTUAL BACKGROUND

**PrimeSource and Its Business**

15. PrimeSource is a distributor of fasteners and other building products. PrimeSource also supplies products under its own proprietary brands, including Grip-Rite®. PrimeSource has 34 distribution centers and approximately 1,100 employees throughout the United States and distributes products throughout North America and the Caribbean. PrimeSource has spent considerable time, money and effort perfecting and refining its business model and its relationships with customers, suppliers, and vendors.

4

**ANSWER:** Defendants admit that PrimeSource is a distributor of fasteners and other building products and that PrimeSource supplies some products under the Grip-Rite brand. Defendant Huttig lacks knowledge and information sufficient to form a belief regarding the remaining allegations of fact contained in Paragraph 15 of Plaintiff's 2d Amended Complaint and therefore denies same. Defendants K. Fishbein, D. Fishbein, Furio and Zinman admit that during their employment with PrimeSource, PrimeSource had approximately 34 distribution centers and approximately 1,100 employees throughout the United States, and that PrimeSource distributed products throughout North America and the Caribbean. Defendants K. Fishbein, D. Fishbein, Furio and Zinman deny the remaining allegations of fact contained in Paragraph 15 of Plaintiff's 2d Amended Complaint.

16. As a distributor, PrimeSource's strength is in its relationships with its suppliers and customers, and the knowledge base that PrimeSource has developed over the years regarding the personnel, capabilities, needs and desires of each of its customers.

**ANSWER:** Defendants lack knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 16 of Plaintiff's 2d Amended Complaint and therefore deny same.

17. PrimeSource's main products are collated, packaged, and bulk nails and screws, construction staples and other construction fasteners, rebar, wire rod, wire and steel mesh, concrete accessories, wraps and weather barriers, building accessories, wire fence products, roofing products and accessories, gypsum, and insulation products and accessories.

**ANSWER:** Defendant Huttig lacks knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 17 of Plaintiff's 2d Amended Complaint and therefore denies same. Defendants K. Fishbein, D. Fishbein, Furio and Zinman admit that during their employment with PrimeSource, PrimeSource sold the types of products identified in Paragraph 17 of Plaintiff's 2d Amended Complaint. Defendants K. Fishbein, D. Fishbein, Furio

and Zinman deny the remaining allegations of fact contained in Paragraph 17 of Plaintiff's Amended Complaint.

18.     PrimeSource distributes products both by (1) purchasing and maintaining an inventory of building products in each of its distribution centers to cater to the local market and the customers in that geographic location; and (2) by arranging direct purchase transactions where product is delivered from the supplier to the buyer without routing through PrimeSource's distribution center network.

**ANSWER:** Defendant Huttig lacks knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 18 of Plaintiff's 2d Amended Complaint and therefore denies same.  Defendants K. Fishbein, D. Fishbein, Furio and Zinman admit that during their employment with PrimeSource, PrimeSource sometimes distributed products by purchasing and maintaining an inventory of building products in each of its distribution centers and also by arranging direct purchase transactions where product is delivered from the supplier to the buyer without routing through PrimeSource's distribution center network.  Defendants K. Fishbein, D. Fishbein, Furio and Zinman deny the remaining allegations of fact contained in Paragraph 18 of Plaintiff's 2d Amended Complaint.

19.     Since 1967, in addition to its distribution and wholesale sales of third-party brands and private-labeled building products, PrimeSource has actively developed its own proprietary brands of fasteners and building products, including among others its well-regarded and broadly-recognized Grip-Rite® brand, which it supplies through its traditional distribution channels.

**ANSWER:** Defendants admit that PrimeSource sells "Grip-Rite"-branded products through its distribution channels.  Except as so expressly admitted, Defendants deny the allegations of fact contained in Paragraph 19 of Plaintiff's 2d Amended Complaint.

20.     Grip-Rite® has been continuously used as a registered trademark by PrimeSource and its predecessor entities since February 1971. Grip-Rite® is a top-selling brand of fasteners and other building products in North America. Customers request Grip-Rite® branded building products by name, including tools, compressors, hoses, fittings, fencing, rebar, steel stakes, housewrap, concrete accessories, collated, bulk and packaged fasteners, floor protection, gypsum products, roofing accessories, poly products, underlayments, tarps and other barriers.

6

**ANSWER:** Defendants lack knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 20 of Plaintiff's 2d Amended Complaint and therefore deny same.

21.     PrimeSource's customers for building products, including third-party branded building products, as well as building products supplied under PrimeSource's proprietary brands, including Grip-Rite®, range widely from small local hardware stores, lumber yards, and specialty building supplies dealers; to franchised and licensed businesses; to multi-national home improvement and big box stores, pro-channel customers and retailers whose brands are household names.

**ANSWER:** Defendants lack knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 21 of Plaintiff's 2d Amended Complaint and therefore deny same.

### PrimeSource's Ownership and Management History

22.     Each of the four CEO Defendants worked for decades at PrimeSource and each ultimately served as a CEO of PrimeSource. Zinman and K. Fishbein were co-CEOs, as were Furio and D. Fishbein, as successors to Zinman and K. Fishbein. The periods of each of their employment with PrimeSource were, generally, as follows:

- a.     K. Fishbein
    - i.      Initial Date of Employment: November 1, 1965
    - ii.     Term of Status as CEO: March 24, 2007 - December 31, 2014
    - iii.    Last Date of Employment: December 31, 2014
- b.     Zinman
    - i.      Initial Date of Employment: December 27, 1967
    - ii.     Term of Status as CEO: March 24, 2007 - December 31, 2014
    - iii.    Last Date of Employment: December 31, 2014
- c.     D. Fishbein
    - i.      Initial Date of Employment: June 11, 1984
    - ii.     Term of Status as CEO: January 1, 2014 – September 15, 2015
    - iii.    Last Date of Employment: September 15, 2015
- d.     Furio
    - i.      Initial Date of Employment: June 30, 1986
    - ii.     Term of Status as CEO: January 1, 2014 – September 15, 2015
    - iii.    Last Date of Employment: September 15, 2015

**ANSWER:** Defendant Huttig lacks knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 22 of Plaintiff's 2d Amended Complaint

and therefore denies same. Defendants K. Fishbein and Zinman admit the allegations of fact specific to them contained in Paragraph 22 of Plaintiff's 2d Amended Complaint. Defendants D. Fishbein and Furio deny that their terms of status of CEO began on January 1, 2016 and ended on September 15, 2015 but admit the other allegations of fact specific to them contained in Paragraph 22 of Plaintiff's 2d Amended Complaint.

23. The Co-CEOs managed the business together by dividing their primary responsibilities for sales, supply and operations and then working together to develop and implement strategic initiatives, importantly including the expansion of the Grip-Rite® brand.

**ANSWER:** Defendant Huttig lacks knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 23 of Plaintiff's 2d Amended Complaint and therefore denies same. K. Fishbein and Zinman admit that they managed the business together and divided their primary responsibilities during their tenure as PrimeSource's co-CEOs. D. Fishbein and Furio admit that they managed the business together and divided their primary responsibilities during their tenure as PrimeSource's co-CEOs. Defendants K. Fishbein, D. Fishbein, Furio and Zinman deny the remaining allegations of fact contained in Paragraph 23 of Plaintiff's 2d Amended Complaint.

24. Primarily, K. Fishbein and D. Fishbein built and managed the customer side of the business. This included building and maintaining relationships with major and national retailers, and overseeing all sales employees across the business platform. The sales team solicited and made sales, fulfilled orders, and oversaw shipment of product to customers.

**ANSWER:** Defendant Huttig lacks knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 24 of Plaintiff's 2d Amended Complaint and therefore denies same. Defendants K. Fishbein, D. Fishbein, Furio and Zinman admit that K. Fishbein and D. Fishbein managed the customer side of PrimeSource's business as well as domestic vendors during their respective tenures as co-CEOs of PrimeSource and that the PrimeSource sales team solicited customers, made sales, fulfilled orders and oversaw shipment

of product to customers. Defendants K. Fishbein, D. Fishbein, Furio and Zinman deny the remaining allegations of fact contained in Paragraph 24 of Plaintiff's 2d Amended Complaint.

25.     Primarily, Zinman and Furio built and managed the supply and operational side of the business. This included a focus on building and maintaining relationships with suppliers, manufacturers and vendors; development of new products including the products making up the Grip-Rite® brand, purchasing and importing product from overseas, and brokering direct sales procuring quality product within North America. The operational role also included organizing and managing the logistics of acquiring product, overseeing inventory levels across the company's distribution centers, and designing and operating distribution centers for optimal product distribution; and getting product to customers in a timely manner.

**ANSWER:** Defendant Huttig lacks knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 25 of Plaintiff's 2d Amended Complaint and therefore denies same. Defendants K. Fishbein, D. Fishbein, Furio and Zinman admit that Furio and Zinman managed the overseas supply and operational aspects of PrimeSource's business during their respective tenures as co-CEO of PrimeSource. CEO Defendants K. Fishbein, D. Fishbein, Furio and Zinman deny the remaining allegations of fact contained in Paragraph 25 of Plaintiff's 2d Amended Complaint.

26.     PrimeSource's business is equally dependent on (i) locating suppliers and obtaining product, (ii) developing and maintaining relationships with its customers, and (iii) establishing and maintaining comprehensive and efficient supplier and customer-specific operations and logistics functions, including shipping and ground transportation, an optimized distribution center network, and just-in-time and customized packaging, labeling, warehousing and delivery services. It is all of these aspects of the business, together with the relationships at the foundation thereof and the business practices and methods thereunder, which the CEO Defendants oversaw and were ultimately responsible.

**ANSWER:** Defendant Huttig lacks knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 26 of Plaintiff's 2d Amended Complaint and therefore denies same. Defendants K. Fishbein, D. Fishbein, Furio and Zinman deny the allegations of fact contained in Paragraph 26 of Plaintiff's 2d Amended Complaint.

**PrimeSource's Vendors**

27.     PrimeSource spent decades and immeasurable amounts of money and resources developing its network of suppliers around the world and its processes and procedures for establishing, maintaining, and growing its relationships and goodwill with these suppliers. PrimeSource has also spent years refining and perfecting its method of getting product from its suppliers directly to customers, and from its suppliers to its distribution centers in order to ultimately serve the buying needs of its customers.

**ANSWER:** Defendants deny the allegations of fact contained in Paragraph 27 of Plaintiff's 2d

Amended Complaint.

28.     PrimeSource partners with recognized and reputable manufacturers. Amid the plethora of production houses around the world, finding those that can be trusted and are capable of supporting top-tier suppliers and distributors like PrimeSource is difficult and requires a great deal of expensive and time-consuming trial and error. PrimeSource has spent years developing business relationships with reputable vendors and suppliers. It required considerable resources to locate and develop these relationships which allow PrimeSource to obtain high quality products at competitive pricing and rates. These relationships have developed over the many years which span PrimeSource's involvement in the industry and the CEO Defendants are well aware of the value of these relationships. The benefits of those relationships are owned by PrimeSource—not the CEO Defendants—and their covenant not to interfere with those relationships was an important part of each of their agreements with PrimeSource.

**ANSWER:** Defendants admit that PrimeSource partners with recognized and reputable

manufacturers.  Defendants deny the remaining allegations of fact contained in Paragraph 28 of

Plaintiff's 2d Amended Complaint.

29.     Although the identity of a small number of PrimeSource's vendors and suppliers are known or knowable through public information, the bulk of PrimeSource's vendors and suppliers, their contact information, identity and the nature and terms of PrimeSource's relationships with its vendors and suppliers are not known to PrimeSource's competitors, nor can they be determined through public resources. Consequently, PrimeSource is able to use that information to gain and maintain a significant economic and competitive advantage over its competitors.

**ANSWER:** Defendants deny the allegations of fact contained in Paragraph 29 of Plaintiff's 2d

Amended Complaint.

**PrimeSource's Customers**

30.     Likewise, PrimeSource has spent decades and immeasurable amounts of money and resources developing and maintaining its network of customers and potential customers. Its

customer relationships and goodwill that it built with its customers at a great expense and investment are vital to PrimeSource's business. PrimeSource maintains confidentiality of its customers' contact identity and information, customers' needs and desires, prospective customer information, purchases, promotions and discounts, and effectiveness and preferences related to its relationships with customers. PrimeSource's customers are varied and include independent lumber yards, independent building supply dealers, major big-box retailers, retail building supply chains, concrete and construction supply yards, roofing wholesalers, drywall distributors, wire and fencing supply yards, agricultural supply yards, steel fabricators industrial customers, specialty wholesalers, and specialty distributors. Each type of customer and each customer has its own unique needs and particular contact people. Over many years, PrimeSource has learned and gathered knowledge of these unique needs. Over many years, and through hard work, dedication and expense, PrimeSource learned and gathered knowledge of these unique needs and maintains this valuable information in secrecy, which gives it a strong competitive advantage in the marketplace.

**ANSWER:** Defendants deny the allegations of fact contained in Paragraph 30 of Plaintiff's 2d

Amended Complaint.

31.     Although PrimeSource publishes some of the brand or company names of certain customers for marketing purposes, the bulk of PrimeSource's customers, their contact information, identity, and the nature and terms of PrimeSource's relationships with its customers are not known to PrimeSource's competitors, nor can these details be determined through public resources. Consequently, PrimeSource is able to use the information it has developed and gathered to gain a significant economic and competitive advantage over its competitors and would suffer irreparable loss of business and significant economic harm if its competitors were to have or gain access to such information.

**ANSWER:** Defendants deny the allegations of fact contained in Paragraph 31 of Plaintiff's 2d

Amended Complaint.

32.     Indeed, Huttig itself considers similar information to be confidential. Its Code of Business Conduct and Ethics Policy limits its employees' use of "confidential information" and defines confidential information as follows:

> Confidential information includes proprietary documents and data the Company has developed in the course of its business operations and encompasses both paper documents and electronic data. Generally, confidential information includes non- public financial information, customer lists, marketing plans and strategies, sales data, internally developed training materials, proprietary software, and internal processes and procedures developed to support unique aspects of the Company's business.

**ANSWER:** Defendant Huttig admits that it maintains a Code of Business Conduct and Ethics

Policy and that the policy speaks for itself as to its terms and contents. Except as so expressly

admitted, Defendants deny the allegations of fact contained in Paragraph 32 of Plaintiff's 2d Amended Complaint.

**PrimeSource's Customer and Vender Information Kept Secret**

33.     PrimeSource's employees generally fall into one of a few primary functions of the company—sales, supply chain and logistics, and operations.

**ANSWER:** Defendant Huttig lacks knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 33 of Plaintiff's 2d Amended Complaint and therefore denies same. Defendants K. Fishbein, D. Fishbein, Furio and Zinman admit that during their employment with PrimeSource, PrimeSource had employees that worked in sales, supply chain and logistics, or operations. Defendants K. Fishbein, D. Fishbein, Furio and Zinman deny the remaining allegations of fact contained in Paragraph 33 of Plaintiff's 2d Amended Complaint.

34.     Sales roles focus on building relationships with customers, soliciting and making sales, order fulfillment, overseeing order quality and account management.

**ANSWER:** Defendant Huttig lacks knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 34 of Plaintiff's 2d Amended Complaint and therefore denies same. Defendants K. Fishbein, D. Fishbein, Furio and Zinman admit that during their employment with PrimeSource, PrimeSource's sales-focused employees were charged with attempting to build relationships with customers, soliciting and making sales, fulfilling customer orders and overseeing order quality and account management. Defendants K. Fishbein, D. Fishbein, Furio and Zinman deny the remaining allegations of fact contained in Paragraph 34 of Plaintiff's 2d Amended Complaint.

35.     Supply chain and logistics roles focus on building relationships with suppliers, manufacturers and vendors, including developing new products, purchasing and importing product, and brokering direct sales.

**ANSWER:** Defendant Huttig lacks knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 35 of Plaintiff's 2d Amended Complaint and therefore denies same. Defendants K. Fishbein, D. Fishbein, Furio and Zinman admit that during their employment with PrimeSource, PrimeSource's supply chain and logistics-focused employees worked with manufacturers and suppliers. Defendants K. Fishbein, D. Fishbein, Furio and Zinman deny the remaining allegations of fact contained in Paragraph 35 of Plaintiff's 2d Amended Complaint.

36. PrimeSource employs a number of measures to protect against the disclosure of its confidential information, such as limiting access to such information to only those employees who have a need to know; providing access on a tiered basis so that the type and amount of information provided to an employee is based on his or her position and role at PrimeSource; password protecting its computers; issuing key cards and limiting access to certain areas of headquarters; controlling access over the limited confidential information located in distribution centers; terminating access to confidential information at the conclusion of employment; maintenance and oversight of employment policies intended to support the company's efforts at maintaining secrecy of its proprietary information; and obtaining non-disclosure and restrictive covenant agreements with key employees who have access to confidential information.

**ANSWER:** Defendants deny the allegations of fact contained in Paragraph 36 of Plaintiff's 2d Amended Complaint.

**Huttig's Proposed Purchase of PrimeSource**

37. In 2014, the then-controlling owners of PrimeSource marketed the company for sale. In or around December 2014, in connection with this process, PrimeSource, including the CEO Defendants, met with Defendant Huttig.

**ANSWER:** Defendants admit that in 2014, Defendant Huttig explored the possibility of acquiring PrimeSource and that Defendant Huttig executed an agreement in connection with the potential acquisition, which speaks for itself as to its terms and contents. Defendants deny the remaining allegations of fact contained in Paragraph 37 of Plaintiff's 2d Amended Complaint.

38. Prior to, and as a condition of, being included in the sales process and exchanging or attending a meeting with PrimeSource, Huttig signed a Non-Disclosure Agreement ("Huttig NDA") dated December 16, 2014.

**ANSWER:** Defendants admit that in 2014, Defendant Huttig explored the possibility of acquiring PrimeSource and that Defendant Huttig executed an agreement in connection with the potential acquisition, which speaks for itself as to its terms and contents. Defendants deny the remaining allegations of fact contained in Paragraph 38 of Plaintiff's 2d Amended Complaint.

39. Upon information and belief, there was no prior relationship of any significance between the two companies or between the executives of the two companies.

**ANSWER:** Defendants lack knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 39 of Plaintiff's 2d Amended Complaint and therefore deny same.

40. The Huttig NDA prohibited Huttig from disclosing any confidential information received in conjunction with the sale process or using that information for any purpose, except for evaluating a potential transaction.

**ANSWER:** Paragraph 40 of Plaintiff's 2d Amended Complaint consists of statements of law not fact and, as such, no answer is required of the same. To the extent that the Court deems any aspect of Paragraph 40 to be a statement of fact, Defendants deny Plaintiff's characterization or the enforceability of the terms of the above-referenced agreement and state that the December 2014 letter agreement speaks for itself as to its terms and contents. Except as so expressly admitted, Defendants deny the allegations of Paragraph 40 of Plaintiff's 2d Amended Complaint.

41. The Huttig NDA also prohibited Huttig, for a period of eighteen months after the date of the Huttig NDA, from "directly or indirectly, solicit[ing] for hire or hir[ing] as a director, officer, employee, independent contractor, consultant or advisor any person employed by any of the Company Parties or any of their subsidiaries in an executive or significant managerial, financial, sales, marketing, sourcing or buying position that you have discussions with, obtain information with respect to, or that otherwise become known to you in the course of your evaluation of a possible Transaction . . . ."

**ANSWER:** Paragraph 41 of Plaintiff's 2d Amended Complaint consists of statements of law not fact and, as such, no answer is required of the same. To the extent that the Court deems any aspect of Paragraph 41 to be a statement of fact, Defendants deny Plaintiff's characterization or

14

the enforceability of the terms of the above-referenced agreements and state that the December 2014 letter agreement speaks for itself as to its terms and contents. Except as so expressly admitted, Defendants deny the allegations of Paragraph 41 of Plaintiff's 2d Amended Complaint.

42. The Huttig NDA also provided: "You acknowledge and agree that remedies at law are not adequate to protect the Company Parties against any actual or threatened breach of this agreement by you or your Representatives and that the Company Parties shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy for any such breach or threatened breach. . . . Such remedy shall not be deemed to be the exclusive remedy for breach of this agreement but shall be in addition to all other remedies available at law or equity to the Company Parties."

**ANSWER:** Defendants deny the enforceability of the terms of the above-referenced agreement but state that the December 2014 letter agreement speaks for itself as to its terms and contents. Except as so expressly admitted, Defendants deny the allegations of Paragraph 42 of Plaintiff's 2d Amended Complaint.

43. After the Huttig NDA was executed, Huttig was included in the sales process, introduced to PrimeSource executives, including the CEO Defendants, and was given access to and received confidential PrimeSource information. Representatives of PrimeSource, including the CEO Defendants, met with Huttig and discussed various matters, including PrimeSource's Grip-Rite® brand strategy, growth opportunities, and competitive strength in the fastener and building supply industries. However, a deal between Huttig and PrimeSource did not materialize.

**ANSWER:** Defendants admit that representatives of Huttig met briefly with representatives of PrimeSource, but were asked to leave by PrimeSource's representatives. Defendants deny the remaining allegations of fact contained in Paragraph 43 of Plaintiff's 2d Amended Complaint.

**Platinum Equity Acquisition**

44. In 2014, PrimeSource began talks with Platinum Equity, LLC ("Platinum") regarding potential acquisition of PrimeSource. Platinum and PrimeSource thereafter consummated a deal for Platinum to acquire PrimeSource which closed on May 8, 2015 (the "Closing Date").

**ANSWER:** Defendant Huttig lacks knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 44 of Plaintiff's 2d Amended Complaint

and therefore denies same. Defendants K. Fishbein, D. Fishbein, Furio and Zinman admit the allegations of fact contained in Paragraph 44 of Plaintiff's 2d Amended Complaint.

45.     The employment of K. Fishbein and Zinman ended on December 31, 2014 pursuant to agreements which included a lucrative pay-out in exchange for agreeing to respect restrictive covenants.

**ANSWER:** Defendants Huttig, D. Fishbein and Furio lack knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 45 of Plaintiff's 2d Amended Complaint and therefore deny same. Defendants K. Fishbein and Zinman admit that on or around December 31, 2014, their employment with PrimeSource ended and they entered into post-employment consulting agreements with PrimeSource. Defendants K. Fishbein and Zinman deny the remaining allegations of fact contained in Paragraph 45 of Plaintiff's 2d Amended Complaint.

46.     After the buyout, D. Fishbein and Furio continued in their roles as co-CEOs. Platinum later decided to make a management change and offered D. Fishbein and Furio lucrative severance agreements incorporating restrictive covenants in connection with their termination, which they accepted. Their employment ended on or about September 16, 2015.

**ANSWER:** Defendants Huttig, K. Fishbein and Zinman lack knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 46 of Plaintiff's 2d Amended Complaint and therefore deny same. Defendants D. Fishbein and Furio admit that after Defendants K. Fishbein's and Zinman's employment with PrimeSource ended, Defendants D. Fishbein and Furio became co-CEOs of PrimeSource. Defendants D. Fishbein and Furio further admit that they were fired in August 2015 and that they entered into severance agreements with PrimeSource. Defendants D. Fishbein and Furio deny the remaining allegations of fact contained in Paragraph 46 of Plaintiff's 2d Amended Complaint.

47.     In sum, the CEO Defendants negotiated and accepted contracts which contained lucrative severance packages, under which they were paid millions of dollars in return for their agreement and covenants not to disparage PrimeSource, not to use or disclose confidential

information, not to compete with PrimeSource or associate with a PrimeSource competitor, and not to solicit PrimeSource employees, customers, vendors or suppliers.

**ANSWER:** Defendant Huttig lacks knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 47 of Plaintiff's 2d Amended Complaint and therefore denies same. Defendants K. Fishbein, D. Fishbein, Furio and Zinman deny Plaintiff's characterization or the enforceability of the terms of the above-referenced agreements. K. Fishbein, D. Fishbein, Furio and Zinman deny the remaining allegations of fact contained in Paragraph 47 of Plaintiff's 2d Amended Complaint.

48. These agreements, which are described more fully below, were all related to and were conditions of the substantial acquisition by Platinum of PrimeSource. The specific purpose was to provide the new buyer protection from raiding of its customers, employees, suppliers, and vendors and to protect the company from competition by the people who grew the business and knew it the best. These individuals were not otherwise entitled to the extraordinary compensation paid to them by PrimeSource under these special agreements and the payments were made to secure the buyer with the full benefit of its purchase.

**ANSWER:** Defendant Huttig lacks knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 48 of Plaintiff's 2d Amended Complaint and therefore denies same. K. Fishbein, D. Fishbein, Furio and Zinman deny the allegations of fact contained in Paragraph 48 of Plaintiff's 2d Amended Complaint.

**K. Fishbein and Zinman Agreements**

49. K. Fishbein and Zinman signed Consulting and Retention Agreements on or around September 29, 2014. These agreements were near-identical and provided, at section 4.1 thereof, that they would not "engage in any activity which is directly competitive with, or that causes material harm to PrimeSource" for a period ending eighteen months after the therein-defined Closing Date (or until after November 8, 2016); stipulated that they could not even "associate" with any Material Competitor during that time; and prohibited them from soliciting for employment or other services any PrimeSource employees.

**ANSWER:** Defendants Huttig, D. Fishbein and Furio lack knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 49 of Plaintiff's 2d Amended Complaint and therefore deny same. Defendants K. Fishbein and

Zinman admit that they entered into "Consulting and Retention Agreements" with PrimeSource on or around September 29, 2014. Defendants K. Fishbein and Zinman deny the remaining facts contained in Paragraph 49 of Plaintiff's 2d Amended Complaint, including Plaintiffs characterization or enforceability of the terms of the Consulting and Retention Agreements.

50.     K. Fishbein and Zinman were each substantially compensated in consideration of their agreements and covenants.

**ANSWER:** Defendants Huttig, D. Fishbein and Furio lack knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 50 of Plaintiff's 2d Amended Complaint and therefore deny same. Defendants K. Fishbein and Zinman deny the facts contained in Paragraph 50 of Plaintiff's 2d Amended Complaint.

51. Under the agreement at section 4.4 thereof, K. Fishbein and Zinman agreed that PrimeSource would be entitled to injunctive relief and "to an equitable accounting of all earnings, profits and other benefits arising from such violation...."

**ANSWER:** Defendants Huttig, D. Fishbein and Furio lack knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 51 of Plaintiff's 2d Amended Complaint and therefore deny same. Defendants K. Fishbein and Zinman deny the remaining allegations of fact contained in Paragraph 50 of Plaintiff's Amended Complaint, including Plaintiffs characterization or enforceability of the terms of the Consulting and Retention Agreements.

**D. Fishbein and Furio Agreements**

52.     D. Fishbein and Furio signed "Severance Agreements and Release of Claims" on or around September 24, 2015. These agreements were near-identical and provided at section 3 (titled "Consideration") substantial sums of money as severance, following their termination from PrimeSource effective September 16, 2015. Other payments and benefits were provided and all of these payments and other consideration were specifically contingent upon compliance with, among other things, paragraphs 5, 6 and 13 of the agreements.

**ANSWER:** Defendants Huttig, K. Fishbein and Zinman lack knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 52 of

18

Plaintiff's 2d Amended Complaint and therefore deny same. Defendants D. Fishbein and Furio admit that they signed agreements with PrimeSource entitled "Severance Agreements and Release of Claims," state that the same speaks for themselves as to their terms and contents, but deny the characterization or enforceability of the terms of these agreements by Plaintiff. Defendants D. Fishbein and Furio deny the remaining allegations of fact contained in Paragraph 52 of Plaintiff's 2d Amended Complaint.

53.     Section 5 is titled, "Company Property," and required them to return all company property.

**ANSWER:** Defendants Huttig, K. Fishbein and Zinman lack knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 53 of Plaintiff's 2d Amended Complaint and therefore deny same. Defendants D. Fishbein and Furio admit that they signed agreements with PrimeSource entitled "Severance Agreements and Release of Claims," state that the same speaks for themselves as to their terms and contents, but deny the characterization or enforceability of the terms of these Agreements by Plaintiff. Defendants D. Fishbein and Furio deny the remaining allegations of fact contained in Paragraph 53 of Plaintiff's 2d Amended Complaint.

54.     Section 6 is titled, "Mutual Non-Disparagement, Confidentiality and Cooperation," and required them, among other things, not to "disparage" PrimeSource or any of its officers, directors, employees or agents.

**ANSWER:** Defendants Huttig, K. Fishbein and Zinman lack knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 54 of Plaintiff's 2d Amended Complaint and therefore deny same. Defendants D. Fishbein and Furio admit that they signed agreements with PrimeSource entitled "Severance Agreements and Release of Claims," state that the same speaks for themselves as to their terms and contents, but deny the characterization or enforceability of the terms of these Agreements by Plaintiff.

Defendants D. Fishbein and Furio deny the remaining allegations of fact contained in Paragraph 54 of Plaintiff's 2d Amended Complaint.

55.     Section 13 is titled, "Continuation of All Obligations Under Any Other Agreement You Have With the Company," and is an affirmation that they will abide by, among other things, the confidentiality and non-compete provisions contained in each of their previously signed "Amended and Restated Employment Agreements" (signed upon closing of the purchase of the company on May 8, 2015), which included a prohibition against rendering any services to or becoming interested in or associated with any material competitor for a period of twelve months following termination from PrimeSource.

**ANSWER:** Defendants Huttig, K. Fishbein and Zinman lack knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 54 of Plaintiff's 2d Amended Complaint and therefore deny same. Defendants D. Fishbein and Furio admit that they signed agreements with PrimeSource entitled "Severance Agreements and Release of Claims," state that the same speaks for themselves as to their terms and contents, but deny the characterization or enforceability of the terms of these Agreements by Plaintiff. Defendants D. Fishbein and Furio deny the remaining allegations of fact contained in Paragraph 55 of Plaintiff's 2d Amended Complaint.

56.     Pursuant to section 11, titled "Breach," of each of the D. Fishbein and Furio Severance Agreements, both of these defendants agreed to repay any and all amounts received upon notice of breach. Neither have repaid as required by the agreements.

**ANSWER:** Defendants Huttig, K. Fishbein and Zinman lack knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 56 of Plaintiff's 2d Amended Complaint and therefore deny same. Defendants D. Fishbein and Furio admit that they signed agreements with PrimeSource entitled "Severance Agreements and Release of Claims," state that the same speaks for themselves as to their terms and contents, but deny the characterization or enforceability of the terms of these Agreements by Plaintiff. Defendants D. Fishbein and Furio deny the remaining allegations of fact contained in Paragraph 56 of Plaintiff's 2d Amended Complaint.

**Huttig**

57.     Huttig has historically advertised itself as a distributor of building products specializing in millwork, such as milled wood products, while also providing an array of other building products. The company started as a sawmill and lumberyard and evolved into a window sash and door manufacturer. Huttig is best known for its millwork, pre-fabricated windows and doors, and pre-hung doors. To put it bluntly, Huttig is not a fastener company and has not been a material supplier or distributor of the types of products specialized in by PrimeSource.

**ANSWER:** Defendants admit that Huttig is a distributor of building products and that Huttig

began in 1865 as a sawmill and lumberyard.  Defendants deny the remaining allegations of fact

contained in Paragraph 57 of Plaintiff's 2d Amended Complaint.

58.     Huttig is a direct competitor of PrimeSource in the sale, marketing, and distribution of certain building products. Huttig competes in the market place with PrimeSource, but is not a high volume seller in the products in which PrimeSource specializes and excels at marketing, such as fasteners and building accessories of the type sold by PrimeSource.

**ANSWER:** Defendants admit that Huttig is a distributor of Building Products and that it

competes with PrimeSource.  Defendants deny the remaining allegations of fact contained in

Paragraph 58 of Plaintiff's 2d Amended Complaint.

59.     Huttig developed its own private label brand of fasteners called HuttiGrip several years ago, but the HuttiGrip product has always been an ancillary service item and not a product the company was proactively marketing and selling as a product line independent of its core business. Huttig has primarily sold fasteners only as an add-on service to its customers. In other words, if a customer buying windows or cabinets also wanted to purchase fasteners as an add-on to its primary product purchase, rather than separately sourcing the material, Huttig provided this limited private label option.

**ANSWER:** Defendant Huttig admits that it developed the trademark "HuttiGrip" more than two

decades ago and that it has sold HuttiGrip-branded products and fasteners for many, many years.

Except as so expressly admitted, Defendant Huttig denies the allegations of fact contained in

Paragraph 59 of Plaintiff's 2d Amended Complaint. Defendants D. Fishbein, K. Fishbein, Furio

and Zinman lack knowledge and information sufficient to form a belief regarding the allegations

of fact contained in Paragraph 59 of Plaintiff's 2d Amended Complaint and therefore deny same.

60.    As of November 2016, Huttig could not and has not been able to make its HuttiGrip fastener sales successfully work on a separate and independent platform for many reasons, including, upon information and belief: (1) Huttig does not have relationships with production and supply mills for many products in the Grip-Rite® product line and could not source sufficient product to be competitive; (2) Huttig does not have a recognized private label brand; (3) its private label brand, HuttiGrip, is sold only as a service and add-on to current customers in the pre-fabricated window and door and milled wood products industries; (4) Huttig does not sell the variety of products already established under the Grip-Rite® brand; (5) Huttig's distribution centers are not set up to store, hold or source large quantities of fasteners and building supplies; (6) Huttig does not have a sufficiently experienced sales force necessary to be successful in fastener and building supply sales; and (7) absent using PrimeSource's misappropriated confidential information, it would be cost-prohibitive and very risky for Huttig to go head-to-head against established fastener and building supply brands, like Grip-Rite®.

**ANSWER:** Defendants deny the allegations of fact contained in Paragraph 60 of Plaintiff's 2d

Amended Complaint

**Huttig Employs Former CEOs**

61.    In or about August 2015, even prior to D. Fishbein's and Furio's departure from PrimeSource, K. Fishbein approached Huttig's CEO about Huttig hiring his son, D. Fishbein, and Bob Furio, to lead a new business opportunity at Huttig that would focus on the sale of fasteners and building materials.

**ANSWER:** Defendants deny the allegations of fact contained in Paragraph 61 of Plaintiff's 2d

Amended Complaint

62.    On or about December 9, 2015, Huttig, on the one hand, and K. Fishbein, D. Fishbein, and Furio, on the other, entered into an agreement ("Letter Agreement") under which the parties committed to commencing a consulting arrangement as to K. Fishbein on or after November 14, 2016 and commencing an employment relationship as to D. Fishbein and Furio on October 17, 2016.

**ANSWER:** Defendant Zinman lacks knowledge and information sufficient to form a belief

regarding the allegations of fact contained in Paragraph 62 of Plaintiff's 2d Amended Complaint

and therefore denies same.  Defendants Huttig, K. Fishbein, D. Fishbein and Furio admit that

they signed a Letter of Intent on or about December 9, 2015 ("LOI") and further state that the

same speaks for itself as to its terms and contents, but deny the characterization of the terms of

the LOI by Plaintiff. Defendants Huttig, K. Fishbein, D. Fishbein and Furio deny the remaining

allegations of fact contained in Paragraph 62 of Plaintiff's 2d Amended Complaint.

63. The Letter Agreement imposed a $1,000,000 fee o the breaching party if either
Huttig or K. Fishbein, D. Fishbein, or Furio failed to execute their respective consulting or
employment agreements.

**ANSWER:** Defendant Zinman lacks knowledge and information sufficient to form a belief

regarding the allegations of fact contained in Paragraph 63 of Plaintiff's 2d Amended Complaint

and therefore denies same. Defendants Huttig, K. Fishbein, D. Fishbein and Furio admit that

they signed an LOI on or about December 9, 2015, further state that the same speaks for itself as

to its terms and contents, but deny the characterization of the terms of the LOI by Plaintiff.

Defendants Huttig, K. Fishbein, D. Fishbein and Furio deny the remaining allegations of fact

contained in Paragraph 62 of Plaintiff's 2d Amended Complaint.

64. Prior to entering employment agreements, on September 19, 2016, D. Fishbein
and Furio entered into consulting agreements with Huttig. Under the consulting agreements, D.
Fishbein and Furio agreed to assist Huttig in developing the HuttiGrip division. The term of the
respective consulting agreements ended on November 18, 2016.

**ANSWER:** Defendants K. Fishbein and Zinman lack knowledge and information sufficient to

form a belief regarding the allegations of fact contained in Paragraph 63 of Plaintiff's 2d

Amended Complaint and therefore deny same. Defendants Huttig, D. Fishbein and Furio admit

they entered into separate consulting agreements on or about September 19, 2016, and further

state that the same speak for themselves as to their terms and contents. Defendants Huttig, D.

Fishbein and Furio deny the remaining allegations of fact contained in Paragraph 64 of Plaintiff's

2d Amended Complaint.

65. Thereafter, on or about November 14, 2016, D. Fishbein and Furio entered into
executive employment agreements with Huttig to manage and oversee the HuttiGrip Division.

**ANSWER:** Defendants K. Fishbein and Zinman lack knowledge and information sufficient to

form a belief regarding the allegations of fact contained in Paragraph 65 of Plaintiff's 2d

Amended Complaint and therefore deny same. Defendants Huttig, D. Fishbein and Furio admit they entered into separate employment agreements on or about November 14, 2016, and further state that the same speak for themselves as to their terms and contents. Defendants Huttig, D. Fishbein and Furio deny the remaining allegations of fact contained in Paragraph 65 of Plaintiff's 2d Amended Complaint.

66.     Also on or about November 14, 2016, K. Fishbein and Zinman entered into consulting agreements with Huttig to work with the HuttiGrip Division.

**ANSWER:** Defendants D. Fishbein and Furio lack knowledge and information sufficient to form a belief regarding the allegations of fact contained in Paragraph 66 of Plaintiff's 2d Amended Complaint and therefore deny same. Defendants Huttig, K. Fishbein and Zinman admit they entered into separate consulting agreements on or about November 14, 2016, and further state that the same speak for themselves as to their terms and contents. Defendants Huttig, K. Fishbein and Zinman deny the remaining allegations of fact contained in Paragraph 66 of Plaintiff's 2d Amended Complaint.


**November 15, 2016 Press Release**

67.     In a press release announcing the start of the HuttiGrip division on November 15, 2016, Huttig stated that it had hired all of the CEO Defendants and was initiating a new division to focus on the development of the HuttiGrip brand of fasteners and other specialty building products.

**ANSWER:** Defendants admit that on or about November 15, 2016, Huttig issued a press release, state that the same speak for itself as to its terms and contents, and denies the summary of the press release alleged by PrimeSource. Defendants deny the remaining allegations of fact contained in Paragraph 67 of Plaintiff's 2d Amended Complaint.

68.     The press release indicates Huttig's intent to mimic the success of the Grip-Rite® brand and to go head-to-head with PrimeSource using the same business model developed and

managed by the CEO Defendants for PrimeSource. Indeed, one customer of PrimeSource has referred to the HuttiGrip division as "PrimeSource II."

**ANSWER:** Defendants deny the allegations of fact contained in Paragraph 68 of Plaintiff's 2d

Amended Complaint.

69. In the weeks since the November 16, 2016 Press Release, PrimeSource has learned that Huttig and the CEO Defendants, and PrimeSource employees who eventually joined Huttig, undertook a series of actions starting in at least December 2015 designed to unfairly undermine PrimeSource to the benefit of Huttig, including the following:

    a.    In December 2015 and January 2016, D. Fishbein was in contact with Garrett Kessler, a then PrimeSource employee who now works at Huttig, about his PrimeSource non-compete agreement and his compensation at PrimeSource.

    b.    In January 2016, D. Fishbein discussed with Brad Strosahl, PrimeSource VP of Major Accounts, the enforceability of Strosahl's restrictive covenants contained in his employment agreement with PrimeSource, implicitly for the purpose of Strosahl later joining D. Fishbein in a business to be competitive with PrimeSource. During that same month, D. Fishbein sent invitations to PrimeSource employees Sam Sprague and Jordan Whitehead to connect via LinkedIn.

    c.    D. Fishbein, K. Fishbein and Furio also attended the International Builders Show in Las Vegas in January, which is one of the most important networking trade shows and events for the building supply industry.

    d.    On June 22, 2016, Huttig registered its HuttiGrip as a trademark for the first time.

    e.    In or around July 2016, D. Fishbein reached out to a former PrimeSource employee and asked him to consider leaving his business to join him in the development of a business competitive to PrimeSource.

    f.    On August 9, 2016, the CEO Defendants met and had dinner in Lincolnshire, Illinois, upon information and belief, to discuss plans to work together in a venture competitive with PrimeSource and to prepare for the launch of the HuttiGrip business. At this same time, Brad Strosahl was also in Lincolnshire, Illinois for a PrimeSource meeting, and upon information and belief, sometime prior to that date.

    g.    On September 17 and 18 2016, Brad Strosahl and Samuel Sprague sent their PrimeSource employment agreement to D. Fishbein for analysis. Sam Sprague met D. Fishbein for dinner and D. Fishbein and Bob Furio for drinks, upon information and belief, sometime prior to that date.

    h.    On October 10, 2016, Strosahl sent an email containing a document entitled "Weekly Update" from his PrimeSource account to his personal email account.

This document contains confidential PrimeSource information, including information about customers and customer relationships. Strosahl also emailed to himself a list of nail importer mills.

i.     On October 27-28, 2016, without any business reason, Sprague accessed confidential PrimeSource information on external flash drives in his possession.

j.     By late October and early November 2016, D. Fishbein was in contact with Sprague, Felten, Kessler, Kottmeyer, Sagunsky, and Whitehead requesting information about their compensation at PrimeSource and whether they had employment agreements at PrimeSource.

k.     On November 11, 2016, Strosahl had a call with D. Fishbein. On this same day, he asked his team to provide a detailed overview of all Major Accounts customers ostensibly for an upcoming meeting, but in reality to help him create a business plan for Huttig. He received information in response to his email from various unsuspecting PrimeSource employees from November 11 through November 15, 2016.

l.     On November 16, 2016, Strosahl emailed his father telling them to change his contact information from his PrimeSource account to his personal email account.

m.     On November 14, 2016, Scott Felten, Territory Manager and Purchaser for PrimeSource, plugged a USB device into his company laptop to access confidential information, including price pages, spreadsheets, and product information. On November 18, 2016, Scott Felten, Territory Manager and Purchaser, resigned and joined Huttig.

n.     On November 17, 2016, Sprague uploaded information from his PrimeSource computer onto a generic flash disk USB, which he retained after leaving PrimeSource. Sprague resigned that day and immediately went to work for Huttig.

o.     On November 17, 2016, Garrett Kessler and Al Sagunsky, both employed in PrimeSource's direct sales department resigned, providing their resignation notices to Strosahl. Upon resigning, Sagunsky transferred contacts and media from his company iPhone to another device.

p.     During the time period immediately prior to his resignation on November 18, 2017, upon information and belief, without any legitimate business reason, PrimeSource employee Jordan Whitehead (referenced above) (i) opened on his computer a USB device containing over 4,000 PrimeSource items, containing confidential and trade secret information, that Mr. Whitehead had placed on that USB drive and (ii) had plugged into his computer a USB containing a Customer Price folder. Whitehead resigned from PrimeSource on November 18 and joined Huttig.

q.　　On November 28, 2016, Strosahl formally resigned from PrimeSource and joined Huttig. That same day, on information and belief, he directed the download of information from his PrimeSource computer to a general UDisk USB device, including a .pst file containing confidential PrimeSource information.

r.　　Since joining Huttig, several of the former PrimeSource employees have solicited business from PrimeSource's customers, in violation of their employment agreements with PrimeSource.

All of these activities were, on information and belief, performed at the direction or acquiescence of Huttig and/or the CEO Defendants for the benefit of Huttig.

**ANSWER:** Defendants deny the allegations of fact contained in Paragraph 69, including

subsections a-r, of Plaintiff's 2d Amended Complaint.

**Huttig Replicates PrimeSource's Marks, Packaging, and SKUs**

70.　　Since at least as early as 1967, PrimeSource or its predecessor-in-interest has continuously used the coined mark Grip-Rite® in commerce in the United States and the mark encompasses nails, and related fasteners, tools, building products, and other products used in the construction industry and related fields.

**ANSWER:** Defendants lack knowledge and information sufficient to form a belief regarding

the allegations of fact contained in Paragraph 70 of Plaintiff's 2d Amended Complaint and

therefore deny same.

71.　　Plaintiff has also for many years widely used a distinctive, non-functional packaging in connection with its Grip-Rite® fastener products. Elements of this packaging include typography, a color scheme incorporating bright color coded labels associated with the intended use of the fastener on neutral colored containers displayed in an array, clear plastic windows with rounded corners, labels covering only a portion of the box top, and images of the product, all in conjunction with the use of the Grip-Rite® mark.

**ANSWER:** Defendants deny the factual allegations of Paragraph 71 of Plaintiff's 2d Amended

Complaint.

72.　　Huttig has selected similar marks and packaging for the products offered for sale by its recently-launched HuttiGrip division.

**ANSWER:** Defendants deny the factual allegations of Paragraph 72 of Plaintiff's 2d Amended

Complaint.

73.     At the time of the November 15, 2016 press release, the newly formed Huttig division was referred to as the "HuttiGrip" division.  However, in April 2017, Huttig filed a request with the United State Patent and Trademark Office to amend the "HuttiGrip" mark to include the mark "Huttig-Grip" in an attempt to make the HuttiGrip mark more similar to the Grip-Rite® mark and to trade on the goodwill of the Grip-Rite® mark. With its request, Huttig submitted specimens demonstrating multiple elements copied from the Grip-Rite® product packaging including an identical color scheme relating to the intended use of the products and the use of the "Huttig-Grip" mark on the packaging.

**ANSWER:**  Defendants state that the November 2015 press release and any materials filed with

the USPTO speak for themselves as to their terms and contents and specifically deny the

characterization of those documents by Plaintiff.  Defendants deny the remaining allegations of

fact contained in Paragraph 73 of Plaintiff's 2d Amended Complaint.

74.     In a further attempt to trade off the goodwill, reputation, and investments of PrimeSource into its Grip-Rite® products, Huttig has been copying PrimeSource's SKU numbers to assign to new products offered for sale out of the HuttiGrip division. The SKU numbers are so similar that at least one customer remarked to Scott Felten, a former PrimeSource employee now employed by Huttig: "good lord you kept basically the same sku's haha . . . ."

**ANSWER:**  Defendants state that the noted email communication speaks for itself as to its terms

and contents and specifically deny the characterization of that document by Plaintiff.  Defendants

deny the remaining allegations of fact contained in Paragraph 74 of Plaintiff's 2d Amended

Complaint.


## COUNT I
## VIOLATION OF THE DEFEND TRADE SECRETS
## ACT AGAINST ALL DEFENDANTS

75.     All foregoing paragraphs are incorporated by reference as if fully set forth herein.

**ANSWER:**  Defendants incorporate their responses to all prior paragraphs and factual

allegations as if set forth in full herein.

76.     The Defend Trade Secrets Act, 18 U.S.C. §§ 1836-39 *et seq.,* provides a remedy against the Defendants for their actual and threatened improper use of Prime Source's trade secrets.

28

**ANSWER:** Paragraph 76 of Plaintiff's 2d Amended Complaint contains legal conclusions, not statements of fact and, as such, no answer is required to the same. To the extent that the Court deems any aspect of Paragraph 76 to be a statement of fact, the same is denied.

77. PrimeSource's trade secrets at issue are related to products and services used in, or intended for use in, interstate commerce. Those trade secrets include:

    a. Historic sales, price, and profit data for a particular customer or customers;

    b. Historic purchasing, price and characteristics of a particular supplier or suppliers;

    c. Compilations of customer information reflecting identity, contacts, pricing, product mix, volumes, terms and/or ordering patterns. Such information is reflected in PrimeSource's SAP and CRM system, and in other formats;

    d. Compilations of supplier information, reflecting identity, contacts, pricing, volumes, terms and/or ordering patterns. Such information is reflected in PrimeSource's SAP system, and in other formats;

    e. Compilations of financial data reflecting operations;

    f. Information reflecting inventory planning and supply chain optimization;

    g. Information reflecting optimization of warehouse operations and distribution networks;

    h. Business plans and budgets, and company objectives including cost-savings and growth measures;

    i. Company-level strategic plans, product line strategic plans, supplier-level strategic plans and customer specific strategic plans; and

    j. Marketing strategy and targets.

**ANSWER:** Defendants deny all factual allegations of Paragraph 77, including subparts a-j, of Plaintiff's 2d Amended Complaint.

78. This information has value by virtue of its secrecy, and through it, Prime Source is able to maintain and grow supplier and customer relationships in an efficient, cost-effective and successful fashion that its competitors cannot duplicate.

**ANSWER:** Defendants deny all factual allegations of Paragraph 78 of Plaintiff's 2d Amended

Complaint.

79.     Compiling and maintaining such information provides PrimeSource with a
competitive advantage that allows it to better serve its customers in the market for building
materials and fasteners. The information is not generally known outside of PrimeSource and is
valuable as a result, and would give any of PrimeSource's competitors—like Huttig—an unfair
competitive advantage.

**ANSWER:** Defendants deny all factual allegations of Paragraph 79 of Plaintiff's 2d Amended

Complaint.

80.     Because of the value of the information, which PrimeSource has spent a
significant amount of time and invested substantial resources developing, PrimeSource restricts
access to such information and requires that it be kept confidential by its employees. Prime
Source employs a number of measures to protect against its disclosure such as limiting access to
information to only employees with a need to know; providing access on a tiered basis so that the
type and amount of information provided to an employee is based on his or her position and role
at PrimeSource; password protecting its computers; issuing key cards and limiting access to
certain areas of its headquarters; controlling access over the limited confidential information
located in distribution centers; terminating access to confidential information at the conclusion of
employment; maintenance and oversight of employment policies intended to support the
company's efforts at maintaining secrecy of its proprietary information; and obtaining
nondisclosure, non-solicitation and, in some cases, noncompetition agreements.

**ANSWER:** Defendants deny all factual allegations of Paragraph 80 of Plaintiff's 2d Amended

Complaint.

81.     The CEO Defendants came to know this information based on their positions at
PrimeSource and under circumstances that gave rise to a duty for them to maintain the secrecy of
the information, and they have misappropriated that information by utilizing it in their roles at
Huttig. Huttig has wrongfully acquired access to PrimeSource's trade secrets by the employment
of the CEO Defendants and other former PrimeSource employees, including Brad Strosahl, for
the purpose of gaining access to PrimeSource's trade secrets. To the extent there is not specific
and intentional use of this information, it is inevitable, based on the CEO Defendants' vast
experience and leadership positions at Huttig, that PrimeSource's trade secrets will be used. Use
of that information will provide Huttig with an unfair competitive advantage, and cause
significant harm to PrimeSource, including, among other things, the loss of the value of that
information.

**ANSWER:** Defendants deny all factual allegations of Paragraph 81 of Plaintiff's 2d Amended

Complaint.

## COUNT II
## VIOLATION OF THE ILLINOIS TRADE SECRETS ACT

82.     Plaintiff incorporates all prior paragraphs and factual allegations by reference.

**ANSWER:**  Defendants incorporate their responses to all prior paragraphs and factual

allegations as if set forth in full herein.

83.     The Illinois Trade Secrets Act 765 ILCS 1065 *et seq.,* prohibits the misappropriation of trade secrets as reflected above, the Defendants have acquired and used PrimeSource's trade secrets in violation of the Illinois Trade Secrets Act.

**ANSWER:**  Defendants deny all factual allegations of Paragraph 83 of Plaintiff's 2d Amended

Complaint.

## COUNT III
## BREACH OF CONTRACT AGAINST KENNETH FISHBEIN

84.     Plaintiff incorporates all prior paragraphs and factual allegations by reference.

**ANSWER:** Defendants incorporate their responses to all prior paragraphs and factual

allegations as if set forth in full herein.  Defendants Huttig, D. Fishbein, Furio and Zinman do

not answer Count III as it is directed solely to another party.  To the extent any allegations of fact

contained in Count III are deemed to be directed at Huttig, D. Fishbein, Furio or Zinman, they

deny each and every allegation.

85.     A breach of contract occurs when (1) there is a valid, enforceable contract, (2) the plaintiff is a proper party to sue for breach of the contract, (3) the plaintiff performed its contractual obligations, (4) defendant breached the contract, and (5) the defendant's breach caused the plaintiff injury.

**ANSWER:** Paragraph 85 of Plaintiff's 2d Amended Complaint contains legal conclusions, not

statements of fact and, as such, no answer is required to the same. To the extent that the Court

deems any aspect of Paragraph 85 to be a statement of fact, Defendant K. Fishbein denies the same.

86.     Defendant K. Fishbein signed the K. Fishbein Consulting and Retention Agreement and Release of Claims ("K. Fishbein Consulting and Retention Agreement") with PrimeSource on September 29, 2014, and an Amendment thereto on April 6, 2015. The Consulting and Retention Agreement incorporated by reference the terms of K. Fishbein's Employment Agreement.

**ANSWER:** Defendant K. Fishbein admits that he signed a Consulting and Retention Agreement with PrimeSource.  Except as so expressly admitted, Defendant K. Fishbein denies the allegations of fact contained in Paragraph 86 of Plaintiff's 2d Amended Complaint.

87.     Per the terms of the K. Fishbein Consulting and Retention Agreement and Employment Agreement, Defendant Kenneth Fishbein was prohibited from disclosing any confidential information, competing with PrimeSource, including associating with material competitors, and soliciting PrimeSource employees to join a competitor.

**ANSWER:** Defendant K. Fishbein admits that he signed a Consulting and Retention Agreement with PrimeSource.  Except as so expressly admitted, Defendant K. Fishbein denies the remaining allegations of fact contained in Paragraph 87 of Plaintiff's 2d Amended Complaint.

88.     Since leaving his employment with PrimeSource on December 31, 2014, Defendant Fishbein has taken and used confidential PrimeSource information for the purpose of planning and preparing to compete with PrimeSource, and to carry out his duties and work at Huttig. K. Fishbein is using his knowledge of PrimeSource's customers and vendors and of PrimeSource's pricing methods and other information to undercut PrimeSource in the market place.

**ANSWER:** Defendant K. Fishbein denies the allegations of fact contained in Paragraph 88 of Plaintiff's 2d Amended Complaint.

89.     He has also violated his non-compete by his association with Huttig prior to November 15, 2016 for purposes of planning, preparing, and forming a competing entity.

**ANSWER:** Defendant K. Fishbein denies the allegations of fact contained in Paragraph 89 of Plaintiff's 2d Amended Complaint.

90.     And he has violated the non-solicitation provisions by recruiting others to join Huttig.

**ANSWER:** Defendant K. Fishbein denies the allegations of fact contained in Paragraph 90 of Plaintiff's 2d Amended Complaint.

91.    PrimeSource has performed its obligations under the Consulting and Retention Agreement and the Employment Agreement.

**ANSWER:** Defendant K. Fishbein denies the allegations of fact contained in Paragraph 91 of Plaintiff's 2d Amended Complaint.

## COUNT IV
## BREACH OF CONTRACT AGAINST DAVID FISHBEIN

92.    Plaintiff incorporates all prior paragraphs and factual allegations by reference.

**ANSWER:** Defendants incorporate their answers to all prior paragraphs and factual allegations as if set forth in full herein.  Defendants Huttig, K. Fishbein, Furio and Zinman do not answer Count IV as it is directed solely to another party.  To the extent any allegations of fact contained in Count IV are deemed to be directed at Huttig, K. Fishbein, Furio or Zinman, they deny each and every allegation.

93.    A breach of contract occurs when (1) there is a valid, enforceable contract, (2) the plaintiff is a proper party to sue for breach of the contract, (3) the plaintiff performed its contractual obligations, (4) defendant breached the contract, and (5) the defendant's breach caused the plaintiff injury.

**ANSWER:** Paragraph 93 of Plaintiff's 2d Amended Complaint states a legal conclusion, not statements of fact and, as such, no answer is required of the same.  To the extent an answer is required, Defendant D. Fishbein denies all allegations of fact contained in paragraph 93 of Plaintiff's 2d Amended Complaint.

94.    Defendant D. Fishbein signed the D. Fishbein Severance Agreement and Release of Claims ("D. Fishbein Severance Agreement") with PrimeSource on September 24, 2015, for and in consideration of Plaintiff providing D. Fishbein with a substantial severance compensation in exchange for the confidentiality, nondisclosure, non-compete, non-solicit and other restrictive covenants in the D. Fishbein Severance Agreement. The Severance Agreement incorporates several provisions of D. Fishbein's Employment Agreement with PrimeSource.

**ANSWER:** Defendant D. Fishbein admits that he signed a Severance Agreement with PrimeSource. Except as so expressly admitted, Defendant D. Fishbein denies the remaining allegations of fact contained in Paragraph 94 of Plaintiff's 2d Amended Complaint.

95. Per the terms of the D. Fishbein Severance Agreement and related Employment Agreement, Defendant D. Fishbein is prohibited from disclosing any of PrimeSource's confidential information, including information relating to PrimeSource's business operations, trade secrets, plans, products, processes, practices, or services including, without limitation, information relating to research, development, invention, suppliers, customers, purchasing, accounting, finance, price lists, and marketing; competing with PrimeSource, including association with material competitors; and soliciting PrimeSource employees to join a competitor.

**ANSWER:** Defendant D. Fishbein admits he signed a Severance Agreement with PrimeSource but denies PrimeSource's characterization or enforceability of its terms. Except as so expressly admitted, Defendant D. Fishbein denies the allegations of fact contained in Paragraph 95 of Plaintiff's 2d Amended Complaint.

96. Since leaving his employment with PrimeSource on September 16, 2015, Defendant D. Fishbein has taken and used confidential PrimeSource information for the purpose of planning and preparing to compete with PrimeSource, and to carry out his duties and work at Huttig. D. Fishbein is using his knowledge of PrimeSource's customers and vendors and of PrimeSource's pricing methods and other information to undercut PrimeSource in the market place.

**ANSWER:** Defendant D. Fishbein denies the allegations of fact contained in Paragraph 96 of Plaintiff's 2d Amended Complaint.

97. He also violated his non-compete by association with Huttig prior to September 16, 2016 for purposes of planning, preparing and forming a competing entity.

**ANSWER:** Defendant D. Fishbein denies the allegations of fact contained in Paragraph 97 of Plaintiff's 2d Amended Complaint.

98. And he also violated the non-solicitation provisions by recruiting others to join Huttig.

**ANSWER:** Defendant D. Fishbein denies the allegations of fact contained in Paragraph 98 of Plaintiff's 2d Amended Complaint.

34

99.     PrimeSource has performed its obligations under the Severance Agreement.

**ANSWER:** Defendant D. Fishbein denies the allegations of fact contained in Paragraph 99 of

Plaintiff's 2d Amended Complaint.

## COUNT V
## BREACH OF CONTRACT AGAINST MONA ZINMAN

100.     Plaintiff incorporates all prior paragraphs and factual allegations by reference.

**ANSWER:** Defendants incorporate their answers to all prior paragraphs and factual allegations

as if set forth in full herein.  Defendants Huttig, K. Fishbein, D. Fishbein and Furio do not

answer Count V as it is directed solely to another party.  To the extent any allegations of fact

contained in Count V are deemed to be directed at Huttig, K. Fishbein, D. Fishbein or Furio, they

deny each and every allegation.

101.     A breach of contract occurs when (1) there is a valid, enforceable contract, (2) the
plaintiff is a proper party to sue for breach of the contract, (3) the plaintiff performed its
contractual obligations, (4) defendant breached the contract, and (5) the defendant's breach
caused the plaintiff injury.

**ANSWER:** Paragraph 101 of Plaintiff's 2d Amended Complaint states a legal conclusion, not

statements of fact and, as such, no answer is required of the same.  To the extent an answer is

required, Defendant Zinman denies all allegations of fact contained in paragraph 101 of

Plaintiff's 2d Amended Complaint.

102.     Defendant Zinman signed the Zinman Consulting and Retention Agreement and
Release of Claims ("Zinman Consulting and Retention Agreement") with PrimeSource on
September 29, 2014, and an Amendment thereto on April 6, 2015. The Consulting and Retention
Agreement incorporated by reference the terms of Zinman's Employment Agreement.

**ANSWER:** Defendant Zinman admit that she entered into "Consulting and Retention

Agreements" with PrimeSource on or around September 29, 2014.  Defendant Zinman denies the

remaining facts contained in Paragraph 102 of Plaintiff's 2d Amended Complaint, including

Plaintiff's characterization or enforceability of the terms of the Consulting and Retention

Agreement. Except as so expressly admitted, Defendant Zinman denies the allegations of fact contained in Paragraph 102 of Plaintiff's 2d Amended Complaint.

103.    Per the terms of the Zinman Consulting and Retention Agreement and Employment Agreement, Defendant Zinman was prohibited from disclosing any confidential information, competing with PrimeSource, including associating with material competitors, and soliciting PrimeSource employees to join a competitor.

**ANSWER:** Defendant Zinman admits she signed a Consulting and Retention Agreement with PrimeSource but denies PrimeSource's characterization or enforceability of its terms. Except as so expressly admitted, Defendant Zinman denies the allegations of fact contained in Paragraph 103 of Plaintiff's 2d Amended Complaint.

104.    Since leaving her employment with PrimeSource on December 31, 2014, Defendant Zinman has taken and used confidential PrimeSource information for the purpose of planning and preparing to compete with PrimeSource, and to carry out her duties and work at Huttig. Zinman is using her knowledge of PrimeSource's customers and vendors and of PrimeSource's pricing and purchasing methods and other information to undercut PrimeSource in the market place.

**ANSWER:** Defendant Zinman denies the allegations of fact contained in Paragraph 104 of Plaintiff's 2d Amended Complaint.

105.    She also violated her non-compete by association with Huttig prior to November 8, 2016 for purposes of forming a competing entity.

**ANSWER:** Defendant Zinman denies the allegations of fact contained in Paragraph 105 of Plaintiff's 2d Amended Complaint.

106.    And she violated the non-solicitation provisions by recruiting others to join Huttig.

**ANSWER:** Defendant Zinman denies the allegations of fact contained in Paragraph 106 of Plaintiff's 2d Amended Complaint.

107.    PrimeSource has performed its obligations under the Consulting and Retention Agreement and Employment Agreement.

**ANSWER:** Defendant Zinman denies the allegations of fact contained in Paragraph 107 of Plaintiff's 2d Amended Complaint.

## COUNT VI
## BREACH OF CONTRACT AGAINST ROBERT FURIO

108. Plaintiff incorporates all prior paragraphs and factual allegations by reference.

**ANSWER:** Defendants incorporate their responses to all prior paragraphs and factual allegations as if set forth in full herein. Defendants Huttig, K. Fishbein, D. Fishbein and Zinman do not answer Count VI as it is directed solely to another party. To the extent any allegations of fact contained in Count VI are deemed to be directed at Huttig, K. Fishbein, D. Fishbein or Zinman, they deny each and every allegation.

109. A breach of contract occurs when (1) there is a valid, enforceable contract, (2) the plaintiff is a proper party to sue for breach of the contract, (3) the plaintiff performed its contractual obligations, (4) defendant breached the contract, and (5) the defendant's breach caused the plaintiff injury.

**ANSWER:** Paragraph 109 of Plaintiff's 2d Amended Complaint states a legal conclusion, not statements of fact and, as such, no answer is required of the same. To the extent an answer is required, Defendant Furio denies all allegations of fact contained in Paragraph 109 of Plaintiff's 2d Amended Complaint.

110. Defendant Furio signed the Furio Severance Agreement and Release of Claims ("Furio Severance Agreement") with PrimeSource on September 24, 2015, for and in consideration of Plaintiff providing Furio with a substantial severance compensation in exchange for the confidentiality, nondisclosure, non-compete, non-solicit and other restrictive covenants in the Furio Severance Agreement. The Severance Agreement incorporates certain provisions of Furio's Employment Agreement with PrimeSource.

**ANSWER:** Defendant Furio admits he signed a Severance Agreement with PrimeSource but denies PrimeSource's characterization or enforceability of its terms. Except as so expressly admitted, Defendant Furio denies the allegations of fact contained in Paragraph 110 of Plaintiff's 2d Amended Complaint.

111.    Per the terms of the Furio Severance Agreement and related Employment Agreement, Defendant Furio is prohibited from disclosing any of PrimeSource's confidential information, including information relating to PrimeSource's business operations, trade secrets, plans, products, processes, practices, or services including, without limitation, information relating to research, development, invention, suppliers, customers, purchasing, accounting, finance, price lists, and marketing; competing with PrimeSource, including association with material competitors; and soliciting PrimeSource employees to join a competitor.

**ANSWER:** Defendant Furio admits he signed a Severance Agreement with PrimeSource but

denies PrimeSource's characterization or enforceability of its terms.   Except as so expressly

admitted, Defendant Furio denies the allegations of fact contained in Paragraph 111 of Plaintiff's

2d Amended Complaint.

112.    Since leaving his employment with PrimeSource on September 16, 2015, Defendant Furio has taken and used confidential PrimeSource information for the purpose of planning and preparing to compete with PrimeSource, and to carry out his duties and work at Huttig. Furio is using his knowledge of PrimeSource's customers and vendors and of PrimeSource's pricing and purchasing methods and other information to undercut PrimeSource in the market place.

**ANSWER:** Defendant Furio denies the allegations of fact contained in Paragraph 112 of

Plaintiff's 2d Amended Complaint.

113.    He also violated his non-compete by association with Huttig prior to September 16, 2016 for purposes of planning, preparing and forming a competing entity.

**ANSWER:** Defendant Furio denies the allegations of fact contained in Paragraph 113 of

Plaintiff's 2d Amended Complaint.

114.    And he violated the non-solicitation provisions by recruiting others to join Huttig.

**ANSWER:** Defendant Furio denies the allegations of fact contained in Paragraph 114 of

Plaintiff's 2d Amended Complaint.

115.    PrimeSource has performed its obligations under the Severance Agreement and related Employment Agreement.

**ANSWER:** Defendant Furio denies the allegations of fact contained in Paragraph 115 of

Plaintiff's 2d Amended Complaint.

## COUNT VII
## TORTIOUS INTERFERENCE WITH PRIMESOURCE'S
## CONTRACTS AGAINST HUTTIG

116.    Plaintiff incorporates all prior paragraphs and factual allegations by reference.

**ANSWER:** Defendants incorporate their responses to all prior paragraphs and factual allegations as if set forth in full herein.  Defendants K. Fishbein, D. Fishbein, Furio and Zinman do not answer Count VII as it is directed solely to another party.  To the extent any allegations of fact contained in Count VII are deemed to be directed at K. Fishbein, D. Fishbein, Furio or Zinman, they deny each and every allegation.

117.    To succeed on a claim for intentional interference, a plaintiff must show (1) that the plaintiff had a valid contract; (2) the defendant intentionally interfered with the contract; (3) the interference proximately caused the plaintiff's injury; (4) the plaintiff suffered actual damage or loss.

**ANSWER:** Paragraph 117 of Plaintiff's 2d Amended Complaint states a legal conclusion, not statements of fact and, as such, no answer is required of the same.  To the extent an answer is required, Defendant Huttig denies all allegations of fact contained in Paragraph 117 of Plaintiff's 2d Amended Complaint.

118.    Valid contracts exist between PrimeSource and K. Fishbein, D. Fishbein, Zinman and Furio. Valid contracts also exist between PrimeSource and Brad Strosahl, another former PrimeSource employee who defected to Huttig.  Huttig had knowledge of these agreements.

**ANSWER:** Defendant Huttig denies all allegations of fact contained in Paragraph 118 of Plaintiff's 2d Amended Complaint.

119.    Huttig collaborated with all of these former PrimeSource employees to plan, prepare, and form the new HuttiGrip division with full knowledge of the restrictions and limitations placed on these employees by their agreements with PrimeSource. In so doing, they intentionally and tortuously interfered with these agreements and caused these former PrimeSource employees to breach their agreements with PrimeSource.

**ANSWER:** Defendant Huttig denies all allegations of fact contained in Paragraph 119 of Plaintiff's 2d Amended Complaint.

120.     PrimeSource has been damaged by Huttig's tortious conduct, which proximately caused PrimeSource's injury.

**ANSWER:** Defendant Huttig denies all allegations of fact contained in Paragraph 120 of Plaintiff's 2d Amended Complaint.

## COUNT VIII
## BREACH OF THE HUTTIG NDA AGAINST HUTTIG

121.     Plaintiff incorporates all prior paragraphs and factual allegations by reference.

**ANSWER:** Defendants incorporate their answers to all prior paragraphs and factual allegations as if set forth in full herein.  Defendants K. Fishbein, D. Fishbein, Furio and Zinman do not answer Count VIII as it is directed solely to another party.  To the extent any allegations of fact contained in Count VIII are deemed to be directed at K. Fishbein, D. Fishbein, Furio or Zinman, they deny each and every allegation.

122.     The Huttig NDA entered into between Plaintiff and Huttig is a valid and enforceable contract.

**ANSWER:** Paragraph 122 of Plaintiff's 2d Amended Complaint states a legal conclusion, not statements of fact and, as such, no answer is required of the same.  To the extent an answer is required, Defendant Huttig denies all allegations of fact contained in Paragraph 122 of Plaintiff's 2d Amended Complaint.

123.     Plaintiff performed its obligations under the Huttig NDA by, among other things, including Huttig in the sales process and providing Huttig confidential PrimeSource information.

**ANSWER:** Defendant Huttig denies all allegations of fact contained in Paragraph 123 of Plaintiff's 2d Amended Complaint.

124.     Huttig breached the Huttig NDA by using confidential information it learned during the sale process to launch the HuttiGrip division and by soliciting for hire K. Fishbein, D. Fishbein, and Furio within eighteen months after the execution of the NDA.

**ANSWER:** Defendant Huttig denies all allegations of fact contained in Paragraph 124 of Plaintiff's 2d Amended Complaint.

125.     PrimeSource has been damaged by Huttig's breach.

**ANSWER:** Defendant Huttig denies all allegations of fact contained in Paragraph 125 of Plaintiff's 2d Amended Complaint.

126.     Huttig agreed that breach of the NDA would result in irreparable harm for which there is no adequate remedy at law.

**ANSWER:** Defendant Huttig denies all allegations of fact contained in Paragraph 123 of Plaintiff's 2d Amended Complaint.

## COUNT IX

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST HUTTIG

127.     Plaintiff incorporates all prior paragraphs and factual allegations by reference.

**ANSWER:** Defendants incorporate their answers to all prior paragraphs and factual allegations as if set forth in full herein.  Defendants K. Fishbein, D. Fishbein, Furio and Zinman do not answer Count IX as it is directed solely to another party.  To the extent any allegations of fact contained in Count IX are deemed to be directed at K. Fishbein, D. Fishbein, Furio or Zinman, they deny each and every allegation.

128.     Bradley Strosahl, as a former Senior Vice President at PrimeSource, owed a fiduciary duty of loyalty to PrimeSource, even after his departure, not to take transactions or opportunities initiated during his time at PrimeSource, on behalf of PrimeSource and based on information and knowledge he acquired at PrimeSource, to another employer, such as Huttig.

**ANSWER:** Defendant Huttig admits that Bradley Strosahl was, at one time, employed by Plaintiff.  The remaining portions of Paragraph 128 constitutes a conclusion of law and, as such, not answer is required to the same.  To the extent that the Court deems any further aspect of Paragraph 128 to be a statement of fact, said factual allegation is denied.

129.     Strosahl breached this duty by, at least, taking an opportunity that PrimeSource had with American Fasteners, a domestic supplier of fasteners, to Huttig. During his tenure with

PrimeSource, Strosahl worked on securing an affiliation with American Fasteners in the weeks prior to his departure from PrimeSource. Within a week of joining Huttig, Strosahl was in discussions with American Fasteners regarding an identical affiliation. On May 9, 2017, Huttig issued a press release announcing that it had formed an affiliation with American Fasteners.

**ANSWER:** Defendant Huttig denies all allegations of fact contained in Paragraph 129 of

Plaintiff's 2d Amended Complaint.

130.    Huttig aided and abetted Strosahl's breach of fiduciary duty to PrimeSource by encouraging Strosahl's pursuit of this opportunity on behalf of Huttig, knowing that it was an opportunity that he had been pursuing during his PrimeSource employment.

**ANSWER:** Defendant Huttig denies all allegations of fact contained in Paragraph 130 of

Plaintiff's 2d Amended Complaint.

131.    Huttig assisted Strosahl by providing him with company resources to pursue and effect the affiliation with American Fasteners.

**ANSWER:** Defendant Huttig denies all allegations of fact contained in Paragraph 131 of

Plaintiff's 2d Amended Complaint.

132.    Huttig was aware of its role in assisting Strosahl's breach of his fiduciary duty at the time it provided assistance.  Huttig knew that Strosahl had worked to create the affiliation with American Fasteners before he left PrimeSource, as Strosahl immediately began discussions with American Fasteners when he started his employment at Huttig.

**ANSWER:** Defendant Huttig denies all allegations of fact contained in Paragraph 132 of

Plaintiff's 2d Amended Complaint.

133.    PrimeSource has incurred damages, including the revenue and additional business associated with the American Fasteners opportunity, as a result of Huttig's actions.

**ANSWER:** Defendant Huttig denies all allegations of fact contained in Paragraph 133 of

Plaintiff's 2d Amended Complaint.

### COUNT X
### TORTIOUS INTERFERENCE WITH PRIMESOURCE CONTRACTS
### AGAINST DAVID FISHBEIN

134.    Plaintiff incorporates all prior paragraphs and factual allegations by reference.

**ANSWER:** Defendants incorporate their answers to all prior paragraphs and factual allegations as if set forth in full herein. Defendants Huttig, K. Fishbein, Furio and Zinman do not answer Count X as it is directed solely to another party. To the extent any allegations of fact contained in Count X are deemed to be directed at Huttig, K. Fishbein, Furio or Zinman, they deny each and every allegation.

135. To succeed on a claim for intentional interference, a plaintiff must show (1) that the plaintiff had a valid contract; (2) the defendant intentionally interfered with the contract; (3) the interference proximately caused the plaintiff's injury; (4) the plaintiff suffered actual damage or loss.

**ANSWER:** Paragraph 135 of Plaintiff's 2d Amended Complaint states a legal conclusion, not statements of fact and, as such, no answer is required of the same. To the extent an answer is required, Defendant D. Fishbein denies all allegations of fact contained in Paragraph 135 of Plaintiff's 2d Amended Complaint.

136. Plaintiff had valid and enforceable employment agreements with former PrimeSource employees who now work for Huttig—Brad Strosahl, Sam Sprague, Scott Felten, Garrett Kessler, Daniel Kottmeyer, Allen Sagunsky, and Jordan Whitehead (the "Former PrimeSource Employees").

**ANSWER:** Paragraph 136 constitutes conclusions of law, not statements of fact, and, as such, not answer is required to the same. To the extent that the Court deems any further aspect of Paragraph 136 to be a statement of fact, said factual allegation is denied.

137. Some of the Former PrimeSource Employees' PrimeSource employment agreements included provisions prohibiting the employees from working for a competitor or selling products or services to PrimeSource customers for a limited period of time after the Former PrimeSource Employees' departure from PrimeSource. All of the Former PrimeSource Employees' PrimeSource employment agreements also included provisions prohibiting the employees from disclosing confidential PrimeSource information.

**ANSWER:** Defendant D. Fishbein states that any agreement impacting any of the identified former employees of Plaintiff speak for themselves as to their terms and contents. Except as so

expressly admitted, Defendant D. Fishbein denies any factual allegation of Paragraph 137 of Plaintiff's 2d Amended Complaint.

138.    D. Fishbein solicited the Former PrimeSource Employees for hire and did hire them to work for Huttig in the HuttiGrip division, which D. Fishbein leads.

**ANSWER:** Defendant D. Fishbein admits that he communicated with some of the so-called "Former PrimeSource Employees" and that they were ultimately hired by Huttig.  Except as so expressly admitted, Defendant D. Fishbein denies any factual allegation of Paragraph 138 of Plaintiff's 2d Amended Complaint.

139.    D. Fishbein targeted these individuals for hire at Huttig based on their experience working at PrimeSource.

**ANSWER:** Defendant D. Fishbein denies any factual allegation of Paragraph 139 of Plaintiff's 2d Amended Complaint.

140.    D. Fishbein was aware of the Former PrimeSource Employees' PrimeSource employment agreements and the provisions therein regarding non-competition, non-solicitation of customers, and non-disclosure of PrimeSource information.

**ANSWER:** Defendant D. Fishbein admits that he knew that some of the so-called "Former PrimeSource Employees" had certain contractual obligations with Plaintiff.  Except as so expressly admitted, Defendant D. Fishbein denies the factual allegation of Paragraph 140 of Plaintiff's 2d Amended Complaint.

141.    D. Fishbein intentionally interfered with these contracts by soliciting the Former PrimeSource Employees for hire, directing that they create lists of their former PrimeSource customers and information related to those customers' purchasing history for use at Huttig, and taking no action upon the hire of the Former PrimeSource employees to prevent them from contacting or soliciting their former PrimeSource customers, directly or through others, or from using confidential PrimeSource information in carrying out their job duties at Huttig.

**ANSWER:** Defendant D. Fishbein denies the factual allegation of Paragraph 141 of Plaintiff's 2d Amended Complaint.

142.    PrimeSource has been damaged by D. Fishbein's tortious conduct, which proximately caused PrimeSource's injury.

**ANSWER:** Defendant D. Fishbein denies the factual allegation of Paragraph 142 of Plaintiff's 2d Amended Complaint.

## JURY DEMAND

Plaintiff demands a jury on all issues so triable.

**ANSWER:** Plaintiff's Jury Demand does not contain any facts that require a response.

## AFFIRMATIVE DEFENSES

1. Plaintiff's claims fail to state a claim upon which relief can be granted.

2. Plaintiff's equitable claims alleged herein are barred by the doctrines of estoppel, laches, waiver and/or unclean hands.

3. Plaintiff's claims fail to the extent they fail to meet applicable statutes of limitations or other periods of limitation.

4. Plaintiff's claims fail in that Huttig has not performed any act or thing, and is not proposing to do any act or thing, in violation of any rights which may validly belong to Plaintiff.

5. Plaintiff has unclean hands, and is itself engaging in unfair competition insofar as this suit is being used by Plaintiff in restraint of trade, i.e., in such a way as to violate antitrust laws by its attempt at monopolization through engaging in over-zealous enforcement of its alleged trademarks, and that further this suit is being brought for an oppressive purpose, i.e., to inappropriately extend its putative monopoly and to damage Huttig's business.

6. Plaintiff's claims fail to the extent the agreements to which Plaintiff references in its 2d Amended Complaint are void of adequate consideration.

7. Plaintiff's claims fail to the extent that the agreements to which Plaintiff references in its 2d Amended Complaint are unconscionable.

8.     Plaintiff's claims fail to the extent that the agreements to which Plaintiff references in its 2d Amended Complaint are unreasonable, unenforceable and/or violate the public policy of the states governing the agreements.

9.     Plaintiff's claims fail to the extent that the agreements to which Plaintiff references in its 2d Amended Complaint were obtained by fraudulent means.

10.     To the extent Plaintiff seeks to blue-pencil or modify the agreements to which Plaintiff references in its 2d Amended Complaint at some point in the future, the Court should decline to do so as the agreements are fundamentally unfair.

11.     The restrictive covenants to which Plaintiff references in its 2d Amended Complaint exceed a reasonable geographic and/or temporal scope and are not reasonably necessary for the protection of Plaintiff's legitimate business interests.

12.     Plaintiff's claims fail to the extent that enforcement of the agreements to which Plaintiff references in its 2d Amended Complaint would cause a significant hardship to Defendants K. Fishbein, D. Fishbein, Furio and Zinman and preclude them from working anywhere in the building products distribution industry.

13.     Plaintiff's breach of contract claims against Defendants Zinman, K. Fishbein, D. Fishbein and B. Furio, and any claim for damages as a result, are subject to arbitration.

14.     Plaintiff's trade secrets claims fail to the extent that information Plaintiff contends qualifies as trade secret that Defendants allegedly misappropriated was generated or obtained by Defendants through independent development.

15.     Plaintiff's trade secrets claims fail in that Plaintiff has unclean hands.

16.     Plaintiff lacks standing with regards to its claims for breach of the so-called non-disclosure agreement with Huttig.

17.     Plaintiff's claims for breach of the so-called non-disclosure agreement with Huttig is brought in the wrong venue as that agreement, if valid, has a forum selection clause directed to the courts of another state.

18.     Plaintiff is not entitled to a trial by jury for its claims for breach of the so-called non-disclosure agreement with Huttig as those rights were voluntarily waived and precluded by the agreement's express terms.

19.     Plaintiff's claims for breach of the so-called non-disclosure agreement with Huttig are barred for failure of consideration

20.     Plaintiff's claims for breach of the so-called non-disclosure agreement with Huttig are barred as that agreement was void *ab initio*.

21.     Plaintiff's claims for breach of the so-called non-disclosure agreement with Huttig are barred as the result of fraud in the inducement.

22.     Plaintiff's claims for breach of the so-called non-disclosure agreement with Huttig and any claim to damages as a result are barred by waiver and/or estoppel.

23.     Plaintiff's claims for breach of the so-called non-disclosure agreement with Huttig are barred by cancellation.

24.     Plaintiff's claims for breach of the so-called non-disclosure agreement with Huttig are barred as an unlawful restrain on trade.

25.     Defendant Huttig was justified in, privileged to, and had an absolute legal right to take actions Plaintiff contends support its claims for tortious interference with contract.

26.     Plaintiff's claims for tortious interference are barred in that Plaintiff did not have a valid expectancy in continued business with any effected entity, if any.

27.     Defendant D. Fishbein was justified in, privileged to, and had an absolute legal right to take the actions Plaintiff contends support its claims for tortious interference with contract.

28.     Plaintiff's claims for misappropriation of trade secrets fail to the extent that the Defendants' acts complained of by Plaintiff were authorized.

29.     Defendants do not knowingly and/or intentionally waive any affirmative defenses, and reserve the right to assert any additional affirmative defense and claims of avoidance as may be appropriate based on the facts or issues disclosed during the course of additional investigation and discovery.


WHEREFORE, having answered Plaintiff's 2d Amended Complaint, Defendants Huttig Building Products, Inc., Kenneth Fishbein, David Fishbein, Mona Zinman and Robert Furio request that Plaintiff's 2d Amended Complaint be dismissed in its entirety with prejudice, with costs and attorneys' fees taxed against Plaintiff and for such other and further relief as this Court deems just and proper.

## COUNTERCLAIMS

Defendants/Counter-Plaintiffs Kenneth Fishbein ("K. Fishbein"), David Fishbein ("D. Fishbein"), Mona Zinman ("Zinman") and Robert Furio ("Furio") (collectively, "Individual Counter-Plaintiffs"), and Huttig Building Products, Inc. ("Huttig") (collectively, with the Individual Counter-Plaintiffs, "Counter-Plaintiffs"), by their attorneys, and for their counterclaims against PrimeSource Building Products, Inc. ("PrimeSource"), state as follows:

**NATURE OF THE CASE**

1.      PrimeSource's lawsuit is sham litigation.  By and through their counterclaims, Counter-Plaintiffs seek redress for PrimeSource's use of this meritless litigation and other exclusionary tactics, as a means to stifle legitimate competition and monopolize and attempt to monopolize antitrust markets for fastener products in the building products industry.

2.      Counter-Plaintiffs request in Counts I and II of their counterclaims the reimbursement of millions of dollars of attorneys' fees they have incurred in defending against PrimeSource's misappropriation of trade secrets claims under the Defend Trade Secrets Act and Illinois Trade Secrets Act—claims asserted and maintained in bad faith.  Among other reasons as set forth herein, PrimeSource's claims for trade secret misappropriation against the Individual Counter-Plaintiffs are baseless because they were first asserted more than 15 months after the last of the Individual Counter-Plaintiffs left PrimeSource's employ, and they are premised entirely on a theory that these former executives will inevitably rely upon or use PrimeSource's alleged trade secrets, which are repeatedly identified in pleadings and discovery only as broad categories and compilations of general business information.  Despite having the benefit of extensive written and oral discovery, PrimeSource cannot point to or provide evidence of a single document or electronic file that has been misappropriated by the Individual Counter-Plaintiffs, and in its recently filed Second Amended Complaint has backtracked from its allegation that the Individual Counter-Plaintiffs have "stolen" trade secrets to now simply suggesting that they have "misappropriated" them by using them on behalf of Huttig, but still without any factual allegations or evidence that anything within these broad categories and compilations of general business information was actually taken and used.

3. By Count III, Counter-Plaintiffs seek damages for the false and defamatory statements PrimeSource is making and disseminating to third parties outside the confines of this litigation, thereby causing damage to Counter-Plaintiffs' reputations within the industry.

4. By Count IV, Huttig seeks damages and injunctive and other equitable relief to address PrimeSource's intentional and unjustified interference with Huttig's legitimate business relationships and prospective economic advantages arising from PrimeSource's interference with Huttig's business relationships with potential suppliers and customers.

5. By Counts V through VII of these counterclaims, Huttig seeks damages and injunctive and other equitable relief to address an improper and unlawful monopolization and attempted monopolization of antitrust markets for fastener products in the building products industry through exclusionary and predatory conduct by PrimeSource with the purpose and effect of excluding competition by and/or increasing the cost of competition to its competitors, including Huttig, among others, in order to obtain, entrench, or maintain PrimeSource's monopoly.

6. PrimeSource, in furtherance of this unlawful monopolization and attempted monopolization, (i) continues to threaten, file, and pursue sham trade secrets, trademark and trade dress infringement and restrictive covenant litigation across the country, including in this case; (ii) continues to make false and defamatory statements regarding Huttig and the Individual Counter-Plaintiffs; (iii) continues to threaten product manufacturers, trading companies, and others with withdrawal of PrimeSource business if the firms sell fastener products to Huttig and other actual or potential wholesale suppliers; (iv) continues to offer and use predatory low pricing with selected wholesale customers on a temporary basis to prevent new entrants from entering into supply arrangements with the customers; (v) continues to use bundled rebate and

pricing conduct with customers to exclude competition; (vi) has made a series of acquisitions of firms engaged in sales of fastener products in order to eliminate growing threats that these competitors posed to PrimeSource's monopolization and attempted monopolization of markets for fastener products; and (vii) has imposed overbroad non-competition covenants in agreements with business managers and senior executives in order to prevent actual and potential competitors from lawfully growing their fastener products sales and businesses. PrimeSource has engaged in this anticompetitive conduct to unlawfully acquire and/or maintain its monopoly power and dominant market position in antitrust markets for fastener products in the building products industry.

7. In addition to the many other non-competition covenants that PrimeSource imposed on its business managers during their employment in order to acquire and maintain its monopoly power, PrimeSource reaffirmed blatantly anticompetitive non-competition covenants on D. Fishbein and Furio when it terminated these Co-CEOs shortly after its sale to a private equity firm in May 2015. The sole and admitted purpose of these restraints was to "protect the company from competition by the people who grew the business and knew it the best" (PS 2d Am. Compl. ¶ 48) and not for any legitimate purpose. Regardless of whether non-competition covenants may be enforceable under applicable state law in some circumstances when used by a normal market participant for a legitimate purpose, these covenants are void and unenforceable under federal and state antitrust laws when used, as here, by a monopolist to willfully acquire and maintain its monopoly power and dominant market position.

8. As a result of this exclusionary and predatory conduct, PrimeSource has harmed Huttig's business and property, threatens to prevent Huttig and other actual and potential competitors from entering or expanding in antitrust markets for fastener products, has imposed

anticompetitive barriers to entry and expansion by Huttig and other actual and potential competitors in these markets, has thereby reduced competition in these markets, and has caused and threatens to cause imminent harm to purchasers in these markets, as well as to Huttig. Huttig has suffered and will continue to suffer antitrust injury, as its injuries arise from reduced competition in these markets.

9.      The unlawful exclusionary and predatory conduct by a monopolist, PrimeSource, violates Section 2 of the Sherman Act.

## PARTIES

10.     K. Fishbein is an individual who resides in Northbrook, Illinois.  K. Fishbein was the Co-Chief Executive Officer of PrimeSource from March 24, 2007 through December 31, 2014.

11.     D. Fishbein is an individual who resides in Highland Park, Illinois.  D. Fishbein was the Co-Chief Executive Officer of PrimeSource from January 1, 2015 through September 15, 2015.

12.     Zinman is an individual who resides in New York, New York.  Zinman was the Co-Chief Executive Officer of PrimeSource from March 24, 2007 through December 31, 2014.

13.     Furio is an individual who resides in Hawthorn Woods, Illinois.  Furio was the Co-Chief Executive Officer of PrimeSource from January 1, 2015 through September 15, 2015.

14.     Huttig is a Delaware corporation with its principal place of business in St. Louis, Missouri.

15.     PrimeSource is a Delaware corporation with its principal place of business in Irving, Texas.

## JURISDICTION AND VENUE

16.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331, because Counter-Plaintiffs' claims arise under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836–39 *et seq.*, and Huttig's claims arise under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

17.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367, because the state law claims arise out of the same case or controversy.

18.     This Court has personal jurisdiction over Counter-Defendant PrimeSource, because it is the Plaintiff in this action and has thereby submitted itself to the jurisdiction of this Court.

19.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Counter-Plaintiffs' claims occurred within this judicial district.

## FACTUAL BACKGROUND

I.     **Background Facts Relevant To PrimeSource's Filing And Maintaining Its Misappropriation Of Trade Secrets Claim Against Counter-Plaintiffs In Bad Faith**

A.     **PrimeSource Failed to Conduct a Reasonable Pre-Filing Investigation Prior to Filing Its Misappropriation of Trade Secrets Claim**

20.     PrimeSource did not undertake a reasonable pre-filing factual investigation prior to asserting a misappropriation of trade secrets claim under the ITSA or the DTSA against Counter-Plaintiffs, as evidenced in large part by its failure to acknowledge that:  (a) the broad categories of business information it has identified as its trade secrets consist largely of general industry knowledge; (b) historical business information such as pricing and margins are time-sensitive and were stale by the time the lawsuit was filed; (c) its alleged trade secrets consist of information that is available in the public domain, and has not otherwise been treated as

confidential or as a trade secret by PrimeSource; and (d) it had *zero* evidence that any of the Individual Counter-Plaintiffs had taken or retained any alleged PrimeSource "trade secrets" in hard copy or other tangible or intangible (electronic) form.

21.     Each of the Individual Counter-Plaintiffs is a former Co-CEO of PrimeSource. K. Fishbein and Zinman's last day of employment with PrimeSource was December 31, 2014, two years before this lawsuit was filed.

22.     K. Fishbein and Zinman both executed consulting and retention agreements with PrimeSource on September 29, 2014. These agreements were substantially similar and each contained a non-competition provision stating that they would not "engage in any activity which is directly competitive with, or that causes material harm to PrimeSource" for a period ending 18 months after the therein-defined Closing Date (or until after November 8, 2016), associate with any Material Competitor (as defined in the PrimeSource agreements) during that time or solicit for employment any PrimeSource employee.

23.     After K. Fishbein and Zinman resigned in late 2014, D. Fishbein and Robert Furio replaced them as Co-CEOs of PrimeSource.

24.     PrimeSource was acquired by Platinum Equity Group on or about May 11, 2015.

25.     Less than four months later, without prior notice or warning, D. Fishbein and Furio were terminated by PrimeSource. D. Fishbein and Furio signed "Severance Agreements and Release of Claims" on or around September 24, 2015. These agreements were substantially similar and provided that the confidentiality and non-competition provisions contained in each of their previously signed "Amended and Restated Employment Agreements" remained applicable, including a 12-month restriction on competing with PrimeSource, or becoming "interested in" or "associated with" any Material Competitor.

26.     At the time of their respective resignations or terminations from PrimeSource, all of the Individual Counter-Plaintiffs returned any PrimeSource business information in their possession.  Since their respective resignations and until this lawsuit was filed, there was no further communication from PrimeSource suggesting that any of the Individual Counter-Plaintiffs had taken or retained any of PrimeSource's purported confidential information or trade secrets.

27.     Based on the foregoing, it is not surprising that PrimeSource failed to include any particularized identification of its alleged trade secrets in its Complaint or First Amended Complaint, or in its memorandum in support of its motion for preliminary injunction.

28.     PrimeSource's Complaint and First Amended Complaint described its alleged trade secrets in broad general categories of information:

    (a)     customer information, including the identity of customers and distribution channels, potential customers and contacts, historic ordering patterns and product mix, margins and merchandising plans;

    (b)     supplier information, including identity of national and international suppliers and the capabilities, contacts, product mix, cost and shipping information and logistics;

    (c)     financial, budget and planning data, including historic sales and pricing patterns and margins, forecasts, growth strategies, new product research and development;

    (d)     employee information, including identity, skill sets, compensation, and industry contacts; and

    (e)     PrimeSource's aggregate business model incorporating all of the above.

29.     Moreover, in its most recent attempt to plead its trade secrets with specificity –
filed after the close of expedited discovery — PrimeSource's Second Amended Complaint still
falls well short of identifying actual trade secrets.   In its Second Amended Complaint,
PrimeSource describes its trade secrets that have been misappropriated for the benefit of Huttig
as follows:

     (a)    historic sales, price and profit data for a particular customer or customers;

     (b)    compilations of customer information reflecting identity, contacts, pricing, product mix, volumes, terms and/or ordering patters.  Such information is reflected in PrimeSource's SAP and CRM systems, and in other formats;

     (c)    compilations of suppler information reflecting identity, contacts, pricing, volumes, terms and/or ordering patterns.  Such information is reflected in PrimeSource's SAP system, and in other formats;

     (d)    compilations of financial data reflecting operations;

     (e)    information reflecting inventory planning and supply chain optimization;

     (f)    information reflecting optimization of warehouse operations and distribution networks;

     (g)    business plans and budgets, and company objectives including cost-savings and growth measures;

     (h)    company-level strategic plans, product line strategic plans, supplier-level strategic plans and customer-specific strategic plans; and

     (i)    marketing strategy and targets.

30.     The broad and sweeping categories of information that PrimeSource has identified
as its purported trade secrets refer to information that is largely time-sensitive in that any value

inherent in its alleged confidentiality diminishes over time (to the extent that it had value to begin with), and this information has long since gone stale. Moreover, PrimeSource continues in discovery and in its pleadings to point to broad categories and compilations of allegedly confidential information without identifying actual trade secrets, and without evidence that the Individual Counter-Plaintiffs took these compilations of PrimeSource to Huttig.

31. PrimeSource is also not in the type of industry that would readily involve the development or use of trade secret information (e.g., technology or manufacturing). PrimeSource does not manufacture any of the building products that it sells. PrimeSource is in the business of sourcing and reselling building products, consisting primarily of commodity fastener items, such as nails, screws and other fasteners, that largely conform to ASTM standard specifications and not any proprietary designs owned by PrimeSource. These identical fasteners are manufactured by many of the same suppliers for different distributors such as PrimeSource, Huttig and others.

32. PrimeSource purchases its fasteners from a network of domestic and overseas suppliers with which it typically does not have written supply contracts or written confidentiality agreements. The identities of many of its suppliers are listed on PrimeSource's website and are publicly available and others disclosed within U.S. Customs records related to incoming overseas shipments. Moreover, PrimeSource itself does not treat the identities of its suppliers as confidential because, among other reasons, it has failed to designate the identity of its suppliers as confidential, even though the U.S. Customs regulations permit it to do so.

33. Many of these overseas suppliers manufacture and supply commodity building products identical to those that they manufacture for PrimeSource, to other companies that compete with PrimeSource in the building products industry. In fact, many suppliers will openly

acknowledge the fact that they manufacture the same products under a different private brand label for different U.S.-based distributors.

34.     PrimeSource sells its products to independent lumber yards, independent building supply dealers, major big-box retailers, retail building supply chains, concrete and construction supply yards, roofing wholesalers, drywall distributors, wire and fencing supply yards, agricultural supply yards, steel fabricators, industrial customers, specialty wholesalers and specialty distributors.  Typically, PrimeSource does not have confidentiality agreements in place with its customers, and these customers are free to share any information regarding their business dealings with PrimeSource with any of PrimeSource's competitors.

35.     PrimeSource knew at the time it filed its Complaint that it has frequently solicited and received information related to its customers' purchasing habits for building products competitive with PrimeSource's building products, including but not limited to Huttig, and this information has included even current pricing information, rebate information, and other business terms.

36.     PrimeSource alleged in its Complaint and First Amended Complaint that each of the Individual Counter-Plaintiffs physically stole or used PrimeSource's confidential information and trade secrets, but failed to identify in the Complaint or First Amended Complaint the specific information that any of the Individual Counter-Plaintiffs allegedly took and used.

37.     PrimeSource knew at the time that it filed its Complaint and First Amended Complaint that no such evidence of misappropriation and use exists, and yet it initiated its claim for theft of trade secrets anyway.

38.     In its Second Amended Complaint, PrimeSource continues to allege in conclusory fashion that certain other former PrimeSource employees (not the Individual Counter-Plaintiffs)

accessed certain purported confidential PrimeSource information while still employed with PrimeSource and that these employees did so, on information and belief, at the direction or acquiescence of Huttig and/or the Individual Counter-Plaintiffs.

39.     Yet PrimeSource still fails to allege any actual misappropriation or specific evidence of use by any of the Individual Counter-Plaintiffs.

40.     PrimeSource has, in addition, relied on the "inevitable disclosure" doctrine to suggest that, given Individual Counter-Plaintiffs' positions with PrimeSource, it would be inevitable that Individual Counter-Plaintiffs will be required to use PrimeSource's trade secrets.

41.     However, PrimeSource knew at the time of filing that no legal support exists for applying the "inevitable disclosure" doctrine to prevent a former executive from being employed with a competitor, where that former executive has not worked for the former employer in more than 12 months, and especially in a commodity industry in which the purported confidential and trade secret information at issue is largely time-sensitive and/or publicly available.

## B.     PrimeSource Lacks an Objectively Reasonable Basis to Continue to Litigate Its Trade Secret Claims

42.     PrimeSource cannot use evidence that came to light after it brought its claim for an anticompetitive purpose, to argue that its claims against Counter-Plaintiffs are objectively reasonable.  On the other hand, evidence that comes to light after a lawsuit is filed is relevant to proving the lack of an objectively reasonable basis for continuing the lawsuit.

43.     In its initial answers to interrogatories, PrimeSource failed to identify any confidential information or trade secret information that the Individual Counter-Plaintiffs took from PrimeSource and are now using on behalf of Huttig.

44.     On April 20, 2017, PrimeSource was ordered by the Court to supplement its interrogatory answers to admit that:  "PrimeSource is unaware of exactly which categories of

59

trade secret information have been misappropriated by Defendants, or exactly how Defendants are using said trade secrets, but PrimeSource continues to investigate this issue through discovery and will continue to supplement its response accordingly." *See* Case No. 16-cv-11468 Doc. 79. Now, two months after the completion of expedited discovery, PrimeSource has still not supplemented this interrogatory response to identify specific evidence of misappropriation or use of trade secrets by the Individual Counter-Plaintiffs.

45. That same day, PrimeSource was also ordered by the Court to indicate in supplemental interrogatory answers, by position at PrimeSource, which categories of employees have access to certain categories of alleged trade secrets set forth in PrimeSource's Amended Complaint. Virtually everyone at PrimeSource has access to over half of the categories of alleged trade secrets.

46. PrimeSource's Rule 30(b)(6) representative Eric Royse admitted at his deposition that PrimeSource has no knowledge that any of the Individual Counter-Plaintiffs have taken or are using any of PrimeSource's confidential information or trade secrets.

47. George Judd, PrimeSource's Chief Executive Officer, admitted in his deposition that he did not have any knowledge that any of the Individual Counter-Plaintiffs have taken or are using any of PrimeSource's confidential information or trade secrets.

48. PrimeSource knows that no such evidence of misappropriation and use exists, and yet it continues to maintain claims for theft of trade secrets against the Individual Counter-Plaintiffs anyway.

49. Royse testified on behalf of PrimeSource that the Individual Counter-Plaintiffs could have developed their business plan vis-à-vis Huttig only by using PrimeSource's confidential information and trade secrets because PrimeSource's entire business plan or the

methods it uses to sell commodity fasteners (that it does not manufacture) constitute PrimeSource's trade secrets. Despite being PrimeSource's Rule 30(b)(6) designee on topics, including PrimeSource's evidentiary basis for asserting its misappropriation of trade secrets claim against Counter-Plaintiffs, Royse could not point to specific trade secrets that were misappropriated, instead testifying that there were rumors in the market that there was no way Counter-Plaintiffs could be competing against PrimeSource this quickly without using confidential information and trade secrets that the Individual Counter-Plaintiffs somehow stole from PrimeSource.

50.     This implausible assertion was recently soundly rejected by Judge J. Eric Elliff in *PrimeSource Building Products, Inc. v. Bradley Strosahl*, pending in the Denver District Court in the State of Colorado, Case No. 2016CV34644. The *Strosahl* case is related to the present lawsuits pending before this Court. Strosahl is another former PrimeSource sales executive who was hired by Huttig in November 2016. PrimeSource sued Strosahl without any evidence of actual theft of confidential information or trade secrets, but nevertheless sought to enjoin him for a period of eight months from working for Huttig based on, among other theories, the "inevitable disclosure" doctrine.

51.     In denying PrimeSource's request for a preliminary injunction, Judge Elliff noted, "Mr. Judd and PrimeSource's Senior Vice Presidents Scott Smith and Eric Royse took the position that PrimeSource's entire business model is a trade secret. By extension, this suggests that everything Defendant did while at PrimeSource was a trade secret. In this regard, PrimeSource paints with a brush too broad. Defendant has over thirty years of experience with seven different companies, all in the fastener industry. By claiming that everything PrimeSource does is a trade secret, PrimeSource is attempting to subject Defendant to a *de fac*to non-compete

provision contrary to Colorado law, or at the very least failing to account for the skill and knowledge Defendant acquired before joining PrimeSource."

52. Royse failed to identify any specific confidential information or trade secrets that were actually used by the Individual Counter-Plaintiffs or incorporated into Huttig's business plan, or to acknowledge that at the time the Co-CEOs were hired by Huttig in late 2016, none of the Individual Counter-Plaintiffs had contributed to any business plan to expand Huttig's fasteners business.

53. Recognizing that it did not have evidence at the time of filing of the Complaint or the First Amended Complaint, and now at the end of extensive expedited written and oral discovery, PrimeSource continues to cling to the unsupported assertion that it is "inevitable" that the Individual Counter-Plaintiffs will rely upon and use PrimeSource's allegedly confidential information and trade secrets to perform their duties for Huttig.

54. Yet Royse testified that George Judd, its current Chief Executive Officer, who was hired from BlueLinx, another large PrimeSource competitor, after D. Fishbein and Furio were fired, can perform his job without relying upon or using BlueLinx's trade secrets or confidential information. In fact, Judd testified that there is nothing wrong with a former executive using information that he may recall in his head from his experience in the building products industry, so long as there is no theft of tangible confidential information.

55. Remarkably, however, PrimeSource has not taken any steps to ensure that Mr. Judd would not use BlueLinx's confidential information or trade secrets after he was hired by PrimeSource, and PrimeSource has seen no similar issues with respect to BlueLinx's trade secrets or confidential information arising from Judd's subsequent hires of Mike Meadows as Branch Manager and former member of BlueLinx's Executive Leadership Team, Steve Deputy,

as Vice President of Major Accounts, and Rudy Buel, Branch Manager, all of whom were former high ranking BlueLinx executives. Any claim based on inevitable disclosure theory is objectively baseless, because any specific item of information that the Individual Counter-Plaintiffs may have retained in their heads by virtue of their employment with PrimeSource has long since gone stale and could be of no competitive use or value to Huttig, and it would be impossible for the Individual Counter-Plaintiffs to have retained in their respective heads the voluminous compilations of data PrimeSource now claims to be the core of its alleged trade secrets.

56.     PrimeSource has provided scant evidence of lost profits or other financial damages, much less any indication of irreparable harm, even though it alleges that Huttig has been operating its purportedly new competitive business line for over half a year.

57.     Indeed, Royse could not identify any specific business that was lost to Huttig or any specific customers or suppliers that are now doing business exclusively with Huttig.  This fact was not lost on Judge Elliff in the *Strosahl* matter.  He noted when finding that PrimeSource had not demonstrated real, immediate and irreparable sufficient to warrant an injunction, that "[g]iven the nature of these claims, there is surprisingly little in the way of evidence of harm to PrimeSource."

58.     Notwithstanding the absence of identifiable trade secrets, and any evidence of misappropriation or use of the broad categories of trade secret information that PrimeSource has bothered to identify, PrimeSource is forcing the Individual Counter-Plaintiffs to incur the considerable expense associated with defending a preliminary injunction hearing in which PrimeSource is seeking, among other things, to prevent the Individual Counter-Plaintiffs from working for Huttig based on false and unsubstantiated allegations of trade secret theft.

59.     Not surprisingly, in its memorandum in support of preliminary injunctive relief, PrimeSource has failed to cite a single case in which an Illinois court, or any court for that matter, has applied the "inevitable disclosure" doctrine to enjoin an employee from continuing with competitive employment after there was a gap in employment from departure to new employment of twelve months.  In this case, by the time the Court considers PrimeSource's preliminary injunction motion at PrimeSource's behest, it will almost be a full two years since D. Fishbein and Furio were terminated by PrimeSource, and a full three years since K. Fishbein and Zinman left PrimeSource.

60.     PrimeSource never cared about the outcomes of these cases.  The litigation itself is being used as a tool to distract and harass Counter-Plaintiffs from focusing their efforts and energy on expanding Huttig's competitive fasteners business.

### C.     PrimeSource's False and Defamatory Remarks Regarding Counter-Plaintiffs

61.     PrimeSource knew at the time that it filed its trade secrets claim that it was specious and contained false allegations that the Individual Counter-Plaintiffs stole PrimeSource's trade secrets, among other false allegations, but it recognized that if it accused Counter-Plaintiffs of theft of trade secrets and other wrongful conduct that it would have an adverse impact on Huttig's ability to expand its competitive fasteners business.

62.     To hasten this adverse impact, after it filed its pleadings in this matter, PrimeSource disseminated copies of its defamatory pleadings to third parties unrelated to the litigation, and upon information and belief, to various actual and potential customers, suppliers, and other business contacts of the Individual Counter-Plaintiffs and Huttig.

63.     For example, PrimeSource disseminated the First Amended Complaint to Grunfeld Desiderio Lebowitz Silverman & Klestadt LLP ("Grunfeld"), a law firm specializing in U.S. customs matters with which both PrimeSource and Huttig did business.  After reviewing the

First Amended Complaint, Grunfeld advised that it was required to cease providing legal services to Huttig.

64.     PrimeSource and its employees and agents have defamed Counter-Plaintiffs by publishing to third parties the false and defamatory statements contained in its pleadings, including by falsely accusing Counter-Plaintiffs of theft and trademark infringement. Specifically, these false and defamatory statements include, without limitation, the following:

(a)     That former PrimeSource employees "downloaded PrimeSource information onto external memory devices or stole information from PrimeSource by emailing or downloading to cloud servers to facilitate Huttig competing with PrimeSource."  (Am. Compl. ¶ 2.)

(b)     That Huttig and the Individual Counter-Plaintiffs "have engaged in illegal conduct intended to destroy the Grip-Rite® product line and secure PrimeSource's Grip-Rite® business for Huttig."  (Id. ¶ 3.)

(c)     That Huttig could not compete absent the use of PrimeSource's stolen confidential information.  (Id. ¶ 54.)

(d)     That former PrimeSource employees stole PrimeSource information at the direction or acquiescence  of Huttig and the Individual Counter-Plaintiffs. (Id. ¶ 57.)

(e)     That K. Fishbein "has taken and used confidential PrimeSource information for the purpose of planning  and preparing to compete with PrimeSource, and to carry out his duties and work at Huttig. K. Fishbein is using his knowledge of PrimeSource's customers and vendors and of

PrimeSource's pricing methods and other information to undercut PrimeSource in the market place." (*Id.* ¶ 72.)

(f)    That "[s]ince leaving his employment with PrimeSource on September 15, 2015, Defendant D. Fishbein has taken and used confidential PrimeSource information for the purpose of planning and preparing to compete with PrimeSource, and to carry out his duties and work at Huttig. D. Fishbein is using his knowledge of PrimeSource's customers and vendors and of PrimeSource's pricing methods and other information to undercut PrimeSource in the market place." (*Id.* ¶ 80.)

(g)    That "[s]ince leaving her employment with PrimeSource on December 31, 2014, Defendant Zinman has taken and used confidential PrimeSource information for the purpose of planning and preparing to compete with PrimeSource, and to carry out her duties and work at Huttig. Zinman is using her knowledge of PrimeSource's customers and vendors and of PrimeSource's pricing and purchasing methods and other information to undercut PrimeSource in the market place." (*Id.* ¶ 88.)

(h)    That "[s]ince leaving his employment with PrimeSource on September 15, 2015, Defendant Furio has taken and used confidential PrimeSource information for the purpose of planning and preparing to compete with PrimeSource, and to carry out his duties and work at Huttig. Furio is using his knowledge of PrimeSource's customers and vendors and of PrimeSource's pricing and purchasing methods and other information to undercut PrimeSource in the market place." (*Id.* ¶ 96.)

(i)     That Huttig is infringing on PrimeSource's trademarks by selling "its competing fasteners using the name "HuttiGrip" using the same red and black color scheme employed for 45 years by PrimeSource. Huttig's actions in this regard are intentionally designed to cause a likelihood of confusion in the marketplace as to the source of Huttig's products." (*Id.* ¶ 110.)

65.     Each of the foregoing statements was false when made, and PrimeSource made such statements with knowledge of their falsity and/or with reckless disregard for the truth.

66.     The publishing of the pleadings to third parties is not covered by the litigation privilege, or by any other applicable privilege.

67.     By publishing these false and defamatory statements about Counter-Plaintiffs to third parties, including actual and potential customers, suppliers, and other business contacts of Counter-Plaintiffs, PrimeSource has impugned Counter-Plaintiffs' integrity and ability to carry on their trade or profession, and has disparaged Huttig and its business practices.

**D.     PrimeSource's Intentional Interference with Huttig's Business Relationships**

68.     PrimeSource is also intentionally interfering with Huttig's business relationships and prospective economic advantages.

69.     Specifically, PrimeSource is threatening manufacturers, mills, and third-party intermediaries with ceasing to do business with them if they continue or enter into relationships with Huttig.

70.     PrimeSource went directly to the suppliers that Huttig was working with or attempting to work with, and threatened the suppliers that if they sold to Huttig, PrimeSource would pull its business from them.  As a result of PrimeSource's threats, Huttig has lost business opportunities with Esrom Screw, among many other entities.

71.     PrimeSource knew that Huttig had relationships with these suppliers and improperly threatened and intentionally interfered with these relationships in an effort to stifle the competition.

72.     PrimeSource's interference and improper threats are not privileged and are knowing, intentional and willful and have caused, and will continue to cause, Huttig irreparable harm.

**E.      PrimeSource's Sham Litigation Continues beyond the DTSA and ITSA Claims**

73.     With respect to its claims for breach of the non-competition and non-interference provisions contained in Counts III through VI, and for tortious interference with such agreements alleged against Huttig in Count VII and against D. Fishbein in Count X, these counts also constitute sham litigation.

74.     PrimeSource has neither alleged nor demonstrated that any of the Individual Counter-Plaintiffs engaged in actual competition in violation of the Individual Counter-Plaintiffs' respective non-competition provisions. Nor has PrimeSource alleged any actual solicitation of PrimeSource employees by any of the Individual Counter-Plaintiffs, alleging only that there were communications with a few employees during the restrictive period. There was no evidence presented in discovery to suggest that any offer or specific employment opportunity was discussed with any PrimeSource employees prior to the expiration of the restrictive period.

75.     Accepting as it must that it has no evidence that the Individual Counter-Plaintiffs competed with PrimeSource during their respective restrictive periods, PrimeSource has suggested the Individual Counter-Plaintiffs violated the non-competition clause that purports to prohibit "associating with" or having an "interest in" any Material Competitor (as defined in the PrimeSource agreements) within the restricted period, even if such association or interest is not

for any competitive or business purpose. Such a provision is facially overbroad and unenforceable, and violates the Texas and Illinois Anti-SLAPP statutes by infringing on the Individual Counter-Plaintiffs' First Amendment rights of free association. Such overbroad restrictions would also never be enforceable because they would prohibit such lawful conduct as belonging to the same industry groups as Huttig, or even having a mild curiosity in how Huttig operates. Provisions such as these were included by PrimeSource intentionally for maximum *in terrorem* effect in order to deter employees from leaving PrimeSource (or a competitor from hiring such employees) because of the threat of litigation rather than because there is a legitimate risk of unfair competition.

76.     PrimeSource's claim for tortious interference with contract against Huttig is equally without merit, as PrimeSource has failed to allege, or establish any evidence of, any breach or other interference with PrimeSource's contractual relationships with the Individual Counter-Plaintiffs or any other former PrimeSource employee.

77.     Similarly, PrimeSource's newly asserted claim for tortious interference with contract against D. Fishbein is wholly without merit, as PrimeSource has failed to allege, or establish any evidence of, any interference with PrimeSource's contractual relationships with its former employees by D. Fishbein.

78.     Specifically, the purported acts of "solicitation" by D. Fishbein are not, in fact, solicitation at all. Indeed, simply inquiring about an individual's non-compete agreement or compensation information does not constitute solicitation. Nor does attending industry trade shows or sending out LinkedIn invitations.

79.     Moreover, most of the acts of supposed solicitation occurred after the expiration of the restrictive period of D. Fishbein's agreement.

80. This case has now progressed through expedited oral and written discovery, and PrimeSource has neither produced nor established any competent evidence, either direct or circumstantial, of any contractual violation by the Individual Counter-Plaintiffs.

81. PrimeSource has therefore failed to establish any evidence of any breach of contract by any of the Individual Counter-Plaintiffs, and its continued maintenance of these claims is without merit.

82. Specifically, without any evidence of any active solicitation or competition by the Individual Counter-Plaintiffs, PrimeSource has no probable cause to support its claim for tortious interference.

83. PrimeSource's claim for federal trademark infringement, which PrimeSource has abandoned in its Second Amended Complaint, was also without merit. PrimeSource previously alleged that Huttig's "HuttiGrip®" infringed on PrimeSource's "Grip-Rite®" trademark because it used the same distinctive color scheme. This allegation is false.

84. Specifically, PrimeSource alleged that Huttig announced on November 15, 2016, that the Individual Counter-Plaintiffs would be joining Huttig's ranks, and that Huttig "will focus on expanding the HuttiGrip® private label product line nationally." (Compl. ¶ 55; Ex. A.) According to PrimeSource, "[t]he press release indicates Huttig's intent to mimic the success of the Grip-Rite brand and to go head-to-head with Plaintiff using the same business model developed and managed by the Individual Defendants for PrimeSource." (*Id*. ¶ 56.) These allegations are false. The press release made no mention of PrimeSource, or Grip-Rite, or of any business model or plan associated with the expansion of the HuttiGrip® private label brand. Moreover, the HuttiGrip® brand has been in use for branding nails and other fasteners for over fifteen years, since 2001.

85. PrimeSource further alleged that Huttig failed to register the term "HuttiGrip" in March 2016 as a trademark, purporting to change the colors of the HuttiGrip brand to those PrimeSource traditionally uses for displaying its GripRite brand. (*Id*. ¶ 57.) This allegation is also false. Huttig's application was filed on June 22, 2016, and registered on November 8, 2016. The HuttiGrip mark "CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR," i.e., color was never an element of the application.

86. The trademark was registered on November 8, 2016. *See* United States Patent and Trademark Office, HuttiGrip Registration Certificate (Nov. 8, 2016), which is publicly available on the USPTO website at

https://tsdr.uspto.gov/documentviewer?caseId=sn87080228&docId=ORC20161023031700#docIndex=0&page=1Id.

87. PrimeSource included the objectively baseless trademark infringement claim because of the potential adverse business impact it would have on Huttig, in that potential customers of Huttig's fastener business would be concerned that they could be purchasing products from Huttig that might expose them to potential liability for damages.

88. This is not the first time PrimeSource has asserted factually meritless intellectual property infringement claims against a competitor that was attempting to take market share from PrimeSource. In 2014, *PrimeSource Building Products, Inc. v. The Hillman Group, Inc.*, 3:14-cv-02521-B (U.S. District Court, Northern District of Texas) (the "Hillman Lawsuit"), PrimeSource asserted claims for trademark and trade dress infringement under the Lanham Act, 15 U.S.C. § 1501 *et seq.*, and Texas common law against the Hillman Group, Inc. This lawsuit

followed immediately on the heels of Hillman displacing approximately 50% of the fasteners business at Loew's from PrimeSource.

89.     In the Hillman Lawsuit, PrimeSource alleged that the defendant's trademarks and trade dress were confusingly similar to the GripRite mark, trade dress, or packaging PrimeSource used to sell its fasteners under the GripRite mark.

90.     Among other things, PrimeSource sought an injunction to preliminarily enjoin Hillman from using its marks, DURA-GRIP and FAS-N-RITE, the trade dress or any other mark or trade dress confusingly similar to PrimeSource's marks and trade dress.

91.     With respect to its trade dress claim, PrimeSource alleged that Hillman's trade packaging utilized elements copied from PrimeSource's packaging, including a similar color-coding scheme, clear plastic windows with rounded corners, labels covering only a portion of the box top and product images.

92.     The court in the Hillman Lawsuit found that PrimeSource had failed to establish a likelihood of success on the merits of its claim for trade dress infringement.

93.     Specifically, the court found that PrimeSource failed to demonstrate that its alleged product packaging was distinctive and functional; prerequisites to any type of trademark protection for packaging trade dress.  To the contrary, the evidence presented at the preliminary injunction hearing demonstrated to the court that many other sellers of packaged nails and screws including Menard's (GripFast), Fox Valley Steel & Wire (Grip-Tite), Ace Hardware, Lowe's (Blue Hawk), Do-It-Best, and Maze all use similarly shaped boxes, a similar color-coding scheme, clear plastic display windows with rounded corners and labels to cover parts of the box. In addition, there was unrefuted testimony that many vendors use the same or similar color-coding systems for their nails and screws as PrimeSource.

72

94.     Further, PrimeSource failed to provide any consumer-survey evidence or direct consumer testimony to show that consumers identify the GripRite trade dress with PrimeSource.

95.     In addition, PrimeSource failed to present evidence establishing that the elements of the GripRite trade dress were distinctive and non-functional, whereas the defendant in the Hillman Lawsuit presented persuasive evidence that most, if not all, of the elements were functional in nature.

96.     With respect to PrimeSource's trademark infringement claim, the court also found that PrimeSource failed to demonstrate a likelihood of success on the merits of such claim.

97.     Specifically, PrimeSource failed to show that its GripRite mark has developed widespread recognition among ordinary consumers or that Hillman somehow copied the GripRite mark with the intent to deceive consumers.

98.     Accordingly, PrimeSource's request for a preliminary injunction in the Hillman Lawsuit was denied.

99.     In Count VII of its Second Amended Complaint, PrimeSource now asserts a claim for breach of a non-disclosure and employee non-interference agreement against Huttig.

100.    In December 2014, when Itochu International, Inc. "(Itochu"), PrimeSource's owner, began marketing PrimeSource and its affiliated entity, Itochu Building Products, Inc. ("IBP") for possible sale. Itochu required any entity that was interested in participating in the bidding process with respect to PrimeSource and IBP to execute a broad non-disclosure agreement containing a blanket 18-month non-solicitation and non-hire provision with respect to any director, officer, employee, independent contractor, consultant or advisor or person employed by PrimeSource, Itochu, IBP or any of their subsidiaries in an executive or significant managerial, financial, sales, marketing, sourcing or buying position that Huttig had discussions

with, obtained information with respect to or that otherwise becomes known to Huttig in the course of evaluating the potential acquisition of PrimeSource or IBP ("NDA").

101.    On or about December 16, 2014, Huttig executed the NDA explicitly in exchange for access to confidential information related to PrimeSource and IBP, and implicitly in exchange for the opportunity to meaningfully participate in the bidding process.

102.    Contrary to PrimeSource's allegations, however, Huttig was excluded from the sale process, was not permitted to attend the management meeting to meaningfully participate or engage with PrimeSource's senior management team, and no representative from Huttig ever accessed the data room containing PrimeSource's confidential information that was set up for the sale process.

103.    PrimeSource has acknowledged this fact because it does not contend that Huttig accessed or used any of its confidential information provided as part of the sale process, and instead attempts to enforce the non-solicitation and non-hire covenant even though it has full knowledge that Huttig did not receive the consideration contemplated by the NDA (i.e., PrimeSource's confidential information related to the potential sale).

104.    Unbeknownst to Huttig, and prior to Huttig's meeting with PrimeSource's senior management and Huttig's receipt of confidential information related to the potential transaction, PrimeSource decided to exclude Huttig from the bidding process because they had a strong preference that PrimeSource and IBP be acquired by a private equity firm rather than another business in the same industry. Upon information and belief, Itochu and PrimeSource never intended to allow Huttig to participate in the sale process, and instead they fraudulently induced Huttig, a direct competitor, into entering the NDA in order to preclude Huttig from soliciting or hiring any key personnel within PrimeSource and IBP.

105.    Prior to Huttig gaining access to PrimeSource's confidential information, and within minutes of attending a meeting with PrimeSource's senior management, in mid-January 2015, Itochu representatives advised Huttig that it would not be allowed to participate in the sale process or attend the management meeting to meet PrimeSource's management team.

106.    On January 17, 2015, Jon Vrabely, Huttig's Chief Executive Officer, sent an e-mail to certain Huttig executives who had received an e-mail with an Internet link to the Platinum Project (i.e., the PrimeSource and IBP sale) data room, and requested that all those at Huttig who received the e-mail with the Internet link delete it without logging into the data room. All of the Huttig personnel who received the e-mail deleted it without accessing the data room purportedly containing confidential information related to PrimeSource and IBP businesses.

107.    Indeed, on February 2, 2015, in-house counsel for Huttig wrote to counsel for Itochu, advising that it considered the NDA null and void based on the fact that Huttig was not permitted to participate in the sale process, and had not received or accessed PrimeSource's confidential information.  Huttig's General Counsel also confirmed that Huttig had not accessed the data room site and had no communication with anyone at the PrimeSource other than the brief introduction at the management meeting from which Huttig was quickly expelled.

108.    Until the Second Amended Complaint was filed, no one from Itochu, PrimeSource or IBP ever responded to Huttig's February 2, 2015 letter contending Huttig received consideration to support the NDA or that the NDA itself was valid.

109.    Such a naked, illusory non-solicitation and non-hire provision is unlawful and in violation of federal antitrust laws as a naked restraint of trade that is not ancillary to a valid nondisclosure agreement.

110. To the extent that the consideration contemplated by the NDA was the full exchange of confidential information related to the potential transaction, and the implied right to meaningfully participate in the bidding process, PrimeSource's actions demonstrated that it fraudulently induced Huttig to enter into the NDA by knowingly executing the NDA with full knowledge that strategic buyers would not be permitted to bid.

111. Accordingly, PrimeSource's claim for breach of the NDA against Huttig is objectively baseless.

112. PrimeSource has also asserted a claim in its Second Amended Complaint alleging that Huttig aided and abetted a breach of fiduciary duty related solely to a purported business opportunity with American Fasteners ("AF") that non-party, Brad Strosahl, another former PrimeSource employee, pursued after he joined Huttig (Count IX). AF is a company based in Dallas, Texas that manufactures, sells and distributes plastic strip framing nails and tapered tape joist hanger nails.

113. This claim is another objectively baseless claim which, for several reasons, PrimeSource was fully aware of at the time that it filed this Count.

114. As PrimeSource concedes, Strosahl is not bound by any non-competition or non-interference agreement with PrimeSource, and had no contractual restriction on his ability to compete for business with PrimeSource after he resigned.

115. Strosahl does not owe a fiduciary duty that extends beyond the cessation of his employment, and there is no suggestion or evidence that he took any action with respect to AF on behalf of Huttig prior to resigning from PrimeSource.

116. PrimeSource's pursuit of a potential business relationship with AF was not the subject of a confidentiality agreement between PrimeSource and AF, and AF was free to do business with whomever it chose both before and after Strosahl joined Huttig.

117. Strosahl was one of several PrimeSource executives who were involved in discussing a supply arrangement between PrimeSource and AF, and Brad Johnson was the point person at PrimeSource with respect to pursuing the AF supply arrangement.

118. PrimeSource did not lose the opportunity to do business with AF, and in fact, has entered into a supply arrangement with AF following Strosahl's departure. Moreover, the current relationship between AF and Huttig, and AF and PrimeSource, is not exclusive, and AF is free to supply plastic strip framing nails and tapered tape joist hanger nails to both PrimeSource and Huttig.

119. Further, it is clear from the Second Amended Complaint that PrimeSource is engaging in impermissible forum shopping. Having lost the preliminary injunction against Strosahl in the Colorado action, it is now seeking to litigate its claims against him before this Court.

**F.     PrimeSource's Subjective Motivation in Filing This Lawsuit Is to Exclude New or Expanded Competition**

120. Upon information and belief, the sole reason PrimeSource instituted this lawsuit was to misuse a government process—the judicial process—as an anticompetitive weapon by using the expense and burden of sham litigation to run an expanding competitor out of antitrust markets for packaged fastener products in order to acquire and/or maintain its monopoly power in these markets, and to send a warning that will discourage other actual or potential suppliers of these products from competing with PrimeSource in markets that PrimeSource regards, or at least wants to regard, as PrimeSource's alone.

121.     While PrimeSource has no objectively reasonable basis for seeking this relief, the burdens that its sham litigation has imposed on others and now imposes on Huttig, and the threat of similar sham litigation against any other would-be competitors in the supply of fastener products, has excluded and will continue to exclude competition and thereby will allow PrimeSource to acquire and/or maintain its monopoly power in antitrust markets for fastener products.

**G.     PrimeSource Misuses the Judicial Process to Impede Counter-Plaintiffs' Counsel**

122.     For example, PrimeSource has designated substantially all of its initial production and most of what has followed "Attorneys' Eyes Only," ("AEO") without regard for whether that designation is appropriate. This impedes Counter-Plaintiffs' ability to defend this case.

123.     Prime Source's over-designation of evidence as AEO and as privileged (without explanation) prevents the litigation from being a fair and open process and causes harm to Huttig's business by preventing the public from knowing the facts.

124.     At his initial deposition on May 15, 2017, Eric Royse, PrimeSource's Rule 30(b)(6) corporate representative, refused to answer direct questions within the topic areas of the Rule 30(b)(6) subpoena, and PrimeSource's counsel engaged in a course of repeated and persistent speaking objections in clear violation of Federal Rule of Civil Procedure 30 designed to prevent Counter-Plaintiffs from discovering relevant information in defense against PrimeSource's claims.  Moreover, PrimeSource's counsel improperly asserted the attorney-client privilege many times during this deposition in an effort to prevent Royse from answering factual questions related to PrimeSource's evidence of alleged misconduct by the Individual Counter-Plaintiffs.

125.    Despite pursuing an exceedingly broad "definition" of its trade secrets from the outset, PrimeSource refused to produce requested documents relating to pricing, sales, or marketing information that PrimeSource obtained from third parties regarding its competitors — i.e., the information alleged to be confidential and/or constitute trade secrets in this case (but which Defendants contend is generally known and communicated within the industry) — absent a court Order entered on April 20, 2017. *See* Case No. 16-cv-11468 Doc. 79.

126.    Despite pursuing an exceedingly broad "definition" of its trade secrets from the outset, PrimeSource refused to produce information regarding its policies and procedures in targeting potential employees — e.g., whether it seeks out employees with industry experience and industry "know-how" — absent a court Order entered on April 20, 2017. *See id*.

127.    When, PrimeSource finally produced requested documents relating to pricing, sales, or marketing information that PrimeSource obtained from third parties regarding its competitors, it marked all such information AEO, without regard to whether it was communicated to PrimeSource by a nonparty, concerned a nonparty, or (in dozens of instances) was contained within a communication (such as an e-mail) to which one of the individual defendants now employed by Huttig (e.g., Brad Strosahl, Sam Sprague, Garrett Kessler, etc.) was a party.

128.    On July 14, 2017, after expedited discovery had been concluded in advance of the PI hearing and after the parties had submitted their pre-hearing briefing on issues related to the upcoming preliminary injunction hearing, PrimeSource produced 1,900 more pages of documents relating to pricing, sales or marketing information that PrimeSource obtained from third parties regarding its competitors.

II.    **Additional Facts Relevant To Huttig's Antitrust Claims Against PrimeSource**

    H.    **The Relevant Product and Geographic Market**

129.    PrimeSource sells fasteners in two antitrust markets for which it has a monopoly, or for which it is unlawfully attempting to obtain a monopoly.

130.    The National Account Packaged Fastener Market (the "NPF Market"), is defined as the United States market for wholesale supply of nails, screws, staples, and other fastener products packaged in one-to five-pound boxes and similar small packaging for sale to large national and regional retail store chains, stores, construction products dealers, and other similar customers who require or seek the following (collectively, "NPF Customer Requirements"):  (i) a full line of these products; (ii) consistent appearance and product mix for all of the customer's stores or other sales outlets; (iii) coordinated rebate, merchandising services, and promotional programs for all of the customer's stores or other sales outlets; (iv) coordinated and prompt deliveries from a national or regional warehouse network and/or coordinated direct shipments from product sources to all of the customer's stores or other sales outlets; (v) ability to quickly fill in shipments from the supplier's warehouses between direct shipments from products sources, or when such shipments are late; and (vi) ability to use bidding procedures to select a supplier for all of the customer's stores or other sales outlets.

131.    Customers in the NPF Market include but are not limited to the following:  Home Depot, Lowe's, US LBM, 84 Lumber, Do-It-Best, Builder's First Source, BMC, Builders First Source, and McCoy's.

132.    The NPF Market is a valid antitrust market.

133.    The Federal Trade Commission ("FTC") and the Department of Justice ("DOJ"), as well as many courts, use a hypothetical monopolist test to identify antitrust markets. Under that test, the market is defined by the smallest set of products in which the only seller of a

product (i.e., the hypothetical monopolist) could profitably increase prices by a small but significant and nontransitory amount ("SSNIP"). The test is used because profitable price increases indicate that customers prefer to absorb anticompetitive prices and suffer antitrust injury rather than switch to alternative products. The test is a measure of the degree to which products in the market compete with and are interchangeable with products outside of the market. A hypothetical monopolist could profitably increase prices in the NPF Market by a SSNIP.

134. Customers in the NPF Market have no reasonable alternatives to the full line of boxed fastener products that PrimeSource and a few other suppliers sell. Other suppliers who sell only particular types of boxed fasteners, and/or do not meet the NPF Customer Requirements are not reasonably interchangeable with the full line of products and coordinated service and delivery arrangements that customers in the NPF Market seek, and that PrimeSource and a few other suppliers offer.

135. The industry recognizes the differences in terms of the speed, cost, and administrative burden of sourcing these products for the retail stores and other sales outlets of customers in the NPF Market, between PrimeSource and the few other suppliers that sell to customers in NPF Market, on the one hand, and other wholesale suppliers of fastener products that do not meet the NPF Customer Requirements and/or sell to customers who purchase only selected types of boxed fasteners or make less frequent or smaller volume purchases.

136. The Wholesale Fastener Market (the "WF Market") is defined as the United States market for wholesale supply of a full line of nails, screws, staples, and other fastener products (i) packaged in one-to five-pound boxes, (ii) packaged in larger sizes of 30-pound pails and 50-pound boxes and (iii) collated and attached to feed strips in various configurations to meet the specifications of most or all power tool brands and suppliers rather than a particular tool

brand, for sale to retail store chains, stores, construction products dealers, and other similar customers that resell the products to end users.

137.    Customers in the WF Market include but are not limited to the following: (i) customers in the NPF Market; (ii) ABC Supply; (iii) SRS; (iv) L&W Supply; (v) Foundation Building Materials; (vi) Golden State Lumber; (vii) Hines Lumber; (viii) Whitecap; (ix) Southern Fastening; (x) Garrett Supply; and (xi) Pro-Fast.

138.    The WF Market is a valid antitrust market.

139.    The FTC and the DOJ, as well as many courts, use a hypothetical monopolist test to identify antitrust markets. Under that test, the market is defined by the smallest set of products in which the only seller of a product (i.e., the hypothetical monopolist) could profitably increase prices by a SSNIP. The test is used because profitable price increases indicate that customers prefer to absorb anticompetitive prices and suffer antitrust injury rather than switch to alternative products. The test is a measure of the degree to which products in the market compete with and are interchangeable with products outside of the market. A hypothetical monopolist could profitably increase prices in the NPF Market by a SSNIP.

140.    Customers in the WF Market have no reasonable alternatives to the full line of fastener products and services of PrimeSource and a few other suppliers, including products that are not branded with the brand of particular power tools. Other suppliers who sell only particular types of fasteners or particular branded fasteners for use with that tool brand, and/or have more limited warehousing, distribution, and delivery arrangements, are not reasonably interchangeable with the full line of products and services that customers in the WF Market seek.

141.    The industry recognizes the differences in terms of the full line of products, speed, cost, and administrative burden of sourcing these products for the retail stores and dealerships of

customers in the WF Market, between PrimeSource and the few other suppliers that sell to customers in the WF Market, on the one hand, and other wholesale suppliers of fastener products that do not sell a full line of fastener products and/or sell products only with the brand of particular tool brands.

## I. Market Characteristics Favoring Monopolization

142. There are barriers to entry in the NPF Market and WF Market, including:

    (a)    The cost and time to arrange a national network of warehouse facilities.

    (b)    The cost and time to arrange sourcing for thousands of fastener products, primarily from non-US manufacturers and trading companies, some of which are subject to U.S. import duties that increase the cost of their products for sale to U.S. wholesale customers.

    (c)    The cost and time to develop product brands and configure packaging/labeling for use with the brands, and to develop industry recognition of the brands.

    (d)    The cost and time to establish a positive reputation with product manufacturers, trading companies, and other intermediaries in the supply chain, and with customers in the market.

    (e)    The cost, burden, delay, and uncertainty of defending unfounded trade secrets, intellectual property, and restrictive covenant litigation by PrimeSource.

    (f)    The cost, burden, delay, and uncertainty of defending threats and claims in litigation by PrimeSource to enforce the many overbroad restrictive non-competition covenants and vague nondisclosure agreements that PrimeSource has imposed on present and former business managers who

possess general industry knowledge about, and experience and positive reputation in, the NPF Market and the WF Market. This includes non-competition covenants imposed at the time that PrimeSource terminated the business managers, the sole and admitted purpose of which is to "protect the company from competition by the people who grew the business and knew it the best." (PS 2d Am. Compl. ¶ 48).

**J.    PrimeSource's Monopoly Power in the NPF Market and Dangerous Probability of Acquiring Monopoly Power in the WF Market**

143.    PrimeSource has monopoly power in the NPF Market.

144.    The NPF Market has become highly concentrated. Today the NPF Market is effectively limited to PrimeSource, and a few other suppliers that meet only some of the NPF Customer Requirements and account for a much smaller share of sales in the NPF Market.

145.    PrimeSource is by far the dominant firm, holding 70 to 75 percent of sales in the NPF Market. On information and belief, the few other suppliers that make some sales to customers in the NPF Market have much smaller shares of such sales, with two other suppliers that each has no more than 10 percent of such sales and any other suppliers having less than five percent of sales.

146.    The NPF Market is highly concentrated, using the FTC and DOJ index for concentration, the Herfindahl-Hirschman Index (the "HHI"). Highly concentrated markets have an HHI above 2,500. On information and belief, the HHI in the NPF Market is above 5,000 and may approach 6,000.

147.    There is a dangerous probability that PrimeSource will acquire monopoly power in the WF Market.

148.    PrimeSource has by far the largest share of sales in the WF Market, and its market share has been growing due to the unlawful conduct complained of herein. On information and belief, PrimeSource holds 60 to 70 percent of sales in the WF for products that are not branded to a particular power tool brand, and 40 percent or more of total sales including products that are branded to a particular power tool brand.

149.    The WF Market has become highly concentrated. Years ago there were a number of established suppliers and new entrants in the WF Market. Today the WF Market is effectively limited to just a few wholesale suppliers. On information and belief, the top five suppliers have 90 percent or more of sales in the WF Market.

150.    The WF Market is highly concentrated, using the FTC and DOJ index for concentration, the Herfindahl-Hirschman Index (the "HHI"). Highly concentrated markets have an HHI above 2,500. On information and belief, the HHI in the WF Market is above 4,000 and may approach 5,000.

### K.    PrimeSource's Exclusionary Conduct

151.    PrimeSource has willfully sought to maintain, protect, and enhance its monopoly power in the NPF Market and WF Market, and to acquire monopoly power in these markets, by means other than the superiority of its services or products, its business acumen, or historic accident, but rather through unlawful exclusionary, predatory, and other conduct to exclude rivals and limit their ability to effectively compete for sales in the NPF Market and WF Market.

152.    PrimeSource has threatened, filed, and pursued sham trade secrets, trademark, and trade dress litigation against former employees and their actual or potential new employers, including Counter-Plaintiffs, Hillman, Brad Strosahl and Sam Sprague, two recently departed PrimeSource executives who have joined Huttig, and others who have sought to enter into or sell in the NPF Market and WF Market. In addition to the Hillman Lawsuit noted above, the District

Court of the State of Colorado recently denied PrimeSource's request to enjoin current Huttig (and former PrimeSource) employee Strosahl from working for Huttig, finding that his employment by Huttig presented no serious threat of use of cognizable PrimeSource trade secrets.

153.    On information and belief, PrimeSource has induced defendants in these lawsuits to enter into agreements that restrict their ability compete with PrimeSource in the NPF Market and WF Market. For example, with respect to D. Fishbein and Furio, PrimeSource represented that they would be free to compete with PrimeSource if they agreed to abide by the 12-month competition provision contained in the severance agreements, but sued them after the expiration of the non-competition period relying on a specious trade secret misappropriation theory.

154.    PrimeSource threatened fastener product manufacturers, trading companies, and others with withdrawal of PrimeSource business if the firms sell fastener products to Huttig and other actual or potential wholesale suppliers in the NPF Market and WF Market, with the intended and/or actual effect of causing these manufacturers and other firms to refuse to deal with Huttig and other actual or potential wholesale suppliers.  PrimeSource made such threats to at least one nail manufacturer in Asia that is not subject to U.S. anti-dumping import duties on sales to U.S. wholesale customers, in order to increase to cost of products purchased in Asia by Huttig and other rivals, who may be forced to purchase fastener products from manufacturers in Asia whose products are covered by such duties.

155.    PrimeSource has used targeted predatory pricing with selected wholesale customers to prevent new and growing rivals from entering into supply arrangements with the customers.

156.    PrimeSource has used bundled rebate and pricing programs that induce customers in the NPF Market and WF Market to purchase most or all of their fastener products from

PrimeSource, and force other suppliers who seek to make some sales to these customers to lower prices for such sales to the point that the sales would be unprofitable and below cost.

157.    Over the last several years, PrimeSource has made a series of acquisitions of firms engaged in actual or potential competition in the NPF Market and WF Market in competition with PrimeSource, with the purpose and effect of achieving and preserving the monopoly power and dominant market position of PrimeSource in the market.  Most recently, in November 2016, PrimeSource acquired Northeast Wholesale, a regional distributor of fasteners, tools and other building materials, which acquisition strategy is consistent with its prior acquisitions of other rivals, Pacific Steel & Supply, 3-GS Supply, Prudential, Coast-to-Coast Building Products, Compass International, Langtry Industries and All Island Exports.

158.    PrimeSource entered into a multi-year exclusive supply arrangement with at least one big box retailer, Lowe's, in 2014, after it lost a large percentage of its business with the customer to Hillman, not for any procompetitive business purpose, but rather to ensure that it would not face any other material competition, loss of market share, and erosion of monopoly prices for its fastener products, thereby creating an additional barrier to entry and expansion by Huttig and others who seek to compete in the NPF Market.

159.    PrimeSource abused the judicial process by asserting what it knew to be baseless claims for misappropriation of trade secrets, breach of contract, tortious interference, and trademark infringement as a basis for seeking injunctive relief to stop Huttig from effectively competing with PrimeSource, and continues to misuse the judicial process by pressing its claims after discovery has shown that PrimeSource lacks an objectively reasonable basis to assert these claims.

160.    PrimeSource's past litigation conduct and other conduct against other actual or potential competitors, and its conduct against Huttig, including in this litigation, show a subjective intent to unlawfully exclude competition.

**L.    Injury to Competition in the Relevant Markets**

161.    PrimeSource has eliminated and injured competition and/or threatens to do so in the NPF Market and WF Market.

162.    PrimeSource has targeted potential competitors, including Hillman, with unfounded litigation in order to impose increased cost and delay on and prevent these firms from making sales in the NPF Market and WF Market.

163.    PrimeSource is targeting Huttig with unfounded trade secrets and other claims in order to impose increased cost and delay on Huttig, thereby preventing Huttig from making sales in the NPF Market and WF Market and eliminating Huttig as one of the only checks on PrimeSource's monopoly power in the NPF Market and its large and growing market share in the WF Market, which constitutes an injury to competition and/or threatened injury to competition in the NPF Market and WF Market.

164.    PrimeSource has acquired actual and potential competitors in order to eliminate competition, and acquire and preserve its monopoly power in the NPF Market and WF Market.

165.    The ongoing unlawful exclusionary and predatory conduct of PrimeSource has harmed competition in the NPF Market and WF Market by (a) preventing or delaying new entry by wholesale suppliers, (b) inhibiting and limiting new entry and expansion in the market by imposing costs on wholesale suppliers that seek to enter or expand in the market, (c) harming the reputation of targeted wholesale suppliers with customers, manufacturers, foreign trading companies, and others and (d) discouraging other actual and potential suppliers of fastener products from competing with PrimeSource.

M.      **Antitrust Injury to Huttig**

166.    Huttig has suffered and is threatened with injury to its business and property caused by PrimeSource's unlawful conduct.

167.    Huttig is poised to provide a substantial and unique constraint on PrimeSource's monopoly power and dominant market position in the NPF Market, and its large and growing market share in the WF Market.  Huttig has served as a wholesale distributor of fastener products for many years, and the Individual Counter-Plaintiffs in this case who now work for Huttig have the reputation, and general industry knowledge and experience, that customers in the NPF Market and WF Market seek in a wholesale distributor of fastener products.

168.    Because of this threat, PrimeSource has targeted Huttig and the Individual Counter-Plaintiffs in this case with the cost, burden, and delay of unfounded theft of trade secrets, trademark and trade dress infringement claims that it has asserted in this case, with the purpose and effect of preventing and/or delaying Huttig from sourcing a full line of fastener products from around the world, and succeeding in sales efforts with customers in the NPF Market and WF Market, thereby giving PrimeSource the ability to control supply and maintain and raise prices in the NPF Market, and a dangerous probability that PrimeSource will gain such ability in the WF Market.

169.    Taken as a whole, the unlawful exclusionary and predatory conduct of PrimeSource has caused and will continue to cause substantial and irreparable harm to Huttig's business and property by (a) preventing Huttig from hiring, or raising the cost and thereby inhibiting the ability of Huttig to hire experienced business managers, (b) preventing Huttig from entering into, or raising the cost and inhibiting the ability of Huttig to enter into, supply arrangements with manufacturers, trading companies, and wholesale customers for fastener products, (c) causing customers and suppliers to raise concerns about PrimeSource's allegations,

and (d) imposing high costs and the burden of litigation on Huttig, all of which, on information and belief, have caused Huttig to lose actual and potential sales to customers, to suffer lost profits as a result of such lost sales, and to suffer a loss of value of its business.

170.     Counter-Plaintiffs have learned through the course of discovery that PrimeSource has been threatening certain overseas vendors that if they supply building products or fasteners to Huttig, PrimeSource would cease buying fastener products from that vendor. Specifically, Huttig has learned that Esrom Screw and at least four other entities have been warned by PrimeSource that they should not do business with Huttig or face losing PrimeSource's business. PrimeSource has directed these threats at fastener products manufacturers in Asia that are not subject to U.S. anti-dumping import duties, in order to raise the cost of Huttig and other rivals for fastener products sourced in Asia, if they are forced to purchase fastener products from other manufacturers in Asia that are subject to such duties. PS also directed the threats, among others, to a small number of qualified screw suppliers (and brokers/trading partners of these qualified suppliers) in order to raise the cost to Huttig and other rivals and prevent them from being able to offer these products for sale to PrimeSource captive customers.

## COUNT I

### (BAD FAITH CLAIM UNDER DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836)
### (All Counter-Plaintiffs v. PrimeSource)

171.     Counter-Plaintiffs restate and reallege Paragraphs 1 through 170 of their counterclaims as if fully set forth herein.

172.     Section 1836(b)(3)(D) of the Defend Trade Secrets Act provides that the Court may award reasonable attorneys' fees to the prevailing defendant or defendants if a claim for misappropriation of trade secrets is made in bad faith.  18 U.S.C. § 1836(b)(3)(D).

173.    PrimeSource has alleged and asserted its misappropriation of trade secrets against Counter-Plaintiffs in bad faith, based on both direct and circumstantial evidence identified in relevant part herein.

174.    PrimeSource did not undertake a reasonable pre-filing factual investigation prior to asserting a misappropriation of trade secrets claim under the DTSA against Counter-Plaintiffs.

175.    PrimeSource failed to include any particularized identification of its alleged trade secrets in its First Amended Complaint, its injunction moving papers and supporting memorandum, or in discovery.

176.    PrimeSource alleged in its initial Complaint and its First Amended Complaint that each of the Individual Counter-Plaintiffs physically took or used PrimeSource's confidential information and trade secrets, but has yet to come forward with any evidence that any of the Individual Counter-Plaintiffs has taken or retained any of PrimeSource's alleged trade secrets.

177.    PrimeSource knows that no such evidence of misappropriation and use exists, and yet it initiated and continues to maintain a claim for theft of trade secrets anyway.

178.    In addition, PrimeSource knew at the time of filing that no legal support exists for applying the "inevitable disclosure" doctrine to prevent Individual Counter-Plaintiffs from being employed by a competitor, and it has failed to demonstrate that the doctrine of inevitable disclosure has any application in this instance, in particular since there is at least a 12-month gap between the Individual Counter-Plaintiffs' employment with PrimeSource and their employment or consulting role with Huttig.

179.    PrimeSource has asserted this trade secrets claim for an improper purpose to harass, intimidate and oppress Counter-Plaintiffs, use the cost and expense of litigation in an effort to slow them down and prevent them from competing with PrimeSource, and thereby

91

unlawfully maintain its monopoly power and dominant market position in relevant antitrust markets for fastener products.

180.     Accordingly, pursuant to Section 1836(b)(3)(D) of the Defend Trade Secrets Act, Counter-Plaintiffs are entitled to their attorneys' fees incurred in having to defend against PrimeSource's trade secret misappropriation claims asserted against Counter-Plaintiffs.

WHEREFORE, Defendants/Counter-Plaintiffs request judgment in their favor and against Plaintiff/Counter-Defendant on Count I of their counterclaims and that they be awarded the following relief:

(a)     attorneys' fees and costs incurred in this matter in excess of $1,700,000; and

(b)     such other and further relief as this Court deems equitable and just.

## COUNT II

### (BAD FAITH CLAIM UNDER ILLINOIS TRADE SECRETS ACT, 765 ILCS 1065/5) (All Counter-Plaintiffs v. PrimeSource)

181.     Defendants/Counter-Plaintiffs restate and reallege Paragraphs 1 through 180 of their counterclaims as if fully set forth herein.

182.     Section 1065/5 of the Illinois Trade Secrets Act provides that the Court may award reasonable attorneys' fees if a claim for misappropriation of trade secrets is made in bad faith.  765 ILCS 1065/5.

183.     PrimeSource has alleged and asserted its misappropriation of trade secrets against Counter-Plaintiffs in bad faith, based on both direct and circumstantial evidence identified in relevant part herein.

184.     PrimeSource did not undertake a reasonable pre-filing factual investigation prior to asserting a misappropriation of trade secrets claim under the DTSA against Counter-Plaintiffs.

92

185.     PrimeSource failed to include any particularized identification of its alleged trade secrets in its First Amended Complaint, its injunction moving papers and supporting memorandum, or in discovery.

186.     PrimeSource alleged in its initial Complaint and its First Amended Complaint that each of the Individual Counter-Plaintiffs physically took or used PrimeSource's confidential information and trade secrets, but has yet to come forward with any evidence that any of the Individual Counter-Plaintiffs has taken or retained any of PrimeSource's alleged trade secrets.

187.     PrimeSource knows that no such evidence of misappropriation and use exists, and yet it initiated and continues to maintain a claim for theft of trade secrets anyway.

188.     In addition, PrimeSource knew at the time of filing that no legal support exists for applying the "inevitable disclosure" doctrine to prevent Individual Counter-Plaintiffs from being employed by a competitor, and it has failed to demonstrate that the doctrine of inevitable disclosure has any application in this instance, in particular since there is at least a 12-month gap between the Individual Counter-Plaintiffs' employment with PrimeSource and their employment or consulting role with Huttig.

189.     PrimeSource has asserted this trade secrets claim for an improper purpose to harass, intimidate and oppress Counter-Plaintiffs, use the cost and expense of litigation in an effort to slow them down and prevent them from competing with PrimeSource, and thereby unlawfully maintain its monopoly power and dominant market position in relevant antitrust markets for fastener products.

190.     Accordingly, pursuant to Section 1065/6 of the Illinois Trade Secrets Act, Counter-Plaintiffs are entitled to their attorneys' fees incurred in having to defend against PrimeSource's frivolous claims.

WHEREFORE, Defendants/Counter-Plaintiffs request judgment in their favor and against Plaintiff/Counter-Defendant on Count II of their counterclaims and that they be awarded the following relief:

    (a)    Attorneys' fees and costs incurred in this matter in excess of $1,700,000; and

    (b)    Such other and further relief as this Court deems equitable and just.

## COUNT III

**(DEFAMATION *PER SE*)**
**(All Counter-Plaintiffs v. PrimeSource)**

191. Counter-Plaintiffs restate and reallege Paragraphs 1 through 190 of their counterclaims as if fully set forth herein.

192. The statements made about the Individual Counter-Plaintiffs and Huttig by PrimeSource as described above, are false and defamatory.

193. Several of the false statements made by PrimeSource constitute defamation *per se* because they: (i) imputed to Counter-Plaintiffs the commission of a crime, i.e., the theft of confidential information from PrimeSource; (ii) imputed a want of integrity in the discharge of the Individual Counter-Plaintiffs' duties of employment; (iii) imputed a lack of ability on the part of the Individual Counter-Plaintiffs to carry out their trade, profession and business, e.g., because they were allegedly prohibited from competing with PrimeSource and could not have done so without the unlawful theft of PrimeSource's confidential information and trade secrets; and (iv) imputed a lack of integrity on the part of Huttig and its business practices and methods.

194. PrimeSource made these false and defamatory statements to third parties outside of this litigation, including but not limited to Grunfeld and, upon information and belief, other customers, vendors and suppliers of Huttig.

195. The numerous publications of the false and defamatory statements about Counter-Plaintiffs as described above, have caused them damages, including but not limited to damage to their reputation within the industry.

196. The publication of the Complaint, First Amended Complaint, and the false and defamatory statements contained within the Complaint and First Amended Complaint to third parties not involved or parties to the this lawsuit are not privileged.

197. The foregoing conduct was willful, wanton and outrageous because, among other things, it was part of a pre-conceived, concerted campaign to destroy Counter-Plaintiffs' reputation and undermine Huttig's business and to squelch the competition by Huttig and the Individual Counter-Plaintiffs with an utter lack of regard for applicable law and Counter-Plaintiffs' rights.

WHEREFORE, Counter-Plaintiffs K. Fishbein, D. Fishbein, Zinman, Furio and Huttig request judgment in their favor and against Counter-Defendant PrimeSource on Count III of their counterclaims and that they be awarded the following relief:

(a) Compensatory damages in an amount to be determined at trial;

(b) Punitive damages; and

(c) Such other and further relief as this Court deems equitable and just.

## COUNT IV

### (TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE)
### (Huttig v. PrimeSource)

198. Counter-Plaintiffs restate and reallege Paragraphs 1 through 197 of their counterclaims as if fully set forth herein.

199.    Huttig has a valid business expectancy in continued relationships with its customers, vendors and suppliers which relationships have been obtained through the expenditure of substantial time, money and effort.

200.    PrimeSource is aware of and has reason to know of Huttig's customer, vendor and supplier relationships by virtue of the fact that PrimeSource has dealings with the same customers, vendors and suppliers and has directly contacted and threatened these third parties.

201.    PrimeSource is using improper threats and disseminating false and defamatory information regarding Counter-Plaintiffs to improperly interfere with Huttig's customers, vendors and suppliers in order to stifle competition and maintain their unfair competitive advantage.

202.    PrimeSource's conduct has interfered with and prevented Huttig (or has threatened to interfere with or prevent Huttig) from continuing certain existing business relationships with its customers, vendors and/or suppliers by inducing and/or otherwise causing these customers, vendors and/or suppliers not to enter into or continue their prospective business relationships with Huttig.

203.    Specifically, PrimeSource has threatened Esrom Screw, and at least four other suppliers or trading partners, that if they continue to do business with Huttig, PrimeSource will cut them off and/or cease doing business with them, thus threatening these customers, vendors and suppliers with financial harm should they choose to do business with Huttig.

204.    PrimeSource knowingly and intentionally interfered with Huttig's valid business expectancy in its continued relationships with its customers, vendors and/or suppliers by inducing and/or otherwise causing these customers, vendors and/or suppliers not to enter into or continue their prospective business relationships with Huttig and by using improper and unlawful

means in order to do so, including but not limited to disseminating false, defamatory and disparaging information about Counter-Plaintiffs and improperly threatening to withdraw business from these customers, vendors and/or suppliers.

205. PrimeSource's actions are not privileged because it acted unlawfully and with the deliberate intent of causing harm to Huttig and the Individual Counter-Plaintiffs.

206. As a direct and proximate result of PrimeSource's tortious interference, Huttig has suffered, and continues to suffer, substantial damages and injury to its existing and prospective customer, vendor and supplier relationships.

207. PrimeSource's misconduct was and is knowing, intentional and reckless, and is of such an aggravated character as to warrant the imposition of punitive damages.

WHEREFORE, Counter-Plaintiff Huttig respectfully requests judgment in its favor and against Counter-Defendant PrimeSource on Count IV of its counterclaims and it be awarded the following relief:

    (a)    compensatory damages in an amount to be determined at trial;

    (b)    punitive damages;

    (c)    injunctive and equitable relief prohibiting PrimeSource and its employees and agents from wrongfully interfering with Huttig's business relationships and prospective economic advantages, including but not limited to injunctive and equitable relief prohibiting PrimeSource and its employees and agents from threatening Huttig's customers, vendors and suppliers and from making false, disparaging and defamatory remarks regarding Huttig and the Individual Counter-Plaintiffs; and

    (d)    such other and further relief as this Court deems equitable and just.

## COUNT V

**(MONOPOLIZATION OF THE U.S. NATIONAL ACCOUNTS BOXED FASTENER MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2)**
**(Huttig v. PrimeSource)**

208.     Counter-Plaintiffs restate and reallege Paragraphs 1 through 207 of their counterclaims as if fully set forth herein.

209.     The conduct of PrimeSource complained of herein occurred in or affected interstate commerce.

210.     The NPF Market is a valid antitrust market.

211.     There are significant barriers to entry in the NPF Market, including without limitation due to the past litigation conduct toward others and the current litigation conduct toward Huttig and the former PrimeSource employees who now work for Huttig as alleged herein.

212.     The current lawsuit is a sham in that the claims asserted are objectively baseless; and, alternatively, the five PrimeSource lawsuits identified herein are part of a pattern of lawsuits that were brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival.

213.     PrimeSource possessed monopoly power in the NPF Market when it filed this lawsuit and related lawsuits in 2016 against Huttig and former PrimeSource employees who now work for Huttig.

214.     PrimeSource has willfully sought and continues to seek to maintain, protect, and enhance its monopoly power in the NPF Market by means other than the superiority of its services or products, its business acumen, or historic accident, but rather by the exclusionary, predatory, and other unjustifiable conduct alleged herein.

215.    PrimeSource's past litigation conduct and other unlawful exclusionary and predatory conduct alleged herein, and its conduct in this and related litigation against Huttig and former PrimeSource employees who now work for Huttig, shows a subjective intent of PrimeSource to exclude competition.

216.    PrimeSource's conduct complained of herein constitutes monopolization of the NPF Market, and has threatened and/or threatens to harm competition and cause antitrust injury to Huttig.  Were PrimeSource to succeed in its illegal monopolization conduct against Huttig, PrimeSource would eliminate Huttig as a key competitor which now employs experienced business managers with general knowledge, experience, and positive reputation in the NPF Market, and which thereby poses an imminent threat to erode and eliminate PrimeSource's monopoly power in the NPF Market through lawful competition.  By harming Huttig, PrimeSource's conduct has the further effect of harming customers in the NPF Market, who are threatened with loss of a key source of wholesale distribution in competition with PrimeSource if Huttig is significantly delayed, weakened, and/or eliminated as a competitor in the NPF Market.

217.    In the absence of injunctive and other equitable relief that Huttig seeks in these counterclaims, PrimeSource will continue to harm competition in the NPF Market through its unlawful conduct, and cause further injury and threatened injury to the business and property of Huttig in the form of lost revenue, increased costs, including unnecessary attorneys' fees and litigation expenses, and inability to participate fully in the judicial process.

218.    PrimeSource's conduct described herein is in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

WHEREFORE, Counter-Plaintiff Huttig requests judgment in its favor and against Counter-Defendant PrimeSource on Count V of its counterclaims and that it be awarded the following relief:

      (a)    treble damages in an amount to be determined at trial;

      (b)    attorneys' fees and costs incurred in this matter;

      (c)    injunctive and equitable relief declaring the non-competition and non-solicitation covenants that PrimeSource has imposed on present and former business managers to be void and unenforceable, and enjoining PrimeSource from imposing such covenants on future business managers; and

      (d)    such other and further relief as this Court deems equitable and just.

## COUNT VI

### (ATTEMPTED MONOPOLIZATION OF THE NPF MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2)
### (Huttig v. PrimeSource)

219.    Counter-Plaintiff Huttig restates and realleges Paragraphs 1 through 218 of its counterclaims as if fully set forth herein.

220.    The conduct of PrimeSource complained of herein occurred in or affected interstate commerce.

221.    The NPF Market is a valid antitrust market.

222.    There are significant barriers to entry in the NPF Market, including without limitation due to the past litigation conduct toward others and the current litigation conduct toward Huttig and the former PrimeSource employees who now work for Huttig as alleged herein.

223. The current lawsuit is a sham in that the claims asserted are objectively baseless; and, alternatively, the five PrimeSource lawsuits identified herein are part of a pattern of lawsuits that were brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival.

224. PrimeSource has acted and continues to act willfully with the specific intent to monopolize the NPF Market, and the conduct of PrimeSource complained of herein has had or will have the following effects: competition in the NPF Market has been and will continue to be impaired and restrained, and there is a dangerous probability that PrimeSource will unlawfully obtain and/or further enhance its monopoly power and ability to exclude competitors from the NPF Market and thereby lessen and/or destroy competition in the NPF Market.

225. PrimeSource's past litigation conduct and other unlawful exclusionary and predatory conduct alleged herein, and its conduct in this and related litigation against Huttig and former PrimeSource employees who now work for Huttig, show a subjective intent of PrimeSource to exclude competition.

226. PrimeSource's conduct complained of herein constitutes an attempt to monopolize the NPF Market, and has threatened and/or threatens to harm competition and cause antitrust injury to Huttig. Were PrimeSource to succeed in its illegal monopolization conduct against Huttig, PrimeSource would eliminate Huttig as a key competitor which now employs experienced business managers with general knowledge, experience, and positive reputation in the NPF Market, and which thereby poses an imminent threat, through lawful competition, to prevent PrimeSource from acquiring monopoly power in the NPF Market. By harming Huttig, PrimeSource's conduct has the further effect of harming customers in the NPF Market, who are

threatened with loss of a key source of wholesale supply in competition with PrimeSource if Huttig is significantly delayed, weakened, and/or eliminated as a competitor in the NPF Market.

227. In the absence of injunctive and other equitable relief that Huttig seeks in these counterclaims, PrimeSource will continue to harm competition in the NPF Market through its unlawful conduct, and cause further injury and threatened injury to the business and property of Huttig in the form of lost revenue, increased costs, including unnecessary attorneys' fees and litigation expenses, and inability to participate fully in the judicial process.

228. PrimeSource's conduct described herein is in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

WHEREFORE, Counter-Plaintiff Huttig requests judgment in its favor and against Counter-Defendant PrimeSource on Count VI of its counterclaims and that it be awarded the following relief:

(a) treble damages in an amount to be determined at trial;

(b) attorneys' fees and costs incurred in this matter;

(c) injunctive and equitable relief declaring the non-competition and non-solicitation covenants that PrimeSource has imposed on present and former business managers to be void and unenforceable, and enjoining PrimeSource from imposing such covenants on future business managers; and

(d) such other and further relief as this Court deems equitable and just.

## COUNT VII

### (ATTEMPTED MONOPOLIZATION OF THE WF MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2)
### (Huttig v. PrimeSource)

229. Defendant/Counter-Plaintiff Huttig restates and realleges Paragraphs 1 through 228 of its counterclaims as if fully set forth herein.

230. The conduct of PrimeSource complained of herein occurred in or affected interstate commerce.

231. The WF Market is a valid antitrust market.

232. There are significant barriers to entry in the WF Market, including without limitation due to the past litigation conduct toward others and the current litigation conduct toward Huttig and the former PrimeSource employees who now work for Huttig as alleged herein.

233. The current lawsuit is a sham in that the claims asserted are objectively baseless; and, alternatively, the five PrimeSource lawsuits identified herein are part of a pattern of lawsuits that were brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival.

234. PrimeSource has acted and continues to act willfully with the specific intent to monopolize the WF Market, and the conduct of PrimeSource complained of herein has had or will have the following effects: competition in the WF Market has been and will continue to be impaired and restrained, and there is a dangerous probability that PrimeSource will unlawfully obtain and/or further enhance its monopoly power and ability to exclude competitors from the WF Market and thereby lessen and/or destroy competition in the WF Market.

235. PrimeSource's past litigation conduct and other unlawful exclusionary and predatory conduct alleged herein, and its conduct in this and related litigation against Huttig and

former PrimeSource employees who now work for Huttig, show a subjective intent of PrimeSource to exclude competition.

236. PrimeSource's conduct complained of herein constitutes an attempt to monopolize the WF Market, and has threatened and/or threatens to harm competition and cause antitrust injury to Huttig. Were PrimeSource to succeed in its illegal monopolization conduct against Huttig, PrimeSource would eliminate Huttig as a key competitor which now employs experienced business managers with general knowledge, experience, and positive reputation in the WF Market, and which thereby poses an imminent threat, through lawful competition, to prevent PrimeSource from acquiring monopoly power in the WF Market. By harming Huttig, PrimeSource's conduct has the further effect of harming customers in the WF Market, who are threatened with loss of a key source of wholesale supply in competition with PrimeSource if Huttig is significantly delayed, weakened, and/or eliminated as a competitor in the WF Market.

237. In the absence of injunctive and other equitable relief that Huttig seeks in these counterclaims, PrimeSource will continue to harm competition in the WF Market through its unlawful conduct, and cause further injury and threatened injury to the business and property of Huttig in the form of lost revenue, increased costs, including unnecessary attorneys' fees and litigation expenses, and inability to participate fully in the judicial process.

238. PrimeSource's conduct described herein is in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

WHEREFORE, Counter-Plaintiff Huttig requests judgment in its favor and against Counter-Defendant PrimeSource on Count VII of its counterclaims and that it be awarded the following relief:

(a)     treble damages in an amount to be determined at trial;

(b)     attorneys' fees and costs incurred in this matter;

(c)     injunctive and equitable relief declaring the non-competition and non-solicitation covenants that PrimeSource has imposed on present and former business managers to be void and unenforceable, and enjoining PrimeSource from imposing such covenants on future business managers; and

(d)     such other and further relief as this Court deems equitable and just.

Dated:  July 26, 2017

By: */s/ Michael R. Annis*_____
One of Defendants' Attorneys

Randall Thompson (ARDC 90785745)
Michael R. Annis (ARDC 6238967)
Robert J. Tomaso (ARDC 39780)
Anthony Grice (ARDC 6301689)
Jason Husgen (*Pro Hac Vice*)
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Telephone:  314-480-1500
Facsimile:  314-480-1505
randall.thompson@huschblackwell.com
mike.annis@huschblackwell.com
bob.tomaso@huschblackwell.com
anthony.grice@huschblackwell.com
jason.husgen@huschblackwell.com

Patrick S. Coffey (ARDC 6188134)
Robert M. Romashko (ARDC 6293659)
HUSCH BLACKWELL LLP
120 S. Riverside Plaza, Suite 2200
Chicago, IL 60606
Telephone:  (312) 655-1500
Facsimile:  (312) 655-1501

patrick.coffey@huschblackwell.com
robert.romashko@huschblackwell.com

Christopher L. Ottele (*Pro Hac Vice*)
HUSCH BLACKWELL LLP
1801 Wewatta Street, Suite 1000
Denver, CO 80202
Telephone:  303-749-7200
chris.ottele@huschblackwell.com

Kevin Koronka (*Pro Hac Vice*)
HUSCH BLACKWELL LLP
2001 Ross Avenue, Suite 2000
Dallas, TX 75201
Telephone:  214-999-6100
kevin.koronka@huschblackwell.com

**Attorneys for Defendants**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on July 26, 2017, I electronically filed the foregoing via the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Michael R. Annis*