**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PRIMESOURCE BUILDING PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 16 cv 11390 |
| | ) | |
| HUTTIG BUILDING PRODUCTS, INC., | ) | |
| KENNETH FISHBEIN, DAVID FISHBEIN, | ) | |
| MONA ZINMAN and ROBERT FURIO, | ) | |
| | ) | |
| Defendants. | ) | Judge Jorge J. Alonso |
| ------------------------------------------------------------ | ) | Magistrate Judge Young B. Kim |
| PRIMESOURCE BUILDING PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 16 cv 11468 |
| | ) | |
| SCOTT FELTEN, GARRETT KESSLER, | ) | |
| DANIEL KOTTMEYER, ALLAN SAGUNSKY, | ) | |
| JORDAN WHITEHEAD, SAMUEL SPRAGUE, | ) | |
| And HUTTIG BUILDING PRODUCTS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**PRIMESOURCE BUILDING PRODUCTS, INC.'S
[REDACTED] PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

I.     PROPOSED FINDINGS OF FACT ...................................................................1

  A.   INTRODUCTION ...........................................................................................1

      1.    The Parties ...................................................................................1

      2.    The Former Co-CEOs...................................................................2

      3.    Former PrimeSource Employees Working in the Huttig-Grip Division ............5

      4.    PrimeSource's Business Model ....................................................11

      5.    Huttig's Business Model: Pre-Huttig-Grip Division .......................12

  B.   THE PARTIES' TRADE SECRET AND CONFIDENTIAL INFORMATION ................13

      1.    PrimeSource Confidential Information.........................................13

      2.    PrimeSource's Efforts to Keep Information Confidential .................17

      3.    PrimeSource Confidential Information has Value by Virtue of Its Secrecy......19

      4.    Huttig Confidential Information ..................................................20

  C.   FISHBEIN AND FURIO TRANSITION TO HUTTIG ............................................21

      1.    Fishbein and Furio are Terminated from PrimeSource and Execute Severance Agreements....................................................................21

      2.    Fishbein and Furio Approach Huttig ...........................................23

      3.    The December 9, 2015 Agreement ..............................................24

  D.   FISHBEIN AND FURIO PLAN AND PREPARE TO JOIN HUTTIG .........................27

  E.   LAUNCH AND OPERATION OF THE HUTTIG-GRIP DIVISION ..........................33

      1.    November 15, 2016 Press Release and Launch of the Huttig-Grip Division ....33

      2.    Huttig Employs Former PrimeSource Employees............................33

      3.    Operation of the Huttig-Grip Division.........................................33

      4.    Focus on Direct Sales ...............................................................35

      5.    Warehouse Ordering and Stocking..............................................35

  F.   HUTTIG'S USE OF PRIMESOURCE TRADE SECRETS AND CONFIDENTIAL INFORMATION ..........................................................................................36

      1.    Felten, *et al.* Create List of their former PrimeSource Customers, Circulate, and Contact ............................................................................36

          a.    Garrett Kessler .................................................................37

          b.    Al Sagunsky....................................................................38

          c.    Dan Kottmeyer.................................................................38

          d.    Scott Felten ....................................................................39

   e.  Jordan Whitehead ................................................................39

   f.  Felten Defendants Exchange PrimeSource Customer Lists and Solicit Customers on those Lists..............................................40

  2. Huttig Uses Lists of Former PrimeSource Customers to Solicit, and Make First Sales.........................................................................................40

  3. Lack of Overlap Between PrimeSource and Huttig Customers .......................42

  4. Mona Zinman Creates List of PrimeSource Suppliers and Contacts................43

  5. ███████████████████████████ ....................................45

  6. Huttig Copies PS Customer Programs............................................45

  7. Huttig Uses PrimeSource's Inventory Management Information ....................46

  8. Huttig Uses PrimeSource Budgeting Information ................................46

 G. TRO ENTERED AND VIOLATED...............................................................47

 H. EVIDENCE OF IRREPARABLE HARM...........................................................48

 I. EVIDENCE OF RELATIVE HARDSHIPS .........................................................49

II. CONCLUSIONS OF LAW .....................................................................50

 A. STANDARD APPLICABLE TO MOTION FOR PRELIMINARY INJUNCTION ...........................50

 B. PRIMESOURCE WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION AND LACKS ANOTHER ADEQUATE REMEDY .................................................50

 C. LIKELIHOOD OF SUCCESS ON THE MERITS ....................................................52

  1. The Individual Defendants Violated their Respective Restrictive Covenants...............................................................................52

   a.  The Ex-CEOs' Restrictive Covenants are Enforceable under New York Law and the Ex-CEOs Breached Those Agreements.................52

   b.  The Felten Defendants Non-Compete and Non-Solicit Agreements are Enforceable Under Texas Law and the Felten Defendants Violated Their Respective Agreements. .................................56

    i.  The Felten Defendants' Non-Disclosure Agreements Are Enforceable. ......................................................56

    ii.  Felten, Kessler, Kottmeyer's and Sagunsky's Non-Compete Provisions Are Enforceable. ....................................57

   c.  Swapping Customer Lists Does Not Circumvent the Non-Solicit Provisions.......................................................61

  2. D. Fishbein and Huttig Tortiously Interfered with PrimeSource's Agreements with the Individual Defendants, Sprague and Strosahl. ...............64

  3. Trade Secret Claims (FDTSA and ITSA).....................................65

   a.  Customer Information........................................................66

b.     Supplier Information .................................................................... 68

c.     Marketing Information ................................................................. 69

      i.      ████████████████ ............................................. 69

      ii.     ████████████ ......................................................... 69

      iii.    Customer-specific programs ................................... 70

d.     Budgeting Information ................................................................. 70

e.     Inventory Management Information ...................................... 71

f.     Combination of Information ...................................................... 71

g.     Inevitable Disclosure of Other Confidential Information .................... 72

h.     PrimeSource Utilized Reasonable Efforts to Maintain the Confidentiality of Their Trade Secrets ................................... 75

i.     The Information at Issue has Value by Virtue of Its Secrecy ............... 75

D.     BALANCE OF HARMS ............................................................................. 75

E.     RELIEF REQUESTED ............................................................................. 76

iv

## I.    PROPOSED FINDINGS OF FACT

### A.    Introduction

#### 1.    The Parties

1.      PrimeSource is a building products company. PrimeSource sells many of its products under the brand name "Grip-Rite," which is considered a premium brand across the country.  Tr. 53 (Judd), Tr. 412–13 (Royse).

2.      PrimeSource spent many years and millions of dollars to develop its Grip-Rite brand.  Tr. 413–14 (Royse).

3.      PrimeSource use other brand names including Pro-Twist and PrimeGuard.  Tr. 58 (Judd), Tr. 468 (Royse).

4.      Approximately ▮▮▮▮▮ of PrimeSource's revenue is derived from the sale of fasteners.  PrimeSource sources these products from around the world and, in most cases, sells them under its Grip-Rite brand portfolio.  Tr. 53, 56 (Judd).

5.      Fasteners are nails and screws that are used in construction projects to join two products together.  There are a wide variety of fasteners, including for example bulk nails and screws in big boxes, collated nails and screws that are shot through "guns,"  galvanized rust-proof nails and screws, and exterior proprietary-finish rust-proof nails and screws.  Tr. 54, 81 (Judd).

6.      Approximately ▮▮▮▮▮ of PrimeSource's revenue is derived from the sale of non-fastener building products, including but not limited to roofing shingles, insulation, roofing-associated building products, and concrete accessories. PrimeSource sources these products from around the world and, in most cases, sells them under its Grip-Rite brand portfolio.  Tr. 53, 56 (Judd).

1

7.      PrimeSource sells a large variety of building products which number ████. Each product has its own unique SKU (Stock Keeping Unit).  PrimeSource's wide variety of fasteners number ████ of its SKUs.  Tr. 55, 67 (Judd).

8.      George Judd is the CEO of PrimeSource, and has held that position since October 2015.  Tr. 50 (Judd).

9.      Eric Royse works for PrimeSource as Senior Vice-President of field sales and operations, where he oversees independent accounts.  Tr. 62, 105 (Judd), Tr. 411 (Royse).

10.      Scott Smith works for PrimeSource as Senior Vice-President and is in charge of national accounts.  Tr. 59, 128 (Judd).

### 2.      The Former Co-CEOs

11.      Ken Fishbein is a former CEO of PrimeSource.  Tr. 486 (Kessler), Tr. 1111 (Furio); PX3.

12.      Ken Fishbein was not fired by PrimeSource.  Ken Fishbein resigned and retired from PrimeSource effective December 31, 2014.  From January through May, 2015, Ken Fishbein continued in a consulting role for PrimeSource which concluded when PrimeSource was sold to Platinum.  Tr. 342 (Vrabely), JX6, JX7, JX8.

13.      Ken Fishbein was involved in the sales process for PrimeSource, including making presentations to Huttig and other potential purchasers of PrimeSource.  Tr. 413 (Royse); PX8.

14.      Ken Fishbein signed the following agreements with PrimeSource, which include non-disclosure of confidential information agreements: January 1, 2007 Employment Agreement (JX6) and September 29, 2014 Consulting and Retention Agreement (JX7, JX8).

2

15.     Ken Fishbein is currently working for Huttig as one of the leaders of the Huttig-Grip Division.  PX158.

16.     Ken Fishbein signed the following agreements with Huttig, which are relevant to this lawsuit: December 9, 2015 Letter Agreement (JX18) and Consulting Agreement (JX24).

17.     Mona Zinman is a former CEO of PrimeSource.  Tr. 1146–47 (Zinman); PX3.

18.     Mona Zinman was not fired by PrimeSource.  Mona Zinman resigned and retired from PrimeSource effective December 31, 2014.  From January through May, 2015, Mona Zinman continued in a consulting role for PrimeSource.  Tr. 1111 (Furio), Tr. 1156–57 (Zinman).

19.     Mona Zinman was involved in the sales process for PrimeSource, including making presentations to Huttig and other potential purchasers of PrimeSource.  PX8.

20.     In her role as Co-CEO of PrimeSource, Ms. Zinman was responsible for import purchasing and logistics, including but not limited to supplier/vendor relationships, identifying overseas mills, sourcing of product from overseas mills, negotiations with suppliers/vendors and transportation and shipping relationships and contract negotiations.  Tr. 1146–50 (Zinman).

21.     Mona Zinman signed the following agreements with PrimeSource, which include non-disclosure of confidential information agreements: January 1, 2007 Employment Agreement (JX3), September 29, 2014 Consulting and Retention Agreement (JX4, JX5), and March 25, 2015 Consulting Agreement (PX9).

22.     Mona Zinman is currently working for Huttig as one of the leaders of the Huttig-Grip Division. PX158.

23.     Mona Zinman signed the following agreements with Huttig, which are relevant to this lawsuit: Consulting Agreement (JX23) and Indemnification Agreement (PX59).

24.     David Fishbein is a former CEO of PrimeSource.  Tr. 486 (Kessler).

25.     David Fishbein was promoted to Co-CEO of PrimeSource with an effective date of January 1, 2015 (upon the retirement and resignation of Ken Fishbein and Mona Zinman). Tr. 698 (Felten).

26.     David Fishbein was involved in the sales process for PrimeSource, including making presentations to Huttig and other potential purchasers of PrimeSource.  PX8.

27.     David Fishbein was fired from PrimeSource, effective September 16, 2015. JX10, Tr. 1537 (Fishbein).

28.     David Fishbein signed the following agreements with PrimeSource, which include non-disclosure of confidential information agreements: Amended and Restated Employment Agreement, May 8, 2015 (JX9) and Severance Agreement, Effective September 16, 2015 (JX10).

29.     David Fishbein is currently working for Huttig as one of the leaders of the Huttig-Grip Division.  PX158.

30.     David Fishbein signed the following agreements with Huttig, which are relevant to this lawsuit: December 9, 2015 Letter Agreement (JX18), Consulting Agreement (JX19), and Executive Agreement (JX21).

31.     Robert Furio is a former CEO of PrimeSource.  Tr. 1000 (Furio).

32.     Robert Furio was promoted to Co-CEO of PrimeSource with an effective date of January 1, 2015 (upon the retirement and resignation of Ken Fishbein and Mona Zinman).  Tr. 698 (Felten).

33.     Robert Furio was involved in the sales process for PrimeSource, including making presentations to Huttig and other potential purchasers of PrimeSource.  PX8.

4

34.     Robert Furio was fired from PrimeSource, effective September 16, 2015. JX12. Tr. 1537 (Fishbein).

35.     Robert Furio signed the following agreements with PrimeSource, which include non-disclosure of confidential information agreements: Amended and Restated Employment Agreement, May 8, 2015 (JX11), and Severance Agreement, Effective September 16, 2015, (JX12).

36.     Robert Furio is currently working for Huttig as one of the leaders of the Huttig-Grip Division. PX158.

37.     Robert Furio signed the following agreements with Huttig, which are relevant to this lawsuit: December 9 Letter Agreement (JX18), Consulting Agreement (JX19), and Executive Agreement (JX22).

38.     The former Co-CEOs were intimately involved with and directed the development and expansion of the Grip-Rite brand for PrimeSource.  Tr. 413 (Royse).

**3.     Former PrimeSource Employees Working in the Huttig-Grip Division**

39.     Sam Sprague is a former employee of PrimeSource.  Sam Sprague held various positions at PrimeSource.  His most recent positions included Regional Vice-President, Vice-President of Independent Sales, and Account Executive on the Major Accounts team.  Tr. 924-925 (Sprague).

40.     In the Major Accounts role, Mr. Sprague managed ███████████████████ ██████████████████████████████████████████. Tr. 933 (Sprague), PX266.

41.     Sam Sprague signed an employment agreement with PrimeSource, which included restrictive covenants including agreements not to disclose PrimeSource confidential

information, not to solicit customers, not to solicit employees, and not to work for a competitor for 18 months after termination of employment.  PX 286.

42.     Sam Sprague was not fired by PrimeSource.  Mr. Sprague voluntarily resigned from PrimeSource on November 17, 2016.  He did not know what his compensation was going to be until after he resigned.  He did not have an offer letter or proposed employment agreement until his first day of employment.  Mr. Sprague's first day of employment with Huttig was November 21, 2016.  Tr. 950–51 (Sprague), PX287.

43.     Sam Sprague is currently working for Huttig as the leader of Huttig-Grip Xpress, the direct sales group of the Huttig-Grip Division.  He also has a product management role, where he manages the programs of domestic products Huttig is stocking in its warehouses.  Tr. 923–24 (Sprague), PX158.

44.     Sam Sprague signed an employment agreement with Huttig, which included restrictive covenants similar to those in his PrimeSource agreement including an agreement not to disclose Huttig confidential information.  PX287.

45.     Garrett Kessler is a former employee of PrimeSource.  Garrett Kessler held various positions at PrimeSource.  His most recent positions included PrimeSource Direct Specialist.  Tr. 431 (Royse), Tr. 486 (Kessler).

46.     Prior to being hired by PrimeSource (in January or February of 2012), Mr. Kessler worked as a golf caddy at a country club in Illinois, where he met Ken and David Fishbein.  Tr. 483-484 (Kessler), Tr. 1474 (Fishbein), Tr. 491 (Kessler).

47.     Garrett Kessler signed an employment agreement with PrimeSource, which included restrictive covenants including agreements not to disclose PrimeSource confidential

information, not to solicit customers, not to solicit employees, and not to work for a competitor for 18 months after termination of employment. JX17.

48.    Garrett Kessler was not fired by PrimeSource. Tr. 486–87 (Kessler).

49.    Mr. Kessler voluntarily resigned from PrimeSource on November 17, 2016. He did not have an offer letter or proposed employment agreement until his first day of employment. Mr. Kessler's first day of employment with Huttig was November 21, 2016. Tr. 487 (Kessler), JX27.

50.    Garrett Kessler was hired by Huttig to work in its Huttig-Grip Xpress department, the direct sales group of the Huttig-Grip Division. Tr. 488 (Kessler), PX158.

51.    Garrett Kessler signed an employment agreement with Huttig, which included restrictive covenants similar to those in his PrimeSource agreement including an agreement not to disclose Huttig confidential information. JX 27.

52.    Scott Felten is a former employee of PrimeSource. Scott Felten held various positions at PrimeSource. His most recent positions included purchasing. Prior to working in purchasing, he was a Territory Manager (also referred to as an outside sales representative). Tr. 426 (Royse), Tr. 694 (Felten).

53.    Scott Felten worked as a caddy and regularly carried David and Ken Fishbein's golf clubs prior to being employed at PrimeSource. Tr. 491 (Kessler).

54.    Scott Felten signed an employment agreement with PrimeSource, which included restrictive covenants including agreements not to disclose PrimeSource confidential information, not to solicit customers, not to solicit employees, and not to work for a competitor for 18 months after termination of employment. JX16

55.     Scott Felten was not fired by PrimeSource.  He met with David Fishbein on November 16, 2016 at the Huttig-Grip Division's office in Lincolnshire, Illinois and was offered a job the same day.  Tr. 720 (Felten).

56.     Mr. Felten voluntarily resigned from PrimeSource on November 18, 2016.  He did not have an offer letter or proposed employment agreement until his first day of employment. Mr. Felten's first day of employment with Huttig was November 21, 2016.  Tr. 725 (Felten), JX28.

57.     David Fishbein told Scott Felten not to tell PrimeSource where he was going to work when he resigned.  Tr. 725 (Felten).

58.     Scott Felten was hired by Huttig to work in its Huttig-Grip Xpress, the direct sales group of the Huttig-Grip Division. PX158.

59.     Huttig did not ask Mr. Felten for a copy of his employment agreement.  Tr. 726 (Felten).

60.     Scott Felten signed an employment agreement with Huttig, which included restrictive covenants similar to those in his PrimeSource agreement including an agreement not to disclose Huttig confidential information.  JX28, PX60.

61.     Daniel Kottmeyer is a former employee of PrimeSource.  Daniel Kottmeyer held various positions at PrimeSource.  His most recent position was Territory Manager, which was a sales role.  Tr. 428 (Royse), Tr. 794 (Kottmeyer).

62.     Prior to becoming employed at PrimeSource, Daniel  Kottmeyer worked as a golf caddy and became acquainted with Ken and David Fishbein through his work as a golf caddy at an Illinois country club.  Tr. 491 (Kessler), Tr. 792 (Kottmeyer).

63.     Daniel Kottmeyer was not fired by PrimeSource.  Tr. 798 (Kottmeyer)

64.     Daniel Kottmeyer signed an employment agreement with PrimeSource, which included restrictive covenants including agreements not to disclose PrimeSource confidential information, not to solicit customers, not to solicit employees, and not to work for a competitor for 18 months after termination of employment.  JX14.

65.     Mr. Kottmeyer voluntarily resigned from PrimeSource on November 17, 2016.  He did not have an offer letter or proposed employment agreement until his first day of employment.  Daniel Kottmeyer's first day of employment with Huttig was November 21, 2016.  Tr. 798, 801 (Kottmeyer), JX25.

66.     Daniel Kottmeyer was hired by Huttig to work in its Huttig-Grip Xpress department, the direct sales group of the Huttig-Grip Division.  Tr. 790 (Kottmeyer), PX-158.

67.     Daniel Kottmeyer signed an employment agreement with Huttig, which included restrictive covenants similar to those in his PrimeSource agreement including an agreement not to disclose Huttig confidential information. JX-25, PX-63, Tr. 814 (Kottmeyer).

68.     Al Sagunsky is a former employee of PrimeSource.  Al Sagunsky held various positions at PrimeSource.  His most recent positions included PrimeSource Direct Specialist.  Tr. 421, 430 (Royse), Tr. 644 (Sagunsky).

69.     Al Sagunsky signed an employment agreement with PrimeSource, which included restrictive covenants including agreements not to disclose PrimeSource confidential information, not to solicit customers, not to solicit employees, and not to work for a competitor for 18 months after termination of employment. JX13.

70.     Al Sagunsky was not fired by PrimeSource.  Tr. 646 (Sagunsky).

71.     Mr. Sagunsky voluntarily resigned from PrimeSource on November 17, 2016.  He did not have an offer letter or proposed employment agreement until his first day of employment.

9

Mr. Sagunsky's first day of employment with Huttig was November 21, 2016.  Tr. 646 (Sagunsky).

72.     Al Sagunsky was hired by Huttig to work in its Huttig-Grip Xpress department, the direct sales group of the Huttig-Grip Division.  Tr. 646 (Sagunsky), PX158.

73.     Al Sagunsky signed an employment agreement with Huttig, which included restrictive covenants similar to those in his PrimeSource agreement including an agreement not to disclose Huttig confidential information.  JX28, PX101, Tr. 647 (Sagunsky).

74.     Jordan Whitehead is a former employee of PrimeSource.  Jordan Whitehead was an inside sales representative for PrimeSource. Tr. 435 (Royse).

75.     Jordan Whitehead was a golf caddy for Ken and David Fishbein prior to being employed at PrimeSource.  Tr. 885 (Whitehead).

76.     Jordan Whitehead signed an employment agreement with PrimeSource, wherein he agreed he will not disclose PrimeSource confidential information. JX15.

77.     Jordan Whitehead was not fired by PrimeSource.   Tr. 883 (Whitehead).

78.     Mr. Whitehead voluntarily resigned from PrimeSource on November 18, 2016. He did not have an offer letter or proposed employment agreement until his first day of employment.  Mr. Whitehead's first day of employment with Huttig was November 28, 2016. Tr. 883 (Whitehead), JX29.

79.     Jordan Whitehead was hired by Huttig to work in its Huttig-Grip Xpress department, the direct sales group of the Huttig-Grip Division.  Tr. 877–78 (Whitehead), PX158.

80.     Jordan Whitehead signed an employment agreement with Huttig, which included restrictive covenants similar to and in addition to those included in his PrimeSource agreement.

The Huttig agreement includes an agreement not to disclose Huttig confidential information. JX29, PX116.

81.     The former Co-CEOs developed the form and content of the PrimeSource employment agreements signed by Defendants Scott Felten, Garrett Kessler, Dan Kottmeyer, Al Sagunsky, Sam Sprague, and Jordan Whitehead.  Tr. 145 (Judd), Tr. 486 (Kessler), Tr. 646 (Sagunsky), Tr. 698 (Felten).

### 4.     PrimeSource's Business Model

82.     PrimeSource distributes products to customers through either a 2-Step Distribution System or via Direct Sales.  Tr. 64-69 (Judd)

83.     Approximately ███████ of PrimeSource's revenues are generated from sales out of its 34 distribution centers through the 2-Step Distribution System.  Tr. 64  (Judd)

84.     Under its 2-Step Distribution System, PrimeSource sources products from mills around the world, arranges transportation from mills into American ports and from the American ports to its 34 distribution centers.  When an order is placed by a customer, the product is packaged and, in many instances, mixed with other products and then delivered to customers throughout the United States.  Tr. 64 (Judd)

85.     PrimeSource also sells product direct from the manufacturer.  Those sales account for approximately ██████ of its revenue. Tr. 68 (Judd)

86.     PrimeSource has two direct sales teams, a building material group and a fastener group.  The fastener direct sales team is called PrimeSource Direct or "PSD." Tr. 69 (Judd)

87.     PrimeSource sells to a variety of customers that supply construction products to building contractors in the United States, including national retail chains, lumber yards,

companies that supply lumber yards, and fastener houses that are unique to fasteners. Tr. 58 (Judd)

88.     PrimeSource has three internal designations of its customers: National Accounts, Major Accounts, and Independent Accounts.  Tr. 58–60 (Judd)

89.     National Accounts are primarily the large retail chains, such as ████████████ ████. Tr. 58 (Judd)

90.     Major accounts are customers that are serviced by multiple distribution centers. Examples of major accounts would be ████████████████████████ ██████. Tr. 60  (Judd).

91.     Independent accounts are serviced by 1-2 distribution centers. They tend to be family-owned, localized businesses. They include lumber yards, drywall yards, and roofing yards.  Tr. 61 (Judd).

### 5.     Huttig's Business Model: Pre-Huttig-Grip Division

92.     Huttig is a building products company.  Huttig primarily distributes pre-fabricated doors, windows and millwork, which are known as its core products.  Tr. 71 (Judd), Tr. 1458 (D. Fishbein).

93.     Jon Vrabely is the CEO of Huttig.  Tr. 238 (Vrabely).

94.     Brad Strosahl is a former PrimeSource employee who now works for Huttig. Brad Strosahl was in charge of Major Accounts for PrimeSource in 2015 and 2016; and was in charge of PrimeSource Direct in 2016. Tr. 421 (Royse); Tr. 1610 (Strosahl).

95.     Brad Strosahl was not fired by PrimeSource.  He voluntarily resigned from PrimeSource on November 28, 2016 and began working for Huttig on November 29, 2016.  Tr. 60-61 (Judd), Tr. 1618 (Strosahl).

12

96.     Brad Strosahl is working for Huttig in substantially the same position he held at PrimeSource.  Tr. 1620–21 (Strosahl).

97.     Rebecca Kujawa is the General Counsel of Huttig.  Tr. 270 (Vrabely), PX15.

98.     Ms. Kujawa represented Huttig in negotiations with Ken Fishbein, David Fishbein and Bob Furio Huttig regarding the December 9, 2015 agreement. PX 15.

99.     Prior to launching the Huttig-Grip Division, Huttig sold a limited amount of fasteners.  PX241, PX245, PX249.

100.    Prior to launching the Huttig-Grip Division, PrimeSource considered Huttig a competitor in the sales of fasteners only in the Pacific Northwest. Tr. 1458 (D. Fishbein).

101.    Prior to launching the Huttig-Grip Division, Huttig did not have a sales force specifically designated to sell fasteners. Tr. 1475 (D. Fishbein).

102.    When Sam Sprague was hired to head the Huttig Xpress team, he was not provided with any historical information regarding direct sales of fasteners by Huttig, and the only direct reports assigned to his team as of November 21, 2016 were Kessler, Kottmeyer, Sagunsky, Felten and Whitehead.  Tr. 955–56 (Sprague).

103.    Prior to launching the Huttig-Grip Division, Huttig primarily used ▮▮▮▮▮▮ a domestic supplier, for the manufacturer of its fasteners.  Tr. 1296–97, 1344 (Zinman), PX157.

**B.      The Parties' Trade Secret and Confidential Information**

**1.      PrimeSource Confidential Information**

104.    PrimeSource identifies the information it considers to be confidential and trade secrets in employment agreements, in its code of conduct and in its employee handbook among other places (JX44, JX43), and in employment and consulting agreements referenced, *supra*, for each of the former Co-CEOs and individual defendants.

13

105.    The trade secrets PrimeSource identifies in its Employee Handbook (JX44)

include, among other things, the following:

- Information regarding the identities, contact information, and preferences of PrimeSource's customers;

- Information regarding the identities, contact information, and preferences of PrimeSource's vendors and suppliers;

- Specific types and amounts of good PrimeSource has provided to customers, and the amounts paid for those goods;

- Financial information and budgets regarding PrimeSource;

- Financial information regarding PrimeSource's customers;

- Financial information regarding PrimeSource's vendors and suppliers;

- Details regarding PrimeSource's relationships with its customers, including pricing information, contract terms, tenor of the relationships, complaints and accolades, status of contracts, contract expiration dates including upcoming cancellations and expirations, purchase history;

- Details regarding PrimeSource's relationships with its vendors/suppliers, including pricing information, contract terms, tenor of the relationships, complaints and accolades, status of contracts, contract expiration dates including upcoming cancellations and expirations, purchase history;

- Profitability of customer relationships;

- Information regarding the sales tactics used by PrimeSource;

- Information regarding PrimeSource's production processes;

- Information regarding PrimeSource's SKU numbers, product numbers, packaging design, and forms used;

- Marketing strategies; and

- Pending Projects and proposals.

14

106.    Customer lists and compilations are PrimeSource confidential information.  Tr. 76–77, 127 (Judd), JX44.

107.    The identity and product mix of customers who buy direct shipments of product is confidential.  Tr. 69 (Judd).

108.    Such information regarding direct ship customers is not readily ascertainable and it takes time and effort to identify and qualify those customers.  Tr. 639 (Kessler).

109.    Information related to a particular customer, including product preferences, habits, contacts, historical buying patterns is PrimeSource confidential information.  JX44, Tr. 434–35 (Royse).

110.    Supplier lists and identity of specific suppliers used by PrimeSource is PrimeSource confidential information.  JX44, Tr. 463 (Royse).

111.    When he was the co-CEO of PrimeSource, D. Fishbein referred to the identity of PrimeSource's main suppliers as its "secret sauce."  Tr. 1390–91 (D. Fishbein); PX10 at p. 21.

112.    Information related to a particular supplier, including the identity of mills which make certain types of products, the mills make what specific products for PrimeSource, the terms of agreements with mills, contact information, costs, and product specifications is PrimeSource confidential information.  Tr. 57 (Judd), JX44.

113.    Sourcing information, including strategies and supply chain plans, is PrimeSource confidential information.  Tr. 56–57, 77–78 (Judd), JX44.

114.    Information related to PrimeSource Direct including the mix, the customers, what they prefer from which mills, boxing and packaging preference, and costs is PrimeSource confidential information. Tr. 69 (Judd), JX44.

15

115.    PrimeSource's profit margin and cost information is PrimeSource confidential information.  Tr. 93, 96 (Judd), JX44.

116.    The terms of PrimeSource's transportation and shipping contracts are confidential.  Tr. 88, 89, 90, 114 (Judd), JX44.

117.    The terms of PrimeSource's programs which are specific to a particular customer is PrimeSource confidential information.  Tr. 76, 141 (Judd), JX44.

118.    Strategic plans developed by PrimeSource and which relate to specific customers or groups of customers are PrimeSource confidential information. Tr. 76, 141 (Judd), JX44.

119.    PrimeSource's budget information is confidential.  Tr. 93 (Judd), JX44.

120.    PrimeSource's sales forecast information is confidential.  Tr. 93 (Judd), JX44.

121.    PrimeSource's marketing strategies and promotion schedules are confidential.  Tr. 76 (Judd), JX44.

122.    The negotiations with and terms of potential deal with ███████████, internal discussions related to potentially engaging in a transaction with ██████████, the development of a marketing strategy for ███████████████ program are all PrimeSource confidential information.  Tr. 90–92, 97–98 (Judd), Tr. 1038 (Furio), Tr. 1616–18 (Strosahl), JX44; see also, PX145, PX176, and PX256.

123.    There are several aspects of PrimeSource's Premier Club program which are confidential, including how the program is structured, how it is funded, the special buying opportunities that are provided at the event, how customers earn the right to participate, and how many points a customer earns.  Tr. 92–93, 117 (Judd).

16

124. The amount and type of inventory PrimeSource stocks in each of its distribution centers and how it is stocked are PrimeSource confidential information. Tr. 66, 90, 96–97, 104 (Judd), JX44.

125. Each of PrimeSource's 34 Distribution Centers is laid out differently and SKU assortments are different. Through the course of time, PrimeSource has determined the preferred fasteners per geography across the country, and by customer. The way each of PrimeSource's Distribution Centers are laid out, including the mix assortment and the lay-out itself, is PrimeSource confidential information. Tr. 66 (Judd).

126. ████████ is a mill in Taiwan that manufactures fasteners. PrimeSource ████████ ████████████████████████████████████████. ████████ makes specific products for PrimeSource and proprietary finishes that are exclusive to PrimeSource. Tr. 81 (Judd).

127. The details of PrimeSource's relationship with ████████ including the type and amount of product ████████ makes for PrimeSource and the exterior coating it produces for Primsource is PrimeSource confidential information. Tr. 81 (Judd), JX44.

### 2. PrimeSource's Efforts to Keep Information Confidential

128. PrimeSource maintains secrecy and control over its confidential information through use of employment agreements, a code of conduct, an employee handbook, training, and controlling access both to electronic information and to facilities. Tr. 423–25 (Royse).

129. PrimeSource has employment agreements with the majority of its employees and those agreements include restrictive covenants based on the role of the employee in the organization. Tr. 416 (Royse).

130. PrimeSource agreements typically include one or more restrictive covenants include an agreement not to disclose confidential information, an agreement not to compete for a

period of time, an agreement not to solicit customers of PrimeSource, and an agreement not to solicit employees of PrimeSource. Tr. 416–17 (Royse).

131.    The former Co-CEOs developed the form and content of the standard PrimeSource employment agreements signed by employees prior to January 1, 2017.  Tr. 145 (Judd).

132.    PrimeSource protects its information, relationship and good will through, among other things, seeking to enforce its agreements with employees. Tr. 424 (Royse).

133.    PrimeSource has a Code of Conduct that includes provisions related to protecting PrimeSource's confidential information and intellectual property.  JX43, pgs. 18–25.

134.    The former Co-CEOs developed PrimeSource's Code of Conduct, which is still in use at PrimeSource.  Tr. 134 (Judd), JX43.

135.    Employee Handbook defines confidential information and trade secrets.  JX 44, pgs. 22–23.

136.    Training on protection of and use of confidential information which occurs both at onboarding and throughout employment. There are online portals where the employee must complete the training and, if not, then human resources monitors and requires completion.  There is a module specifically for confidential information.  Tr. 134–35 (Judd), Tr. 423–25 (Royse).

137.    PrimeSource controls access to its electronic information by, among other things, limiting network access based on type of role and information needed for the role, multiple levels of password protection for accessing information on the network, and removing access to electronic information immediately upon termination of employment.  Tr. 425–26 (Royse).

138.     PrimeSource also has secured, controlled access to its facilities, including key pads, access cards, limitation on distribution of keys to certain facilities, and security cameras. Access is given based on the need of the role of the employee.  Tr. 425 (Royse).

### 3.     PrimeSource Confidential Information has Value by Virtue of Its Secrecy

139.     PrimeSource's confidential information has value strictly by virtue of its secrecy. Tr. 56, 77–80 (Judd).

140.     PrimeSource's confidential information has value because it is not easily replicated. Tr. 77–80 (Judd).

141.     PrimeSource's confidential customer information has value because it is secret and not easily replicated.  Tr. 77–80 (Judd).

142.     PrimeSource's confidential sourcing and supplier information has value because it is secret and not easily replicated.  Tr. 77–80 (Judd).

143.     PrimeSource's confidential marketing information has value because it is secret and not easily replicated.  Tr. 77–80 (Judd).

144.     PrimeSource's confidential financial information has value because it is secret and not easily replicated. Tr. 77–80 (Judd).

145.     PrimeSource's confidential inventory management information and processes have value because they are secret and are not easily replicated. Tr. 77–80 (Judd).

146.     PrimeSource confidential information has value because it contains the details that have evolved over time and include information that takes years and millions of dollars to develop.  Tr. 77 (Judd).

147.     If a competitor knew PrimeSource's confidential information, it would provide them with a jump start.  Tr. 78–79 (Judd).

19

### 4. Huttig Confidential Information

148. Much of the very information that Huttig claims is not confidential in this case, is considered confidential in Huttig's Code of Conduct and Employment Agreements. In addition, Huttig's CEO Jon Vrabely testified that information of the type at issue here is confidential.

149. Huttig's Code of Conduct defines confidential information to include: non-public financial information, customer lists, marketing plans and strategies, sales data, internally developed training materials, proprietary software, and internal processes and procedures…" JX42.

150. Vrabely's Employment Contract contains a prohibition on the use of confidential information. PX 255.

151. The employment contracts entered into between PrimeSource's ex-CEOs and Huttig contained prohibitions on the use of confidential information. *See, e.g*, JX21.

152. The employment contracts entered into between Felten et and Huttig contained prohibitions on the use of confidential information. *See, e.g.*, PX 101.

153. Vrabely testified that he "absolutely" would prefer that the types of information identified in JX 42 remain confidential. Tr. 375. He also testified that he would like to remain confidential: customer rebate programs, vendor rebate programs, pricing to customers, sales information, customer lists, sales margins on fasteners, marketing plans and strategies. Tr. 377–82.

154. Furio testified that marketing information could be considered confidential. Tr. 1038.

C.  **Fishbein and Furio Transition to Huttig**

1.  **Fishbein and Furio are Terminated from PrimeSource and Execute Severance Agreements.**

155.    On May 8, 2015,  the sale of PrimeSource to Platinum Equity closed.  Tr. 1168 (Zinman); JX4 at ¶ 4.1.

156.    At the time of the closing, D. Fishbein and Furio were the Co-CEOs of PrimeSource, and they remained the Co-CEOs of PrimeSource under Platinum's ownership for a period of time.  Tr. 1378, 1405–06 (D. Fishbein).

157.    Then, in mid-August 2015, Platinum advised D. Fishbein and Furio that their employment with PrimeSource would be terminated.  Tr. 1537 (D. Fishbein).

158.    In conjunction with their termination, both D. Fishbein and Furio executed severance agreements, which they negotiated with Platinum.  JX10; JX12; Tr. 1540–41 (D. Furio).

159.    D. Fishbein and Furio received ███████████ under the severance agreements. JX10 at ¶ 1; JX12 at ¶ 1; Tr. 1408 (D. Fishbein).

160.    D. Fishbein and Furio agreed that the effective date of their employment termination from PrimeSource was September 16, 2015.  JX10 at 1; JX12 at 1.

161.    In their severance agreements, D. Fishbein and Furio agreed that the "Employment Covenants" section of their PrimeSource Amended and Restated Employment Agreements (dated May 8, 2015) ("PrimeSource Employment Agreements") remained in effect. JX10 at ¶ 13; JX12 at ¶ 13.

162.    The Employment Covenants section of their PrimeSource Employment Agreements included covenants regarding confidentiality (Article 4.1) and non-competition (Article 4.2).  JX9 at ¶ 4; JX11 at ¶ 4.

21

163.    Pursuant to the confidentiality section of their PrimeSource Employment

Agreements, D. Fishbein and Furio agreed that PrimeSource's "confidential information" means:

> [I]nformation disclosed to or known by Executive as a consequence of or through
> his employment by PS concerning PS's or PS's client's business, operations, trade
> secrets, plans, products, processes, practices, or services including, without
> limitation, information relating to research, development, inventions, suppliers,
> customers, purchasing, accounting, finance, price lists, and marketing.

JX9 at ¶ 4.1; JX11 at ¶ 4.1.

164.    D. Fishbein and Furio agreed not to use, disseminate, or disclose PrimeSource's

confidential information to third parties either during *or after the term* of their Employment

Agreements.  JX9 at ¶ 4.1.1; JX11 at ¶ 4.1.1 (emphasis added).

165.    And, they agreed that Article 4.1 of their PrimeSource Employment

Agreements—governing confidentiality—survived the expiration or termination of their

Agreements.  JX9 at ¶ 4.1.4; JX11 at ¶ 4.1.4; Tr. 1412 (D. Fishbein).

166.    Pursuant to the non-competition section of their PrimeSource Employment

Agreements, D. Fishbein and Furio agreed, among other things:

   a.    not to "enter the employ of, or render any services to" a  "Material

         Competitor" of PrimeSource;

   b.    "become interested in or associated with any . . . Material Competitor,

         directly or indirectly, as an individual, partner, shareholder, director,

         officer, principal, agent, Executive, trustee, consultant, lender, or any other

         relationship or capacity"; or

   c.    "solicit for employment or in any other fashion hire any of the executives,

         employees, agents, or representatives" of PrimeSource.  JX9 at ¶ 4.2(a);

         JX11 at ¶ 4.2(a).

22

167.    Huttig falls within the definition of "Material Competitor" under D. Fishbein and Furio's PrimeSource Employment Agreements because Huttig is engaged in a business competitive with PrimeSource and Huttig "has sold or offered for sale [packaged nails or screws, collated tools or fasteners, compressors, wood, roofing or other building products or materials or related products] or engaged or attempted to engage in said activities to or with any entity located within a 150 mile radius of any [PrimeSource] distribution center . . . during either of the two (2) most recently completed calendar years."  JX9 at ¶ 4.2(b)(1); JX11 at ¶ 4.2(b)(1).

168.    D. Fishbein's and Furio's non-compete obligation began from the effective date of termination—September 16, 2015—and ran for twelve months—until September 16, 2016. JX9 at ¶ 4.2(a); JX11 at ¶ 4.2(a).

### 2.    Fishbein and Furio Approach Huttig

169.    Prior to their effective termination date, both D. Fishbein and Furio had conversations in August 2015 with Jon Vrabely, Huttig's CEO, about entering an arrangement whereby D. Fishbein and Furio would become employed by Huttig after the expiration of their PrimeSource non-compete obligations.  Tr. 1136–37 (Furio), 1426, 1536 (D. Fishbein).

170.    The timing of these conversations was confirmed by the billing records of D. Fishbein's and Furio's attorney, Philip Mowery at Vedder Price, ███████████████. Tr. 348, 350–51 (Mowery); PX12.

171.    The contact between Huttig and D. Fishbein/Furio was initiated by either Ken Fishbein or David Fishbein, who contacted Vrabely upon learning that D. Fishbein and Furio's employment with PrimeSource was being terminated.  Tr. 256 (Vrabely), Tr. 1426 (D. Fishbein).

One of the Fishbeins personally called Vrabely to "make him aware" that D. Fishbein and Furio had been terminated.  Tr. 256 (Vrabely).

172.    After that initial call, there was another call in the late third quarter of 2015 where the possibility of D. Fishbein and Furio entering an arrangement with Huttig was discussed.  Tr. 258–59 (Vrabely).

173.    D. Fishbein and Furio knew that Huttig might be interested in hiring them because Huttig had expressed interest in purchasing PrimeSource in late 2014/early 2015.  JX2; Tr. 1423–24 (D. Fishbein).

### 3.    The December 9, 2015 Agreement

174.    The arrangement between Huttig and D. Fishbein, Furio, and K. Fishbein was ultimately memorialized in a letter agreement, the final version of which was executed on December 9, 2015 ("Letter Agreement").  JX18.

175.    The Letter Agreement provided that upon the expiration of their respective non-compete periods, D. Fishbein and Furio would become employed by Huttig, and K. Fishbein would become a consultant to Huttig, to lead a "█████████████████" that would expand Huttig's private label brand, HuttiGrip, to a national scale.  JX18; Tr. 383 (Vrabely).

176.    The Letter Agreement specified that ███████████████████

██████████████████████████████████████████
██████████████████████. JX18.

177.    The first version of the Letter Agreement was authored by Huttig and sent to Furio/Fishbein's attorney, Philip Mowery, on October 2, 2015.  PX13; Stipulation, 16-cv-11390, Dkt. 116, 16-cv-11468, Dkt. 151 ("Stipulation") at ¶¶ 4–5.

178.     The parties negotiated the agreement for over two months, and met in person to work out its terms.  Tr. 1426 (D. Fishbein).  Huttig agreed to reimburse, and did reimburse, ███████ of the executives' attorney's fees in negotiating the Letter Agreement, including time billed in August 2015, when D. Fishbein and Furio were still employed by PrimeSource.  Tr. 353–54 (Mowery).

179.     As part of the Letter Agreement, the parties negotiated the proposed compensation and other terms of the employment agreements that would be entered into between Huttig and D. Fishbein, Furio, and K. Fishbein at the expiration of their non-compete periods. (JX18 at ¶ 4, Exhs. A, B.)  The Letter Agreement attached as exhibits the proposed employment agreements of D. Fishbein and Furio and consulting agreement of K. Fishbein.  JX18 at Exhs. A, B.

180.     Under the draft employment agreements attached to the Letter Agreement, both D. Fishbein and Furio would receive ████████ in salary the first year, plus █████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████.  JX18 at ¶ 4; Tr. 1436–37.

181.     The Letter Agreement also included a break-up fee of $1,000,000.  The break-up fee would have been triggered if any one or more of the executives, on the one hand, or Huttig, on the other, failed to execute employment agreements (or a consulting agreement in the case of K. Fishbein) with Huttig.  JX18 at ¶ 7; Tr. 1438 (D. Fishbein).

182.     In other words, if D. Fishbein and Furio had decided not to be employed by Huttig, they would have lost at least ████████—$1 million in the form of the break-up fee and at least ████████ in lost compensation.  Tr. 1438 (D. Fishbein).

183.    Huttig, D. Fishbein and Furio now attempt to marginalize the legal significance of the Letter Agreement by claiming it was meant only to give Huttig a right of first refusal to employ D. Fishbein and Furio after their PrimeSource non-compete periods were over.  Tr. 1428–29 (D. Fishbein).  In a further attempt to distance themselves from any commitment to Huttig, D. Fishbein claimed at the hearing that he interpreted the Letter Agreement as only requiring him to show up and go through the process of getting to know Huttig.  Tr. 1429 (D. Fishbein).

184.    This testimony is at odds with the language of the Letter Agreement, which obligates the executives to pay the $1,000,000 break-up fee if they do not sign their respective employment agreements.  JX18 at ¶ 7; Tr. 1432–33 (D. Fishbein).  It is also at odds with D. Fishbein and Furio's conduct in negotiating the Letter Agreement.  They proposed a ████████ break-up fee in response to Huttig's original proposal of ██████.  PX14 at 5; Tr. 1430 (D. Fishbein).  They also proposed that the Letter Agreement specifically state that ██████████ ████████████████████████████████ PX14 at 1.

185.    Ultimately, no party paid the break-up fee in the Letter Agreement.

186.    Prior to executing the Huttig employment agreements contemplated by the Letter Agreement, D. Fishbein and Furio executed consulting agreements with Huttig.  JX19; JX20.  The stated purpose of these agreements was to assist Huttig in developing the "█████████ ████████", i.e. the Huttig-Grip Division, and determine whether it was "████████████ ████████████████████████████████████████" prior to seeking board approval.  JX19; JX20; Tr. 383 (Vrabely).

187.    Then, on November 14, 2016, D. Fishbein and Furio signed their employment agreements with Huttig and K. Fishbein executed his consulting agreement with Huttig.  JX21; JX22; JX24.

188.    Although Mona Zinman was not a party to the Letter Agreement, she also signed a consulting agreement with Huttig effective November 14, 2016.  JX23.  Ms. Zinman's consulting agreement is identical to Ken Fishbein's.  *Compare* JX23, *with* JX24.

189.    The executives' agreements with Huttig are nearly identical to the form of agreements contemplated in and attached to the December 9, 2015 Letter Agreement.  *Compare* JX21, JX22, JX24, *with* JX18 at Exhs. A, B.

**D.    Fishbein and Furio Plan and Prepare to Join Huttig**

190.    During the period September 15, 2015 through November 15, 2016, David Fishbein and Furio worked on the launch of the NBO.  Tr. 1044–45 (Furio); JX45.

191.    D. Fishbein carried a "ticker on his phone" which counted-down the days, hours and minutes until the non-compete/non-association provisions in his PS contract expired.  Tr. 1608 (Strosahl).

192.    D. Fishbein admitted that recruiting employees on behalf of Huttig during the period September 2015 to September 2016 would constitute a violation of his agreement not to "associate" with a material competitor of PrimeSource during that time period.  Tr. 1410 (D. Fishbein).

193.    Starting in December 2015 and continuing through August 2016, D. Fishbein texted, emailed, and met in person various persons employed by PS for the purpose of recruiting those persons to join him in the NBO.  Those contacts included the following:

a.      On December 11, 2015, D. Fishbein provided his personal email address to Kessler.  PX 26.  He also supplied the email address to others then employed by PrimeSource.  Tr. 1448 (D. Fishbein).

b.      On December 16, 2015, at D. Fishbein's request, Kessler provided information about his PS non-compete agreement to D. Fishbein.  PX 260; Tr. 497 (Kessler).

c.      In January 2016, D. Fishbein and B. Strosahl discussed Strosahl's non-compete.  Tr. 1608 (Strosahl).

d.      On January 28, 2016, D. Fishbein asked Kessler about his compensation.  PX260.

e.      On February 11, 2016, Fishbein suggested to Kessler that he should ███ ███████████████████████████████████████████████ ████████████. PX260.

f.      Between December 2015 and September 16, 2016, Fishbein contacted Kessler via text an additional three times, including on the following dates: February 23, 2016, June 18, 2016, and August 1, 2016.  PX260.

g.      In the summer of 2016, D. Fishbein sent a text to Kottmeyer asking him to play golf.  Tr. 1448 (D. Fishbein), Tr. 799 (Kottmeyer).  Kottmeyer had not previously received a similar invitation.  Tr. 800 (Kottmeyer).

h.      In May 2016, D. Fishbein sent an email to Sagunsky wishing him a happy birthday.  Tr. 649 (Sagunksy).  Sagunsky also called D. Fishbein in August 2016.  Tr. 649 (Sagunsky).

      i.      In addition to the January 2016 meeting referenced above, D. Fishbein met with Brad Strosahl two or three times between September 2015 and September 2016.  Tr. 1611 (Strosahl).  D. Fishbein also spoke with Strosahl, and texted with Strosahl, on other occasions during the time period.  Tr. 1611 (Strosahl).

      j.      D. Fishbein met with Sam Sprague on at least two occasions between September 2015 and September 2016.  Tr. 1452 (D. Fishbein).  During at least one of those meetings, Sprague told Fishbein that he was looking for a job.  Tr. 942-43 (Sprague), Tr. 1453 (D. Fishbein).

      k.      K. Fishbein and Zinman spoke once a month during 2016.  Tr. 1163 (Zinman).  D. Fishbein met with Mona Zinman in August 2016.  Tr. 1460 (D. Fishbein).  At that dinner, which was also attended by K. Fishbein and Furio, Zinman was told "they" were thinking about something.  Tr. 1460 (D. Fishbein).  Zinman testified that at this dinner, she was asked if she would be interested in joining them in working together once their non-competes expired. Tr. 1165 (Zinman).

      l.      D. Fishbein testified he "potentially" mentioned to others that he might have an opportunity for them upon the expiration of his non-compete.  Tr. 1456 (D. Fishbein).

*See also* **Exhibit A**, Timeline of Events.

194.     D. Fishbein, Furio and K. Fishbein attended an industry trade show in January 2016 at which they spoke with persons they knew in the industry.  Tr. 1054–55 (Furio).

195.    Between September 2016 and November 15, 2016, D. Fishbein continued his contacts with PrimeSource employees, including the following:

        a.     On September 18, 2016, he asked Sam Sprague for his non-compete agreement. PX39.

        b.     On September 19, 2016 he contacted Brad Strosahl regarding Strosahl's non-compete.  PX40.

        c.     On September 22, 2016, he contacted Kessler about Kessler's non-compete agreement. PX260.

        d.     In October 2016, he contacted Whitehead about Whitehead and his co-workers joining Huttig.  PX216.

196.    While Kottmeyer, Felten, Sagunsky, Kessler, and Whitehead professed to be unhappy at their jobs at PrimeSource, none took any steps to locate new jobs.  Tr. 798 (Kottmeyer).  But each of them applied for jobs with Huttig on November 15, 2016, and all started work for Huttig on within a few days.  Tr. 798 (Kottmeyer).

197.    Zinman started at Huttig on November 14, 2016. Tr. 1194 (Zinman).

198.    Sprague started at Huttig on November 21, 2016.  PX287.

199.    Strosahl started at Huttig on November 28, 2016.  Tr. 1618 (Strosahl).

200.    In September 2016, D. Fishbein and Furio met with Vrabely and Huttig's Chief Financial Officer, Oscar Martinez, to develop a tactical plan for the launch of the NBO.  Tr. 1047 (Furio); PX41.

201.    After this meeting, on September 20, 2016, Furio emailed Martinez the following:

"███████████████████████████████████████████████████

███████████████████████████████████████████" PX41.

202.    By October 2016, a tactical plan had been created which identified tasks to be completed, the "███████" of those tasks and other persons assigned to accomplish those tasks. JX45. The "██████" of a task was the person assigned, or anticipated would be assigned, to the task. Tr. 295 (Vrabely).

203.    One of the tasks on the tactical plan read, "███████████████████ ██████████████████████████████████████████ ████████" JX45, p. 2 of 7.  A later version of the tactical plan assigned "████████" and D Fishbein to the team assigned to this task.  PX300, p. 30 of 49.  The customers referenced were PS's customers, and Furio testified that D. Fishbein directed the new hires of Huttig-Grip to record, from the memory, PrimeSource customers information.  Tr. 1072 (Furio), Tr. 1478–69 (D. Fishbein).

204.    Additional items on the tactical plan included tasks related to stocking Huttig's distribution centers with the increase in fastener inventory associated with the launch of the Huttig-Grip division.  JX45, p. 2 of 7.  Bob Furio was assigned as the "█████" of those tasks. *Id.*

205.    Another of the tasks on the tactical plan was "███████████████████." Mona Zinman was designated as the "██████" of this task, even though her non-compete with PS did not expire until November 2016.  JX45, p. 5 of 7.  At the time JX 45 was created, Huttig had not identified any other candidates to fill this role. Tr. 295 (Vrabely).

206.    Another of the tasks on the tactical plan read "█████████."  JX45, p. 4 of 7; Tr. 1090 (Furio).  The Huttig Club was intended to replicate PrimeSource's Premier Club—a customer recognition event.  Tr. 92; 1090 (Furio), Tr. 1505 (D. Fishbein).

207.    A later version of the tactical plan included additional tasks (PX 300; Tr. 1482):

a.    D. Fishbein and Furio were tasked with determining financial impact of new Division.  PX300, p. 2 of 49.

b.    Furio was charged with reviewing existing Huttig SKU data to determine "█████████████████████████."  PX300, p. 5 of 49.

c.    Furio was charged with developing a layout for racking set up for each Huttig facility, and creating plan-o-grams for each facility.  PX300, p. 6 of 49.

d.    Furio was charged with warehouse/operations training, including figuring out "███████████████████████████████████████"  PX300, p. 6 of 49.

e.    D. Fishbein and Furio were to "███████████████████████████ ████████████████████████████ ████████████████████████████."  PX300, p. 6 of 49.

f.    D. Fishbein and Furio were charged with developing a "██████████ ██████████"  PX300, p. 10 of 49.

g.    Furio developed a "██████████████████" for one Huttig distribution center, and was to "██████████████████████ ██████████████████."  PX300, p. 25 of 49.

h.    Furio and D. Fishbein "████████████████████████ ██████" for use in verifying budget.  PX300, p. 26 of 49.

i.    Furio was charged with "██████████████████████████" products for every HBP location.  PX300, p. 31 of 49.

j.    Furio was assigned to be "████" of the task of developing "████
████████████." PX300, p. 35 of 49.

k.    D. Fishbein and Furio were charged with developing job positions and
salaries for inclusion in final budget package. PX300, p. 40 of 49.

l.    D. Fishbein and Furio were charged with defining Huttig-Grip's
"████████." PX300, p. 49.

### E.    Launch and Operation of the Huttig-Grip Division

#### 1.    November 15, 2016 Press Release and Launch of the Huttig-Grip Division

208.    Huttig issued a press release on November 15, 2016 announcing the launch of the Huttig-Grip Division. JX1; Tr. 71 (Judd), Tr. 335 (Vrabely).

209.    The Huttig-Grip Division was essentially operational on November 16, 2016 and was already implementing the plan prepared previous to that date. Tr. 335 (Vrabely)

#### 2.    Huttig Employs Former PrimeSource Employees

210.    Within days after its launch, the Huttig-Grip Division employed 16 people. All but 1 were former PrimeSource employees. PX158, Tr. 363 (Vrabely), Tr. 490–91 (Kessler).

211.    Prior to hiring the Former Co-CEOs and the Individual Defendants, Huttig did not possess the human resources or human capital or knowledge to expand the products in the product line carrying the Huttig-Grip name. Tr. 340, 341, 389 (Vrabely).

#### 3.    Operation of the Huttig-Grip Division

212.    As of March 2017, Huttig believed the overall construction fastener market to be $2.5 billion. Tr. 336 (Vrabely), PX215.

213.    Huttig's sales of fasteners during 2016 was ████████. Tr. 336 (Vrabely), PX241, PX245, PX249.

214.    Huttig's stated goal to its shareholders is to grow its revenues from the sales of fasteners to $250 million in sales of fasteners within 24-36 months (or by approximately year-end 2019).  Tr. 336–39 (Vrabely), PX215.

215.    Prior to launching the Huttig-Grip Division, Huttig did not have an office in Illinois.  A new office was established in Lincolnshire,  Illinois to house the Huttig-Grip Division.  The Huttig-Grip Division's office is a 5 minute drive from PrimeSource's Buffalo Grove, Illinois office and distribution center. Tr. 298 (Vrabely); Tr. 529 (Kessler), PX44.

216.    All of the Huttig-Grip Division employees, other than Mona Zinman, work in the Lincolnshire office for Huttig.  Tr. 298 (Vrabely).

217.    Immediately upon the launch of the Huttig-Grip Division, there was a Leadership Meeting in St. Louis at the Huttig headquarters from November 29 to December 1, 2016.  In attendance were David Fishbein, Bob Furio, Brad Strosahl, and Sam Sprague.  Tr. 1618 (Strosahl).

218.    In that 3-day meeting, the team developed a game plan for the Huttig-Grip Division and discussed strategy, setting up processes, personnel needed, warehouse space needed, sourcing, products to be sold, and customers to be targeted.  Tr. 1618–20 (Strosahl)

219.    Huttig is trying to duplicate PrimeSource in order to lower costs and get to market fast.  Tr. 73 (Judd)

220.    Huttig, through its Huttig-Grip brand and division, is duplicating PrimeSource and its Grip-Rite brand by hiring a core group of former leaders and then-current employees of PrimeSource and utilizing their combined knowledge of the PrimeSource business, which includes Prime Source confidential information and trade secrets. Tr. 71–73, 95 (Judd).

### 4. Focus on Direct Sales

221.    The first priority of the Huttig-Grip Division was to procure direct shipment sales. Tr. 325-326, 327 (Vrabely).

222.    Direct sales are a good revenue generator and they do not require stocked inventory.  Tr. 1478 (D. Fishbein); Tr. 68–69 (Judd).

223.    Prior to the launch of the Huttig-Grip Division, Huttig had only sold fasteners through direct sales to one or two customers.  Huttig's CEO could not name one for the year 2016.  Vrabely could only name two historically.  Tr. 362–63, 400–01 (Vrabely).

224.    Huttig did not have a department that focused on direct sales.  Tr. 402 (Vrabely).

225.    Huttig employees David Fishbein and Sam Sprague were in charge of developing the sales plan to grow direct shipment sales. Tr. 326 (Vrabely).

226.    Like PrimeSource Direct, Huttig Xpress is focused on selling direct containers of product to customers.  Tr. 646.

### 5. Warehouse Ordering and Stocking

227.    Although the Huttig-Grip Division's first sales priority was direct sales, the Huttig-Grip Division is planning, and starting, to sell product to customers through its warehouses.  Tr. 1097–98 (Furio), 1488–89 (D. Fishbein).

228.    Huttig added a large number of SKUs after hiring former PrimeSource employees to run its Huttig-Grip Division.  Tr. 301, 303–04 (Vrabely).

229.    Huttig has also increased its volume of fastener inventory to carry in its warehouses ▮▮▮▮▮▮▮.  Tr. 307 (Vrabely).

230.    Huttig is expanding its warehouses ▮▮▮▮▮▮▮▮ to house the additional fasteners it plans to sell through its warehouses.  Tr. 304–11 (Vrabely).

### F. Huttig's Use of PrimeSource Trade Secrets and Confidential Information

#### 1. Felten, *et al.* Create List of their former PrimeSource Customers, Circulate, and Contact

231.     When they started working at Huttig, the employees in the Xpress Division—Kessler, Sagunsky, Kottmeyer, Felten, Whitehead ("Felten Defendants")—were responsible for identifying customers they could solicit for sales of product from the Huttig-Grip Division.  Tr. 624–26 (Kessler).

232.     They were given the Huttig's entire customer list, which amounted to a 3 to 4-inch thick stack of paper, and ███████ customers.  PX119,, Tr. 627–28 (Kessler).

233.     After they started using that list, it became clear that the Felten Defendants needed a way to pinpoint customers that would be more suited to buying direct containers of fasteners and building materials.  Tr. 629 (Kessler).

234.     Huttig's pre-existing customer list was not well-suited to identifying those customers because Huttig had traditionally sold millwork and other materials that the Huttig-Grip Division was not selling.  Tr. 629 (Kessler).

235.     One of the ways the Felten Defendants pinpointed customers that might be more suitable for the Huttig-Grip Division was by creating lists of their former PrimeSource customers.  Tr. 633 (Kessler).

236.     To that end, shortly after starting their employment at Huttig, Garrett Kessler, Al Sagunsky, Scott Felten, Dan Kottmeyer, and Jordan Whitehead created lists of their former PrimeSource customers ("Customer Lists").  *See infra*, Sections F.1.a.–e.

237.     They did this at the direction of Sam Sprague and David Fishbein.  Tr. 1468–69 (D. Furio), Tr. 911–12 (Whitehead).

### a. Garrett Kessler

238. Garrett Kessler testified that he created his list of his former PrimeSource customers from memory and used online resources to fill in information he could not remember. Tr. 538–39 (Kessler).

239. Kessler's list included 220 of his former PrimeSource customers. PX141; Tr. 538–41 (Kessler).

240. Kessler's Customer List also included a reference to the PrimeSource branch that serviced each customer. PX141; Tr. 542 (Kessler). Although Kessler testified that he used the PrimeSource branch to "spur" his memory; he could not recall whether he included the PrimeSource branch after he had already remembered and written down the customer name. PX141; Tr. 542–44. Notably, the call lists Kessler used when he worked at PrimeSource included the branch number. PX141; Tr. 544–45. Because the PrimeSource branch number had no relevance to the work he was performing at Huttig, the existence of the branch number is circumstantial evidence the list was assembled from a PrimeSource document.

241. Kessler's Customer List also included the city and state of the identified customers, a contact name, and information about the products the customers purchased. PX141; Tr. 543–45 (Kessler). Kessler testified that the product information included either the products he remembered those customers purchasing from PrimeSource or information he found online. PX141; Tr. at 546 (Kessler). The product information included information about specific SKU numbers for PrimeSource products. PX141; Tr. 546–47 (Kessler).

242. In some cases, Kessler also identified additional information about the customers' buying habits under "call notes." PX141; Tr. 546 (Kessler). This was information Kessler remembered from servicing those customers at PrimeSource. Tr. 546 (Kessler).

37

#### b. Al Sagunsky

243. Al Sagunsky also created a list of his former PrimeSource customers once he joined Huttig. PX160; Tr. 654–56 (Sagunsky).

244. Sagunsky's Customer List included 50-60 of his former PrimeSource customers. PX160 Tr. 688 (Sagunsky). Sagunsky testified that the list of customer names was what he could remember from working at PrimeSource. Tr. 656, 688 (Sagunsky).

245. His Customer List also included the city and state of the customers he could remember. PX160. He also included the customer contact person, email and phone number. PX160. Sagunsky testified that he either remembered this information from working at PrimeSource or used the internet to find it. Tr. 656 (Sagunsky).

246. Sagunsky's list of his former PrimeSource customers also included information about the products those customers purchased from PrimeSource. Tr. 656 (Sagunsky).

247. His list also included information about his former customer's buying habits, which Sagunsky recalled from servicing them at PrimeSource. PX160, Tr. 656 (Sagunsky).

248. The phone number information, at least for one of his customers, may have come from his PrimeSource cell phone. Tr. 657–58 (Sagunsky). Upon his resignation from PrimeSource, he transferred his contacts from his PrimeSource cell phone, including 5 to 10 of the customers he serviced at PrimeSource. Tr. 657–58 (Sagunsky). One of those customers was ██████████████████████████████████████████████ that appears on Sagunsky's list of former PrimeSource customers. PX160; Tr. 658 (Sagunsky).

#### c. Dan Kottmeyer

249. Dan Kottmeyer also created a list of his former PrimeSource customers shortly after he started at Huttig. PX138, Tr. 801–02, 805, 807–11 (Kottmeyer).

250.    Kottmeyer testified that he identified those former customers from his memory. Tr. 802 (Kottmeyer).

251.    Kottmeyer's Customer List included about 40 of his former PrimeSource customers with information about the products those customers purchased and the customer contact name.  PX138; Tr. 807–11 (Kottmeyer).

252.    After starting at Huttig, Kottmeyer also reached out to approximately 5 to 10 of the customers he had serviced at PrimeSource.  Tr. 813–14, 828–29, 837–38 (Kottmeyer).  He reached out to those customers he classified as "A and B" customers at PrimeSource, or the best and second best classes of customers.  Tr. 794, 813–14 (Kottmeyer).

### d.    Scott Felten

253.    Scott Felten also created a list of his former PrimeSource customers when he started at Huttig.  Tr. 739 (Felten).[1]

254.    Felten's Customer List included about 25 of the customers he recalled working with at PrimeSource.  Tr. 739 (Felten).

255.    Felten also reached out to some of his former PrimeSource customers that he included on his list of former PrimeSource customers.  Tr. 739–40, 742–44 (Felten).

### e.    Jordan Whitehead

256.    Like the other Felten Defendants, Jordan Whitehead also created a list of customers he recalled from PrimeSource.  PX229; Tr. 907–08 (Whitehead).

257.    Whitehead created his Customer List shortly after he started at Huttig.  Tr. 909 (Whitehead).

---

[1] Felten's customer list does not appear to have been produced by Defendants.

258. Whitehead created the list at the direction of his supervisor, Sam Sprague. Tr. 911–12 (Whitehead).

### f. Felten Defendants Exchange PrimeSource Customer Lists and Solicit Customers on those Lists

259. After creating their lists, the Felten Defendants exchanged the lists of their former PrimeSource customers amongst each other. Tr. 690 (Sagunsky).

260. For example, Kessler sent his prospects list to Felten, Sagunsky, Schroeder (PX141; Tr. 548 (Kessler)) and Kottmeyer (PX168; Tr. 819 (Kottmeyer)); Sagunsky sent his prospects list to Felten (PX160); and Kottmeyer sent his prospects list to Felten (PX138).

261. The stated purpose of the list exchange shuffling was so that the person who created the list would not be directly contacting the customers that they serviced at PrimeSource. Tr. 689–90 (Sagunsky).

### 2. Huttig Uses Lists of Former PrimeSource Customers to Solicit, and Make First Sales

262. Once the list of PrimeSource customers was shuffled, the Felten Defendants used the names and information of their co-workers PrimeSource customers to reach out to those customers on behalf of Huttig. Tr. 663–64 (Sagunsky).

263. Felten also added those customers identified in the Felten Defendants' prospect lists to the database of Huttig's pre-existing customers. Tr. 820–21 (Kottmeyer).

264. Kessler identified customers that Felten, Kottmeyer, Sagunsky, and Whitehead contacted on behalf of Huttig that were his former PrimeSource customers. Tr. 550–56, 581–83 (Kessler). Nearly *every* customer contacted by Sagunsky on behalf of Huttig was one of Kessler's former customers. Tr. 554–65 (Kessler).

265.    Sagunsky likewise identified customers that Felten, Kessler, and Kottmeyer contacted on behalf of Huttig that were his former PrimeSource customers.  Tr. 661–63 (Sagunsky).

266.    Kessler made the Huttig-Grip's *first sale* to one of Sagunsky's former PrimeSource customers ████████████ who also appeared on Sagunsky's customer list.  PX160; PX170; Tr. 563–68 (Kessler).

267.    When he was securing the sale, Kessler made sure that the customer knew he was working with Sagunsky and that Sagunsky was making sure she was taken care of.  PX170 ("█ ███████████████████████████████████████████████████ ███"); Tr. 567 (Kessler).

268.    Sagunsky did the same thing.  For example, as to one of Kessler's former customers ██████████████ Sagunsky used the name and contact information from Kessler's prospect list to reach out to ████████████████ .  Tr. 669–70 (Sagunsky); PX223.  When he reached out, he made sure ███████ knew that he was working with Kessler.  PX223 ("██████████████████████████████████████████ █████████████")

269.    On March 30, 2017, D. Fishbein directed Kessler to collect, consolidate, and segregate by Huttig branch the customers lists that had been created by those in the Xpress Division.  Tr. at 1492–95 (D. Fishbein).

270.    The customer lists that Kessler integrated into the Huttig database included the lists of PrimeSource customers that the Felten Defendants had created and exchanged in November/December 2016.  Tr. 576–84 (Kessler), 664 (Sagunsky), 910–11 (Whitehead), 754–56 (Felten); PX245.

41

271.    The purpose of this consolidation was for Huttig's sales persons in the field to use the information gathered by the Huttig Xpress individuals between November 2016 and March 2017.  Tr. 1494–95 (D. Fishbein).

272.    Huttig's field sellers currently have access to this information and can use it for soliciting sales.  Tr. 1495 (D. Fishbein).

### 3.    Lack of Overlap Between PrimeSource and Huttig Customers

273.    Although Huttig claims that Huttig has most, if not all, of the same customers as PrimeSource, a comparison of the lists of the former PrimeSource customers identified by the Felten defendants to the Huttig customer list circulated to the Felten Defendants in November 2016 (PX119) demonstrates otherwise.  *See* **Exhibit B**, Compilation of Felten Defendant Prospect Lists (PX138, PX141, PX160, PX229), Huttig Pre-Existing Customers (PX119), and Huttig 2016 Sales (PX245/PX249).

274.    Collectively, the Felten Defendants identified at least 249[2] of their former PrimeSource customers.  Exh. B.

275.    Only ▮ of those customers were pre-existing Huttig customers.  Exh. B.

276.    Of those ▮ customers, Huttig only sold fasteners to ▮ of them in 2016.  Exh. B.

277.    Huttig's 2016 sales to those customers was ▮▮▮▮ of Huttig's total 2016 fastener sales of ▮▮▮▮.  Exh. B; PX245.

---

[2] This number includes all customer locations as one customer.

### 4. Mona Zinman Creates List of PrimeSource Suppliers and Contacts

278. One of the first things Mona Zinman did was to create a list of PrimeSource's suppliers from memory on her first day of employment, which was on or around November 15, 2016.[3]  Tr. 1252–55 (Zinman).

279. On November 16 and ending on or around December 7, 2016, Ms. Zinman sent the same or similar email message to the multiple suppliers on the list. All of the suppliers were PrimeSource suppliers.  None of the suppliers had ever worked with Huttig.  All of the suppliers she contacted are located overseas.  Tr. 1179–84 (Zinman), JX45, PX69–77, PX85, PX87, PX92, PX93, PX95, PX99, PX105, PX107, PX111–113, PX126-128, PX136, PX137, PX139, PX152, PX156.

280. All of the emails referenced Ms.  Zinman's prior relationship with PrimeSource and her prior position as CEO.  Tr. 1267 (Zinman).

281. Some of the emails referenced the prior relationship between PrimeSource and the mill.  Tr. 1267  (Zinman).

282. Some of the emails referenced the specific products that PrimeSource purchases from the mills.  Tr. 1267 (Zinman).

283. From November 16 to December 7, 2016, Ms. Zinman sent similar messages to many mills who she knows supplies product to PrimeSource.  PX69–77, PX85, PX87, PX92, PX93, PX95, PX99, PX105, PX107, PX111–113, PX126–128, PX136, PX137, PX139, PX152, PX156.

284. Ms. Zinman also contacted ███████████████████████████
███████████████████████████.  Tr. 1189–90 (Zinman), PX143, PX149, PX195.

---

[3] This list was not produced by Defendants and, according to Ms. Zinman, she was never asked to retain any handwritten notes and she has discarded this list.  Tr. 1265-1266 (Zinman).

285.    Ms. Zinman wanted to source product from ███████ and work with ███████ because she knew confidential and valuable details about their relationship with PrimeSource and she wanted to use that information to Huttig's advantage.  For example, she knew ███████ █████████████████████████████████████████ and she wanted them to duplicate that information for Huttig (PX149); and she wanted ████████████████████████████ for Huttig (PX143); and she wanted to duplicate ████████████████████████████ ███████████████ (PX195).  *See also* Tr. 1198–04 (Zinman).

286.    Ms. Zinman's role and the work she had to do in order to launch Huttig-Grip was harder than she expected.  Tr. 1302–03 (Zinman), PX213.

287.    Huttig was starting from ground zero and had no people and no systems in place for sourcing fastener products from overseas.  Tr. 1184, 1218–19, 1302–03, 1305–08 (Zinman), PX209, PX213.

288.    Huttig did not have any employee who knew anything about sourcing fasteners from overseas mills prior to hiring Ms. Zinman.  Tr. 1302, 1305–08 (Zinman), PX213.

289.    Huttig intended to leverage PrimeSource's relationships with mills to Huttig's benefit.  PX219.

290.    On March 15, 2016, Ms. Zinman stated that Garrett Kessler could tell ███████ (a PrimeSource customer) that they ████████████████████████████████████ █████████████████│██████████████████████████████████ ████████████████████████████████████" PX230.

291.    All but one of the mills who sourced the product for the direct sales referenced in Mr. Sprague's ████████████████ are mills that source PrimeSource and which were included on Ms. Zinman's list.  PX 214, Tr 1297–99 (Zinman).

44

292.    Huttig has purchased product from PrimeSource suppliers, and currently ███ of Huttig's supply is sourced by PrimeSource suppliers.  Tr. 1343 (Zinman).

**5.    ████████████████████████████████████**

293.    Prior to his leaving PS, Strosahl was working on a plan with a supplier, ██████ █████, to create an arrangement under which ██████████ would supply fasteners to PS, and PS would market those fasteners ████████████████████████████████ Tr. 90 (Judd).

294.    Within a few days after joining Huttig, Strosahl sought to have Huttig replace PS in the planned ████████ campaign.  Tr. 1502 (D. Fishbein); PX176; PX145.

295.    D. Fishbein believed it was important for Huttig to secure a relationship with ██████████ for purposes of this marketing plan.  In an email dated December 7, 2016, where the concept of a ████████ program was discussed, he wrote:  "███████ █████████████████████████████████" PX145.

296.    According to B. Strosahl, ████████ had done business with PrimeSource because he was then at PrimeSource.  PX176.

297.    On May 9, 2017, Huttig announced its ████████████████████████ ████████. PX256.

**6.    Huttig Copies PS Customer Programs**

298.    One of the items on the Huttig-Grip Tactical Plan read "████████████ ████████████████████████" JX45, p. 4 of 7.

299.    After joining Huttig, Brad Strosahl created programs for customers he had serviced at PrimeSource, including ████████████████████████. Tr. 1621–22 (Strosahl).

300.    The programs he created for Huttig-Grip were substantially similar to the programs he created at PrimeSource for these customers.  Tr. 1621–22 (Strosahl).  Huttig-Grip has targeted customers included on the Customer Lists for the direct shipment of fasteners and other building products. Tr. 1491 (D Fishbein).

### 7.    Huttig Uses PrimeSource's Inventory Management Information

301.    B. Furio worked on inventory management at PrimeSource, including being involved in decisions regarding the product mix of fasteners stored in PrimeSource's distribution centers.  Tr. 1008–09 (Furio).

302.    Huttig historically did not stock the level or mix of fasteners that PrimeSource does.  Tr. 1029–30 (Furio).

303.    The business plan for the Huttig-Grip Division called for purchasing ███████ in fasteners and storing those fasteners in Huttig's distribution centers.  PX300.

304.    The tactical plan for the formation of the Huttig-Grip Division assigned Furio with responsibility to determine the product mix of fasteners to be put into the Huttig distribution centers. PX300.

305.    Considering his work at PrimeSource on inventory management, and the lack of experience at Huttig with respect to fasteners, it is more likely than not that Furio put to use PrimeSource's inventory management information when making decisions about stocking the Huttig distribution centers.

### 8.    Huttig Uses PrimeSource Budgeting Information

306.    In September and October 2016, D. Fishbein and Furio created the Huttig-Grip budget, including a budget related to the sales of direct shipment of fasteners.  Tr. 324–25 (Vrabely).

307. In light of the fact that Huttig did not have a direct shipment business in 2016, it is more likely than not that D. Fishbein and Furio used information they learned at PrimeSource to create, at least in part, the Huttig-Grip budget.

## G.    TRO Entered and Violated

308. On March 3, 2017, this Court entered a Temporary Restraining Order ("TRO") which prohibited Defendants from soliciting customers to which the Individual Defendants, while PrimeSource employees, had sold products or services during the last two calendar years of their employment with PrimeSource.  Case No. 16-cv-11468 ("Felten Case"), Dkt. 41.

309. On March 16, 2017, the Court entered an Amended Temporary Restraining Order, after a motion to modify filed by Huttig, which limited the scope of the TRO to the solicitation of sales of fasteners.  Felten case, Dkt. 52.

310. On April 19, 2017, upon a further motion by Defendants, the TRO was amended again, and reads in its entirety:

1.    All Defendants shall not use and shall return to PrimeSource all PrimeSource materials and documents in whatever format that are held in Defendants' possession, if any, and, after returning the same, shall then destroy any electronic copies made of the same.

2.    a.    Defendants Scott Felten, Garrett Kessler, Daniel Kottmeyer, and Allan Sagunsky are prohibited from soliciting any PrimeSource customers, either directly or indirectly, to whom they, individually as PrimeSource employees, sold products or services to during the past two calendar years, where those products or services are (i) competitive with PrimeSource's fasteners or are (ii) fasteners of a similar type, kind, or nature to those supplied or distributed by PrimeSource during their employment with PrimeSource.

b.    Defendant Huttig is not prohibited from soliciting customers to whom Defendants Felten, Kessler, Kottmeyer, or Sagunsky, individually as PrimeSource employees, sold products or services to during the past two calendar years, provided that Defendants Felten, Kessler, Kottmeyer, and/or Sagunsky have no role, either directly or indirectly, in such solicitations by Huttig. *Huttig shall not solicit such customers using information provided to Huttig by Defendants Felten, Kessler, Kottmeyer, or Sagunsky.*

3.    PrimeSource shall post bond in the amount of twenty-five thousand dollars ($25,000.00).

4.    This order remains in effect pending the outcome of the preliminary injunction hearing in this matter, which is currently scheduled to begin on May 30, 2017.

Felten case, Dkt. 78 (emphasis added).

311.    During the preliminary injunction hearing in this matter, which concluded on August 25, 2017, the following evidence was adduced:

a.    shortly after joining Huttig, defendants Felten, Kottmeyer, Sagunsky and Kessler created customer or prospect lists ("Customer Lists") identifying customers they serviced at PrimeSource and, including the customer contact, information about the products those customers purchased, and other related information about those customers (*supra* Section I.F.1.);

b.    defendants then either called directly on their former PrimeSource customers or circulated their list of PrimeSource customers to their colleagues within the Huttig-Grip Division for their colleagues to call on the customers (*supra* Section I.F.1.); and

c.    in late March, 2017 the Customer Lists were provided to others within the Huttig-Grip Division, who were not personally bound by the TRO, for purposes of calling on the customers identified on the Customer Lists (Tr. 403 (Vrabely); 967 (Sprague); 1494–95 (D. Fishbein);

d.    during Opening Statements, Defendants' counsel "rebutted" the allegation that the TRO had been violated by stating, "you can't have a violation here where they're talking about public information that was used." Tr. 43.

**H.    Evidence of Irreparable Harm**

312. Huttig-Grip's intent is to take market share from competitors, including PrimeSource. Tr. 1486–87 (D. Fishbein).

313. Huttig-Grip's plan was to rollout products that were competitive with PrimeSource's products on a national level. Tr. 1401 (D. Fishbein).

314. Huttig-Grip has created a customer "club" called Huttig Club which is substantially similar to a club established by PS called Premier Club. Tr. 1090 (Furio).

315. Huttig-Grip replicated PrimeSource's PS Direct department, calling it Huttig Xpress. Tr. 402 (Vrabely), 1039 (Furio), PX158.

316. Just as PrimeSource brands its products under the Grip-Rite brand, Huttig is trying to brand its products under the Huttig-Grip brand. Tr. 1505 (D. Fishbein).

317. Judd testified that Huttig's actions in the marketplace were negatively affecting PrimeSource's relationships with its suppliers, employees and customers. Tr. 93–94 (Judd).

**I.    Evidence of Relative Hardships**

318. Huttig-Grip has yet to fully stock its warehouses with the more-than ▮▮▮▮▮▮▮ in additional fasteners intended to be sold out of its distribution centers. Tr. 307–08 (Vrabely).

319. Prior to November 2016, customers who had not purchased fasteners from Huttig had other sources of supply. Tr. 95 (Judd). Hence, if the Huttig-Grip Division of Huttig were shut down, its customers and potential customers could still purchase fasteners from other suppliers.

320. Huttig-Grip's activities in the marketplace are causing PS hardship in terms of its relationships with its suppliers, employees and customers. Tr. 93–94 (Judd).

## II. CONCLUSIONS OF LAW

### A. Standard Applicable to Motion for Preliminary Injunction

The standard to be applied to a motion for a preliminary injunction is set forth in

*Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002), as follows:

> A party seeking a preliminary injunction is required to demonstrate a likelihood of success on the merits, that it has no adequate remedy at law, and that it will suffer irreparable harm if the relief is not granted. *Ty, Inc. v Jones Group*, 237 F.3d 891 (7th Cir. 2001) (citing *Abbot Labs v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). If the moving party can satisfy these conditions, the court must then consider any irreparable harm an injunction would cause the non-moving party. *Ty*, 237 F.3d at 895. Finally, the court must consider any consequences to the public from denying or granting the injunction. *Id.* "Sitting as a court of equity, the court then weighs all these factors employing a sliding-scale approach." *Abbot Labs.*, 971 F.2d at 12. That is, the more likely the plaintiff's chance of success on the merits, and less the balance of harms need weigh in its favor. *Id.*

A plaintiff seeking a preliminary injunction is considered to have a likelihood of success

on the merits, if "the plaintiff's chances are better than negligible." *Brunswick Corp. v. Jones,*

*Jr.*, 784 F.2d 271, 275 (7th Cir. 1986) ("Although the plaintiff must demonstrate some

probability of success on the merits, the threshold is low. It is enough that the plaintiff's chances

are better than negligible.") (internal citation and quotations omitted).

Applying this standard, the evidence presented at the hearing supports the entry of a

preliminary injunction.

### B. PrimeSource Will Suffer Irreparable Harm Without a Preliminary Injunction and Lacks Another Adequate Remedy

In the absence of a preliminary injunction, PrimeSource stands to lose long-standing

customer relationships, and damages cannot adequately compensate for such losses. *Foodcomm*

*Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003) (Loss of relationship with customer constitutes

irreparable harm). Defendants have already solicited PrimeSource's customers, and the loss of

business or potential loss of business due to solicitation constitutes irreparable harm. "[I]t is

precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'" *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005) (describing "ongoing competition itself as a sufficient basis for [injunctive] relief."); *Diamond Blade Warehouse, Inc. v. Paramount Diamond,* 420 F.Supp.2d 866, 872 (N.D. Ill. 2006) (holding that pilfering of customer and employees results in loss of goodwill, competitive position, and continuity of business relationships with customers and employees).

The use or potential use of PrimeSource's trade secrets and confidential information by Defendants also constitutes irreparable harm that no remedy at law can adequately compensate. *Inertek USA Inc. v. AmSpec,* LLC 2014 Wl 4477933, *6 (N.D. Ill. Sept. 11, 2014) (quoting *Computer Assocs. Int'l v. Quest Software, Inc*., 333 F.Supp.2d 688, 700 (N. D. Ill. 2004) ("There is a presumption of irreparable harm to the plaintiff in cases of trade secret misappropriation . . . .")); *Mazak Optionics Corporation v. Marlette*, 2017 Wl 3394727 (N.D. Ill., August 8, 2017) (use by competitor of confidential information constitutes irreparable harm); *IDS Financial Services, Inc. v. Smithson*, 843 F. Supp. 415, 418 (N.D. Ill. 1994) ("Where trade secrets and goodwill are involved, the threat is significant that the harm experienced by the misappropriation or misuse of trade secrets will be irreparable."); *Inter/National Rental Ins. Serv., Inc. v. Albrecht*, No. 4:11-CV-00853, 2012 WL 4506140, at *5 (E.D. Tex. March 14, 2012) ("The Court agrees that Albrecht's ability to use this information to unfairly compete with USI poses a credible and serious threat to its goodwill, confidential information, and profits for which USI will have no adequate remedy at law.").  The irreparable harm suffered by PrimeSource is particularly acute. Huttig-Grip's tactical plan is designed to replicate PrimeSource and take market share from PrimeSource.

### C. Likelihood of Success on the Merits

The evidence presented at the hearing established that PrimeSource is likely to prevail on

the following claims:

- that D. Fishbein and Furio violated their non-solicitation and non-disclosure provisions in their contracts with PrimeSource (CEO First Amended Complaint [ECF No. 18], Count IV and VI) and that Zinman violated the non-disclosure provisions of her contracts with PrimeSource (CEO First Amended Complaint, Counts V);

- that Huttig interfered with PrimeSource contracts with Felten, Kottmeyer, Kessler, Whitehead, Sagunsky, and Sprague (CEO First Amended Complaint [No. 1:16-cv-11390, ECF No. 18], Count VII and Felten First Amended Complaint [No. 1:16-cv-11468, ECF No. 18], Count 7);

- that Felten, Kottmeyer, Kessler, Whitehead, Sagunsky, and Sprague violated their PrimeSource employment agreements by joining Huttig, by soliciting PrimeSource customers, by utilizing confidential information and trade secrets to build their call lists, and by sharing confidential customer information with each other and with other Huttig employees for the purpose of soliciting those customers (Felten First Amended Complaint [No. 1:16-cv-11468, ECF No. 18], Counts 1, 2, 3, 4);

- that D. Fishbein, Zinman and Furio, acting on behalf of Huttig, have utilized and will inevitably continue to utilize PrimeSource's trade secrets (CEO First Amended Complaint, Counts I and II).

#### 1. The Individual Defendants Violated their Respective Restrictive Covenants.

##### a. The Ex-CEOs' Restrictive Covenants are Enforceable under New York Law and the Ex-CEOs Breached Those Agreements.

The four Ex-CEO Defendants' restrictive covenants are governed by New York law. JX3,

JX6, JX9, JX10, JX11, JX12. As a general rule, restrictive covenants under New York law will

be enforced where the covenant is "reasonable in time and area, necessary to protect the employer's

legitimate interest, not harmful to the general public and not unreasonably burdensome to the

employee." *Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 307 (1976). A restrictive

covenant will be enforced to the extent its scope is reasonable in time and area. *Id.* New York

law permits employers to protect customer relationships the employee acquired in the course of employment and the information regarding those relationships which was acquired during the employment. *BDO Seidman v. Hischberg*, 93 N.Y.2d 382, 391–93 (1999).[4]  An employer has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which was created and maintained at the employer's expense, to the employer's competitive detriment. *Id.*  at 392.

D. Fishbein and Furio breached their Separation Agreements, *inter alia*, by soliciting PrimeSource employees during the period of December 2015 through September 2016.  During that time period, D. Fishbein and Furio repeatedly communicated and met with PrimeSource employees and with Ms. Zinman.  The PrimeSource employees they contacted were all persons whom they would eventually hire to join the Huttig-Grip Division, including: Kessler (numerous text exchanges); Sagunsky (email and conversations); Sprague (dinner meeting, meeting over drinks, and calls); Whitehead (numerous text exchanges); Strosahl (calls, texts and dinners); Kottmeyer (texts).   All of these contacts were designed to recruit these employees to the  Huttig-Grip Division once it was up and running.

D. Fishbein and Furio's actions constitute breaches of the non-solicitation provisions in their Separation Agreements.  *See Marsh USA, Inc. v. Karasaki*, No. 08 Civ. 4195, 2008 WL 4778239, at *15 (S.D.N.Y. Oct. 31, 2008) (holding that direct and indirect solicitation of customers and employees constituted contractual violations supporting a preliminary injunction under New York law); *Arpac Corp. v. Murray*, 226 Ill. App. 3d 65, 76–77 (1992) (affirming preliminary injunction that Defendant violated non-solicitation provision where Defendant's phone records showed communication with Plaintiff's employees, and Plaintiff's employees quit

---

[4] If an restrictive covenant is unenforceable or overly broad, a New York court will blue-pencil and revise the unenforceable provisions.  *BDO Seidman v. Hischberg*, 93 N.Y.2d at 391-93.

at approximately the same time as Defendant's resignation); *Malone v. Cort Furniture Corp.*, No. 02 C 1729, 2002 WL 1874819, at *1 (N.D. Ill. Aug. 13, 2002) (entering temporary restraining order enforcing non-solicitation provision where Plaintiff's employee quit to work with Defendant at competing company); *see also O'Brien v. Rattikin Title Co.*, No. 2-05-238-CV, 2006 WL 417237, at *1 (Tex. App. Feb. 23, 2006); *World Auto Parts, Inc. v. Labenski*, 217 A.D. 940 (N.Y. App. Div. 1995) ("[D]efendant breached the non-compete provisions of the Retirement Agreement by attending trade shows, distributing his business card and discussing with competitors his plans to re-enter the auto parts business when the non-compete provision expired.").

D. Fishbein and Furio requested information regarding the Felten Defendants and Strosahl's wages and agreements with PrimeSource and asked if the Felten Defendants were happy with their current employment. Tr. 497 (Kessler); Tr. 650 (Sagunsky); Tr. 895–98 (Whitehead). A reasonable jury could consider these communications to be solicitations and a breach of the Ex-CEOs non-solicitation provisions. *See Marsh USA, Inc. v. Karasaki*, No. 08 Civ. 4195, 2008 WL 4778239, at *15 (S.D.N.Y. Oct. 31, 2008) (holding that an individual solicited former employees when he assisted his current employer by knowing what the target employees made in their current position and by talking to some of the target employees, even if the contents of the conversations were unknown); *Renaissance Nutrition Inc. v. Jarrett*, 08-CV-800S, at *6 (W.D.N.Y. Jan. 9, 2012) ("[A] reasonable jury could conclude that Defendants played a role [in solicitation of customers]. . . in a series of suspicious correlated events. . . ."). The Felten Defendants and Strosahl's responses to and actions immediately after the Huttig-Grip Press Release was published, support the reasonable inference that the Felten Defendants and Strosahl viewed D. Fishbein's prior communications as solicitations. For instance, the Felten

54

Defendants immediately "applied" for jobs and accepted jobs within 24-48 hours of the publication of the press release.

D. Fishbein and Furio also breached the non-disclosure provisions in their PrimeSource Agreements through their use of PrimeSource budgeting, marketing, and inventory management information. *See supra* Section I.F.5.–8.

On her first day of employment at Huttig-Grip, Mona Zinman re-created from memory a list of the mills she recalled working with at PrimeSource and then, within 24 hours, reached out to those supplier contacts, referenced her previous employment at PrimeSource, and referenced confidential arrangements and agreements between PrimeSource and certain of the suppliers all in an attempt to obtain quick access to product for the Huttig-Grip Division. She continued to utilize similar information thereafter.

Zinman's use of PrimeSource's goodwill and information with suppliers that she developed at PrimeSource and on behalf of PrimeSource constitutes a use of PrimeSource's confidential information which is a legitimate interest under New York law to support an injunction. *BDO Seidman v. Hischberg*, 93 N.Y.2d 382, 392 (1999) ("An employer has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment."). *Yeti by Molly, Ltd. v. Deckors Outdoor Corp.*, 259 F.3d 1011, 1108 (9th Cir. 2001) (supplier information confidential); *Sigma Chem. Co. v. Harris*, 794 F.2d 371, 373–74 (8th Cir. 1986) (knowledge of which supplier provided which product at certain prices and quantities constituted a trade secret).

**b.    The Felten Defendants Non-Compete and Non-Solicit Agreements are Enforceable Under Texas Law and the Felten Defendants Violated Their Respective Agreements.**

The Felten Defendants' restrictive covenants are governed by Texas Law.  *See* JX13, JX14, JX15, JX16, JX17; *see also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 20 F.3d 713, 719 (7th Cir. 1994) (finding that contractual choice of law provisions should govern even if the most significant contacts were in a different state); *Potomac Leasing Co. v. Chuck's Pub. Inc.*, 156 Ill. App. 3d 755, 759 (2d Dist. 1987) (finding that a contractual choice of law provision is enforced if there is "*some* relationship between the chosen forum and the parties or the transaction." (emphasis added)).  *See also* Felten case, Dkt. 105 (Memorandum Report and Recommendation).

*i.    The Felten Defendants' Non-Disclosure Agreements Are Enforceable.*

Felten, Sagunsky, Kottmeyer, Kessler, and Whitehead each have non-disclosure agreements with PrimeSource which are enforceable.  Under Texas law, non-disclosure agreements prevent "disclosure of trade secrets and confidential information acquired by the former employee," but are not considered restraints on trade and are not governed by the Texas Covenants Not to Compete Act.  *Shoreline Gas, Inc. v. McGaughey*, No. 13-07-364-CV, 2008 WL 1747624, at *10 (Tex. App. 2008) (explaining that "[n]on-disclosure agreements are different than non-compete covenants" because "non-compete covenants are considered restraints on trade, non-disclosure agreements are not.").

The non-disclosure provisions prohibit the former employees from disclosing any of PrimeSource's confidential information, including but not limited to information regarding PrimeSource's customers, costs and margins, suppliers/vendors, marketing strategies and decisions, budgets, and methods of operations.  This type of information was disclosed to Felten,

Kessler, Kottmeyer, Sagunsky, and Whitehead by PrimeSource and constitutes protectable confidential information under Texas law. *Rugen v. Interactive Business Systems, Inc.*, 864 S.W.2d 548, 552 (Tex. App. 1993) (finding that "customer information, pricing information, the identity of IBS's consultants, and the pricing of these consultants is confidential."); *Weed Eater, Inc. v. Dowling*, 562 S.W.2d 898, 901 (Tex. App. 1978) (upholding injunction against former employee and prohibiting disclosure of "marketing strategy and forecasts, product specifications, performance specifications, testing equipment, testing procedures, vendor identity, [and] past proposed product designs").

      ii.    *Felten, Kessler, Kottmeyer's and Sagunsky's Non-Compete Provisions Are Enforceable.*

Felten, Kessler, Kottmeyer, and Sagunsky each entered into additional restrictive covenants with PrimeSource in exchange for PrimeSource providing access to confidential information, access to customer relationships, provision of training, and use of PrimeSource's goodwill. JX13, JX14, JX16, JX17. Each of their agreements are governed by Texas law, as discussed above. *Id.*

The enforceability of a covenant not to compete in Texas is a question of law for the court. *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 295 (5th Cir. 2004). Under Texas law, "[a] non-competition agreement is enforceable if it is reasonable in time, scope and geography and, as a threshold matter, 'if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made.'" *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 771 (Tex. 2011) (citation omitted).

Noncompete agreements in Texas are governed by the Covenants Not to Compete Act. Tex. Bus. & Com. Code § 15.50-52. The act states that "a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the

agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." Tex. Bus. & Com. Code § 15.50(a). Texas courts have found that a restrictive covenant that is part of an agreement not to disclose confidential information is ancillary or part of an otherwise enforceable agreement. *Id*. at 775 ("Consideration for a noncompete that is reasonably related to an interest worthy of protection, such as trade secrets, confidential information, or goodwill, satisfies the statutory nexus"); *Mann Frankfort Stein & Lipp Advisors*, *Inc. v. Fielding*, 289 S.W.3d 844, 851–52 (Tex. 2009) (holding implied promise and provision of access to confidential information was sufficient to support restrictive covenant). Felten, Kessler, Kottmeyer, and Sagunsky were each provided with certain PrimeSource confidential information.

Felten, Kessler, Kottmeyer, and Sagunsky agreed not to compete with PrimeSource by accepting employment with a competitor that sells the same building materials or related products as PrimeSource within 300 miles of Buffalo Grove, Illinois or within the territories they serviced. JX13, JX14, JX16, JX17. Their respective agreements state:

> IV. For a period of eighteen months from the date of the termination of Employee's employment with PrimeSource (other than an involuntary termination without good cause), Employee will not, within a three-hundred (300) mile radius of any (a) distribution center of PrimeSource or (b) sales territory which has been services by Employee at any time during his or her employment with PrimeSource:
>
> • Sell or offer for sale any products or services of the type sold or offered by PrimeSource to any customer to whom PrimeSource sold products or provided services or any prospect PrimeSource solicited for business during the two most recently complete calendar years;
>
> • Enter the employ of, or render any services to, any person, firm or business that is engaged in any business competitive with that of PrimeSource, including but not limited to the business of wholesale distributing or selling packaged or bulk nails or screws, collated tools, or fasteners, roofing, gypsum, insulation, adhesives, wire products or any other building, building materials, or related products and who has sold or offered for sale such

products or services during the two most recently completed calendar
years;.…

JX13, JX14, JX16, JX17.

These post-employment restrictions are enforceable under Texas law because they
"'contain [] limitations as to time, geographical area, and scope of activity to be restrained that
are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or
other business interest of the promisee.' " *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209
S.W.3d 644, 655 (Tex. 2006) (citation omitted); Tex. Bus. & Com. Code §15.50(a).

Eighteen months is a reasonable time limitation for a restrictive covenant under Texas
law. *Gallagher Healthcare Ins. Servs. v. Vogelsang*, 312 S.W.3d 640, 655 (Tex. App. 2009)
(holding two year non-compete was reasonable and commenting that "[t]wo to five years has
repeatedly been held as a reasonable time in a noncompetition agreement."); *Electronic Data
Sys. Corp. v. Powell*, 524 S.W.2d 393, 399 (Tex. App. 1975) (enforcing a three-year covenant);
*WM Recycle Am., LLC v. Lavin*, 2011 IL App (2d) 110180-U, 2011 WL 10457477, at *15 (May
13, 2011) (holding that a two-year noncompete was reasonable under Texas law).[5]

Three hundred miles from the Buffalo Grove, Illinois distribution center, where Felten,
Kessler, Kottmeyer, and Sagunsky reported during their employment, or their assigned sales
territory are reasonable scope limitations. *See Curtis v. Ziff Energy Grp., Ltd.*, 12 S.W.3d 114,
119 (Tex. App. 1999) ("Generally, a reasonable area for purposes of a covenant not to compete
is considered to be the territory in which the employee worked while in the employment of his
employer."); *Vais Arms*, 383 F.3d at 295–96, n.20 (upholding fifty state non-compete based on
nationwide marketing of product and commenting that "Texas courts have upheld nationwide

---

[5] Illinois unpublished decisions are non-precedential but may be used for their reasoning and logic. *Zahn
v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1093 (7th Cir. 2016).

geographic limitations in non-compete agreements when it has been clearly established that the business is national in character.").  The prohibition restricting Felten, Kessler, Kottmeyer, and Sagunsky from working in the same territory is reasonable.

Likewise, the prohibition restricting Felten, Kessler, Kottmeyer, and Sagunsky from soliciting or servicing the customers they serviced at PrimeSource is reasonable.  *Gallagher Healthcare*, 312 S.W.3d at 654 ("A number of courts have held that a non-compete covenant that is limited to the employee's clients is a reasonable alternative to a geographic limit"); *GE Betz Inc. v. Moffitt-Johnson*, H-13-0459, 2014 WL 12596523, at *7 (S.D. Tex. Jun. 6, 2014) ("Therefore a territorial restriction may be expressed 'not in geographic terms, but by describing a limited number of' clients, customers, or patients."); *Orchestratehr, Inc. v. Trombetta*, 3:13-CV-2110, 2016 WL 4563348, at *4 (N.D. Tex. Sept. 10, 2016) ("Because the non-compete covenant is explicitly limited to Plaintiff's current customers, the Court finds that this limitation serves as a substitute for a geographical limit.").

It is an abuse of discretion under Texas law to not enforce a valid non-compete. *Tranter, Inc. v. Liss*, 02-13-00167-CV, 2014 WL 1257278, at *5 (Tex. App. March 27, 2014) (holding that is was an abuse of discretion for a trial court to not reform and enforce a noncompete that failed to have any geographic condition); Tex. Bus. & Com. Code § 15.51(c). The Texas Covenants Not to Compete Act provides that even if the limitations as to time, geographical area, or scope of activity are not reasonable or impose a greater restraint than is necessary, the court *shall* reform the covenant to be reasonable. Tex. Bus. & Com.Code § 15.51(c) (Vernon 2009); *see also Tranter, Inc. v. Liss*, 02-13-000167-CV, 2014 WL 1257278, at *5 (Tex. App. Mar. 27,

2014) (holding that it was an abuse of discretion for a District Court to not reform an agreement that completely lacked a geographic restriction[6]).

Moreover, the argument about the geographic scope is merely hypothetical because Defendants are working just 1.3 miles away from their prior PrimeSource location in an office that was opened specifically to directly compete with PrimeSource.[7]  In *Saddlers Row, LLC v. Dainton* an Illinois Court of Appeals rejected a similar challenge finding that a defendant cannot knowingly accept employment with one of plaintiff's chief competitors "located a mere seven miles from plaintiff," and then complain about the geographic limitation.  2012 IL App (2d) 1209141-U, 2012 WL 7989526, at ¶ 14 (Apr. 23, 2013).

Here, Felten, Kessler, Kottmeyer and Sagunsky's noncompetes are reasonably limited in temporal and geographic scope and the activity to be restrained. The agreements contain limitations that are necessary to protect PrimeSource's the goodwill and business interest and propose limitations that do not impose a greater restrain on trade than is necessary to protect those interests.

### c. Swapping Customer Lists Does Not Circumvent the Non-Solicit Provisions.

Felten, Kessler, Kottmeyer, and Sagunsky agreed not to solicit for sale the products or services sold or offered by PrimeSource to any customer to whom they sold or serviced during

---

[6] The Texas Court of Appeals in *Tranter* found that a non-compete agreement should be enforced even if there is no evidence that the former employee was actively using the former employer's information, if the former employee is in a similar position or would have difficulty not using confidential information in that position.  *Id.* at *9-10.

[7] The Huttig-Grip office is at 300 Knightsbridge Parkway in Lincolnshire, Illinois, while the PrimeSource distribution center that the Felten Defendants reported to is at 1650 Leider Lane, Buffalo Grove, Illinois. PX44, Tr. 529 (Kessler), Tr. 719 (Felten); Tr. 862 (Kottmeyer).

the past two years that they were employed by PrimeSource.  JX13, JX14, JX16, JX17.  These

provisions read:

> IV. For a period of eighteen months from the date of the termination of Employee's
> employment with PrimeSource (other than an involuntary termination without good
> cause), Employee will not, within a three-hundred (300) mile radius of any
> (a) distribution center of PrimeSource or (b) sales territory which has been services
> by Employee at any time during his or her employment with PrimeSource:
>
> - Sell or offer for sale any products or services of the type sold or offered by
>   PrimeSource to any customer to whom PrimeSource sold products or
>   provided services or any prospect PrimeSource solicited for business during
>   the two most recently complete calendar years; . . .

Under Texas law, non-solicit provisions are governed by the Covenants Not to Compete

Act, which also governs non-compete provisions.  Tex. Bus. & Com. Code § 15.50(a); DeSantis

v. Wackenhut Corp., 793 S.W.2d 670, 681-82 (Tex. 1990). Therefore non-solicit provisions must

be limited in scope time, geographic area, and activity to be restrained. *Id.*  As discussed above,

the eighteen-month and geographic restrictions are reasonable under Texas law.

Defendants contend that because they added the customers that they had at PrimeSource

to a master customer list at Huttig and for the most part did not directly contact their customers

from PrimeSource that they did not violate their non-solicit agreements. Tr. 629, 633, 690

(Kessler).  The Defendants' stated purpose for shuffling the lists was so that the person who

created the list would not be directly contacting the customers that they serviced at PrimeSource.

Tr. 689-90 (Sagunsky).

The use of PrimeSource customer information to develop call lists constitutes

misappropriation of PrimeSource's confidential information and trade secrets and is a direct

violation of the Felten Defendants' non-solicit and non-disclosure restrictive covenants. *Allied

Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016) ("Trade

secrets include customer lists that are not readily ascertainable, pricing, distribution, and

marketing plans, and sales data and market analysis information." (internal quotation omitted));

*York v. Hair Club for Men, LLC.*, No. 01-09-00024-CV, 2009 Tex App LEXIS 4866, 2009 WL

1840813, at \*5 (Tex. App. June 25, 2009) ("Even if York and Reynolds disclosed only the lists

of customers that they serviced, divulging them to their new employer violates the non-

solicitation, if not the non-disclosure, agreement."); *First Financial Bank, N.A. v. Bauknecht*, 71

F. Supp. 3d 819 (C.D. Ill. 2014) (finding that customer lists assembled by a former employee

from memory and a phone book were a trade secret of a former employer and the trade secret

was misappropriated when he provided that list to his new employer).

In *York*, a Texas Court of Appeals stated that it would be a violation of two former

employee's non-solicit and, likely, their non-disclosure agreements to disclose the identities of

their former employer's customers to their new employer, even if they only disclosed the

customers that they serviced and did not directly contact those customers. 2009 WL 1840813, at

\*5. The court held that that divulging customer identities violated the agreement because the

non-solicit provision included language that prohibited both soliciting and aiding in the

solicitation of business related to the former employer's industry. *Id.* Similarly, the court held

that the identities of customers constituted confidential or trade secret information. *Id.*

Felten, Kessler, Kottmeyer, and Sagunsky's agreements similarly prohibit the solicitation

of former PrimeSource customers, while also prohibiting the former employees from

"render[ing] any services to, and person . . . or business . . . engaged in any business competitive

with that or PrimeSource" as well as prohibiting the disclosure of PrimeSource's confidential

information. JX 13, 14, 16, & 17. Felten, Kessler, Kottmeyer, and Sagunksy's attempt to avoid

their restrictions by swapping the lists among themselves and other Huttig employees does not

support the conclusion that they can circumvent their agreements with PrimeSource. To the contrary, their agreements with PrimeSource were directly violated by these actions.

### 2. D. Fishbein and Huttig Tortiously Interfered with PrimeSource's Agreements with the Individual Defendants, Sprague and Strosahl.

Huttig tortiously interfered with PrimeSource's agreements with the Felten Defendants, Sprague and Strosahl. The elements of tortious interference with a contract, under Illinois law, are (1) The existence of a valid and enforceable contract between plaintiff and another; (2) the defendant's awareness of this contractual relation; (2) the defendant's intentional and unjustified inducement of a breach of contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct, and (5) damages. *Koehler v. Packer Grp., Inc.*, 53 N.E.3d 218, 237 (Ill. App. 2016).

PrimeSource has valid non-disclosure and restrictive covenant agreements with the Individual Defendants, Sprague and Strosahl as outlined above. Huttig intentionally interfered with these agreements by employing and continuing to employ Felten, Kessler, Kottmeyer, Sagunsky, and Whitehead. As a result of the employment of Felten, Kessler, Kottmeyer, Sagunsky, and Whitehead, Huttig has access to PrimeSource's confidential information and trade secrets.

Huttig had knowledge of these agreements because the former CEOs, employees of Huttig and acting on its behalf, were aware of the agreements and of the non-disclosure and post-employment restrictions placed upon each of Felten, Kessler, Kottmeyer, Sagunsky, and Whitehead. Nevertheless, Huttig chose to interfere with the non-compete restrictions in these agreements when it employed the former employees in roles substantially similar to those they performed while working at PrimeSource and in a location a few miles away from their prior office.

Moreover, Huttig asked Felten, Kessler, Kottmeyer, Sagunsky, Sprague and Whitehead to violated their non-solicitation and non-disclosure agreements by having them create customer lists and having them reach out to their former PrimeSource customers in order to try and sell them Huttig-Grip product and/or by asking them to provide information to their co-workers to solicit on their behalf.

Similarly, Huttig and D. Fishbein encouraged Strosahl to take a business opportunity that he had been planning for PrimeSource's benefit.  Tr. 1595, 1616–17 (Strosahl). Under either Illinois or Colorado law, a high level employee cannot take a business opportunity from a former employer to a new employer.  *See T.A. Pelsue Co. v. Grand Enterprises, Inc.*, 782 F. Supp. 1476, 1485–86 (D. Colo. 1991); *Comedy Cottage, Inc. v. Berk*, 145 Ill.App.3d 355, 360 (Ill. App. 1986) (*see also Smith-Shrader Co. v. Smith*, 136 Ill. App. 3d 571, 578-79 (1985)); *H. Vincent Allen & Assocs., Inc. v. Weis*, 63 Ill. App. 3d 285, 292 (1978).  Thus, Strosahl's taking of this opportunity constitutes a breach if his fiduciary duty to PrimeSource; and Huttig aided and abetted these activities.  *See id.*; *Intelldent Corp. v. Int'l Plastics LLC*, No. 13 CV 638, 2013 WL 657671, at *5 (N.D. Ill. Feb. 22, 2013); *In re H. King & Assocs.*, 295 B.R. 246, 275 (Bankr. N.D. Ill. 2003); *McMahan v. Deutsche Bank AG*, No. 12 C 4356, 2016 WL 1019674, at *3 (N.D. Ill. Mar. 15, 2016). Huttig and D. Fishbein encourage Mr. Strosahl's breach of his duties to Huttig's benefit.

### 3.    Trade Secret Claims (FDTSA and ITSA)

The Illinois Trade Secret Act ("ITSA") prohibits misappropriation of trade secrets through improper means.  The Act defines a "trade secret" to mean:

> information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers that:

(1)     is sufficiency secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2)     is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065 *et seq.*

The Federal Defend Trade Secrets Act also prohibits misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." Under the Act, a trade secret is defined as:

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if:

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. §1839.

PrimeSource has established that Defendants misappropriated certain of its trade secrets including customer information, supplier information, marketing information, budgeting information and inventory management information, as more fully set forth below.

### a.     Customer Information

The use by Felten, Kottmeyer, Sagunsky, Whitehead and Kessler of PrimeSource customer information to develop their Customer Lists constitutes misappropriation of PrimeSource's trade secrets. *See First Financial Bank, N.A. v. Bauknecht*, 71 F. Supp. 3d 819 (C. D. Ill. 2014) (customer list and characteristics, recalled from memory, constituted trade

66

secret); *Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016) (internal quotation omitted) ("Trade secrets include customer lists that are not readily ascertainable, pricing, distribution, and marketing plans, and sales data and market analysis information."); *Mickey's Linen v. Donald Fischer*, No. 17 C 2154, 2017 WL 3970593 (N.D. Ill. Sept. 8, 2017) (customer list was a trade secret).

PrimeSource demonstrated that it expended time and money in developing and servicing its customers. And while some of the customers may appear in trade association listings, information about their buying practices and preferences, and contact information, is not readily available.

Here, defendants used more than the mere identity of the customers they had served at PrimeSource, they also used information about those customer's buying habits, including what the customer purchased, the contact persons at the customer, and whether the customer was a direct ship customer. These customers are of sufficient size and sophistication to be able to purchase and handle containers filled with fasteners shipped directly from overseas manufacturers. Huttig did not service this type of customer in 2016 prior to the formation to the Huttig-Grip division, and only on a limited basis prior to 2016.

At the hearing, Defendants contended that they had not "stolen" PrimeSource customer lists, but merely recorded customer information they had memorized. But as illustrated by *First Financial Bank v. Bauknecht*, 71 F. Supp. 3d 819 (C.D.Ill. 2014), memorization of customer information does not change the character of the information; in other words, whether memorized, or in hard copy, customer lists are eligible for trade secret status.

### b.    Supplier Information

"Supplier lists" is specifically included in the definition of "trade secret" in the ITSA. 1065 ILCS 1065. In its Counterclaim filed in the CEO case, Huttig has admitted that it takes a substantial effort of time and money to "arrange sourcing for thousands of fastener products, primarily from non-US manufacturers and trading companies" and to "establish a positive reputation with product manufacturers, trading companies and other intermediaries in the supply chain…" Case no. 16-cv-11390, Dkt. 103, ¶¶ 142(b), (d). And other courts have recognized that supplier information is protectable as a trade secret. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp*., 259 F.3d 1101, 1108 (9th Cir. 2001) (holding that supplier in formation is trade secret); *Sigma Chem. Co v. Harris*, 794 F.2d 371, 373–74 (8th Cir. 1986) (court found that while some on misappropriate files was on the public domain, knowledge of which suppliers supplied which chemicals at the requisite quality and price was not in the public domain and constituted a trade secret.) See, *also*, *Morton v. Rank Am., Inc*., 812 F. Supp. 1062 (C.D. Cal. 1993) (allegation that trade secret owner expended substantial time and expense in developing supplier lists adequate allegation that lists were trade secrets); *MJ & Partners Rest. Ltd. P'ship v. Zadikoff*, 10 F. Supp. 2d 922, 933 (N.D. Ill. 1998) (information regarding suppliers could constitute trade secrets); *Zep, Inc. v. First Aid Corp.*, No. 09 CV 1973, 2010 WL 1195094, at *10 (N.D. Ill. Mar. 19, 2010) (same).

Zinman, one of PrimeSource's ex-CEOs, was hired by Huttig to find overseas suppliers of fasteners. She had a similar position at PrimeSource. On her first day of employment at Huttig-Grip, she reached out to the supplier contacts she had established at PrimeSource in an attempt to utilize those contacts to supply product to Huttig. She continued to utilize similar information thereafter.

### c.    Marketing Information

PrimeSource considers marketing information as a trade secret and confidential information.  Even Defendants' witnesses conceded that marketing plans, particularly in their inception, are confidential.  Tr. 375-376 (Vrabely); Tr. 1038 (Furio).  It is well recognized that marketing information can constitute a trade secret or confidential information.  *See PepsiCo, Inc., v. Redmond*, 54 F.3d 1262 (7th Cir. 1995).

Huttig has utilized the following PrimeSource marketing information it is operation of the Huttig-Grip Division.

### i.    ██████████████████

In April 2015, D. Fishbein and R. Furio participated in a presentation to bankers where PrimeSource identified ████████████████████████████████████████ ████.  PX10.  It is therefore not surprising, under the circumstances of this case, that Huttig-Grip's ███████████████████████████████████████████ ████████████████████████████████████████████████.  PX158, p. 4.

### ii.    █████████████████

Furio testified that it was "possible" that the PrimeSource marketing opportunity with █████████████ was confidential.  Tr. 1039.  While at PrimeSource, Brad Strosahl was working on setting up ████████████████████████████████████ ███████████████████████████████.  Within a week of joining Huttig, Stosahl sought to bring that concept to Huttig.  And in May of 2017, Huttig ████████ ██████████████████████████████████.  PX256.

### iii. Customer-specific programs

The Huttig-Grip tactical plan, under the heading "████████████████" called for the

████████████████████████████████████████████████████." JX45, p. 4 of 7.  Vrabely

testified that customer rebate programs were considered confidential.  Tr. 377 (Vrabely).  Upon

joining Huttig Strosahl implemented customer programs (a means of providing customer

incentives) to customers he had serviced at PrimeSource.  The terms of these programs were

substantially similar to the programs Strosahl had worked on with those customers while at

PrimeSource.

### d.  Budgeting Information

Budgeting and similar financial information can constitute a trade secret.  *See Interek*

*USA Inc. v. AmSpec,* 2014 WL 4477933 (N.D. Ill. Sept. 11, 2014) (financial information

contained in profit and loss statement constitute trade secrets); *Mickey's Linen,* 2017 WL

3970593 (budgetary information trade secret); *Sunbelt Rentals, Inc. v. Head & Enquist Equip.,*

*L.L.C.*, 174 N.C. App. 49, 620 S.E.2d 222 (2005) (capital and branch budget information,

combined with other information, constituted trade secret); *Prosonic Corp. v. Stafford*, 539

F.Supp.2d 999 (S.D. Ohio 2008) (budgetary information held to be trade secret); *Everest Nat'l*

*Ins. Co. v. Rockhill Ins. Co.*, 2016 WL 8914545 (M.D. Fla. Oct. 5, 2016) (budget information,

among other information, constituted trade secret).

In September and October 2016, D. Fishbein and Furio created the Huttig-Grip budget,

including a budget related to the sales of direct shipment of fasteners. Tr. 324–25 (Vrabely).

Huttig had not run a fastener business on a national level, and had not made any direct shipments

of fasteners in 2016.  D. Fishbein and Furio testified they felt free to use whatever information

they learned from PrimeSource in their work at Huttig.  It is thus more probable than not (or

certainly more than a negligible possibility) that Fishbein and Furio used PrimeSource information to develop the Huttig-Grip budget.

### e.    Inventory Management Information

PrimeSource considers its mix of inventory to be a trade secret. While PrimeSource sold ████████████████████, Huttig stocking of fasteners "did not approach that." Prior to the formation of the Huttig-Grip Division, Huttig had a limited offering of SKUs. Tr. 303 (Vrabely), Tr. 1029–30 (Furio). A "key element" of the Huttig-Grip growth plan was to add new products and related SKUs. Tr. 301, 303 (Vrabely). Huttig-Grip's plans called for the addition of █████████ in fastener inventory to Huttig's distribution centers. Tr. 336 (Vrabely), PX300.

Furio participated in product mix decisions at PrimeSource (Tr. 1007–08) and knew ████ ████████████. Tr. 1009 (Furio). At Huttig, he was assigned the task of determining, in detail, the mix of product to be put into the Huttig warehouses. PX 300, Tr. 1097 (Furio). Considering Huttig was stocking its distribution centers with products it had either never sold, or never sold at those levels, it is more likely than not that Furio put to use PrimeSource information in developing the inventory stocking plan for Huttig-Grip.

### f.    Combination of Information

Even if one or more of the categories of information above are not confidential, the combination of the information is a protectable trade secret.

It is well recognized that even if various components of a process are not, individually, trade secrets, the compilation of those components can be a trade secret. *See, Minnesota, Mining & Mnfctrg Corp. v. Pribyl,* 259 F.3d 587, 595 (7th Cir. 2001) ("A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain,

but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret."); *Noddings Investment Group, Inc. v. Kelly*, 1994 WL 91932, *4 (N. D. Ill. March 18, 1994) ("[W]e note that certain components of the system are known in the industry; thus, divulging the use of those components is not tantamount to disclosure of the purported trade secret, where such disclosure does not reveal the combination of the components or other specifics."); *Sunbelt Rentals, Inc. v. Head & Enquist Equip.*, L.L.C., 175 N. C. App. 49, 55–56, 620 S.E.2d 222, 227–28 (2005) (where defendant's plan was to target competitor's employees, compilation of information, pricing information, customer information, employees' salaries and budget information held to be trade secret).

Huttig-Grip's objection was to "combine and leverage product, market, sales, and sourcing expertise to increase category revenue and incremental profit." Tr. 305 (Vrably). Vrably testified that Huttig lacked the ability to expand its fastener product line because "[w]e just never possessed the human resources or human capital or knowledge to expand those products on a global basis until middle of—middle, end of 2016, when one of our competitors in those categories helped us achieve and implement that opportunity through a transaction." Tr. 389 (Vrably). In other words, Huttig's plan was to use ex-PrimeSource personnel to supply it with the expertise and information necessary to create a national fastener business.

### g. Inevitable Disclosure of Other Confidential Information

PrimeSource is also likely to succeed on the merits because Defendants will continue to use or inevitably use PrimeSource's confidential information and trade secrets to compete with PrimeSource. The use or disclosure of PrimeSource's information is inevitable because Huttig's new division directly competes with PrimeSource and the positions Defendants accepted with Huttig are comparable to the positions they held with PrimeSource. *Weed Eater, Inc. v.*

*Dowling*, 562 S.W.2d 898, 901–02 (Tex. App. 1978) ("Even in the best of good faith, Dowling can hardly prevent his knowledge of his former employer's confidential methods from showing up in his work."); *Molon Motor & Coil, Corp. v. Nidec Motor Corp.*, 16-C-03545, 2017 WL 1954531 (N.D. Ill. May 11, 2017) (holding that the inevitable disclosure doctrine applied under the Defendant Trade Secrets Act and the Illinois Trade Secrets Act when a former employee joins a competitor in a similar position that he was in at his former employer and the competitor had not taken steps to prevent the use of a confidential information).

In *Molon Motor*, the Northern District of Illinois recently decided a case similar to the one currently at bar. 2017 WL 1954531, at *5–*7. The court in *Molon Motor*, found that acquisition or use of trade secrets could be established by circumstantial evidence through considering the following items: "(1) the level of competition between the former employer and the new employer; (2) whether the employee's position with the new employer is comparable to the position he held with the former employer and (3) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer." *Id.* at *5 (citing *Saban v. Caremark Rx, L.L.C.*, 780 F. Supp. 2d 700, 734–35 (N.D. Ill. 2011)). The court stated that these items should not be considered as "factors" or a "rigid test", but instead the items should be considered as a question of circumstantial evidence of whether a trade secret would inevitably be disclosed which evades "straitjacket formulas." *Id.* at n.13. In that case, court found that the inevitable disclosure doctrine applied solely because the former employer was a serious competitor with the new employer and that the former employee's position had a similar breadth and role as his former quality control position at his former employer. *Id.* at *7.

Furthermore, numerous courts applying Illinois, Texas and Federal trade secret laws have held that misappropriation has occurred in similar circumstances. *FMC Corp. v. Varco Int'l Inc.*,

73

677 F.2d 500, 505 (5th Cir. 1982) ("Given the facts of this case—that [Former Employer] has trade secrets, that [Former Employee] has knowledge of at least some of those secrets, and that [Former Employee] has been placed in a comparable position with a direct competitor without restriction against using or disclosing [Former Employer]'s trade secrets—the fear of irreparable injury is realistic."); *Electronic Data Sys. Corp. v. Powell*, 524 S.W.2d 393, 398 (Tex. App. 1975) ("[Former Employee] cannot be loyal both to this promise to his former employer[ ] and to his new obligation to his present employer. . . ."); *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1271 (7th Cir. 1995) ("[Former Employee]'s position at [New Employer] would initially cause him to disclose trade secrets, it would necessarily force him to breach his agreement not to disclose confidential information acquired while employed at [Former Employer]."). The inevitable disclosure doctrine can apply for all levels of employees where the employee is working for a competitor in a similar position and the competitor has taken little action to prevent the disclosure of the former employer's trade secrets. *Lumenate Techs., LP v. Integrated Data Storage, LLC*, No. 13 C 3767, 2013 WL 5974731, at *6 (N.D. Ill. Nov. 11, 2013) (applying inevitable disclosure doctrine where employees held similar jobs at competitor, without regard to their positions in the corporate hierarchy). *Molon Motor*, 2017 WL 1954531, at *7; *see Electronic Data Sys.*, 524 S.W.2d at 398 ("In these circumstances, the most effective protective device is to restrain [Former Employee] from working in the same computer field in which he was associated while employed at [Former Employer].").

Considering the similarity in the positions and the direct competition, the Defendants will be unable to perform their duties at Huttig without relying on PrimeSource's trade secrets. Here, there is no dispute that Huttig, specifically its HuttiGrip division for which each of the defendants now work, is a direct competitor of PrimeSource. Tr. 1486–87 (D. Fishbein). The

74

Huttig-Grip division was created to compete directly with PrimeSource's Grip-Rite® fastener products. Tr. 1505. Each of the Defendants is working in similar positions at Huttig. The fact that the Felten Defendants may service different territories of customers is irrelevant for the inevitable disclosure analysis, since the positions themselves are similar. The fact that Huttig had the defendants sign acknowledgements that they would not use PrimeSource's confidential information should be given little deference here, where D. Fishbein directed the newly hired employees to record from memory PrimeSource's customer information. *See* Tr. 1072 (Furio). D. Fishbein testified that he believed he was free to use at Huttig anything he had learned while at PrimeSource. Tr. 1413 (D. Fishbein).

> **h.** **PrimeSource Utilized Reasonable Efforts to Maintain the Confidentiality of Their Trade Secrets**

To qualify for trade secret status, steps to maintain the confidentiality of the information need only be "reasonable under the circumstances" (ITSA) or "reasonable" (DTSA). As noted in the Proposed Statement of Facts, Section B.2., PrimeSource has utilized reasonable efforts to protect the information claimed as trade secrets here**.**

> **i.** **The Information at Issue has Value by Virtue of Its Secrecy**

To qualify as a trade secret under with the ITSA or the DTSA, the information must sufficiency secret to derive actual or potential economic value. As noted in the Proposed Statement of Facts, Section B.3., there is sufficient evidence for the court to find that the information at issue here has value to PrimeSource.

### D. Balance Of Harms

The harm to PrimeSource if the injunction is not issued is significant. PrimeSource will suffer considerable harm if Defendants are allowed to use PrimeSource's information and goodwill to create a new competitor and poach PrimeSource's customers. *Inter/National Rental*,

2012 WL 4506140, at *6 ("The Court also finds that the threatened injury to USI outweighs any potential harm to Albrecht, as the restraint imposed reflects the contractual agreement between the parties."). The public interest is also benefited by requiring companies to compete fairly. *nClosures Inc. v. Block & Co., Inc.*, No. 12 C 9358, 2013 WL 158954, at *4 (N.D. Ill. Jan. 15, 2013) ("It is in the public interest to enforce valid contracts. In addition, it is in the public interest to protect confidential information since such protection encourages design, innovation, and collaboration."); *Marsh USA, Inc. v. Cook*, 354 S.W.3d 764, 769 (Tex. 2011) ("Stated differently, valid covenants not to compete ensure that the costs incurred to develop human capital are protected against competitors who, having not made such expenditures, might appropriate the employer's investment.").

Any harm suffered by the defendants is of their own making. *See Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) (In assessing defendant's harm, the court excludes the burden defendant voluntarily assumed by proceeding in the face of a known risk.).

Neither is there any potential harm to Huttig's customers. There are plenty of other sources of fasteners should the court enter a "production injunction" against the Huttig-Grip Division or bar sales to certain customers. *See*, *Hess, Newmark, Owens, Wolf, Inc. v. Owens*, 415 F.3d 630, 634 (7th Cir. 2005) (no harm to enjoined party's customer since "plenty of competition" remained).

### E. Relief Requested

In circumstances where a defendant's wrongdoing permeates an entire business operation, courts have permanently enjoined the operation—otherwise known as a "production injunction." For example, in *E. I. DuPont D. Nemours and Co. v. Kolon Industries, Inc.*, 894 F.Supp.2d 691 (E.D. Vir. 2012), after a finding that the defendant Kolon had misappropriated

DuPont's trade secrets, the district court entered a permanent injunction prohibiting the production of the product at issue for 20 years.

A production injunction is appropriate where the misused information is "inextricably connected" to the defendant's production, and where a "use injunction is ineffective because the misappropriator cannot be relied upon to 'unlearn' or abandon the misappropriated technology." *General Elec. Co. v. Sung*, 843 F. Supp. 776, 780 (D. Mass. 1994) (misappropriating competitor enjoined for seven years); *Viscofan, S.A. v. U. S. Int'l Trade Comm'n*, 787 F.2d 544 (Fed. Cir. 1986) (prohibition on sale of sausage casings); *Aerosonic Corp. v. Trodyne Corp.*, 402 F.2d 223 (5th Cir. 1968) (injunction against making or selling pressure sensitive devices); *ILG Industries, Inc. v. Scott*, 49 Ill.2d 88 (1971) (enjoining manufacture of product at issue for 18 months); *Rockwell Graphic Systems, Inc. v. DEV Industries, Inc.*, 1993 WL 286484, *6 (N.D. Ill. 1993) (defendants enjoined for two years "from using and selling products based on, or substantially derived from, [plaintiff's] trade secret information.")

While this case does not involve production of a "product," the rationale of these cases is applicable here. The use of PrimeSource's supplier, customer and other information was central to the formation of the Huttig-Grip Division, and such it is inextricably connected to the operations of the division. Moreover, based on the evidence adduced to date, Defendants cannot be relied upon to cease using such information—indeed, they refuse to admit that it is even confidential.

Because a permanent production injunction would be appropriate here, it is appropriate for the court to enter a preliminary production injunction shutting down the operation of the Huttig-Grip Division pending a final trial on the merits.

[Alternatively, it is appropriate that the following relief be awarded:

77

a.     that Huttig be enjoined from selling building products to those customers included on the Felten Defendants' Customer Lists that had not previously purchased building products from Huttig;

b.     that Huttig submit periodic confirmation to the court that it is in compliance with a.;

c.     that Felten, Sagunsky, Kottmeyer and Kessler cease to be employed by Huttig, or if they continue to be employed by Huttig that they do not work within the Huttig-Grip Division and that the TRO remain in place pending a trial on the merits;

d.     that David Fishbein, Bob Furio and Mona Zinman be enjoined from working with the Huttig-Grip Division pending a final trial on the merits; and/or

e.     that Huttig be enjoined from using the PrimeSource suppliers that Zinman contacted during her first month of employment at Huttig.]

Respectfully submitted,

**PRIMESOURCE BUILDING PRODUCTS, INC.**

By:   /s Mary Goodrich Nix
        One of Its Attorneys

Richard R. Winter
Chelsea A. McCarthy
Holland & Knight LLP
131 S. Dearborn St., 30th Fl.
Chicago, IL 60603
312-263-3600
richard.winter@hklaw.com
chelsea.mccarthy@hklaw.com

Mary Goodrich Nix
Holland & Knight LLP
200 Crescent Court, Ste. 1600
Dallas, TX 75201
214-964-9407
mary.nix@hklaw.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that on **September 19, 2017**, a true and correct copy of the foregoing **PrimeSource Building Products, Inc.'s [Redacted] Proposed Findings of Fact and Conclusions of Law** was electronically transmitted using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel of record.

/s Mary Goodrich Nix