**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PRIMESOURCE BUILDING PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 16 cv 11390 |
| | ) | |
| HUTTIG BUILDING PRODUCTS, INC., | ) | Hon. Jorge J. Alonso |
| KENNETH FISHBEIN, DAVID FISHBEIN, | ) | Magistrate Judge Young B. Kim |
| MONA ZINMAN and ROBERT FURIO, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S ANSWER AND AFFIRMATIVE
DEFENSES TO DEFENDANTS' COUNTERCLAIMS**

Plaintiff PrimeSource Building Products, Inc. ("PrimeSource"), by and through its undersigned counsel, hereby files it answer to the Counterclaims submitted by Defendants Huttig Building Products, Inc. ("Huttig") and Kenneth Fishbein, Mona Zinman, and Robert Furio (collectively, with Huttig, "Counter-Plaintiffs"), as follows:

**NATURE OF THE CASE**

1.     PrimeSource's lawsuit is sham litigation. By and through their counterclaims, Counter-Plaintiffs seek redress for PrimeSource's use of this meritless litigation and other exclusionary tactics, as a means to stifle legitimate competition and monopolize and attempt to monopolize antitrust markets for fastener products in the building products industry.

**ANSWER:**     PrimeSource admits that Counter-Plaintiffs have asserted counterclaims, but PrimeSource denies that those counterclaims have any merit and denies all other allegations contained in ¶ 1.

2.     Counter-Plaintiffs request in Counts I and II of their counterclaims the reimbursement of millions of dollars of attorneys' fees they have incurred in defending against PrimeSource's misappropriation of trade secrets claims under the Defend Trade Secrets Act and Illinois Trade Secrets Act—claims asserted and maintained in bad faith. Among other reasons as set forth herein, PrimeSource's claims for trade secret misappropriation against the Individual Counter-Plaintiffs are baseless because they were first asserted more than 15 months after the last

of the Individual Counter-Plaintiffs left PrimeSource's employ, and they are premised entirely on a theory that these former executives will inevitably rely upon or use PrimeSource's alleged trade secrets, which are repeatedly identified in pleadings and discovery only as broad categories and compilations of general business information. Despite having the benefit of extensive written and oral discovery, PrimeSource cannot point to or provide evidence of a single document or electronic file that has been misappropriated by the Individual Counter-Plaintiffs, and in its recently filed Second Amended Complaint has backtracked from its allegation that the Individual Counter-Plaintiffs have "stolen" trade secrets to now simply suggesting that they have "misappropriated" them by using them on behalf of Huttig, but still without any factual allegations or evidence that anything within these broad categories and compilations of general business information was actually taken and used.

**ANSWER:**  PrimeSource admits that Counter-Plaintiffs have asserted counterclaims, but PrimeSource denies that those counterclaims have any merit and denies all other allegations contained in ¶ 2.

3.  By Count III, Counter-Plaintiffs seek damages for the false and defamatory statements PrimeSource is making and disseminating to third parties outside the confines of this litigation, thereby causing damage to Counter-Plaintiffs' reputations within the industry.

**ANSWER:**  PrimeSource admits that Counter-Plaintiffs have asserted counterclaims, but PrimeSource denies that those counterclaims have any merit and denies all other allegations contained in ¶ 3.

4.  By Count IV, Huttig seeks damages and injunctive and other equitable relief to address PrimeSource's intentional and unjustified interference with Huttig's legitimate business relationships and prospective economic advantages arising from PrimeSource's interference with Huttig's business relationships with potential suppliers and customers.

**ANSWER:**  PrimeSource admits that Huttig has asserted counterclaims, but PrimeSource denies that those counterclaims have any merit and denies all other allegations contained in ¶ 4.

5.  By Counts V through VII of these counterclaims, Huttig seeks damages and injunctive and other equitable relief to address an improper and unlawful monopolization and attempted monopolization of antitrust markets for fastener products in the building products industry through exclusionary and predatory conduct by PrimeSource with the purpose and effect of excluding competition by and/or increasing the cost of competition to its competitors, including Huttig, among others, in order to obtain, entrench, or maintain PrimeSource's monopoly.

**ANSWER:**  PrimeSource admits that Huttig has asserted counterclaims, but PrimeSource denies that those counterclaims have any merit and denies all other allegations contained in ¶ 5.

6. PrimeSource, in furtherance of this unlawful monopolization and attempted monopolization, (i) continues to threaten, file, and pursue sham trade secrets, trademark and trade dress infringement and restrictive covenant litigation across the country, including in this case; (ii) continues to make false and defamatory statements regarding Huttig and the Individual Counter-Plaintiffs; (iii) continues to threaten product manufacturers, trading companies, and others with withdrawal of PrimeSource business if the firms sell fastener products to Huttig and other actual or potential wholesale suppliers; (iv) continues to offer and use predatory low pricing with selected wholesale customers on a temporary basis to prevent new entrants from entering into supply arrangements with the customers; (v) continues to use bundled rebate and pricing conduct with customers to exclude competition; (vi) has made a series of acquisitions of firms engaged in sales of fastener products in order to eliminate growing threats that these competitors posed to PrimeSource's monopolization and attempted monopolization of markets for fastener products; and (vii) has imposed overbroad non-competition covenants in agreements with business managers and senior executives in order to prevent actual and potential competitors from lawfully growing their fastener products sales and businesses. PrimeSource has engaged in this anticompetitive conduct to unlawfully acquire and/or maintain its monopoly power and dominant market position in antitrust markets for fastener products in the building products industry.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 6.

7. In addition to the many other non-competition covenants that PrimeSource imposed on its business managers during their employment in order to acquire and maintain its monopoly power, PrimeSource reaffirmed blatantly anticompetitive non-competition covenants on D. Fishbein and Furio when it terminated these Co-CEOs shortly after its sale to a private equity firm in May 2015. The sole and admitted purpose of these restraints was to "protect the company from competition by the people who grew the business and knew it the best" (PS 2d Am. Compl. ¶ 48) and not for any legitimate purpose. Regardless of whether non-competition covenants may be enforceable under applicable state law in some circumstances when used by a normal market participant for a legitimate purpose, these covenants are void and unenforceable under federal and state antitrust laws when used, as here, by a monopolist to willfully acquire and maintain its monopoly power and dominant market position.

**ANSWER:** PrimeSource admits that certain of its current and former employees agreed to and accepted certain contractual non-competition restrictions and that Counter-Plaintiffs have quoted a portion of PrimeSource's Second Amended Complaint out of context, but PrimeSource denies all other allegations contained in ¶ 7.

8. As a result of this exclusionary and predatory conduct, PrimeSource has harmed Huttig's business and property, threatens to prevent Huttig and other actual and potential competitors from entering or expanding in antitrust markets for fastener products, has imposed anticompetitive barriers to entry and expansion by Huttig and other actual and potential competitors in these markets, has thereby reduced competition in these markets, and has caused and threatens to cause imminent harm to purchasers in these markets, as well as to Huttig. Huttig

has suffered and will continue to suffer antitrust injury, as its injuries arise from reduced competition in these markets.

**ANSWER:** PrimeSource admits that Huttig has asserted counterclaims, but PrimeSource denies that those counterclaims have any merit and denies all other allegations contained in ¶ 8.

9.     The unlawful exclusionary and predatory conduct by a monopolist, PrimeSource, violates Section 2 of the Sherman Act.

**ANSWER:** PrimeSource denies all allegations contained in ¶ 9.

## PARTIES

10.     K. Fishbein is an individual who resides in Northbrook, Illinois. K. Fishbein was the Co-Chief Executive Officer of PrimeSource from March 24, 2007 through December 31, 2014.

**ANSWER:** PrimeSource admits the allegations contained in ¶ 10.

11.     D. Fishbein is an individual who resides in Highland Park, Illinois. D. Fishbein was the Co-Chief Executive Officer of PrimeSource from January 1, 2015 through September 15, 2015.

**ANSWER:** PrimeSource admits the allegations contained in ¶ 11

12.     Zinman is an individual who resides in New York, New York. Zinman was the Co-Chief Executive Officer of PrimeSource from March 24, 2007 through December 31, 2014.

**ANSWER:** PrimeSource admits the allegations contained in ¶ 12.

13.     Furio is an individual who resides in Hawthorn Woods, Illinois. Furio was the Co-Chief Executive Officer of PrimeSource from January 1, 2015 through September 15, 2015.

**ANSWER:** PrimeSource admits the allegations contained in ¶ 13.

14.     Huttig is a Delaware corporation with its principal place of business in St. Louis, Missouri.

**ANSWER:** PrimeSource admits the allegations contained in ¶ 14.

15.     PrimeSource is a Delaware corporation with its principal place of business in Irving, Texas.

**ANSWER:** PrimeSource admits the allegations contained in ¶ 15.

## JURISDICTION AND VENUE

16.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331, because Counter-Plaintiffs' claims arise under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836–39 *et seq.*, and

Huttig's claims arise under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

**ANSWER:** PrimeSource admits that jurisdiction is proper in this District, but PrimeSource denies that Counter-Plaintiff's counterclaims have any merit and denies all other allegations contained in ¶ 16.

17.    This Court has supplemental jurisdiction under 28 U.S.C. § 1367, because the state law claims arise out of the same case or controversy.

**ANSWER:** PrimeSource admits that jurisdiction is proper in this District, but PrimeSource denies that Counter-Plaintiff's counterclaims have any merit and denies all other allegations contained in ¶ 17.

18.    This Court has personal jurisdiction over Counter-Defendant PrimeSource, because it is the Plaintiff in this action and has thereby submitted itself to the jurisdiction of this Court.

**ANSWER:** PrimeSource admits that this Court has personal jurisdiction over it.

19.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Counter-Plaintiffs' claims occurred within this judicial district.

**ANSWER:** PrimeSource admits that venue is proper in this District, but PrimeSource denies that Counter-Plaintiff's counterclaims have any merit and denies all other allegations contained in ¶ 19.

## FACTUAL BACKGROUND

**I.    Background Facts Relevant To PrimeSource's Filing And Maintaining Its Misappropriation Of Trade Secrets Claim Against Counter-Plaintiffs In Bad Faith**

**A.    PrimeSource Failed to Conduct a Reasonable Pre-Filing Investigation Prior to Filing Its Misappropriation of Trade Secrets Claim**

20.    PrimeSource did not undertake a reasonable pre-filing factual investigation prior to asserting a misappropriation of trade secrets claim under the ITSA or the DTSA against Counter-Plaintiffs, as evidenced in large part by its failure to acknowledge that: (a) the broad categories of business information it has identified as its trade secrets consist largely of general industry knowledge; (b) historical business information such as pricing and margins are time-sensitive and were stale by the time the lawsuit was filed; (c) its alleged trade secrets consist of information that

is available in the public domain, and has not otherwise been treated as confidential or as a trade secret by PrimeSource; and (d) it had *zero* evidence that any of the Individual Counter-Plaintiffs had taken or retained any alleged PrimeSource "trade secrets" in hard copy or other tangible or intangible (electronic) form.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 20.

21.     Each of the Individual Counter-Plaintiffs is a former Co-CEO of PrimeSource. K. Fishbein and Zinman's last day of employment with PrimeSource was December 31, 2014, two years before this lawsuit was filed.

**ANSWER:** PrimeSource admits that each of the Individual Counter-Plaintiffs is a former Co-

CEO of PrimeSource and K. Fishbein's and Zinman's last day of employment with (but not

consulting for) PrimeSource was December 31, 2014, but PrimeSource denies all other allegations

contained in ¶ 21.

22.     K. Fishbein and Zinman both executed consulting and retention agreements with PrimeSource on September 29, 2014. These agreements were substantially similar and each contained a non-competition provision stating that they would not "engage in any activity which is directly competitive with, or that causes material harm to PrimeSource" for a period ending 18 months after the therein-defined Closing Date (or until after November 8, 2016), associate with any Material Competitor (as defined in the PrimeSource agreements) during that time or solicit for employment any PrimeSource employee.

**ANSWER:** PrimeSource admits the allegations contained in ¶ 22.

23.     After K. Fishbein and Zinman resigned in late 2014, D. Fishbein and Robert Furio replaced them as Co-CEOs of PrimeSource.

**ANSWER:** PrimeSource admits the allegations contained in ¶ 23.

24.     PrimeSource was acquired by Platinum Equity Group on or about May 11, 2015.

**ANSWER:** PrimeSource admits the allegations contained in ¶ 24.

25.     Less than four months later, without prior notice or warning, D. Fishbein and Furio were terminated by PrimeSource. D. Fishbein and Furio signed "Severance Agreements and Release of Claims" on or around September 24, 2015. These agreements were substantially similar and provided that the confidentiality and non-competition provisions contained in each of their previously signed "Amended and Restated Employment Agreements" remained applicable, including a 12-month restriction on competing with PrimeSource, or becoming "interested in" or "associated with" any Material Competitor.

**ANSWER:** PrimeSource admits that the employment of D. Fishbein and Furio ended on or about September 16, 2015, that D. Fishbein and Furio signed substantially similar "Severance Agreements and Release of Claims," and that those agreements provided that the confidentiality and non-competition provisions contained in each of their previously signed "Amended and Restated Employment Agreements" remained applicable, including a 12-month restriction on competing with PrimeSource, or becoming "interested in" or "associated with" any Material Competitor. PrimeSource denies the remaining allegations contained in ¶ 25.

26.     At the time of their respective resignations or terminations from PrimeSource, all of the Individual Counter-Plaintiffs returned any PrimeSource business information in their possession. Since their respective resignations and until this lawsuit was filed, there was no further communication from PrimeSource suggesting that any of the Individual Counter-Plaintiffs had taken or retained any of PrimeSource's purported confidential information or trade secrets.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 26.

27.     Based on the foregoing, it is not surprising that PrimeSource failed to include any particularized identification of its alleged trade secrets in its Complaint or First Amended Complaint, or in its memorandum in support of its motion for preliminary injunction.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 27.

28.     PrimeSource's Complaint and First Amended Complaint described its alleged trade secrets in broad general categories of information:

> (a)     customer information, including the identity of customers and distribution channels, potential customers and contacts, historic ordering patterns and product mix, margins and merchandising plans;
>
> (b)     supplier information, including identity of national and international suppliers and the capabilities, contacts, product mix, cost and shipping information and logistics;
>
> (c)     financial, budget and planning data, including historic sales and pricing patterns and margins, forecasts, growth strategies, new product research and development;
>
> (d)     employee information, including identity, skill sets, compensation, and industry contacts; and
>
> (e)     PrimeSource's aggregate business model incorporating all of the above.

**ANSWER:** PrimeSource admits that Counter-Plaintiffs have purported to categorize allegations contained in and/or summarize excerpts of the Complaint and/or First Amended Complaint but otherwise denies the allegations contained in ¶ 28.

29.     Moreover, in its most recent attempt to plead its trade secrets with specificity – filed after the close of expedited discovery—PrimeSource's Second Amended Complaint still falls well short of identifying actual trade secrets. In its Second Amended Complaint, PrimeSource describes its trade secrets that have been misappropriated for the benefit of Huttig as follows:

(a)     historic sales, price and profit data for a particular customer or customers;

(b)     compilations of customer information reflecting identity, contacts, pricing, product mix, volumes, terms and/or ordering patters. Such information is reflected in PrimeSource's SAP and CRM systems, and in other formats;

(c)     compilations of suppler information reflecting identity, contacts, pricing, volumes, terms and/or ordering patterns. Such information is reflected in PrimeSource's SAP system, and in other formats;

(d)     compilations of financial data reflecting operations;

(e)     information reflecting inventory planning and supply chain optimization;

(f)     information reflecting optimization of warehouse operations and distribution networks;

(g)     business plans and budgets, and company objectives including cost-savings and growth measures;

(h)     company-level strategic plans, product line strategic plans, supplier-level strategic plans and customer-specific strategic plans; and

(i)     marketing strategy and targets.

**ANSWER:** PrimeSource answers that the allegations in its Complaint, First Amended Complaint, and Second Complaint stand for themselves and PrimeSource denies any allegations inconsistent with the language of those documents.  PrimeSource admits that Counter-Plaintiffs have purported to categorize allegations contained in and/or summarize excerpts of the Complaint and/or First Amended Complaint but otherwise denies the allegations contained in ¶ 29.

30.     The broad and sweeping categories of information that PrimeSource has identified as its purported trade secrets refer to information that is largely time-sensitive in that any value inherent in its alleged confidentiality diminishes over time (to the extent that it had value to begin with), and this information has long since gone stale. Moreover, PrimeSource continues in discovery and in its pleadings to point to broad categories and compilations of allegedly confidential information without identifying actual trade secrets, and without evidence that the Individual Counter-Plaintiffs took these compilations of PrimeSource to Huttig.

**ANSWER:** Primesource denies the allegations contained in ¶ 30.

31.    PrimeSource is also not in the type of industry that would readily involve the development or use of trade secret information (e.g., technology or manufacturing). PrimeSource does not manufacture any of the building products that it sells. PrimeSource is in the business of sourcing and reselling building products, consisting primarily of commodity fastener items, such as nails, screws and other fasteners, that largely conform to ASTM standard specifications and not any proprietary designs owned by PrimeSource. These identical fasteners are manufactured by many of the same suppliers for different distributors such as PrimeSource, Huttig and others.

**ANSWER:** PrimeSource admits that it does not itself manufacture the products that it sells, and that it sources and sells building products that include some commodity fastener items such as nails, screws and other fasteners, that largely conform to some ASTM standard specifications. PrimeSource denies the remaining allegations contained in ¶ 31.

32.    PrimeSource purchases its fasteners from a network of domestic and overseas suppliers with which it typically does not have written supply contracts or written confidentiality agreements. The identities of many of its suppliers are listed on PrimeSource's website and are publicly available and others disclosed within U.S. Customs records related to incoming overseas shipments. Moreover, PrimeSource itself does not treat the identities of its suppliers as confidential because, among other reasons, it has failed to designate the identity of its suppliers as confidential, even though the U.S. Customs regulations permit it to do so.

**ANSWER:** PrimeSource admits that it purchases its fasteners from a network of domestic and overseas suppliers with which it has various different arrangements, that certain suppliers are disclosed on its website, that certain suppliers are disclosed within U.S. Customs records, and that it has not always designated the identity of certain of its suppliers as confidential with U.S. Customs, although Customs and Border Protection has stated that "Customs and Border Protection (CBP) cannot guarantee that the identity(ies) of the parties to the importation(s) will never be published." PrimeSource denies the remaining allegations contained in ¶ 32.

33.    Many of these overseas suppliers manufacture and supply commodity building products identical to those that they manufacture for PrimeSource, to other companies that compete with PrimeSource in the building products industry. In fact, many suppliers will openly acknowledge the fact that they manufacture the same products under a different private brand label for different U.S.-based distributors.

**ANSWER:** PrimeSource admits that various companies compete with it in the building products industry and that there are many different U.S.-based distributors of commodity building products in the United States. PrimeSource denies the remaining allegations contained in ¶ 33.

34. PrimeSource sells its products to independent lumber yards, independent building supply dealers, major big-box retailers, retail building supply chains, concrete and construction supply yards, roofing wholesalers, drywall distributors, wire and fencing supply yards, agricultural supply yards, steel fabricators, industrial customers, specialty wholesalers and specialty distributors. Typically, PrimeSource does not have confidentiality agreements in place with its customers, and these customers are free to share any information regarding their business dealings with PrimeSource with any of PrimeSource's competitors.

**ANSWER:** PrimeSource admits that it sells its products to independent lumber yards, independent building supply dealers, major big-box retailers, retail building supply chains, concrete and construction supply yards, roofing wholesalers, drywall distributors, wire and fencing supply yards, agricultural supply yards, steel fabricators, industrial customers, specialty wholesalers and specialty distributors. PrimeSource denies the remaining allegations contained in ¶ 34.

35. PrimeSource knew at the time it filed its Complaint that it has frequently solicited and received information related to its customers' purchasing habits for building products competitive with PrimeSource's building products, including but not limited to Huttig, and this information has included even current pricing information, rebate information, and other business terms.

**ANSWER:** PrimeSource admits that it knew at the time it filed its Complaint that it has solicited and received information related to its customers purchasing habits for building products competitive with PrimeSource's building products including, but not limited to, Huttig, and information provided by customers has included current pricing information, rebate information and other business terms. PrimeSource denies the remaining allegations contained in ¶ 35.

36. PrimeSource alleged in its Complaint and First Amended Complaint that each of the Individual Counter-Plaintiffs physically stole or used PrimeSource's confidential information and trade secrets, but failed to identify in the Complaint or First Amended Complaint the specific information that any of the Individual Counter-Plaintiffs allegedly took and used.

**ANSWER:** PrimeSource answers that the allegations in its Complaint, First Amended Complaint, and Second Complaint stand for themselves and PrimeSource denies any allegations inconsistent with the language of those documents. PrimeSource admits that it alleged in its Complaint and First Amended Complaint that each of the Individual Counter-Plaintiffs physically stole or used PrimeSource's confidential information and trade secrets and further admits that, pursuant to the Federal Rules of Civil Procedure, the Court's local rules, and applicable law, it was not required to identify the specific information that any of the Individual Counter-Plaintiffs allegedly took and used. PrimeSource denies the remaining allegations contained in ¶ 36.

37. PrimeSource knew at the time that it filed its Complaint and First Amended Complaint that no such evidence of misappropriation and use exists, and yet it initiated its claim for theft of trade secrets anyway.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 37.

38. In its Second Amended Complaint, PrimeSource continues to allege in conclusory fashion that certain other former PrimeSource employees (not the Individual Counter-Plaintiffs) accessed certain purported confidential PrimeSource information while still employed with PrimeSource and that these employees did so, on information and belief, at the direction or acquiescence of Huttig and/or the Individual Counter-Plaintiffs.

**ANSWER:** PrimeSource answers that the allegations in its Complaint, First Amended Complaint, and Second Complaint stand for themselves and PrimeSource denies any allegations inconsistent with the language of those documents. PrimeSource admits that it alleges in its Second Amended Complaint that certain former PrimeSource employees accessed certain confidential PrimeSource information while still employed with PrimeSource and that these employees did so, on information and belief, at the direction or acquiescence of Huttig and/or the Individual Counter-Plaintiffs. PrimeSource denies the remaining allegations contained in ¶ 38.

39. Yet PrimeSource still fails to allege any actual misappropriation or specific evidence of use by any of the Individual Counter-Plaintiffs.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 39.

40.    PrimeSource has, in addition, relied on the "inevitable disclosure" doctrine to suggest that, given Individual Counter-Plaintiffs' positions with PrimeSource, it would be inevitable that Individual Counter-Plaintiffs will be required to use PrimeSource's trade secrets.

**ANSWER:**  PrimeSource admits the allegations in ¶ 40.

41.    However, PrimeSource knew at the time of filing that no legal support exists for applying the "inevitable disclosure" doctrine to prevent a former executive from being employed with a competitor, where that former executive has not worked for the former employer in more than 12 months, and especially in a commodity industry in which the purported confidential and trade secret information at issue is largely time-sensitive and/or publicly available.

**ANSWER:**  PrimeSource admits that it operates in a commodity industry but denies the

remaining allegations in ¶ 41.

### B.    PrimeSource Lacks an Objectively Reasonable Basis to Continue to Litigate Its Trade Secret Claims

42.    PrimeSource cannot use evidence that came to light after it brought its claim for an anticompetitive purpose, to argue that its claims against Counter-Plaintiffs are objectively reasonable. On the other hand, evidence that comes to light after a lawsuit is filed is relevant to proving the lack of an objectively reasonable basis for continuing the lawsuit.

**ANSWER**:  PrimeSource denies the allegations in ¶ 42.

43.    In its initial answers to interrogatories, PrimeSource failed to identify any confidential information or trade secret information that the Individual Counter-Plaintiffs took from PrimeSource and are now using on behalf of Huttig.

**ANSWER**:    PrimeSource answers that its response to interrogatories, as amended and

supplemented, in this matter speak for themselves and denies the remaining allegations in ¶ 43.

44.    On April 20, 2017, PrimeSource was ordered by the Court to supplement its interrogatory answers to admit that: "PrimeSource is unaware of exactly which categories of trade secret information have been misappropriated by Defendants, or exactly how Defendants are using said trade secrets, but PrimeSource continues to investigate this issue through discovery and will continue to supplement its response accordingly." *See* Case No. 16-cv-11468 Doc. 79. Now, two months after the completion of expedited discovery, PrimeSource has still not supplemented this interrogatory response to identify specific evidence of misappropriation or use of trade secrets by the Individual Counter-Plaintiffs.

**ANSWER:**  PrimeSource denies the allegations contained in ¶ 44.

45.    That same day, PrimeSource was also ordered by the Court to indicate in supplemental interrogatory answers, by position at PrimeSource, which categories of employees

have access to certain categories of alleged trade secrets set forth in PrimeSource's Amended Complaint. Virtually everyone at PrimeSource has access to over half of the categories of alleged trade secrets.

**ANSWER:** PrimeSource answers that the Court's order speaks for itself and denies any characterization inconsistent with the express terms of the order. PrimeSource denies the remaining allegations in ¶ 45.

46. PrimeSource's Rule 30(b)(6) representative Eric Royse admitted at his deposition that PrimeSource has no knowledge that any of the Individual Counter-Plaintiffs have taken or are using any of PrimeSource's confidential information or trade secrets.

**ANSWER:** PrimeSource admits that at the time of Mr. Royse's deposition, PrimeSource had not fully determined what information was being used by which Individual Counter-Plaintiffs. PrimeSource denies the remaining allegations in ¶ 46.

47. George Judd, PrimeSource's Chief Executive Officer, admitted in his deposition that he did not have any knowledge that any of the Individual Counter-Plaintiffs have taken or are using any of PrimeSource's confidential information or trade secrets.

**ANSWER:** PrimeSource admits that at the time of Mr. Judd's deposition, PrimeSource had not fully determined what information was being used by which Individual Counter-Plaintiffs. PrimeSource denies the remaining allegations in ¶ 47.

48. PrimeSource knows that no such evidence of misappropriation and use exists, and yet it continues to maintain claims for theft of trade secrets against the Individual Counter-Plaintiffs anyway.

**ANSWER:** PrimeSource denies the allegations in ¶ 48.

49. Royse testified on behalf of PrimeSource that the Individual Counter-Plaintiffs could have developed their business plan vis-à-vis Huttig only by using PrimeSource's confidential information and trade secrets because PrimeSource's entire business plan or the methods it uses to sell commodity fasteners (that it does not manufacture) constitute PrimeSource's trade secrets. Despite being PrimeSource's Rule 30(b)(6) designee on topics, including PrimeSource's evidentiary basis for asserting its misappropriation of trade secrets claim against Counter-Plaintiffs, Royse could not point to specific trade secrets that were misappropriated, instead testifying that there were rumors in the market that there was no way Counter-Plaintiffs could be competing against PrimeSource this quickly without using confidential information and trade secrets that the Individual Counter-Plaintiffs somehow stole from PrimeSource.

**ANSWER:** PrimeSource admits that at the time of Mr. Royse's deposition, PrimeSource had not fully determined what information was being used by which Individual Counter-Plaintiffs. PrimeSource denies the remaining allegations in ¶ 49.

50. This implausible assertion was recently soundly rejected by Judge J. Eric Elliff in *PrimeSource Building Products, Inc. v. Bradley Strosahl*, pending in the Denver District Court in the State of Colorado, Case No. 2016CV34644. The *Strosahl* case is related to the present lawsuits pending before this Court. Strosahl is another former PrimeSource sales executive who was hired by Huttig in November 2016. PrimeSource sued Strosahl without any evidence of actual theft of confidential information or trade secrets, but nevertheless sought to enjoin him for a period of eight months from working for Huttig based on, among other theories, the "inevitable disclosure" doctrine.

**ANSWER:** PrimeSource admits that the Strosahl lawsuit is related to this lawsuit, Strosahl is a former PrimeSource employee now working for Huttig, and one of the theories of recovery against Strosahl is based on "inevitable disclosure." PrimeSource denies the remaining allegations in ¶ 50.

51. In denying PrimeSource's request for a preliminary injunction, Judge Elliff noted, "Mr. Judd and PrimeSource's Senior Vice Presidents Scott Smith and Eric Royse took the position that PrimeSource's entire business model is a trade secret. By extension, this suggests that everything Defendant did while at PrimeSource was a trade secret. In this regard, PrimeSource paints with a brush too broad. Defendant has over thirty years of experience with seven different companies, all in the fastener industry. By claiming that everything PrimeSource does is a trade secret, PrimeSource is attempting to subject Defendant to a *de fac*to non-compete provision contrary to Colorado law, or at the very least failing to account for the skill and knowledge Defendant acquired before joining PrimeSource."

**ANSWER:** PrimeSource admits that the quotation is included in Judge Elliff's order but denies the remaining allegations in ¶ 51.

52. Royse failed to identify any specific confidential information or trade secrets that were actually used by the Individual Counter-Plaintiffs or incorporated into Huttig's business plan, or to acknowledge that at the time the Co-CEOs were hired by Huttig in late 2016, none of the Individual Counter-Plaintiffs had contributed to any business plan to expand Huttig's fasteners business.

**ANSWER:** PrimeSource admits that at the time of Royse's deposition it had not fully determined what information was being used by which Individual Counter-Plaintiff, and that, as of that time,

it had not fully determined the extent to which the Individual Counter-Plaintiffs had contributed to the Huttig business plan. PrimeSource denies the remaining allegations in ¶ 52.

53. Recognizing that it did not have evidence at the time of filing of the Complaint or the First Amended Complaint, and now at the end of extensive expedited written and oral discovery, PrimeSource continues to cling to the unsupported assertion that it is "inevitable" that the Individual Counter-Plaintiffs will rely upon and use PrimeSource's allegedly confidential information and trade secrets to perform their duties for Huttig.

**ANSWER:** PrimeSource admits that it is "inevitable" that the Individual Counter-Plaintiffs will rely upon and use PrimeSource's confidential information and trade secrets to perform their duties for Huttig. PrimeSource denies the remaining allegations in ¶ 53.

54. Yet Royse testified that George Judd, its current Chief Executive Officer, who was hired from BlueLinx, another large PrimeSource competitor, after D. Fishbein and Furio were fired, can perform his job without relying upon or using BlueLinx's trade secrets or confidential information. In fact, Judd testified that there is nothing wrong with a former executive using information that he may recall in his head from his experience in the building products industry, so long as there is no theft of tangible confidential information.

**ANSWER:** PrimeSource admits the allegations of the first sentence of this paragraph, but denies the allegations of the second sentence.

55. Remarkably, however, PrimeSource has not taken any steps to ensure that Mr. Judd would not use BlueLinx's confidential information or trade secrets after he was hired by PrimeSource, and PrimeSource has seen no similar issues with respect to BlueLinx's trade secrets or confidential information arising from Judd's subsequent hires of Mike Meadows as Branch Manager and former member of BlueLinx's Executive Leadership Team, Steve Deputy, as Vice President of Major Accounts, and Rudy Buel, Branch Manager, all of whom were former high ranking BlueLinx executives. Any claim based on inevitable disclosure theory is objectively baseless, because any specific item of information that the Individual Counter-Plaintiffs may have retained in their heads by virtue of their employment with PrimeSource has long since gone stale and could be of no competitive use or value to Huttig, and it would be impossible for the Individual Counter-Plaintiffs to have retained in their respective heads the voluminous compilations of data PrimeSource now claims to be the core of its alleged trade secrets.

**ANSWER:** PrimeSource denies the allegations in ¶ 55.

56. PrimeSource has provided scant evidence of lost profits or other financial damages, much less any indication of irreparable harm, even though it alleges that Huttig has been operating its purportedly new competitive business line for over half a year.

**ANSWER:** PrimeSource denies the allegations in ¶ 56.

15

57. Indeed, Royse could not identify any specific business that was lost to Huttig or any specific customers or suppliers that are now doing business exclusively with Huttig. This fact was not lost on Judge Elliff in the *Strosahl* matter. He noted when finding that PrimeSource had not demonstrated real, immediate and irreparable sufficient to warrant an injunction, that "[g]iven the nature of these claims, there is surprisingly little in the way of evidence of harm to PrimeSource."

**ANSWER:** PrimeSource admits that at the time of Royce's deposition it had not determined what specific business it had lost to Huttig. PrimeSource also admits that Judge Elliff's opinion contained the quoted language, but PrimeSource denies the remaining allegations in ¶ 57.

58. Notwithstanding the absence of identifiable trade secrets, and any evidence of misappropriation or use of the broad categories of trade secret information that PrimeSource has bothered to identify, PrimeSource is forcing the Individual Counter-Plaintiffs to incur the considerable expense associated with defending a preliminary injunction hearing in which PrimeSource is seeking, among other things, to prevent the Individual Counter-Plaintiffs from working for Huttig based on false and unsubstantiated allegations of trade secret theft.

**ANSWER:** PrimeSource admits that it continues to pursue its wholly legitimate claims and remedies against Counter-Plaintiffs, including seeking a preliminary injunction. PrimeSource denies the remaining allegations in ¶ 58.

59. Not surprisingly, in its memorandum in support of preliminary injunctive relief, PrimeSource has failed to cite a single case in which an Illinois court, or any court for that matter, has applied the "inevitable disclosure" doctrine to enjoin an employee from continuing with competitive employment after there was a gap in employment from departure to new employment of twelve months. In this case, by the time the Court considers PrimeSource's preliminary injunction motion at PrimeSource's behest, it will almost be a full two years since D. Fishbein and Furio were terminated by PrimeSource, and a full three years since K. Fishbein and Zinman left PrimeSource.

**ANSWER:** PrimeSource admits that it continues to pursue its wholly legitimate claims and remedies against Counter-Plaintiffs, including seeking a preliminary injunction and further states that its memorandum in support of preliminary injunctive relief and the cases cited therein speak for themselves. PrimeSource denies the remaining allegations in ¶ 59.

60. PrimeSource never cared about the outcomes of these cases. The litigation itself is being used as a tool to distract and harass Counter-Plaintiffs from focusing their efforts and energy on expanding Huttig's competitive fasteners business.

**ANSWER:** PrimeSource denies the allegations in ¶ 60.

### C. PrimeSource's False and Defamatory Remarks Regarding Counter-Plaintiffs

61. PrimeSource knew at the time that it filed its trade secrets claim that it was specious and contained false allegations that the Individual Counter-Plaintiffs stole PrimeSource's trade secrets, among other false allegations, but it recognized that if it accused Counter-Plaintiffs of theft of trade secrets and other wrongful conduct that it would have an adverse impact on Huttig's ability to expand its competitive fasteners business.

**ANSWER:** PrimeSource denies the allegations in ¶ 61.

62. To hasten this adverse impact, after it filed its pleadings in this matter, PrimeSource disseminated copies of its defamatory pleadings to third parties unrelated to the litigation, and upon information and belief, to various actual and potential customers, suppliers, and other business contacts of the Individual Counter-Plaintiffs and Huttig.

**ANSWER:** PrimeSource denies the allegations in ¶ 62.

63. For example, PrimeSource disseminated the First Amended Complaint to Grunfeld Desiderio Lebowitz Silverman & Klestadt LLP ("Grunfeld"), a law firm specializing in U.S. customs matters with which both PrimeSource and Huttig did business. After reviewing the First Amended Complaint, Grunfeld advised that it was required to cease providing legal services to Huttig.

**ANSWER:** PrimeSource cannot admit or deny this allegation without revealing confidential communications with its long-time counsel, the law firm of Grunfield, Desiderio, Lebowitz Silverman & Klestadt. PrimeSource denies that it authorized Grunfield to disseminate any information to Huttig or Counter-Plaintiffs about its representation of PrimeSource  PrimeSource is without information and belief as to any attorney-client communications exchanged between Grunfeld and Huttig.

64. PrimeSource and its employees and agents have defamed Counter-Plaintiffs by publishing to third parties the false and defamatory statements contained in its pleadings, including by falsely accusing Counter-Plaintiffs of theft and trademark infringement. Specifically, these false and defamatory statements include, without limitation, the following:

> (a) That former PrimeSource employees "downloaded PrimeSource information onto external memory devices or stole information from PrimeSource by emailing or downloading to cloud servers to facilitate Huttig competing with PrimeSource." (Am. Compl. ¶ 2.)

(b)    That Huttig and the Individual Counter-Plaintiffs "have engaged in illegal conduct intended to destroy the Grip-Rite® product line and secure PrimeSource's Grip-Rite® business for Huttig." (*Id.* ¶ 3.)

(c)    That Huttig could not compete absent the use of PrimeSource's stolen confidential information. (*Id.* ¶ 54.)

(d)    That former PrimeSource employees stole PrimeSource information at the direction or acquiescence of Huttig and the Individual Counter-Plaintiffs. (*Id.* ¶ 57.)

(e)    That K. Fishbein "has taken and used confidential PrimeSource information for the purpose of planning and preparing to compete with PrimeSource, and to carry out his duties and work at Huttig. K. Fishbein is using his knowledge of PrimeSource's customers and vendors and of PrimeSource's pricing methods and other information to undercut PrimeSource in the market place." (*Id.* ¶ 72.)

(f)    That "[s]ince leaving his employment with PrimeSource on September 15, 2015, Defendant D. Fishbein has taken and used confidential PrimeSource information for the purpose of planning and preparing to compete with PrimeSource, and to carry out his duties and work at Huttig. D. Fishbein is using his knowledge of PrimeSource's customers and vendors and of PrimeSource's pricing methods and other information to undercut PrimeSource in the market place." (*Id.* ¶ 80.)

(g)    That "[s]ince leaving her employment with PrimeSource on December 31, 2014, Defendant Zinman has taken and used confidential PrimeSource information for the purpose of planning and preparing to compete with PrimeSource, and to carry out her duties and work at Huttig. Zinman is using her knowledge of PrimeSource's customers and vendors and of PrimeSource's pricing and purchasing methods and other information to undercut PrimeSource in the market place." (*Id.* ¶ 88.)

(h)    That "[s]ince leaving his employment with PrimeSource on September 15, 2015, Defendant Furio has taken and used confidential PrimeSource information for the purpose of planning and preparing to compete with PrimeSource, and to carry out his duties and work at Huttig. Furio is using his knowledge of PrimeSource's customers and vendors and of PrimeSource's pricing and purchasing methods and other information to undercut PrimeSource in the market place." (*Id.* ¶ 96.)

(i)    That Huttig is infringing on PrimeSource's trademarks by selling "its competing fasteners using the name "HuttiGrip" using the same red and black color scheme employed for 45 years by PrimeSource. Huttig's actions in this regard are intentionally designed to cause a likelihood of confusion in the marketplace as to the source of Huttig's products." (*Id.* ¶ 110.)

**ANSWER:** PrimeSource denies the allegations in ¶ 64.

65.    Each of the foregoing statements was false when made, and PrimeSource made such statements with knowledge of their falsity and/or with reckless disregard for the truth.

**ANSWER:** PrimeSource denies the allegations in ¶ 65.

66.     The publishing of the pleadings to third parties is not covered by the litigation privilege, or by any other applicable privilege.

**ANSWER:**  PrimeSource denies the allegations in ¶ 66.

67.     By publishing these false and defamatory statements about Counter-Plaintiffs to third parties, including actual and potential customers, suppliers, and other business contacts of Counter-Plaintiffs, PrimeSource has impugned Counter-Plaintiffs' integrity and ability to carry on their trade or profession, and has disparaged Huttig and its business practices.

**ANSWER:**  PrimeSource denies the allegations in ¶ 67.

### D.     PrimeSource's Intentional Interference with Huttig's Business Relationships

68.     PrimeSource is also intentionally interfering with Huttig's business relationships and prospective economic advantages.

**ANSWER:**  PrimeSource denies the allegations in ¶ 68.

69.     Specifically, PrimeSource is threatening manufacturers, mills, and third-party intermediaries with ceasing to do business with them if they continue or enter into relationships with Huttig.

**ANSWER:**  PrimeSource denies the allegations in ¶ 69.

70.     PrimeSource went directly to the suppliers that Huttig was working with or attempting to work with, and threatened the suppliers that if they sold to Huttig, PrimeSource would pull its business from them. As a result of PrimeSource's threats, Huttig has lost business opportunities with Esrom Screw, among many other entities.

**ANSWER:**  PrimeSource denies the allegations in ¶ 70.

71.     PrimeSource knew that Huttig had relationships with these suppliers and improperly threatened and intentionally interfered with these relationships in an effort to stifle the competition.

**ANSWER:**  PrimeSource denies the allegations in ¶ 71.

72.     PrimeSource's interference and improper threats are not privileged and are knowing, intentional and willful and have caused, and will continue to cause, Huttig irreparable harm.

**ANSWER:**  PrimeSource denies the allegations in ¶ 72.

### E. PrimeSource's Sham Litigation Continues beyond the DTSA and ITSA Claims

73. With respect to its claims for breach of the non-competition and non-interference provisions contained in Counts III through VI, and for tortious interference with such agreements alleged against Huttig in Count VII and against D. Fishbein in Count X, these counts also constitute sham litigation.

**ANSWER:** PrimeSource denies the allegations in ¶ 73.

74. PrimeSource has neither alleged nor demonstrated that any of the Individual Counter-Plaintiffs engaged in actual competition in violation of the Individual Counter-Plaintiffs' respective non-competition provisions. Nor has PrimeSource alleged any actual solicitation of PrimeSource employees by any of the Individual Counter-Plaintiffs, alleging only that there were communications with a few employees during the restrictive period. There was no evidence presented in discovery to suggest that any offer or specific employment opportunity was discussed with any PrimeSource employees prior to the expiration of the restrictive period.

**ANSWER:** PrimeSource denies the allegations in ¶ 74.

75. Accepting as it must that it has no evidence that the Individual Counter-Plaintiffs competed with PrimeSource during their respective restrictive periods, PrimeSource has suggested the Individual Counter-Plaintiffs violated the non-competition clause that purports to prohibit "associating with" or having an "interest in" any Material Competitor (as defined in the PrimeSource agreements) within the restricted period, even if such association or interest is not for any competitive or business purpose. Such a provision is facially overbroad and unenforceable, and violates the Texas and Illinois Anti-SLAPP statutes by infringing on the Individual Counter-Plaintiffs' First Amendment rights of free association. Such overbroad restrictions would also never be enforceable because they would prohibit such lawful conduct as belonging to the same industry groups as Huttig, or even having a mild curiosity in how Huttig operates. Provisions such as these were included by PrimeSource intentionally for maximum *in terrorem* effect in order to deter employees from leaving PrimeSource (or a competitor from hiring such employees) because of the threat of litigation rather than because there is a legitimate risk of unfair competition.

**ANSWER:** PrimeSource admits that it continues to pursue its wholly legitimate claims and remedies against Counter-Plaintiffs, including enforcement of contractual provisions to which various employees agreed. PrimeSource denies the remaining allegations in ¶ 75.

76. PrimeSource's claim for tortious interference with contract against Huttig is equally without merit, as PrimeSource has failed to allege, or establish any evidence of, any breach or other interference with PrimeSource's contractual relationships with the Individual Counter-Plaintiffs or any other former PrimeSource employee.

**ANSWER:** PrimeSource denies the allegations in ¶ 76.

77.     Similarly, PrimeSource's newly asserted claim for tortious interference with contract against D. Fishbein is wholly without merit, as PrimeSource has failed to allege, or establish any evidence of, any interference with PrimeSource's contractual relationships with its former employees by D. Fishbein.

**ANSWER:**  PrimeSource denies the allegations in ¶ 77.

78.     Specifically, the purported acts of "solicitation" by D. Fishbein are not, in fact, solicitation at all. Indeed, simply inquiring about an individual's non-compete agreement or compensation information does not constitute solicitation. Nor does attending industry trade shows or sending out LinkedIn invitations.

**ANSWER:**  PrimeSource denies the allegations in ¶ 78.

79.     Moreover, most of the acts of supposed solicitation occurred after the expiration of the restrictive period of D. Fishbein's agreement.

**ANSWER:**  PrimeSource denies the allegations in ¶ 79.

80.     This case has now progressed through expedited oral and written discovery, and PrimeSource has neither produced nor established any competent evidence, either direct or circumstantial, of any contractual violation by the Individual Counter-Plaintiffs.

**ANSWER:**  PrimeSource denies the allegations in ¶ 80.

81.     PrimeSource has therefore failed to establish any evidence of any breach of contract by any of the Individual Counter-Plaintiffs, and its continued maintenance of these claims is without merit.

**ANSWER:**  PrimeSource denies the allegations in ¶ 81.

82.     Specifically, without any evidence of any active solicitation or competition by the Individual Counter-Plaintiffs, PrimeSource has no probable cause to support its claim for tortious interference.

**ANSWER:**  PrimeSource denies the allegations in ¶ 82.

83.     PrimeSource's claim for federal trademark infringement, which PrimeSource has abandoned in its Second Amended Complaint, was also without merit. PrimeSource previously alleged that Huttig's "HuttiGrip®" infringed on PrimeSource's "Grip-Rite®" trademark because it used the same distinctive color scheme. This allegation is false.

**ANSWER:**  PrimeSource admits that it currently does not allege trademark infringement by

Hutting, but denies the remaining allegations in ¶ 83.

84.    Specifically, PrimeSource alleged that Huttig announced on November 15, 2016, that the Individual Counter-Plaintiffs would be joining Huttig's ranks, and that Huttig "will focus on expanding the HuttiGrip® private label product line nationally." (Compl. ¶ 55; Ex. A.) According to PrimeSource, "[t]he press release indicates Huttig's intent to mimic the success of the Grip-Rite brand and to go head-to-head with Plaintiff using the same business model developed and managed by the Individual Defendants for PrimeSource." (*Id.* ¶ 56.) These allegations are false. The press release made no mention of PrimeSource, or Grip-Rite, or of any business model or plan associated with the expansion of the HuttiGrip® private label brand. Moreover, the HuttiGrip® brand has been in use for branding nails and other fasteners for over fifteen years, since 2001.

**ANSWER:**    PrimeSource answers that the allegations in its Second Complaint stand for

themselves and PrimeSource denies any allegations inconsistent with the language of that

documents.  PrimeSource admits that the term "PrimeSource" does not appear in the press release.

PrimeSource denies the remaining allegations in ¶ 84.

85.    PrimeSource further alleged that Huttig failed to register the term "HuttiGrip" in March 2016 as a trademark, purporting to change the colors of the HuttiGrip brand to those PrimeSource traditionally uses for displaying its GripRite brand. (*Id.* ¶ 57.) This allegation is also false. Huttig's application was filed on June 22, 2016, and registered on November 8, 2016. The HuttiGrip mark "CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR," i.e., color was never an element of the application.

**ANSWER:**    The allegations of PrimeSource's Complaint speak for themselves.  PrimeSource

admits that the application was filed on June 22, 2016 and registered on November 8, 2016, and

that application contained the quoted language.  PrimeSource denies the remaining allegations of

paragraph 85.

86.    The trademark was registered on November 8, 2016. *See* United States Patent and Trademark Office, HuttiGrip Registration Certificate (Nov. 8, 2016), which is publicly available on the USPTO website at **https://tsdr.uspto.gov/documentviewer?caseId=sn87080228&docId=ORC20161023031700#docIndex=0&page=1Id.**

**ANSWER**:  PrimeSource admits the allegations of ¶ 86.

87.    PrimeSource included the objectively baseless trademark infringement claim because of the potential adverse business impact it would have on Huttig, in that potential customers of Huttig's fastener business would be concerned that they could be purchasing products from Huttig that might expose them to potential liability for damages.

**ANSWER:** PrimeSource denies the allegations in ¶ 87.

88.     This is not the first time PrimeSource has asserted factually meritless intellectual property infringement claims against a competitor that was attempting to take market share from PrimeSource. In 2014, *PrimeSource Building Products, Inc. v. The Hillman Group, Inc.*, 3:14-cv-02521-B (U.S. District Court, Northern District of Texas) (the "Hillman Lawsuit"), PrimeSource asserted claims for trademark and trade dress infringement under the Lanham Act, 15 U.S.C. § 1501 *et seq.*, and Texas common law against the Hillman Group, Inc. This lawsuit followed immediately on the heels of Hillman displacing approximately 50% of the fasteners business at Loew's from PrimeSource.

**ANSWER:** PrimeSource admits that in 2014 it filed *PrimeSource Building Products, Inc. v. The Hillman Group, Inc.*, 3:14-cv-02521-B (U.S. District Court, Northern District of Texas) (the "Hillman Lawsuit") and asserted claims for trademark and trade dress infringement under the Lanham Act, 15 U.S.C. § 1501 *et seq.*, and Texas common law against the Hillman Group, Inc. PrimeSource denies the remaining allegations in ¶ 88.

89.     In the Hillman Lawsuit, PrimeSource alleged that the defendant's trademarks and trade dress were confusingly similar to the GripRite mark, trade dress, or packaging PrimeSource used to sell its fasteners under the GripRite mark.

**ANSWER:** PrimeSource admits the allegation of ¶ 89 to the extent that they reflect its pleadings in the Hillman Lawsuit and denies any allegations contrary to those pleadings.

90.     Among other things, PrimeSource sought an injunction to preliminarily enjoin Hillman from using its marks, DURA-GRIP and FAS-N-RITE, the trade dress or any other mark or trade dress confusingly similar to PrimeSource's marks and trade dress.

**ANSWER:** PrimeSource admits the allegations of ¶ 90 to the extent they reflect its pleadings in the Hillman Lawsuit speak for themselves and denies any allegations contrary to those pleadings.

91.     With respect to its trade dress claim, PrimeSource alleged that Hillman's trade packaging utilized elements copied from PrimeSource's packaging, including a similar color-coding scheme, clear plastic windows with rounded corners, labels covering only a portion of the box top and product images.

**ANSWER:** PrimeSource admits the allegations of ¶ 91 to the extent they reflect its pleadings in the Hillman Lawsuit and denies any allegations contrary to those pleadings.

92. The court in the Hillman Lawsuit found that PrimeSource had failed to establish a likelihood of success on the merits of its claim for trade dress infringement.

**ANSWER:** In a non-final order on PrimeSource's request for a preliminary injunction in the Hillman Lawsuit, PrimeSource admits that the Court found that PrimeSource at the preliminary injunction hearing had failed to establish a likelihood of success on the merits of its claim for trade dress infringement. PrimeSource denies the remaining allegations in ¶ 92.

93. Specifically, the court found that PrimeSource failed to demonstrate that its alleged product packaging was distinctive and functional; prerequisites to any type of trademark protection for packaging trade dress. To the contrary, the evidence presented at the preliminary injunction hearing demonstrated to the court that many other sellers of packaged nails and screws including Menard's (GripFast), Fox Valley Steel & Wire (Grip-Tite), Ace Hardware, Lowe's (Blue Hawk), Do-It-Best, and Maze all use similarly shaped boxes, a similar color-coding scheme, clear plastic display windows with rounded corners and labels to cover parts of the box. In addition, there was unrefuted testimony that many vendors use the same or similar color-coding systems for their nails and screws as PrimeSource.

**ANSWER:** PrimeSource answers that the Court's non-final order in the Hillman Lawsuit speaks for itself and denies any allegation inconsistent therewith. To the extent Counter-Plaintiffs purport to interpret that non-final order or "the evidence presented at the preliminary injunction hearing" or testimony, PrimeSource denies those allegations.

94. Further, PrimeSource failed to provide any consumer-survey evidence or direct consumer testimony to show that consumers identify the GripRite trade dress with PrimeSource.

**ANSWER:** During the preliminary injunction hearing in the Hillman Lawsuit, PrimeSource admits that it did not provide any consumer-survey evidence or direct consumer testimony to show that consumers identify the GRIP-RITE Trade Dress with PrimeSource.

95. In addition, PrimeSource failed to present evidence establishing that the elements of the GripRite trade dress were distinctive and non-functional, whereas the defendant in the Hillman Lawsuit presented persuasive evidence that most, if not all, of the elements were functional in nature.

**ANSWER:** During the preliminary injunction phase of the Hillman Lawsuit, the Court found in a non-final decision on PrimeSource's request for a preliminary injunction that PrimeSource at the

24

preliminary injunction hearing failed to present evidence establishing that the elements of the GRIP-RITE Trade Dress were distinctive and non-functional and further that the defendant at the preliminary injunction hearing persuasively argued that most, if not all, of the elements were functional in nature, as evidenced, in part, by their common use in the industry.

96.     With respect to PrimeSource's trademark infringement claim, the court also found that PrimeSource failed to demonstrate a likelihood of success on the merits of such claim.

**ANSWER:**  In a non-final order on PrimeSource's request for a preliminary injunction in the Hillman Lawsuit, PrimeSource admits that the Court found that PrimeSource failed to demonstrate at the preliminary injunction hearing a likelihood of success on the merits of such claim.

97.     Specifically, PrimeSource failed to show that its GripRite mark has developed widespread recognition among ordinary consumers or that Hillman somehow copied the GripRite mark with the intent to deceive consumers.

**ANSWER:**  PrimeSource answers that the Court's order speaks for itself and denies any allegation inconsistent therewith.  PrimeSource further answers that the court, in a  non-final decision on PrimeSource's request for a preliminary injunction in the Hillman Lawsuit, found that Hillman's mark was sufficiently similar to PrimeSource's GRIP-RITE FAS'NERS Mark to cause an ordinary consumer confusion and that there was a risk of confusion among consumers, but that PrimeSource's evidence at the preliminary injunction hearing did not show that its GRIP-RITE Marks had developed the widespread recognition among ordinary consumers that PrimeSource's executives attributed to them or prove that Hillman copied PrimeSource's GRIP-RITE Marks with the intent to deceive consumers.

98.     Accordingly, PrimeSource's request for a preliminary injunction in the Hillman Lawsuit was denied.

**ANSWER:**  In a non-final order on PrimeSource's request for a preliminary injunction in the Hillman Lawsuit, PrimeSource admits that the court denied its request for a preliminary injunction.

99.     In Count VII of its Second Amended Complaint, PrimeSource now asserts a claim for breach of a non-disclosure and employee non-interference agreement against Huttig.

**ANSWER:**  PrimeSource admits the allegations in ¶ 99.

100.     In December 2014, when Itochu International, Inc. "(Itochu"), PrimeSource's owner, began marketing PrimeSource and its affiliated entity, Itochu Building Products, Inc. ("IBP") for possible sale. Itochu required any entity that was interested in participating in the bidding process with respect to PrimeSource and IBP to execute a broad non-disclosure agreement containing a blanket 18-month non-solicitation and non-hire provision with respect to any director, officer, employee, independent contractor, consultant or advisor or person employed by PrimeSource, Itochu, IBP or any of their subsidiaries in an executive or significant managerial, financial, sales, marketing, sourcing or buying position that Huttig had discussions with, obtained information with respect to or that otherwise becomes known to Huttig in the course of evaluating the potential acquisition of PrimeSource or IBP ("NDA").

**ANSWER:**     PrimeSource admits that in December 2014, when Itochu International, Inc.,

PrimeSource's then-owner, began marketing PrimeSource and its affiliated entity, Itochu Building

Products, Inc. for possible sale, Itochu required any entity that was interested in participating in

the bidding process with respect to PrimeSource and IBP to execute a non-disclosure agreement

containing a 18-month non-solicitation and non-hire provision with respect to any director, officer,

employee, independent contractor, consultant or advisor or person employed by PrimeSource,

Itochu, IBP or any of their subsidiaries in an executive or significant managerial, financial, sales,

marketing, sourcing or buying position that Huttig had discussions with, obtained information with

respect to or that otherwise becomes known to Huttig in the course of evaluating the potential

acquisition of PrimeSource or IBP.  PrimeSource denies the remaining allegations in ¶ 100.

101.     On or about December 16, 2014, Huttig executed the NDA explicitly in exchange for access to confidential information related to PrimeSource and IBP, and implicitly in exchange for the opportunity to meaningfully participate in the bidding process.

**ANSWER:**  PrimeSource admits that on or about December 16, 2014,Huttig executed the NDA

and that the NDA speaks for itself.  PrimeSource denies the remaining allegations in ¶ 101.

102.     Contrary to PrimeSource's allegations, however, Huttig was excluded from the sale process, was not permitted to attend the management meeting to meaningfully participate or engage with PrimeSource's senior management team, and no representative from Huttig ever

26

accessed the data room containing PrimeSource's confidential information that was set up for the sale process.

**ANSWER:** PrimeSource denies that Huttig was prevented from meaningfully participating or engaging with PrimeSource's senior management team. PrimeSource is without sufficient information or belief concerning Huttig's accessing the data room and therefore denies same.

103. PrimeSource has acknowledged this fact because it does not contend that Huttig accessed or used any of its confidential information provided as part of the sale process, and instead attempts to enforce the non-solicitation and non-hire covenant even though it has full knowledge that Huttig did not receive the consideration contemplated by the NDA (i.e., PrimeSource's confidential information related to the potential sale).

**ANSWER:** PrimeSource denies the allegations in ¶ 103.

104. Unbeknownst to Huttig, and prior to Huttig's meeting with PrimeSource's senior management and Huttig's receipt of confidential information related to the potential transaction, PrimeSource decided to exclude Huttig from the bidding process because they had a strong preference that PrimeSource and IBP be acquired by a private equity firm rather than another business in the same industry. Upon information and belief, Itochu and PrimeSource never intended to allow Huttig to participate in the sale process, and instead they fraudulently induced Huttig, a direct competitor, into entering the NDA in order to preclude Huttig from soliciting or hiring any key personnel within PrimeSource and IBP.

**ANSWER:** PrimeSource denies the allegations in ¶ 104.

105. Prior to Huttig gaining access to PrimeSource's confidential information, and within minutes of attending a meeting with PrimeSource's senior management, in mid-January 2015, Itochu representatives advised Huttig that it would not be allowed to participate in the sale process or attend the management meeting to meet PrimeSource's management team.

**ANSWER:** PrimeSource admits that Huttig was not permitted to attend all meetings with PrimeSource's senior management. PrimeSource is without sufficient information or belief concerning the remaining allegations in ¶ 105 and therefore denies same.

106. On January 17, 2015, Jon Vrabely, Huttig's Chief Executive Officer, sent an email to certain Huttig executives who had received an e-mail with an Internet link to the Platinum Project (i.e., the PrimeSource and IBP sale) data room, and requested that all those at Huttig who received the e-mail with the Internet link delete it without logging into the data room. All of the Huttig personnel who received the e-mail deleted it without accessing the data room purportedly containing confidential information related to PrimeSource and IBP businesses.

**ANSWER:** _ PrimeSource is without sufficient information or belief concerning the allegations in ¶ 106 and therefore denies same.

107.    Indeed, on February 2, 2015, in-house counsel for Huttig wrote to counsel for Itochu, advising that it considered the NDA null and void based on the fact that Huttig was not permitted to participate in the sale process, and had not received or accessed PrimeSource's confidential information. Huttig's General Counsel also confirmed that Huttig had not accessed the data room site and had no communication with anyone at the PrimeSource other than the brief introduction at the management meeting from which Huttig was quickly expelled.

**ANSWER:** PrimeSource admits that the letter was written but as the letter was not sent to PrimeSource, PrimeSource is without information concerning the remaining allegations of ¶ 107 and therefore denies same.

108.    Until the Second Amended Complaint was filed, no one from Itochu, PrimeSource or IBP ever responded to Huttig's February 2, 2015 letter contending Huttig received consideration to support the NDA or that the NDA itself was valid.

**ANSWER:** PrimeSource admits the allegations in ¶ 108.

109.    Such a naked, illusory non-solicitation and non-hire provision is unlawful and in violation of federal antitrust laws as a naked restraint of trade that is not ancillary to a valid nondisclosure agreement.

**ANSWER:** PrimeSource denies the allegations in ¶ 109.

110.    To the extent that the consideration contemplated by the NDA was the full exchange of confidential information related to the potential transaction, and the implied right to meaningfully participate in the bidding process, PrimeSource's actions demonstrated that it fraudulently induced Huttig to enter into the NDA by knowingly executing the NDA with full knowledge that strategic buyers would not be permitted to bid.

**ANSWER:** PrimeSource denies the allegations in ¶ 110.

111.    Accordingly, PrimeSource's claim for breach of the NDA against Huttig is objectively baseless.

**ANSWER:** PrimeSource denies the allegations in ¶ 111.

112.    PrimeSource has also asserted a claim in its Second Amended Complaint alleging that Huttig aided and abetted a breach of fiduciary duty related solely to a purported business opportunity with American Fasteners ("AF") that non-party, Brad Strosahl, another former PrimeSource employee, pursued after he joined Huttig (Count IX). AF is a company based in

Dallas, Texas that manufactures, sells and distributes plastic strip framing nails and tapered tape joist hanger nails.

**ANSWER:** PrimeSource admits that it asserted a claim in its Second Amended Complaint alleging that Huttig aided and abetted a breach of fiduciary duty relating to a business opportunity with American Fasteners ("AF") that non-party, Brad Strosahl, another former PrimeSource employee, pursued after he joined Huttig (Count IX). PrimeSource further admits that AF is a company based in Dallas, Texas that manufactures, sells and distributes plastic strip framing nails and tapered tape joist hanger nails. PrimeSource denies the remaining allegations in ¶ 112.

113. This claim is another objectively baseless claim which, for several reasons, PrimeSource was fully aware of at the time that it filed this Count.

**ANSWER:** PrimeSource denies the allegations in ¶ 113.

114. As PrimeSource concedes, Strosahl is not bound by any non-competition or non-interference agreement with PrimeSource, and had no contractual restriction on his ability to compete for business with PrimeSource after he resigned.

**ANSWER:** PrimeSource admits that a judge in Denver found, in related to a request for preliminary injunction, that an employment agreement between Brad Strosahl and PrimeSource which included a non-compete agreement expired on July 31, 2014 and could not be used to support a request for preliminary injunction. The order in that matter speaks for itself. Otherwise, PrimeSource denies the remaining allegations in ¶ 114.

115. Strosahl does not owe a fiduciary duty that extends beyond the cessation of his employment, and there is no suggestion or evidence that he took any action with respect to AF on behalf of Huttig prior to resigning from PrimeSource.

**ANSWER:** PrimeSource denies the allegations in ¶ 115.

116. PrimeSource's pursuit of a potential business relationship with AF was not the subject of a confidentiality agreement between PrimeSource and AF, and AF was free to do business with whomever it chose both before and after Strosahl joined Huttig.

**ANSWER:** PrimeSource admits that AF is free to choose to do business with whatever competitor it chooses, whether that it PrimeSource, Huttig, or another competitor. PrimeSource further admits

that its discussions with AF were not subject to a confidentiality agreement and that the lack of a confidentiality agreement does not allow current or former employees of PrimeSource to use confidential information obtained while an employee of PrimeSource for the benefit of PrimeSource's competitors. PrimeSource denies all remaining allegations in ¶ 116.

117. Strosahl was one of several PrimeSource executives who were involved in discussing a supply arrangement between PrimeSource and AF, and Brad Johnson was the point person at PrimeSource with respect to pursuing the AF supply arrangement.

**ANSWER:** PrimeSource admits that Strosahl was one of several PrimeSource executives who were involved in discussing a supply arrangement between PrimeSource and AF and denies the remaining allegations in ¶ 117.

118. PrimeSource did not lose the opportunity to do business with AF, and in fact, has entered into a supply arrangement with AF following Strosahl's departure. Moreover, the current relationship between AF and Huttig, and AF and PrimeSource, is not exclusive, and AF is free to supply plastic strip framing nails and tapered tape joist hanger nails to both PrimeSource and Huttig.

**ANSWER:** PrimeSource denies that it "did not lose the opportunity to do business with AF" in that it was deprived of the opportunity as alleged in PrimeSource's Second Amended Complaint. PrimeSource further denies that it has entered into a supply "arrangement" with AF following Strosahl's departure. PrimeSource admits it has purchased product from AF since Strosahl's departure and that its relationship with AF is not exclusive. PrimeSource lacks sufficient information about the terms of AF's arrangement with Huttig to be able to admit or deny allegations related to AF's relationship with Huttig.

119. Further, it is clear from the Second Amended Complaint that PrimeSource is engaging in impermissible forum shopping. Having lost the preliminary injunction against Strosahl in the Colorado action, it is now seeking to litigate its claims against him before this Court.

**ANSWER:** PrimeSource denies the allegations in ¶ 119.

### F.     PrimeSource's Subjective Motivation in Filing This Lawsuit Is to Exclude New or Expanded Competition

120.     Upon information and belief, the sole reason PrimeSource instituted this lawsuit was to misuse a government process—the judicial process—as an anticompetitive weapon by using the expense and burden of sham litigation to run an expanding competitor out of antitrust markets for packaged fastener products in order to acquire and/or maintain its monopoly power in these markets, and to send a warning that will discourage other actual or potential suppliers of these products from competing with PrimeSource in markets that PrimeSource regards, or at least wants to regard, as PrimeSource's alone.

**ANSWER:**  PrimeSource denies the allegations in ¶ 120.

121.     While PrimeSource has no objectively reasonable basis for seeking this relief, the burdens that its sham litigation has imposed on others and now imposes on Huttig, and the threat of similar sham litigation against any other would-be competitors in the supply of fastener products, has excluded and will continue to exclude competition and thereby will allow PrimeSource to acquire and/or maintain its monopoly power in antitrust markets for fastener products.

**ANSWER:**  PrimeSource denies the allegations in ¶ 121.

### G.     PrimeSource Misuses the Judicial Process to Impede Counter-Plaintiffs' Counsel

122.     For example, PrimeSource has designated substantially all of its initial production and most of what has followed "Attorneys' Eyes Only," ("AEO") without regard for whether that designation is appropriate. This impedes Counter-Plaintiffs' ability to defend this case.

**ANSWER:**  PrimeSource admits that it has designated portions of its production in this matter AEO but denies the remaining allegations in ¶ 122.  Answering further, PrimeSource states that Counter-Plaintiffs never requested that any documents be redesignated nor challenged any designation.

123.     Prime Source's over-designation of evidence as AEO and as privileged (without explanation) prevents the litigation from being a fair and open process and causes harm to Huttig's business by preventing the public from knowing the facts.

**ANSWER:**  PrimeSource denies the allegations in ¶ 123.

124.     At his initial deposition on May 15, 2017, Eric Royse, PrimeSource's Rule 30(b)(6) corporate representative, refused to answer direct questions within the topic areas of the Rule 30(b)(6) subpoena, and PrimeSource's counsel engaged in a course of repeated and persistent speaking objections in clear violation of Federal Rule of Civil Procedure 30 designed to prevent

Counter-Plaintiffs from discovering relevant information in defense against PrimeSource's claims. Moreover, PrimeSource's counsel improperly asserted the attorney-client privilege many times during this deposition in an effort to prevent Royse from answering factual questions related to PrimeSource's evidence of alleged misconduct by the Individual Counter-Plaintiffs.

**ANSWER:** PrimeSource denies the allegations in ¶ 124.

125.    Despite pursuing an exceedingly broad "definition" of its trade secrets from the outset, PrimeSource refused to produce requested documents relating to pricing, sales, or marketing information that PrimeSource obtained from third parties regarding its competitors — i.e., the information alleged to be confidential and/or constitute trade secrets in this case (but which Defendants contend is generally known and communicated within the industry) — absent a court Order entered on April 20, 2017. *See* Case No. 16-cv-11468 Doc. 79.

**ANSWER:**  PrimeSource admits that in response to Huttig's request for "[a]ll documents that

reflect or reference or relate to the pricing, sales or marketing information or written materials of

each of PrimeSource's competitors that PrimeSource obtained directly from a customer, supplier,

or vendor, or that was obtained by PrimeSource's sales employees," PrimeSource responded

"PrimeSource objects to this request as overly broad, unduly burdensome, and not proportional to

the needs of the case as the request is not limited to any issue that is relevant to the claims and

defenses in this matter" and admits that in its April 20, 2017 Order, the Court narrowed the scope

of the request and ordered PrimeSource to produce "For the year 2016, all documents that reflect

or reference or relate to the pricing, sales or marketing information or written materials of each of

PrimeSource's competitors that PrimeSource obtained directly from a customer, supplier, vendor

or that was obtained by PrimeSource's sales employees."  PrimeSource denies the remaining

allegations of ¶ 125.

126.    Despite pursuing an exceedingly broad "definition" of its trade secrets from the outset, PrimeSource refused to produce information regarding its policies and procedures in targeting potential employees — e.g., whether it seeks out employees with industry experience and industry "know-how" — absent a court Order entered on April 20, 2017. *See id*.

**ANSWER:**  PrimeSource denies that it is pursuing exceedingly broad "definition" of its trade

secrets.  PrimeSource admits that in response to Huttig's request for "[d]ocuments reflecting Your

policies and procedures regarding who You and Your external employment recruiters, target for employment at PrimeSource," PrimeSource responded "PrimeSource objects to this request as overly broad, unduly burdensome, and not proportional to the needs of the case as the request is not limited to any issue that is relevant to the claims and defenses in this matter" and admits that in its April 20, 2017 Order, the Court narrowed the scope of the request and ordered PrimeSource to produce "For the years 2015 and 2016, documents reflecting Your policies and procedures regarding who You and Your internal and external employment recruiters, target for employment at PrimeSource." PrimeSource denies the remaining allegations in ¶ 126.

127.    When, PrimeSource finally produced requested documents relating to pricing, sales, or marketing information that PrimeSource obtained from third parties regarding its competitors, it marked all such information AEO, without regard to whether it was communicated to PrimeSource by a nonparty, concerned a nonparty, or (in dozens of instances) was contained within a communication (such as an e-mail) to which one of the individual defendants now employed by Huttig (e.g., Brad Strosahl, Sam Sprague, Garrett Kessler, etc.) was a party.

**ANSWER:**    PrimeSource denies the allegations in ¶ 127 except PrimeSource admits that PrimeSource marked much of the production of documents in response to the Court's April 20, 2017 Order as AEO due to the sensitivity of much of the information (including internal communications regarding pricing and other issues) and the expedited basis upon which it was ordered to be produced. Further answering, Counter-Plaintiffs never requested that documents be redesignated or asserted at the time of production that the designations were improper.

128.    On July 14, 2017, after expedited discovery had been concluded in advance of the PI hearing and after the parties had submitted their pre-hearing briefing on issues related to the upcoming preliminary injunction hearing, PrimeSource produced 1,900 more pages of documents relating to pricing, sales or marketing information that PrimeSource obtained from third parties regarding its competitors.

**ANSWER:**    PrimeSource admits that it made a production of documents on July 14, 2017, and that the documents were not produced earlier due to an inadvertent production error. PrimeSource denies that the production was intentionally delayed in any way. Further answering, Counter-

Plaintiff's counsel recognized that "miscommunication and other administrative snafus happen" in discovery.

## II.    Additional Facts Relevant To Huttig's Antitrust Claims Against PrimeSource

### H.    The Relevant Product and Geographic Market

129.    PrimeSource sells fasteners in two antitrust markets for which it has a monopoly, or for which it is unlawfully attempting to obtain a monopoly.

**ANSWER:** PrimeSource denies the allegations in ¶ 129.

130.    The National Account Packaged Fastener Market (the "NPF Market"), is defined as the United States market for wholesale supply of nails, screws, staples, and other fastener products packaged in one-to five-pound boxes and similar small packaging for sale to large national and regional retail store chains, stores, construction products dealers, and other similar customers who require or seek the following (collectively, "NPF Customer Requirements"): (i) a full line of these products; (ii) consistent appearance and product mix for all of the customer's stores or other sales outlets; (iii) coordinated rebate, merchandising services, and promotional programs for all of the customer's stores or other sales outlets; (iv) coordinated and prompt deliveries from a national or regional warehouse network and/or coordinated direct shipments from product sources to all of the customer's stores or other sales outlets; (v) ability to quickly fill in shipments from the supplier's warehouses between direct shipments from products sources, or when such shipments are late; and (vi) ability to use bidding procedures to select a supplier for all of the customer's stores or other sales outlets.

**ANSWER:** PrimeSource denies the allegations in ¶ 130.

131.    Customers in the NPF Market include but are not limited to the following: Home Depot, Lowe's, US LBM, 84 Lumber, Do-It-Best, Builder's First Source, BMC, Builders First Source, and McCoy's.

**ANSWER:  ANSWER:** PrimeSource admits that Home Depot, Lowe's, US LBM, 84 Lumber,

Do-It-Best, Builder's First Source, BMC, Builders First Source, and McCoy's are actual or

potential customers but denies the remaining allegations in ¶ 131.

132.    The NPF Market is a valid antitrust market.

**ANSWER:** PrimeSource denies the allegations in ¶ 132.

133.    The Federal Trade Commission ("FTC") and the Department of Justice ("DOJ"), as well as many courts, use a hypothetical monopolist test to identify antitrust markets. Under that test, the market is defined by the smallest set of products in which the only seller of a 80 product (i.e., the hypothetical monopolist) could profitably increase prices by a small but significant and

nontransitory amount ("SSNIP"). The test is used because profitable price increases indicate that customers prefer to absorb anticompetitive prices and suffer antitrust injury rather than switch to alternative products. The test is a measure of the degree to which products in the market compete with and are interchangeable with products outside of the market. A hypothetical monopolist could profitably increase prices in the NPF Market by a SSNIP.

**ANSWER:** PrimeSource admits that the FTC and DOJ and certain courts under certain circumstances at certain times have referenced the hypothetical monopolist test, although the FTC and DOJ have specifically noted that the test simply is a methodological tool and that antitrust analysis employs a wide range of analytical tools in the fact-specific process through which the agencies review competition issues. PrimeSource denies the remaining allegations in ¶ 139.

134.    Customers in the NPF Market have no reasonable alternatives to the full line of boxed fastener products that PrimeSource and a few other suppliers sell. Other suppliers who sell only particular types of boxed fasteners, and/or do not meet the NPF Customer Requirements are not reasonably interchangeable with the full line of products and coordinated service and delivery arrangements that customers in the NPF Market seek, and that PrimeSource and a few other suppliers offer.

**ANSWER:** PrimeSource admits that it has other suppliers as competitors but denies the remaining allegations in ¶ 134.

135.    The industry recognizes the differences in terms of the speed, cost, and administrative burden of sourcing these products for the retail stores and other sales outlets of customers in the NPF Market, between PrimeSource and the few other suppliers that sell to customers in NPF Market, on the one hand, and other wholesale suppliers of fastener products that do not meet the NPF Customer Requirements and/or sell to customers who purchase only selected types of boxed fasteners or make less frequent or smaller volume purchases.

**ANSWER:** PrimeSource denies the allegations in ¶ 135.

136.    The Wholesale Fastener Market (the "WF Market") is defined as the United States market for wholesale supply of a full line of nails, screws, staples, and other fastener products (i) packaged in one-to five-pound boxes, (ii) packaged in larger sizes of 30-pound pails and 50-pound boxes and (iii) collated and attached to feed strips in various configurations to meet the specifications of most or all power tool brands and suppliers rather than a particular tool brand, for sale to retail store chains, stores, construction products dealers, and other similar customers that resell the products to end users.

**ANSWER:** PrimeSource denies the allegations in ¶ 136.

137.    Customers in the WF Market include but are not limited to the following: (i) customers in the NPF Market; (ii) ABC Supply; (iii) SRS; (iv) L&W Supply; (v) Foundation Building Materials; (vi) Golden State Lumber; (vii) Hines Lumber; (viii) Whitecap; (ix) Southern Fastening; (x) Garrett Supply; and (xi) Pro-Fast.

**ANSWER:**  PrimeSource admits that ABC Supply, SRS, L&W Supply, Foundation Building Materials, Golden State Lumber, Hines Lumber, Whitecap, Southern Fastening, Garrett Supply, and Pro-Fast are actual or potential customers but denies the remaining allegations in ¶ 137.

138.    The WF Market is a valid antitrust market.

**ANSWER:**  PrimeSource denies the allegations in ¶ 138.

139.    The FTC and the DOJ, as well as many courts, use a hypothetical monopolist test to identify antitrust markets. Under that test, the market is defined by the smallest set of products in which the only seller of a product (i.e., the hypothetical monopolist) could profitably increase prices by a SSNIP. The test is used because profitable price increases indicate that customers prefer to absorb anticompetitive prices and suffer antitrust injury rather than switch to alternative products. The test is a measure of the degree to which products in the market compete with and are interchangeable with products outside of the market. A hypothetical monopolist could profitably increase prices in the NPF Market by a SSNIP.

**ANSWER:**  PrimeSource admits that the FTC and DOJ and certain courts under certain circumstances at certain times have referenced the hypothetical monopolist test, although the FTC and DOJ have specifically noted that the test simply is a methodological tool and that antitrust analysis employs a wide range of analytical tools in the fact-specific process through which the agencies review competition issues.  PrimeSource denies the remaining allegations in ¶ 139.

140.    Customers in the WF Market have no reasonable alternatives to the full line of fastener products and services of PrimeSource and a few other suppliers, including products that are not branded with the brand of particular power tools. Other suppliers who sell only particular types of fasteners or particular branded fasteners for use with that tool brand, and/or have more limited warehousing, distribution, and delivery arrangements, are not reasonably interchangeable with the full line of products and services that customers in the WF Market seek.

**ANSWER:**  PrimeSource denies the allegations in ¶ 140.

141.    The industry recognizes the differences in terms of the full line of products, speed, cost, and administrative burden of sourcing these products for the retail stores and dealerships of customers in the WF Market, between PrimeSource and the few other suppliers that sell to customers in the WF Market, on the one hand, and other wholesale suppliers of fastener products

that do not sell a full line of fastener products and/or sell products only with the brand of particular tool brands.

**ANSWER:** PrimeSource denies the allegations in ¶ 141.

### I. Market Characteristics Favoring Monopolization

142. There are barriers to entry in the NPF Market and WF Market, including:

(a) The cost and time to arrange a national network of warehouse facilities.

(b) The cost and time to arrange sourcing for thousands of fastener products, primarily from non-US manufacturers and trading companies, some of which are subject to U.S. import duties that increase the cost of their products for sale to U.S. wholesale customers.

(c) The cost and time to develop product brands and configure packaging/labeling for use with the brands, and to develop industry recognition of the brands.

(d) The cost and time to establish a positive reputation with product manufacturers, trading companies, and other intermediaries in the supply chain, and with customers in the market.

(e) The cost, burden, delay, and uncertainty of defending unfounded trade secrets, intellectual property, and restrictive covenant litigation by PrimeSource.

(f) The cost, burden, delay, and uncertainty of defending threats and claims in litigation by PrimeSource to enforce the many overbroad restrictive non-competition covenants and vague nondisclosure agreements that PrimeSource has imposed on present and former business managers who possess general industry knowledge about, and experience and positive reputation in, the NPF Market and the WF Market. This includes non-competition covenants imposed at the time that PrimeSource terminated the business managers, the sole and admitted purpose of which is to "protect the company from competition by the people who grew the business and knew it the best." (PS 2d Am. Compl. ¶ 48).

**ANSWER:** PrimeSource admits that it takes time and money to (a) arrange for a national network of warehouse facilities; (b) to arrange sourcing for thousands of fastener products, primarily from non-US manufacturers and trading companies, some of which are subject to U. S. import duties that increase the cost of their products for sale to U. S. wholesale customers; and (c) to develop product brands and configure packaging/labeling for use with the brands, and to develop industry recognition of the brands; and (d) to establish a positive reputation with product manufacturers, trading companies, and other intermediaries in the supply chain, and with customers in the market.

37

PrimeSource denies the balance of the allegations in ¶ 142 and specifically denies that all or some

of the specified items are "barriers to entry" within the meaning of the Sherman Act.

**J.** **PrimeSource's Monopoly Power in the NPF Market and Dangerous Probability of Acquiring Monopoly Power in the WF Market**

143.    PrimeSource has monopoly power in the NPF Market.

**ANSWER:**  PrimeSource denies the allegations in ¶ 143.

144.    The NPF Market has become highly concentrated. Today the NPF Market is effectively limited to PrimeSource, and a few other suppliers that meet only some of the NPF Customer Requirements and account for a much smaller share of sales in the NPF Market.

**ANSWER:**  PrimeSource denies the allegations in ¶ 144.

145.    PrimeSource is by far the dominant firm, holding 70 to 75 percent of sales in the NPF Market. On information and belief, the few other suppliers that make some sales to customers in the NPF Market have much smaller shares of such sales, with two other suppliers that each has no more than 10 percent of such sales and any other suppliers having less than five percent of sales.

**ANSWER:**  PrimeSource denies the allegations in ¶ 145.

146.    The NPF Market is highly concentrated, using the FTC and DOJ index for concentration, the Herfindahl-Hirschman Index (the "HHI"). Highly concentrated markets have an HHI above 2,500. On information and belief, the HHI in the NPF Market is above 5,000 and may approach 6,000.

**ANSWER:**  PrimeSource denies the allegations in ¶ 146.

147.    There is a dangerous probability that PrimeSource will acquire monopoly power in the WF Market.

**ANSWER:**  PrimeSource denies the allegations in ¶ 147.

148.    PrimeSource has by far the largest share of sales in the WF Market, and its market share has been growing due to the unlawful conduct complained of herein. On information and belief, PrimeSource holds 60 to 70 percent of sales in the WF for products that are not branded to a particular power tool brand, and 40 percent or more of total sales including products that are branded to a particular power tool brand.

**ANSWER:**  PrimeSource denies the allegations in ¶ 148.

149.    The WF Market has become highly concentrated. Years ago there were a number of established suppliers and new entrants in the WF Market. Today the WF Market is effectively

limited to just a few wholesale suppliers. On information and belief, the top five suppliers have 90 percent or more of sales in the WF Market.

**ANSWER:** PrimeSource denies the allegations in ¶ 149.

150. The WF Market is highly concentrated, using the FTC and DOJ index for concentration, the Herfindahl-Hirschman Index (the "HHI"). Highly concentrated markets have an HHI above 2,500. On information and belief, the HHI in the WF Market is above 4,000 and may approach 5,000.

**ANSWER:** PrimeSource denies the allegations in ¶ 150.

### K.    PrimeSource's Exclusionary Conduct

151. PrimeSource has willfully sought to maintain, protect, and enhance its monopoly power in the NPF Market and WF Market, and to acquire monopoly power in these markets, by means other than the superiority of its services or products, its business acumen, or historic accident, but rather through unlawful exclusionary, predatory, and other conduct to exclude rivals and limit their ability to effectively compete for sales in the NPF Market and WF Market.

**ANSWER:** PrimeSource denies the allegations in ¶ 151.

152. PrimeSource has threatened, filed, and pursued sham trade secrets, trademark, and trade dress litigation against former employees and their actual or potential new employers, including Counter-Plaintiffs, Hillman, Brad Strosahl and Sam Sprague, two recently departed PrimeSource executives who have joined Huttig, and others who have sought to enter into or sell in the NPF Market and WF Market. In addition to the Hillman Lawsuit noted above, the District Court of the State of Colorado recently denied PrimeSource's request to enjoin current Huttig (and former PrimeSource) employee Strosahl from working for Huttig, finding that his employment by Huttig presented no serious threat of use of cognizable PrimeSource trade secrets.

**ANSWER:** PrimeSource admits that it has pursued legal action again Counter-Plaintiffs, Hillman, Brad Strosahl and Sam Sprague. PrimeSource admits that the Colorado court recently denied PrimeSource's request to enjoin current Huttig (and former PrimeSource) employee Strosahl from working for Huttig for the reasons that the court stated. PrimeSource denies the remaining allegations in ¶ 152.

153. On information and belief, PrimeSource has induced defendants in these lawsuits to enter into agreements that restrict their ability compete with PrimeSource in the NPF Market and WF Market. For example, with respect to D. Fishbein and Furio, PrimeSource represented that they would be free to compete with PrimeSource if they agreed to abide by the 12-month competition provision contained in the severance agreements, but sued them after the expiration of the non-competition period relying on a specious trade secret misappropriation theory.

**ANSWER:** PrimeSource denies the allegations in ¶ 153.

154. PrimeSource threatened fastener product manufacturers, trading companies, and others with withdrawal of PrimeSource business if the firms sell fastener products to Huttig and other actual or potential wholesale suppliers in the NPF Market and WF Market, with the intended and/or actual effect of causing these manufacturers and other firms to refuse to deal with Huttig and other actual or potential wholesale suppliers. PrimeSource made such threats to at least one nail manufacturer in Asia that is not subject to U.S. anti-dumping import duties on sales to U.S. wholesale customers, in order to increase to cost of products purchased in Asia by Huttig and other rivals, who may be forced to purchase fastener products from manufacturers in Asia whose products are covered by such duties.

**ANSWER:** PrimeSource denies the allegations in ¶ 154.

155. PrimeSource has used targeted predatory pricing with selected wholesale customers to prevent new and growing rivals from entering into supply arrangements with the customers.

**ANSWER:** PrimeSource denies the allegations in ¶ 155.

156. PrimeSource has used bundled rebate and pricing programs that induce customers in the NPF Market and WF Market to purchase most or all of their fastener products from PrimeSource, and force other suppliers who seek to make some sales to these customers to lower prices for such sales to the point that the sales would be unprofitable and below cost.

**ANSWER:** PrimeSource denies the allegations in ¶ 156.

157. Over the last several years, PrimeSource has made a series of acquisitions of firms engaged in actual or potential competition in the NPF Market and WF Market in competition with PrimeSource, with the purpose and effect of achieving and preserving the monopoly power and dominant market position of PrimeSource in the market. Most recently, in November 2016, PrimeSource acquired Northeast Wholesale, a regional distributor of fasteners, tools and other building materials, which acquisition strategy is consistent with its prior acquisitions of other rivals, Pacific Steel & Supply, 3-GS Supply, Prudential, Coast-to-Coast Building Products, Compass International, Langtry Industries and All Island Exports.

**ANSWER:** PrimeSource admits it has acquired several firms that competed in whole or in part

with PrimeSource, such as Northeast Wholesale, Pacific Steel & Supply, 3-GS Supply, Prudential,

Coast-to-Coast Building Products, Compass International, Langtry Industries and All Island

Exports. PrimeSource denied the remaining allegations in ¶ 157.

158. PrimeSource entered into a multi-year exclusive supply arrangement with at least one big box retailer, Lowe's, in 2014, after it lost a large percentage of its business with the customer to Hillman, not for any procompetitive business purpose, but rather to ensure that it would not face any other material competition, loss of market share, and erosion of monopoly

prices for its fastener products, thereby creating an additional barrier to entry and expansion by Huttig and others who seek to compete in the NPF Market.

**ANSWER:** PrimeSource admits that its competitor Hillman obtained a significant amount of business from Lowe's prior to 2014 in competition with PrimeSource and that in 2014 PrimeSource was able to win a significant contract from Lowe's in competition with Hillman and others. PrimeSource denies the remaining allegations in ¶ 158.

159. PrimeSource abused the judicial process by asserting what it knew to be baseless claims for misappropriation of trade secrets, breach of contract, tortious interference, and trademark infringement as a basis for seeking injunctive relief to stop Huttig from effectively competing with PrimeSource, and continues to misuse the judicial process by pressing its claims after discovery has shown that PrimeSource lacks an objectively reasonable basis to assert these claims.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 159.

160. PrimeSource's past litigation conduct and other conduct against other actual or potential competitors, and its conduct against Huttig, including in this litigation, show a subjective intent to unlawfully exclude competition.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 160.

### L.    Injury to Competition in the Relevant Markets

161. PrimeSource has eliminated and injured competition and/or threatens to do so in the NPF Market and WF Market.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 161.

162. PrimeSource has targeted potential competitors, including Hillman, with unfounded litigation in order to impose increased cost and delay on and prevent these firms from making sales in the NPF Market and WF Market.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 162.

163. PrimeSource is targeting Huttig with unfounded trade secrets and other claims in order to impose increased cost and delay on Huttig, thereby preventing Huttig from making sales in the NPF Market and WF Market and eliminating Huttig as one of the only checks on PrimeSource's monopoly power in the NPF Market and its large and growing market share in the WF Market, which constitutes an injury to competition and/or threatened injury to competition in the NPF Market and WF Market.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 163.

164.    PrimeSource has acquired actual and potential competitors in order to eliminate competition, and acquire and preserve its monopoly power in the NPF Market and WF Market.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 164.

165.    The ongoing unlawful exclusionary and predatory conduct of PrimeSource has harmed competition in the NPF Market and WF Market by (a) preventing or delaying new entry by wholesale suppliers, (b) inhibiting and limiting new entry and expansion in the market by imposing costs on wholesale suppliers that seek to enter or expand in the market, (c) harming the reputation of targeted wholesale suppliers with customers, manufacturers, foreign trading companies, and others and (d) discouraging other actual and potential suppliers of fastener products from competing with PrimeSource.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 165.

### M.    Antitrust Injury to Huttig

166.    Huttig has suffered and is threatened with injury to its business and property caused by PrimeSource's unlawful conduct.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 166.

167.    Huttig is poised to provide a substantial and unique constraint on PrimeSource's monopoly power and dominant market position in the NPF Market, and its large and growing market share in the WF Market. Huttig has served as a wholesale distributor of fastener products for many years, and the Individual Counter-Plaintiffs in this case who now work for Huttig have the reputation, and general industry knowledge and experience, that customers in the NPF Market and WF Market seek in a wholesale distributor of fastener products.

**ANSWER:** PrimeSource admits that it has a number of competitors, including Huttig, that Huttig has served as a wholesale distributor of fastener products for many years, and that, upon information and belief, Huttig hired the Individual Counter-Plaintiffs because of their prior experience with PrimeSource. PrimeSource denies the remaining allegations in ¶ 167.

168.    Because of this threat, PrimeSource has targeted Huttig and the Individual Counter-Plaintiffs in this case with the cost, burden, and delay of unfounded theft of trade secrets, trademark and trade dress infringement claims that it has asserted in this case, with the purpose and effect of preventing and/or delaying Huttig from sourcing a full line of fastener products from around the world, and succeeding in sales efforts with customers in the NPF Market and WF Market, thereby giving PrimeSource the ability to control supply and maintain and raise prices in the NPF Market, and a dangerous probability that PrimeSource will gain such ability in the WF Market.

**ANSWER:** PrimeSource admits that it has brought this action against Huttig and the Individual

Counter-Plaintiffs based on the claims stated in its Second Amended Complaint, but

PrimeSource denies the remaining allegations in ¶ 168.

169. Taken as a whole, the unlawful exclusionary and predatory conduct of PrimeSource has caused and will continue to cause substantial and irreparable harm to Huttig's business and property by (a) preventing Huttig from hiring, or raising the cost and thereby inhibiting the ability of Huttig to hire experienced business managers, (b) preventing Huttig from entering into, or raising the cost and inhibiting the ability of Huttig to enter into, supply arrangements with manufacturers, trading companies, and wholesale customers for fastener products, (c) causing customers and suppliers to raise concerns about PrimeSource's allegations, and (d) imposing high costs and the burden of litigation on Huttig, all of which, on information and belief, have caused Huttig to lose actual and potential sales to customers, to suffer lost profits as a result of such lost sales, and to suffer a loss of value of its business.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 169.

170. Counter-Plaintiffs have learned through the course of discovery that PrimeSource has been threatening certain overseas vendors that if they supply building products or fasteners to Huttig, PrimeSource would cease buying fastener products from that vendor. Specifically, Huttig has learned that Esrom Screw and at least four other entities have been warned by PrimeSource that they should not do business with Huttig or face losing PrimeSource's business. PrimeSource has directed these threats at fastener products manufacturers in Asia that are not subject to U.S. anti-dumping import duties, in order to raise the cost of Huttig and other rivals for fastener products sourced in Asia, if they are forced to purchase fastener products from other manufacturers in Asia that are subject to such duties. PS also directed the threats, among others, to a small number of qualified screw suppliers (and brokers/trading partners of these qualified suppliers) in order to raise the cost to Huttig and other rivals and prevent them from being able to offer these products for sale to PrimeSource captive customers.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 170.

## COUNT I
### (BAD FAITH CLAIM UNDER DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836)
### (ALL COUNTER-PLAINTIFFS V. PRIMESOURCE)

171. Counter-Plaintiffs restate and reallege Paragraphs 1 through 170 of their counterclaims as if fully set forth herein.

**ANSWER:** PrimeSource restates and re-alleges ¶¶ 1 through 170 above as if fully set forth

herein.

172.     Section 1836(b)(3)(D) of the Defend Trade Secrets Act provides that the Court may award reasonable attorneys' fees to the prevailing defendant or defendants if a claim for misappropriation of trade secrets is made in bad faith. 18 U.S.C. § 1836(b)(3)(D).

**ANSWER:**  PrimeSource admits that Counter-Plaintiffs have summarized section 1836(b)(3)(D) of the Defend Trade Secrets Act but denies that it is applicable here.

173.     PrimeSource has alleged and asserted its misappropriation of trade secrets against Counter-Plaintiffs in bad faith, based on both direct and circumstantial evidence identified in relevant part herein.

**ANSWER:**  PrimeSource denies the allegations contained in ¶ 173.

174.     PrimeSource did not undertake a reasonable pre-filing factual investigation prior to asserting a misappropriation of trade secrets claim under the DTSA against Counter-Plaintiffs.

**ANSWER:**  PrimeSource denies the allegations contained in ¶ 174.

175.     PrimeSource failed to include any particularized identification of its alleged trade secrets in its First Amended Complaint, its injunction moving papers and supporting memorandum, or in discovery.

**ANSWER:**  PrimeSource denies the allegations in ¶ 121.

176.     PrimeSource alleged in its initial Complaint and its First Amended Complaint that each of the Individual Counter-Plaintiffs physically took or used PrimeSource's confidential information and trade secrets, but has yet to come forward with any evidence that any of the Individual Counter-Plaintiffs has taken or retained any of PrimeSource's alleged trade secrets.

**ANSWER:**  PrimeSource answers that the allegations in its Complaint, First Amended Complaint, and Second Amended Complaint speak for themselves and PrimeSource denies any allegations inconsistent with the language of those documents.  PrimeSource denies the remaining allegations contained in ¶ 176.

177.     PrimeSource knows that no such evidence of misappropriation and use exists, and yet it initiated and continues to maintain a claim for theft of trade secrets anyway.

**ANSWER:**  PrimeSource denies the allegations contained in ¶ 177.

178.     In addition, PrimeSource knew at the time of filing that no legal support exists for applying the "inevitable disclosure" doctrine to prevent Individual Counter-Plaintiffs from being employed by a competitor, and it has failed to demonstrate that the doctrine of inevitable disclosure has any application in this instance, in particular since there is at least a 12-month gap between the

44

Individual Counter-Plaintiffs' employment with PrimeSource and their employment or consulting role with Huttig.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 178.

179.    PrimeSource has asserted this trade secrets claim for an improper purpose to harass, intimidate and oppress Counter-Plaintiffs, use the cost and expense of litigation in an effort to slow them down and prevent them from competing with PrimeSource, and thereby unlawfully maintain its monopoly power and dominant market position in relevant antitrust markets for fastener products.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 179.

180.    Accordingly, pursuant to Section 1836(b)(3)(D) of the Defend Trade Secrets Act, Counter-Plaintiffs are entitled to their attorneys' fees incurred in having to defend against PrimeSource's trade secret misappropriation claims asserted against Counter-Plaintiffs.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 180.

WHEREFORE, Defendants/Counter-Plaintiffs request judgment in their favor and against Plaintiff/Counter-Defendant on Count I of their counterclaims and that they be awarded the following relief:

    (a)    attorneys' fees and costs incurred in this matter in excess of $1,700,000; and

    (b)    such other and further relief as this Court deems equitable and just.

**ANSWER:** PrimeSource denies the allegations contained in Counter-Plaintiffs' Wherefore paragraph.

## COUNT II
## (BAD FAITH CLAIM UNDER ILLINOIS TRADE SECRETS ACT, 765 ILCS 1065/5)
## (ALL COUNTER-PLAINTIFFS V. PRIMESOURCE)

181.    Defendants/Counter-Plaintiffs restate and reallege Paragraphs 1 through 180 of their counterclaims as if fully set forth herein.

**ANSWER:** PrimeSource restates and re-alleges ¶¶ 1 through 180 above as if fully set forth herein.

182.    Section 1065/5 of the Illinois Trade Secrets Act provides that the Court may award reasonable attorneys' fees if a claim for misappropriation of trade secrets is made in bad faith. 765 ILCS 1065/5.

**ANSWER:** PrimeSource admits that Counter-Plaintiffs have summarized section 1065/5 of the Illinois Trade Secrets Act but denies that it is applicable here.

183.    PrimeSource has alleged and asserted its misappropriation of trade secrets against Counter-Plaintiffs in bad faith, based on both direct and circumstantial evidence identified in relevant part herein.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 183.

184.    PrimeSource did not undertake a reasonable pre-filing factual investigation prior to asserting a misappropriation of trade secrets claim under the DTSA against Counter-Plaintiffs.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 184.

185.    PrimeSource failed to include any particularized identification of its alleged trade secrets in its First Amended Complaint, its injunction moving papers and supporting memorandum, or in discovery.

**ANSWER:** PrimeSource denies the allegations in ¶ 121.

186.    PrimeSource alleged in its initial Complaint and its First Amended Complaint that each of the Individual Counter-Plaintiffs physically took or used PrimeSource's confidential information and trade secrets, but has yet to come forward with any evidence that any of the Individual Counter-Plaintiffs has taken or retained any of PrimeSource's alleged trade secrets.

**ANSWER:** PrimeSource answers that the allegations in its Complaint, First Amended Complaint, and Second Amended Complaint speak for themselves and PrimeSource denies any allegations inconsistent with the language of those documents. PrimeSource denies the remaining allegations contained in ¶ 186.

187.    PrimeSource knows that no such evidence of misappropriation and use exists, and yet it initiated and continues to maintain a claim for theft of trade secrets anyway.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 187.

188.    In addition, PrimeSource knew at the time of filing that no legal support exists for applying the "inevitable disclosure" doctrine to prevent Individual Counter-Plaintiffs from being employed by a competitor, and it has failed to demonstrate that the doctrine of inevitable disclosure has any application in this instance, in particular since there is at least a 12-month gap between the Individual Counter-Plaintiffs' employment with PrimeSource and their employment or consulting role with Huttig.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 188.

189.    PrimeSource has asserted this trade secrets claim for an improper purpose to harass, intimidate and oppress Counter-Plaintiffs, use the cost and expense of litigation in an effort to slow them down and prevent them from competing with PrimeSource, and thereby unlawfully maintain

its monopoly power and dominant market position in relevant antitrust markets for fastener products.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 189.

190. Accordingly, pursuant to Section 1065/6 of the Illinois Trade Secrets Act, Counter-Plaintiffs are entitled to their attorneys' fees incurred in having to defend against PrimeSource's frivolous claims.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 190.

WHEREFORE, Defendants/Counter-Plaintiffs request judgment in their favor and against Plaintiff/Counter-Defendant on Count II of their counterclaims and that they be awarded the following relief:

       (a)     Attorneys' fees and costs incurred in this matter in excess of $1,700,000; and

       (b)     Such other and further relief as this Court deems equitable and just.

**ANSWER:** PrimeSource denies the allegations contained in Counter-Plaintiffs' Wherefore

paragraph.

## COUNT III
## (DEFAMATION *PER SE*)
## (All Counter-Plaintiffs v. PrimeSource)

191. Counter-Plaintiffs restate and reallege Paragraphs 1 through 190 of their counterclaims as if fully set forth herein.

**ANSWER:** PrimeSource restates and re-alleges ¶¶ 1 through 190 above as if fully set forth herein.

192. The statements made about the Individual Counter-Plaintiffs and Huttig by PrimeSource as described above, are false and defamatory.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 192.

193. Several of the false statements made by PrimeSource constitute defamation *per se* because they: (i) imputed to Counter-Plaintiffs the commission of a crime, i.e., the theft of confidential information from PrimeSource; (ii) imputed a want of integrity in the discharge of the Individual Counter-Plaintiffs' duties of employment; (iii) imputed a lack of ability on the part of the Individual Counter-Plaintiffs to carry out their trade, profession and business, e.g., because they were allegedly prohibited from competing with PrimeSource and could not have done so without the unlawful theft of PrimeSource's confidential information and trade secrets; and (iv) imputed a lack of integrity on the part of Huttig and its business practices and methods.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 193.

194.    PrimeSource made these false and defamatory statements to third parties outside of this litigation, including but not limited to Grunfeld and, upon information and belief, other customers, vendors and suppliers of Huttig.

**ANSWER:**  PrimeSource denies the allegations contained in ¶ 194.

195.    The numerous publications of the false and defamatory statements about Counter-Plaintiffs as described above, have caused them damages, including but not limited to damage to their reputation within the industry.

**ANSWER:**  PrimeSource denies the allegations contained in ¶ 195.

196.    The publication of the Complaint, First Amended Complaint, and the false and defamatory statements contained within the Complaint and First Amended Complaint to third parties not involved or parties to the this lawsuit are not privileged.

**ANSWER:**  PrimeSource denies the allegations contained in ¶ 196.

197.    The foregoing conduct was willful, wanton and outrageous because, among other things, it was part of a pre-conceived, concerted campaign to destroy Counter-Plaintiffs' reputation and undermine Huttig's business and to squelch the competition by Huttig and the Individual Counter-Plaintiffs with an utter lack of regard for applicable law and Counter-Plaintiffs' rights.

**ANSWER:**  PrimeSource denies the allegations contained in ¶ 197.

WHEREFORE, Counter-Plaintiffs K. Fishbein, D. Fishbein, Zinman, Furio and Huttig request judgment in their favor and against Counter-Defendant PrimeSource on Count III of their counterclaims and that they be awarded the following relief:

    (a)    Compensatory damages in an amount to be determined at trial;
    (b)    Punitive damages; and
    (c)    Such other and further relief as this Court deems equitable and just.

**ANSWER:**  PrimeSource denies the allegations contained in Counter-Plaintiffs' Wherefore

paragraph.

## COUNT IV
### (TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE)
### (Huttig v. PrimeSource)

198.    Counter-Plaintiffs restate and reallege Paragraphs 1 through 197 of their counterclaims as if fully set forth herein.

**ANSWER:** PrimeSource restates and re-alleges ¶¶ 1 through 198 above as if fully set forth herein.

199.    Huttig has a valid business expectancy in continued relationships with its customers, vendors and suppliers which relationships have been obtained through the expenditure of substantial time, money and effort.

**ANSWER:**  PrimeSource lacks knowledge or information sufficient to form a belief as to the

allegations set forth in ¶ 199 and, therefore, deny them.

200.    PrimeSource is aware of and has reason to know of Huttig's customer, vendor and supplier relationships by virtue of the fact that PrimeSource has dealings with the same customers, vendors and suppliers and has directly contacted and threatened these third parties.

**ANSWER**:  PrimeSource admits that it has knowledge concerning certain of Huttig's customers,

vendors, and suppliers because PrimeSource has pre-existing relationships with such entities.

PrimeSource denies all other allegations in ¶ 200.

201.    PrimeSource is using improper threats and disseminating false and defamatory information regarding Counter-Plaintiffs to improperly interfere with Huttig's customers, vendors and suppliers in order to stifle competition and maintain their unfair competitive advantage.

**ANSWER:**  PrimeSource denies the allegations contained in ¶ 201.

202.    PrimeSource's conduct has interfered with and prevented Huttig (or has threatened to interfere with or prevent Huttig) from continuing certain existing business relationships with its customers, vendors and/or suppliers by inducing and/or otherwise causing these customers, vendors and/or suppliers not to enter into or continue their prospective business relationships with Huttig.

**ANSWER:**  PrimeSource denies the allegations contained in ¶ 202.

203.    Specifically, PrimeSource has threatened Esrom Screw, and at least four other suppliers or trading partners, that if they continue to do business with Huttig, PrimeSource will cut them off and/or cease doing business with them, thus threatening these customers, vendors and suppliers with financial harm should they choose to do business with Huttig.

**ANSWER**:  PrimeSource denies the allegations contained in ¶ 203.

204.    PrimeSource knowingly and intentionally interfered with Huttig's valid business expectancy in its continued relationships with its customers, vendors and/or suppliers by inducing and/or otherwise causing these customers, vendors and/or suppliers not to enter into or continue their prospective business relationships with Huttig and by using improper and unlawful means in order to do so, including but not limited to disseminating false, defamatory and disparaging information about Counter-Plaintiffs and improperly threatening to withdraw business from these customers, vendors and/or suppliers.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 204.

205.    PrimeSource's actions are not privileged because it acted unlawfully and with the deliberate intent of causing harm to Huttig and the Individual Counter-Plaintiffs.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 205.

206.    As a direct and proximate result of PrimeSource's tortious interference, Huttig has suffered, and continues to suffer, substantial damages and injury to its existing and prospective customer, vendor and supplier relationships.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 206.

207.    PrimeSource's misconduct was and is knowing, intentional and reckless, and is of such an aggravated character as to warrant the imposition of punitive damages.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 207.

WHEREFORE, Counter-Plaintiff Huttig respectfully requests judgment in its favor and against Counter-Defendant PrimeSource on Count IV of its counterclaims and it be awarded the following relief:

      (a)    compensatory damages in an amount to be determined at trial;
      (b)    punitive damages;
      (c)    injunctive and equitable relief prohibiting PrimeSource and its employees and agents from wrongfully interfering with Huttig's business relationships and prospective economic advantages, including but not limited to injunctive and equitable relief prohibiting PrimeSource and its employees and agents from threatening Huttig's customers, vendors and suppliers and from making false, disparaging and defamatory remarks regarding Huttig and the Individual Counter-Plaintiffs; and
      (d)    such other and further relief as this Court deems equitable and just.

**ANSWER:** PrimeSource denies the allegations contained in Huttig's Wherefore paragraph.

### COUNT V
### (MONOPOLIZATION OF THE U.S. NATIONAL ACCOUNTS BOXED FASTENER MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2)
### (Huttig v. PrimeSource)

208.    Counter-Plaintiffs restate and reallege Paragraphs 1 through 207 of their counterclaims as if fully set forth herein.

**ANSWER:** PrimeSource restates and re-alleges ¶¶ 1 through 207 above as if fully set forth herein.

209.    The conduct of PrimeSource complained of herein occurred in or affected interstate commerce.

**ANSWER:** PrimeSource admits that its business activities occur in or affect interstate commerce, but PrimeSource denies that such conduct has been improper or unlawful.

210. The NPF Market is a valid antitrust market.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 210.

211. There are significant barriers to entry in the NPF Market, including without limitation due to the past litigation conduct toward others and the current litigation conduct toward Huttig and the former PrimeSource employees who now work for Huttig as alleged herein.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 211.

212. The current lawsuit is a sham in that the claims asserted are objectively baseless; and, alternatively, the five PrimeSource lawsuits identified herein are part of a pattern of lawsuits that were brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 212.

213. PrimeSource possessed monopoly power in the NPF Market when it filed this lawsuit and related lawsuits in 2016 against Huttig and former PrimeSource employees who now work for Huttig.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 213.

214. PrimeSource has willfully sought and continues to seek to maintain, protect, and enhance its monopoly power in the NPF Market by means other than the superiority of its services or products, its business acumen, or historic accident, but rather by the exclusionary, predatory, and other unjustifiable conduct alleged herein.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 214.

215. PrimeSource's past litigation conduct and other unlawful exclusionary and predatory conduct alleged herein, and its conduct in this and related litigation against Huttig and former PrimeSource employees who now work for Huttig, shows a subjective intent of PrimeSource to exclude competition.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 215.

216. PrimeSource's conduct complained of herein constitutes monopolization of the NPF Market, and has threatened and/or threatens to harm competition and cause antitrust injury to Huttig. Were PrimeSource to succeed in its illegal monopolization conduct against Huttig, PrimeSource would eliminate Huttig as a key competitor which now employs experienced business managers with general knowledge, experience, and positive reputation in the NPF Market, and which thereby poses an imminent threat to erode and eliminate PrimeSource's

monopoly power in the NPF Market through lawful competition. By harming Huttig, PrimeSource's conduct has the further effect of harming customers in the NPF Market, who are threatened with loss of a key source of wholesale distribution in competition with PrimeSource if Huttig is significantly delayed, weakened, and/or eliminated as a competitor in the NPF Market.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 216.

217.    In the absence of injunctive and other equitable relief that Huttig seeks in these counterclaims, PrimeSource will continue to harm competition in the NPF Market through its unlawful conduct, and cause further injury and threatened injury to the business and property of Huttig in the form of lost revenue, increased costs, including unnecessary attorneys' fees and litigation expenses, and inability to participate fully in the judicial process.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 217.

218.    PrimeSource's conduct described herein is in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 218.

WHEREFORE, Counter-Plaintiff Huttig requests judgment in its favor and against Counter-Defendant PrimeSource on Count V of its counterclaims and that it be awarded the following relief:

(a)    treble damages in an amount to be determined at trial;
(b)    attorneys' fees and costs incurred in this matter;
(c)    injunctive and equitable relief declaring the non-competition and non-solicitation covenants that PrimeSource has imposed on present and former business managers to be void and unenforceable, and enjoining PrimeSource from imposing such covenants on future business managers; and
(d)    such other and further relief as this Court deems equitable and just.

**ANSWER:** PrimeSource denies the allegations contained in Huttig's Wherefore paragraph.

## COUNT VI
### (ATTEMPTED MONOPOLIZATION OF THE NPF MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2)
### (Huttig V. PrimeSource)

219.    Counter-Plaintiff Huttig restates and realleges Paragraphs 1 through 218 of its counterclaims as if fully set forth herein.

**ANSWER:** PrimeSource restates and re-alleges ¶¶ 1 through 218 above as if fully set forth herein.

220.    The conduct of PrimeSource complained of herein occurred in or affected interstate commerce.

**ANSWER:** PrimeSource admits that its business activities occur in or affect interstate commerce, but PrimeSource denies that such conduct has been improper or unlawful.

221. The NPF Market is a valid antitrust market.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 221.

222. There are significant barriers to entry in the NPF Market, including without limitation due to the past litigation conduct toward others and the current litigation conduct toward Huttig and the former PrimeSource employees who now work for Huttig as alleged herein.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 222.

223. The current lawsuit is a sham in that the claims asserted are objectively baseless; and, alternatively, the five PrimeSource lawsuits identified herein are part of a pattern of lawsuits that were brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 223.

224. PrimeSource has acted and continues to act willfully with the specific intent to monopolize the NPF Market, and the conduct of PrimeSource complained of herein has had or will have the following effects: competition in the NPF Market has been and will continue to be impaired and restrained, and there is a dangerous probability that PrimeSource will unlawfully obtain and/or further enhance its monopoly power and ability to exclude competitors from the NPF Market and thereby lessen and/or destroy competition in the NPF Market.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 224.

225. PrimeSource's past litigation conduct and other unlawful exclusionary and predatory conduct alleged herein, and its conduct in this and related litigation against Huttig and former PrimeSource employees who now work for Huttig, show a subjective intent of PrimeSource to exclude competition.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 225.

226. PrimeSource's conduct complained of herein constitutes an attempt to monopolize the NPF Market, and has threatened and/or threatens to harm competition and cause antitrust injury to Huttig. Were PrimeSource to succeed in its illegal monopolization conduct against Huttig, PrimeSource would eliminate Huttig as a key competitor which now employs experienced business managers with general knowledge, experience, and positive reputation in the NPF Market, and which thereby poses an imminent threat, through lawful competition, to prevent PrimeSource from acquiring monopoly power in the NPF Market. By harming Huttig, PrimeSource's conduct has the further effect of harming customers in the NPF Market, who are threatened with loss of a key source of wholesale supply in competition with PrimeSource if Huttig is significantly delayed, weakened, and/or eliminated as a competitor in the NPF Market.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 226.

227.   In the absence of injunctive and other equitable relief that Huttig seeks in these counterclaims, PrimeSource will continue to harm competition in the NPF Market through its unlawful conduct, and cause further injury and threatened injury to the business and property of Huttig in the form of lost revenue, increased costs, including unnecessary attorneys' fees and litigation expenses, and inability to participate fully in the judicial process.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 227.

228.   PrimeSource's conduct described herein is in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**ANSWER:** PrimeSource denies the allegations contained in ¶ 228.

WHEREFORE, Counter-Plaintiff Huttig requests judgment in its favor and against Counter-Defendant PrimeSource on Count VI of its counterclaims and that it be awarded the following relief:

      (a)    treble damages in an amount to be determined at trial;

      (b)    attorneys' fees and costs incurred in this matter;

      (c)    injunctive and equitable relief declaring the non-competition and non-solicitation covenants that PrimeSource has imposed on present and former business managers to be void and unenforceable, and enjoining PrimeSource from imposing such covenants on future business managers; and

      (d)    such other and further relief as this Court deems equitable and just.

**ANSWER:** PrimeSource denies the allegations contained in Huttig's Wherefore paragraph.

## COUNT VII
### (ATTEMPTED MONOPOLIZATION OF THE WF MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 14 U.S.C. § 2)
### (Huttig v. PrimeSource)

229.   Defendant/Counter-Plaintiff Huttig restates and realleges Paragraphs 1 through 228 of its counterclaims as if fully set forth herein.

**ANSWER:** PrimeSource restates and re-alleges ¶¶ 1 through 228 above as if fully set forth herein.

230.   The conduct of PrimeSource complained of herein occurred in or affected interstate commerce.

**ANSWER:** PrimeSource admits that its business activities occur in or affect interstate commerce,

but PrimeSource denies that such conduct has been improper or unlawful.

231.    The WF Market is a valid antitrust market.

**ANSWER:**  PrimeSource denies the allegations contained in ¶ 231.

232.    There are significant barriers to entry in the WF Market, including without limitation due to the past litigation conduct toward others and the current litigation conduct toward Huttig and the former PrimeSource employees who now work for Huttig as alleged herein.

**ANSWER:**  PrimeSource denies the allegations contained in ¶ 232.

233.    The current lawsuit is a sham in that the claims asserted are objectively baseless; and, alternatively, the five PrimeSource lawsuits identified herein are part of a pattern of lawsuits that were brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival.

**ANSWER:**  PrimeSource denies the allegations contained in ¶ 233.

234.    PrimeSource has acted and continues to act willfully with the specific intent to monopolize the WF Market, and the conduct of PrimeSource complained of herein has had or will have the following effects: competition in the WF Market has been and will continue to be impaired and restrained, and there is a dangerous probability that PrimeSource will unlawfully obtain and/or further enhance its monopoly power and ability to exclude competitors from the WF Market and thereby lessen and/or destroy competition in the WF Market.

**ANSWER:**  PrimeSource denies the allegations contained in ¶ 234.

235.    PrimeSource's past litigation conduct and other unlawful exclusionary and predatory conduct alleged herein, and its conduct in this and related litigation against Huttig and former PrimeSource employees who now work for Huttig, show a subjective intent of PrimeSource to exclude competition.

**ANSWER:**  PrimeSource denies the allegations contained in ¶ 235.

236.    PrimeSource's conduct complained of herein constitutes an attempt to monopolize the WF Market, and has threatened and/or threatens to harm competition and cause antitrust injury to Huttig. Were PrimeSource to succeed in its illegal monopolization conduct against Huttig, PrimeSource would eliminate Huttig as a key competitor which now employs experienced business managers with general knowledge, experience, and positive reputation in the WF Market, and which thereby poses an imminent threat, through lawful competition, to prevent PrimeSource from acquiring monopoly power in the WF Market. By harming Huttig, PrimeSource's conduct has the further effect of harming customers in the WF Market, who are threatened with loss of a key source of wholesale supply in competition with PrimeSource if Huttig is significantly delayed, weakened, and/or eliminated as a competitor in the WF Market.

**ANSWER:**  PrimeSource denies the allegations contained in ¶ 236.

237.    In the absence of injunctive and other equitable relief that Huttig seeks in these counterclaims, PrimeSource will continue to harm competition in the WF Market through its unlawful conduct, and cause further injury and threatened injury to the business and property of Huttig in the form of lost revenue, increased costs, including unnecessary attorneys' fees and litigation expenses, and inability to participate fully in the judicial process.

**ANSWER:**  PrimeSource denies the allegations contained in ¶ 237.

238.    PrimeSource's conduct described herein is in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**ANSWER:**  PrimeSource denies the allegations contained in ¶ 238.

WHEREFORE, Counter-Plaintiff Huttig requests judgment in its favor and against Counter-Defendant PrimeSource on Count VII of its counterclaims and that it be awarded the following relief:

(a)    treble damages in an amount to be determined at trial;

(b)    attorneys' fees and costs incurred in this matter;

(c)    injunctive and equitable relief declaring the non-competition and non-solicitation covenants that PrimeSource has imposed on present and former business managers to be void and unenforceable, and enjoining PrimeSource from imposing such covenants on future business managers; and

(d)    such other and further relief as this Court deems equitable and just.

**ANSWER:**  PrimeSource denies the allegations contained in Huttig's Wherefore paragraph.

## AFFIRMATIVE DEFENSES

1.    Counter-Plaintiffs have failed to state a claim upon which relief may be granted.

2.    Counter-Plaintiffs lack standing to assert all or a portion of their claims under the anti-trust laws.

3.    Counter-Plaintiffs have not suffered anti-trust injury in connection with all or a portion of their claims under the antitrust laws.

4.    Counter-Plaintiffs' claims are barred by the doctrine of laches.

5.    Counter-Plaintiffs' claims are barred by the doctrine of unclean hands.

6.    Counter-Plaintiffs' have not suffered damages or have failed to mitigate their damages.

56

7.      Counter-Plaintiffs' challenges to conduct protected by the First Amendment and the Noerr-Pennington doctrine are improper.

8.      PrimeSource does not possess a monopoly, is not likely to obtain a monopoly and has never attempted to obtain a monopoly in any relevant market.

9.      PrimeSource had legitimate business justification for all conduct at issue in this matter.

10.     PrimeSource's conduct did not adversely affect competition in any relevant market.

11.     PrimeSource's conduct was privileged and/or legally justified.

12.     Any factual assertions made by PrimeSource were substantially true.

13.     Any damages suffered by counter-Plaintiffs were caused by or contributed to by Counter-Plaintiffs' own conduct.

Respectfully submitted,

**PRIME SOURCE BUILDING PRODUCTS, INC.**

By:    s/ Chelsea Ashbrook McCarthy
           One of Its Attorneys

Richard R. Winter
Chelsea A. McCarthy
Holland & Knight LLP
131 S. Dearborn St., 30th Fl.
Chicago, IL 60603
312-263-3600
richard.winter@hklaw.com
chelsea.mccarthy@hklaw.com

Mary Goodrich Nix
Holland & Knight LLP
200 Crescent Court, Ste. 1600
Dallas, TX 75201
214-964-9407
mary.nix@hklaw.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney certifies that on **September 20, 2017**, the foregoing **Plaintiff's Answer and Affirmative Defenses to Defendants' Counterclaims** was served via the CM/ECF system on all counsel of record.

s/ Chelsea Ashbrook McCarthy